**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

NICE SYSTEMS, INC. and
NICE SYSTEMS LTD.,

    *Plaintiffs,*

    v.

WITNESS SYSTEMS, INC.,

    *Defendant.*

C.A. No. 06-311-JJF

## SECOND DECLARATION OF KYLE WAGNER COMPTON IN SUPPORT OF DEFENDANT WITNESS SYSTEMS, INC.'S MOTION FOR TRANSFER

I, Kyle Wagner Compton, declare under penalty of perjury that I am over twenty-one (21) years of age and am competent to make the following statements based on my personal knowledge:

1.    I am an attorney with the law firm of Fish & Richardson P.C., 919 N. Market Street, Suite 1100, Wilmington, DE 19899-1114, and a member in good standing of the Delaware State Bar.

2.    Fish & Richardson P.C., represents Witness Systems, Inc. ("Witness") in connection with the above-captioned case.

3.    Attached as Exhibit 41 is a true and correct copy of the United States District Court for the Northern District of Georgia's Order in *STS Software Systems Ltd. v. Witness Systems, Inc.*, Civil Action No. 1:04-CV-2111-RWS ("*NICE I*"), dated January 6, 2006, denying Plaintiff's Motion to Dismiss, Motion for Contempt and Motion for Protective Order, and granting Defendant's Motion for leave to file Surreply

12005057.doc

Declarations, and granting in part Defendant's Motion to Compel and Motion for Modification of Patent L.R. Schedule.

4.    Attached as Exhibit 42 are true and correct copies of Inventor Declarations signed by Mr. Eitan Bar on October 5, 2004.

5.    Attached as Exhibit 43 is a true and correct copy of the transcript of a Telephonic Status Conference held before Special Master Roderick McKelvie in *NICE I* and *Witness Systems, Inc. v. NICE Systems, Inc and NICE Systems Ltd.*, Civil Action No. 1:04-CV-2531-CAP ("*NICE II*"), conducted March 1, 2006.

6.    Attached as Exhibit 44 is a true and correct copy of the United States District Court for the Northern District of California in *NICE II*, denying Third Party Netopia, Inc.'s Motion for Protective Order and granting Witness' Motion to Compel, dated February 15, 2006.

7.    Attached as Exhibit 45 is a true and correct copy of a letter from Witness' counsel, Noah C. Graubart, to NICE Systems Ltd. and NICE Systems, Inc.'s (collectively, "NICE") counsel, Scott G. Lindvall, dated May 31, 2006.

8.    Attached as Exhibit 46 is a true and correct copy of a letter from Mr. Lindvall to Witness' counsel, Nagendra Setty, dated February 28, 2005.

9.    Attached as Exhibit 47 is a true and correct copy of the transcript of a Status Conference before Judge Richard W. Story in *NICE I*, conducted January 4, 2006.

10.     Attached as Exhibit 48 is a true and correct copy of the United States District Court for the District of Delaware's Memorandum Opinion in *Cashedge, Inc. v. Yodlee, Inc.,* Civil Action No. 06-170-JJF, dated July 19, 2006, granting Defendant's Motion to Transfer.

11.     Attached as Exhibit 49 is a true and correct copy of the Final Transcript of NICE's "Q2 2006 NICE Systems Earnings Conference Call," conducted August 2, 2006 at 8:30AM ET.

12.     Attached as Exhibit 50 is a true and correct copy of the bibliographical data sheet for U.S. Patent Application No. 09/664,775.

I declare under penalty of perjury that the foregoing is true and correct, pursuant to 28 U.S.C. § 1746.

Executed on August 11, 2006.

Kyle Wagner Compton (#4693)

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of August, 2006, I electronically filed with the Clerk of Court the attached Second Declaration of Kyle Wagner Compton in Support of Defendant Witness Systems, Inc.'s Motion for Transfer using CM/ECF which will send electronic notification of such filing(s) to the following attorneys of record. In addition, the filing will also be sent at the following addresses in the manner indicated below:

**VIA HAND DELIVERY**

Josy W. Ingersoll (#1088)                  *Attorneys for Plaintiffs*
Karen L. Pascale (#2903)                   *NICE Systems Ltd. and*
YOUNG CONAWAY STARGATT &                   *NICE Systems, Inc.*
TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19899-0391
Tel: (302) 571-6672


**VIA ELECTRONIC MAIL**

Of Counsel:

Scott G. Lindvall.                         *Attorneys for Plaintiffs*
Patricia J. Clarke                         *NICE Systems Ltd. and*
Robert R. Laurenzi                         *NICE Systems, Inc.*
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022
Fax: (212) 836-6369
slindvall@kayescholer.com
pclarke@kayescholer.com
rlaurenzi@kayescholer.com


                                           */s/ Kyle Wagner Compton*
                                           Kyle Wagner Compton

12005057.doc

# EXHIBIT 41

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |  |
|---|---|---|
|  | : |  |
|  | : |  |
| STS SOFTWARE SYSTEMS, | : |  |
| LTD., | : |  |
|  | : |  |
| Plaintiff, | : | CIVIL ACTION NO. |
|  | : | 1:04-CV-2111-RWS |
| v. | : |  |
|  | : |  |
| WITNESS SYSTEMS, INC., | : |  |
|  | : |  |
| Defendant. | : |  |

## ORDER

Now before the Court are Plaintiff's Motion to Dismiss All Claims

Relating to the '665 Patent for Lack of Subject Matter Jurisdiction [105];

Plaintiff's Motion for Protective Order [135]; Plaintiff's Motion for Contempt

of the Court's Order of September 26, 2005 and for Sanctions [138];

Defendant's Motion for Modification of Patent LR Schedule [147]; Plaintiff's

Motion for Leave to file Surreply Declarations [180]; and Defendant's Motion to

Compel [148].  After considering the entire record, the Court enters the

following Order.

## I.  Plaintiff's Motion to Dismiss all Claims Related to the '665 Patent

STS Software Systems, Ltd. ("STS") is the assignee of all interest in

U.S. Patent No. 6,122,665 ("the '665 patent").  On July 20, 2004, Witness

Systems filed a complaint in the Northern District of Georgia seeking a

declaratory judgment that it does not infringe any valid claim of the '665 patent.

On the same day, STS filed a complaint in the Southern District of New York

alleging infringement of the '665 patent.  Witness Systems later counterclaimed

in that suit seeking declaratory judgments of non-infringement and invalidity.

The New York action was subsequently transferred to this District and, by Orders

of this Court entered January 14, 2005 [46] and February 9, 2005 [49]

respectively, the two cases were consolidated under the caption STS Software

Systems, Ltd. v. Witness Systems, Inc., No. 1:04-CV-2111-RWS.

After the cases were consolidated, three additional patents were issued

and assigned to STS.  These patents, U.S. Patent Nos. 6,865,604 ("the '604

patent"), 6,880,004 ("the '004 patent"), and 6,871,229 ("the '229 patent"), are

directly related to the application which issued as the '665 patent.  STS sought,

2

and was granted, leave to file a supplemental complaint which Witness Systems did not oppose. On July 7, 2005, STS filed its supplemental complaint asserting claims for infringement of these three additional patents; Witness Systems has counterclaimed seeking declarations of non-infringement and invalidity as to these patents as well.

On August 22, 2005, STS filed the instant motion seeking the dismissal of all claims related to the '665 patent on the grounds that a covenant not to sue executed by STS has divested this Court of jurisdiction. Witness Systems vigorously contended that, with respect to the '665 patent, a justiciable case or controversy remained, and that as such, the Court retained jurisdiction over its declaratory judgment claims. On November 9, 2005, after the issue had been fully briefed, STS filed a supplemental covenant not to sue which replaced the original covenant upon which the Motion to Dismiss had been based. The supplemental covenant provides:

> Plaintiff STS Software Systems, Ltd. ("STS"), for itself, its parents, subsidiaries, successors, heirs, beneficiaries, assigns, affiliated companies and agents, hereby releases and covenants not to assert any claim of patent infringement under 35 U.S.C. § 271 (including but not limited to direct infringement, contributory infringement, and inducing infringement) against Witness Systems, Inc., together with its directors, officers, parents, subsidiaries,

3

customers, resellers, partners, affiliated companies and joint ventures, as well as Witness Systems' heirs, permitted assigns, and successors, for U.S. Patent No.6,122,665 ("the '665 Patent"). This release and covenant applies to any and all claims, demands, liabilities, actions or causes of action of any kind which STS has had or has now or may in the future have, and operates with respect to any and all versions of any and all Witness Systems products, including but not limited to Contact Store for IP, Contact Store Business Edition, Contract Store Enterprise Edition, Witness Contact Store for Communication Manager, Witness Quality for Communication Manager, Impact 360, Nortel Contact Recording, the Nortel Quality Monitoring Suite and the Witness eQuality Suite, which includes eQuality Contact Store for IP, eQuality Contact Store Express, and eQuality Contact Store.

This release and covenant applies only to the '665 Patent and does not apply to any patent that may arise from a continuation or continuation-in-part application of the '665 Patent including, but not limited to U.S. Patent Nos. 6,865,604; 6,880,004; 6,871,229.

(Notice of Covenant Not to Sue [151-1].)  STS contends that this supplemental covenant divests the Court of jurisdiction to consider all claims related to the '665 patent because the covenant has "extinguished the controversy with respect to Witness [Systems'] infringement, and the covenant removes any apprehension . . . that [Witness Systems'] activities could subject it to suit for infringement of the '665 patent."  (Mot. to Dismiss [105] at 4.)

Witness Systems objected to the supplemental covenant on the grounds that it expressly excepted continuations and continuations-in-part of the '665

4

patent and proposed the following release language:

> This release and covenant covers all claims of the '665 patent and any
> claim in any reissued or reexamined version of the '665 patent, or any
> continuation, continuation in part or divisional of the '665 patent, that
> is the same or substantially identical to any current claim of the '665
> patent.

(Letter to Judge Story in Response to STS' 11/9/05 Letter to Court re Covenant
Not to Sue [164] at 2. [hereinafter Witness Letter Brief].)  This proposed
language was rejected by STS, and in light of that rejection, Witness Systems
maintains that the supplemental covenant is insufficient to divest this Court of
jurisdiction over its declaratory judgment claims.  (Id.)

Witness Systems' only point of contention with the supplemental
covenant, and thus the only basis for its opposition to dismissal, relates to
STS's failure to include language which would release Witness Systems from
liability for any infringement of any claim in a continuation patent that is "the
same or substantially identical to any current claim in the '665 patent."  Witness
Systems contends that for a covenant not to sue to divest the court of
jurisdiction, it must "forever estop" STS from asserting the claims
of the '665 patent in an action for infringement.  In this regard, Witness Systems
argues that any claims in a reissued patent that are legally identical to those of

5

the '665 patent would constitute a continuation of the original patent under 35

U.S.C. § 252 and have effect continuously from the date of the original patent.

Therefore, if STS were to surrender the '665 patent to the United States Patent

& Trademark Office for reissue proceedings, and if that patent were to reissue

with claims identical or substantially identical to the current claims, then Witness

Systems would remain susceptible to liability under the terms of the covenant

and that liability would accrue from the effective date of the '665 patent. As

such, Witness Systems argues that an actual controversy remains.

## A. Analysis

### 1. The "actual controversy" jurisdictional requirement

The Declaratory Judgment Act, 28 U.S.C. § 2201, enables a person who

is reasonably at legal risk because of an unresolved dispute to obtain judicial

resolution of that dispute without having to await commencement of legal action

by the other side. BP Chem. Ltd. v. Union Carbide Corp., 4 F.3d 975, 977

(Fed. Cir. 1993). The Act provides:

> In a case of actual controversy within its jurisdiction, . . . any court
> of the United States, upon the filing of an appropriate pleading, may
> declare the rights and other legal relations of any interested party
> seeking such declaration, whether or not further relief is or could be
> sought. Any such declaration shall have the force and effect of a final

6

judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).   As the text of the Act makes clear, "a district court has

jurisdiction over a declaratory judgment action only when there is an actual

controversy." Amana Refrigeration, Inc. v. Quadlux, Inc., 172 F.3d 852, 855

(Fed. Cir. 1999); Super Sack Mfg. Corp. v. Chase Packaging Corp., 57 F.3d

1054, 1058 (Fed. Cir. 1995) ("The existence of a sufficiently concrete dispute

between the parties [is] a jurisdictional predicate to the vitality of such an

action."). The actual controversy must be extant at all stages of the litigation,

and not merely at the time the complaint is filed. Preiser v. Newkirk, 422 U.S.

395, 401, 95 S. Ct. 2330, 45 L. Ed. 2d 272 (1975).

"In general, the presence of an 'actual controversy' within the meaning of

the [Declaratory Judgment Act] depends on 'whether the facts alleged, under all

the circumstances, show . . . a substantial controversy, between parties having

adverse legal interests, of sufficient immediacy and reality to warrant the

issuance of a declaratory judgment.' " EMC Corp. v. Norand Corp., 89 F.3d

807, 810 (Fed. Cir. 1996) (quoting Md. Cas. Co. v. Pac. Coal & Oil Co., 312

U.S. 270, 273, 61 S. Ct. 510, 85 L. Ed. 826 (1941)). "The long established rule

of law is that a declaratory judgment plaintiff must establish an actual

7

controversy on the totality of the circumstances." Spectronics Corp. v. H.B.

Fuller Co., 940 F.2d 631, 634 (Fed. Cir. 1991), abrogated on other grounds by

Cardinal Chem. Co. v. Morton Int'l, 508 U.S. 83, 95, 113 S. Ct. 1967, 124 L.

Ed. 2d 1 (1993). Because courts test the presence vel non of an actual

controversy by reference to the facts of each case, generally applicable rules are

few. Super Sack, 57 F.3d at 1058; see also BP Chems., 4 F.3d at 978 ("There

is no simple rule that addresses all shades of relationships between disputants.")

In the context of declarations of patent rights and liabilities, the Federal

Circuit has articulated a two-part test for determining whether a justiciable

controversy exists:

> There must be both (1) an explicit threat or other action by the
> patentee, which creates a reasonable apprehension on the part of the
> declaratory plaintiff that it will face an infringement suit, and (2)
> present activity which could constitute infringement or concrete steps
> taken with the intent to conduct such activity.

Super Sack, 57 F.3d at 1058 (quoting BP Chems., 4 F.3d at 977). "The

element of threat or reasonable apprehension turns on the conduct of the

patentee, while the infringement element depends on the conduct of the asserted

infringer." BP Chems., 4 F.3d at 978. The purpose of the two-part test is to

8

determine whether the need for judicial attention is real and immediate or is

prospective and uncertain of occurrence.  Id.

Finally, even if a case satisfies the actual controversy requirement, "the

district court is not required to exercise declaratory judgment jurisdiction, but

has substantial discretion to decline that jurisdiction."  Teva Pharms. USA, Inc.

v. Pfizer, Inc., 395 F.3d 1324, 1331 (Fed. Cir. 2005).  "The court must make a

reasoned judgment whether the investment of time and resources will be

worthwhile."  Serco Svcs. Co., v. Kelley Co., 51 F.3d 1037, 1039 (Fed. Cir.

1995).  The exercise of the court's discretion, however, is not unfettered.  Id.

"An abuse of discretion may occur when the trial court's decision was based on

an incorrect conclusion of law or clearly erroneous findings of fact, was devoid

of any evidence in the record upon which the court rationally could have based

its decision, or was clearly unreasonable or arbitrary."  Id. (quoting Genentech,

Inc. v. Eli Lilly & Co., 998 F.2d 931, 936 (Fed. Cir. 1993)).

2.  Effect of the supplemental covenant and the possibility of patent
reissue

STS has executed a covenant not to sue Witness Systems on the '665

patent.  Under well-established Federal Circuit precedent, "a patentee defending

9

against an action for a declaratory judgment of invalidity can divest the trial

court of jurisdiction over the case by filing a covenant not to assert the patent at

issue against the putative infringer. . . ." Super Sack, 57 F.3d at 1058.  The

filing of a sufficient covenant not to sue  eliminates any "actual controversy,"

and thus declaratory judgment jurisdiction, because the covenant removes any

reasonable apprehension on the part of the alleged infringer that it will face

liability for infringement of the patent claims. See Fina Research, S.A. v. Baroid

Ltd., 141 F.3d 1479, 1484-85 (Fed. Cir. 1998).  This rule applies with equal

force "even when a reissue application covering the same claimed subject matter

is then pending." Super Sack, 57 F.3d at 1058.

The supplemental covenant in this case, however, applies only to the '665

patent and expressly reserves the right to bring an action for infringement of any

patent that is a continuation or continuation-in-part of the '665 patent.  The

question then is whether, in light of that reservation of rights, the supplemental

covenant is sufficient to divest the Court of its declaratory judgment jurisdiction

by removing any reasonable apprehension of suit.  Witness Systems contends

that it is not. According to Witness Systems, it faces potential liability for its

present activities on the claims of the '665 patent, which may be reasserted in

10

future actions if STS submits the '665 patent for reexamination or reissue and

the reexamined or reissued patent contains identical or substantially identical

claims.

The legal effect of a reissued patent is governed by 35 U.S.C. § 252.

That section provides:

> The surrender of the original patent shall take effect upon the issue of
> the reissued patent, and every reissued patent shall have the same
> effect and operation in law, on the trial of actions for causes thereafter
> arising, as if the same had been originally granted in such amended
> form, but insofar as the claims or the original and reissued patents are
> identical, such surrender shall not affect any action then pending nor
> abate any cause then existing and the reissued patent to the extent that
> its claims are identical with the original patent, shall constitute a
> continuation thereof and have effect continuously from the date of the
> original patent.

Thus, the holder of a reissued patent is entitled to infringement damages for the

period between the issue date of the original claims and the issue date of the

reissued claims if the original and reissued claims are "identical." See 35 U.S.C.

§ 252; Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1347 (Fed. Cir. 1998).

Reissued claims are "identical" to their original counterparts if they are "without

substantive change." Id.; Seattle Box Co. v. Industrial Crating & Packing, 731

F.2d 818, 827-28 (Fed. Cir. 1984).  In determining whether substantive changes

11

have been made, courts must look to whether the scope of the claims are identical and not merely whether different words are used. <u>Laitram</u>, 163 F.3d at 1347. Witness Systems is therefore correct in that if STS were to submit the '665 patent for reexamination and reissue, and the patent were to reissue with identical or substantially identical claims, then under the terms of the supplemental covenant, Witness Systems would face possible liability from the effective date of the '665 patent. As such, the Court is confronted with the question of whether, in light of the language of the supplemental covenant and considering the totality of the circumstances, Witness Systems has a reasonable apprehension of suit on the claims of the '665 patent.

In cases involving potential liability for infringement of reissued patents, the Federal Circuit has distinguished between possible liability on new claims contained in the reissued patent and possible liability on the claims of the patent submitted for reissue. Where a party facing possible future liability seeks a declaratory judgment with respect to the former, there can be no doubt that jurisdiction over the action is lacking. <u>See, e.g.</u>, <u>Spectronics</u>, 940 F.2d at 633 (stating that fear of liability for infringement of new claims in a reissue patent is insufficient to create an objectively reasonable apprehension of suit on the part

12

of putative infringer). First, it is well-established that the mere possibility that a party may face potential liability on a reissued patent is, in and of itself, generally insufficient to support the exercise of declaratory judgment jurisdiction. See Amana, 172 F.3d at 856 ("[T]he future existence of a reissue patent is wholly speculative and, therefore, cannot create a case or controversy."); Spectronics, 940 F.2d at 636 (noting that there is no guarantee that the reissue patent will eventually issue); State Indus., Inc. v. A.O. Smith Corp., 751 F.2d 1226, 1236 (Fed. Cir. 1985) (the ultimate fate and legal effect of a pending patent application is inherently uncertain). Second, because the claims of the patent are the central focus of any patent infringement action, Schoell v. Regal Marine Indus., Inc., 247 F.3d 1202, 1207 (Fed. Cir. 2001) ("An infringement analysis requires . . . a comparison of the properly construed claims with the allegedly infringing device or method to determine whether the device or method embodies every limitation of the claims."), in the absence of reissued patent claims, there is nothing by which infringement can be measured. Spectronics, 940 F.2d at 636.

But, where the declaratory judgment plaintiff asserts that it faces possible liability on the claims of the present patent upon reissue, the existence of declaratory judgment jurisdiction is dependent upon whether the patentee

remains free to assert the present claims against the putative infringer. For

example, in Spectronics Corp. v. H.B. Fuller Co., Inc., 940 F.2d 631 (Fed. Cir.

1991), the patentee filed a covenant not to sue in which it both acknowledged

that it had filed a reissue application covering the patent in issue and expressly

stated that the declaratory judgment plaintiff had no liability to defendants or any

successors in interest for infringement of the claims contained in the patent in

suit.[1]  Id. at 633.  The scope and effect of the covenant was clarified by the

patentee on two occasions.  First, its counsel represented to the court that, in

view of the covenant not to sue, the claims of the patent in suit could never be

enforced against the declaratory judgment plaintiff.  Id. at 636.  Second, in a

letter to the alleged infringer, the patentee reiterated that "[it] has clearly and

---

[1] The covenant not to sue provided:

Defendant, H.B. Fuller Company, Inc., has filed a reissue application to
reissue U.S. Patent No. 4,758,366 cancelling claims 1-18 and seeking new
claims.

Spectronics has no liability to Defendants or any successors-in-interest to
U.S. Patent No. 4,758,366 for infringement of claims 1-18 of U.S. Patent
No. 4,758,366, and Defendants and any successors-in-interest to U.S. Patent
No. 4,758,366 will not sue Spectronics for infringement of claims 1-18 of
U.S. Patent No. 4,758,366.

14

unequivocally stated that there is no liability . . . for infringement of the claims

that are presently in the patent," but also indicated that "[i]f new claims emerge

from the reissue [proceeding], and if there is an issue of infringement by

Spectronics, and if there is subsequent litigation," the alleged infringer would be

free to raise a specified defense.  Id.

Despite the covenant, representations of counsel, and the letter, the

declaratory judgment plaintiff contended that possible liability on identical claims

in the reissue patent was sufficient to sustain the district court's jurisdiction.  In

rejecting this argument and concluding that no actual controversy existed, the

Federal Circuit explained:

> Beneath Spectronics' contention appears to lie the argument that it
> could be held liable for its current allegedly infringing activity if any of
> the reissue claims are "identical" to the original claims within the
> meaning of § 252. However, § 252 also provides that identical reissue
> claims "shall constitute a continuation" of the original claims, and that
> surrender of the original claims upon reissuance of identical claims
> "shall not affect any action then pending nor abate any cause of action
> then existing." In the instant case, Fuller asserted in the statement of
> non liability that Spectronics "has no liability to [Fuller] for
> infringement of claims 1-18 of [the '366 patent]," and unequivocally
> reiterated in its letter accompanying the statement that "there is no
> liability by Spectronics for infringement" of those claims. In addition,
> Fuller "released Spectronics from any liability with respect to the
> claims of the '366 patent. This includes past products, current
> products  or  products  contemplated  in  the  future.  Because

15

> Spectronics has been absolved from liability on all the claims of the
> '366 patent, there will be no future confrontation with respect to
> them." Brief for Appellees at 28, Spectronics Corp. v. H.B. Fuller
> Co., No. 91-1041 (Fed. Cir. filed Feb. 7, 1991).
>
> Although Spectronics may have some cause to fear a suit for future
> infringement of substantively non-identical claims after reissue, it has
> no cause for concern that it can be held liable for practicing the
> invention claimed in the '366 patent. As to that invention, Fuller is
> estopped by its statement of non liability, on its face and as explained
> by Fuller, from asserting liability for the making, selling or using of
> any Spectronics' product that would infringe the claims of the '366
> patent.

Id. at 637-38.

For the same reason that the Federal Circuit found that the covenant not

to sue divested the district court of jurisdiction in Spectronics, the Court

concludes that an actual controversy remains in this case.  Whereas in

Spectronics, § 252 operated to eliminate any fear that the declaratory judgment

plaintiff would face liability on the claims of the patent in suit, in this case, STS

has availed itself of § 252 to provide itself with a narrow, but no less viable,

means of asserting the very claims of the '665 patent against Witness Systems in

a future action.  Therefore, the Court cannot conclude that STS is "forever

estopped" from asserting the claims of the '665 patent against Witness Systems,

and as such, jurisdiction may remain.  See Id.; Super Sack, 57 F.3d at 1058-60

16

(promise not to sue the declaratory judgment plaintiff over "products [it] currently manufactured and sold" was sufficient to divest the district court of jurisdiction because the patentee was "forever estopped" from suing the declaratory judgment plaintiff over its current activities).

In this case, STS, after multiple revisions, has chosen the language of its supplemental covenant carefully. STS could have extended the protections of the supplemental covenant to any patent resulting from the reexamination or reissue of the '665 patent which contains claims substantively identical to the original '665 patent claims. Without question, such a covenant would be sufficient to divest this Court of jurisdiction. But, this it did not do. Rather, STS expressly reserved, through the niceties of patent law and careful draftsmanship, the right to assert the very claims of the '665 patent in a future action. See 35 U.S.C. § 252 (stating that a reissued patent with claims that are identical to the original patent, "shall constitute a continuation thereof"). Furthermore, "when original claims are reissued without substantive change, they are generally enforceable from the original date of the patent." Spectronics, 940 F.2d at 637; see also 35 U.S.C. § 252 ("[T]he reissued patent to the extent that its claims are identical with the original patent, shall constitute a continuation

17

thereof and have effect continuously from the date of the original patent.").

Thus, if Witness Systems were denied the opportunity to litigate the validity of

the claims of the '665 patent through dismissal of its declaratory judgment

action, and the '665 patent were reissued with substantively similar claims,

Witness Systems would face potential liability for its present activities and

would have potentially incurred additional, and possibly substantial, liability

between the dismissal of its declaratory judgment action and the assertion of

infringement in the new suit. Quite simply, "one who may become liable for

infringement should not be subject to manipulation by a patentee who uses

careful phrases in order to . . . deny recourse to the courts while damages

accrue." Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha, 57 F.3d

1051, 1053 (Fed. Cir. 1995).

Furthermore, the concerns of the Federal Circuit with respect to the

inability to measure infringement are less pronounced, where as here, the only

concern of the allegedly infringing party relates to the future reissue of the patent

with legally identical claims. As explained above, the declaratory judgment

plaintiff faces potential liability for present activities only where the claims of the

reissued patent are legally identical and of equal scope to those of the original

patent. Therefore, an infringement analysis comparing the properly construed

claims of the existing patent with the allegedly infringing product or products

would apply with equal force to any legally identical claims contained in the

reissued patent.

Finally, the Court must address one final point. At present, there is no

evidence in the record to indicate that STS has submitted the '665 patent for

reexamination and reissue. This alone, however, is not dispositive as to Witness

Systems' reasonable apprehension of suit. The Court is cognizant that neither

the mere existence of an adverse patent nor a history of litigation between the

parties, in and of itself, is sufficient to create a reasonable apprehension of suit.

BP Chems., 4 F.3d at 978 ("for an actual controversy more is required than the

existence of an adversely held patent"); see also In re Laitram Mach., Inc., 52

F.3d 343 (Fed. Cir. 1995) (unpublished decision); Int'l Harvester Co. v. Deere

& Co., 623 F.2d 1207 (7th Cir. 1980). But, a history of litigation is not

irrelevant and may be sufficient to create a reasonable apprehension of suit

where, as here, there is ongoing litigation between the parties over a series of

closely related patents involving the same technology. Apotex, Inc. v. Pfizer

Inc., 385 F. Supp. 2d 187, 194 (S.D.N.Y. 2005); see Goodyear Tire & Rubber

Co. v. Releasomers, Inc., 824 F.2d 953 (Fed. Cir. 1987) (finding declaratory judgment jurisdiction proper and noting that "these parties are themselves currently embroiled in a protracted dispute in state court over the commercial technology generally covered by the patents" in suit); c.f. Teva Pharms. USA, Inc. v. Abbott Labs., 301 F. Supp. 2d 819, 825 (N.D. Ill. 2004) (finding that three prior patent infringement suits relating to production and marketing of other generic drugs supported declaratory judgment plaintiff's reasonable apprehension of suit with respect to new drug).

In this case, the parties are direct and primary competitors in the industry. Each has been embroiled in highly contentious, ongoing patent litigation involving the same technology and closely related patents. Moreover, this litigation was initiated by STS when it filed suit against Witness Systems for infringement of the '665 patent. Finally, during the course of this litigation both parties have evinced a willingness to seize on any ambiguity or technicality and use it to their advantage, and as such, the Court has every reason to believe that the existence of a narrow loophole in STS's supplemental covenant not to sue did not occur by mere happenstance. On these facts, the Court concludes that the parties' relationship, their history of litigation, and the proven willingness of

20

STS to bring an infringement action against Witness Systems on the '665 and

related patents all militate in favor of concluding that Witness Systems maintains

a reasonable apprehension of suit on the claims of the '665 patent.

In light of the foregoing, the Court concludes that, on the narrow facts of

this case, the supplemental covenant is insufficient to eliminate any reasonable

apprehension of suit on the part of Witness Systems.  As such, Plaintiff's

Motion to Dismiss is hereby denied.

## II.  Plaintiff's Motion for Contempt and for Sanctions

A review of the facts of this case relevant to the STS motion makes clear

that neither party is without fault.  First, Witness Systems without question failed

to adequately provide discovery which had been ordered by this Court.

Specifically, the Court finds that Witness Systems failed to timely provide

financial, sales, and marketing information as was required by this Court's

Order of September 26, 2005, and reiterated in its verbal order of October 6,

2005.  While the Court need not address each and every deficiency, as an

example, the Court points to Witness Systems' November 1, 2005 production

of previously redacted documents.  Witness Systems had previously provided

STS with redacted versions of the same documents on May 20, 2005.

21

Therefore, these documents were clearly in the possession of Witness Systems at the time the Court ordered production and there is no reason that they should not have been quickly produced upon the entry of the Court's September 26, 2005 Order. As STS correctly notes, the decision to provide discovery ordered by the Court should not require the prompting of a motion for contempt, and in this regard, Witness Systems has clearly failed.

But, it is also clear that STS has overreached in bringing this motion, and in so doing, forced Witness Systems to incur needless expense. STS contends that Witness Systems should be held in contempt for its failure to provide not only a searchable copy of the source code, but also searchable copies of source code-related documents. STS argues that this production constitutes a deliberate effort to hinder the retrieval of information in these documents and thwarts "the clear purpose and intent of the Court's Order requiring that source code be provided in searchable form." (Reply in Supp. of Mot. for Contempt [173] at 2.)

The Court's Order of October 7, 2005 stated that Witness Systems was "ordered to produce the laptop complete with a searchable version of Defendant's source code and deliver the same to the New York office of Plaintiff's counsel

22

within five (5) days from the date of this Order." As the Order was dated October 7, 2005, the deadline for producing the laptop containing a searchable version of the source code was October 12, 2005. Witness Systems has clearly complied with this aspect of the Court's Order. Moreover, and despite Plaintiff's contention to the contrary, nothing in the Court's October 7, 2005 Order required that any source code-related documents provided along with the source code be in searchable form.

To the extent that STS takes issue with the classification of the documents as "Highly Sensitive -- Source Code" under the Protective Order, the Court recognizes that under the terms of that Order, the improper designation of documents may significantly impede access to the information they contain. Were a party found to be exploiting the protections of the Court's Order to impede discovery, the Court would not hesitate to impose appropriate sanctions. But, as that issue is not properly before the Court, it declines to impose sanctions or award costs on this basis.

In light of the fact that both parties bear some responsibility for this discovery dispute, each shall bear its own costs with respect to the bringing of, and responding to, this motion. That said, the Court fully expects that the

23

parties will, from this point forward, conduct discovery in this case in strict

compliance with Orders of this Court, the Federal Rules of Civil Procedure, and

the Local Rules of the Northern District of Georgia.  The failure of either party

to do so will result in the imposition of such sanctions as the Court in its

discretion deems appropriate.

## III.  Defendant's Motion for Modification of Patent LR Schedule

As a preliminary matter, Plaintiff's Motion to file Surreply Declarations

[180] vis-a-vis this motion is granted.

Defendant seeks modification of the Patent Local Rule schedule for claim

construction proceedings.  Specifically, Defendant asks this Court to delay the

exchange of disputed claim terms under Patent LR 6.1 until 30 days after the

depositions of Mr. Bar and Dr. Friedman have been completed and both parties

have received English language transcripts of the testimony of both individuals,

with subsequent claim construction proceedings to follow on the schedule set

by the Patent Local Rules.  (Supplemental Mem. in Supp. of Mot. for Mod. of

Patent LR Sched. [182] at 2-3.)  STS opposes this Motion and contends that

the request for modification is dilatory in purpose; that the testimony of these

inventors is minimally relevant to the issue of claim construction; that preliminary

constructions provided pursuant to Rule 6.2 may, in any event, be

supplemented as additional evidence is obtained; and that such evidence would

not even arguably be needed until the filing of the Rule 6.3 Joint Claim

Construction Statement.

As Witness Systems correctly notes, this case has been anything but a

model of the discovery and claim construction envisioned by the Patent Local

Rules. As evidenced by Plaintiff's Motion for Contempt and the multiple

motions to compel which have been filed in this case, it has been plagued from

the outset with delay and contentious discovery disputes. Nevertheless, the

Court endeavors to return this case to a schedule calculated to result in the fair

and expeditious resolution of this dispute. Therefore, the Court declines to

extend the time for Local Patent Rule exchanges any further.

The Court recognizes the possibility that the depositions of Mr. Bar and

Mr. Friedman, inventors of the patents in issue, may provide some evidence

relevant to the claim construction phase of this litigation. On December 5, 2005,

Witness Systems obtained a partial deposition from Mr. Bar. Certainly, the

deposition was not as productive as it could have been. Moreover, the failure to

obtain deposition testimony from Mr. Friedman is indeed unfortunate. But, at

25

present, substantial uncertainty exists as to when, if ever, either deposition will

be completed.  Having initiated the process of securing their testimony under the

Hague Convention approximately five months before either deposition was

actually scheduled, the Court is not inclined to place this litigation on hold in

order to repeat that process.  Furthermore, because additional inventor

testimony does not appear essential to claim construction in this case, the Court

concludes that the prejudice to Witness Systems caused by proceeding with

claim construction in the absence of that testimony, if any, will be minimal.

In light of the foregoing, Defendant's motion is granted insofar as

Witness Systems is not in default by failing to comply with the Local Patent

Rule exchange procedures.  That said, the Court concludes that the exchange of

proposed terms under Local Patent Rule 6.1 as to each patent in issue in this

case shall occur no later than twenty (20) days from the entry of this Order.  All

subsequent dates for exchanges shall be fixed according to the Local Patent

Rules.  Witness Systems shall be required to comply with the disclosure

requirements of Local Patent Rule 6.2(b) with respect to relevant information in

its possession.  Witness Systems shall, however, have the opportunity to

supplement its Rule 6.2(b) disclosures in the event additional pertinent

information becomes available.

## IV. Defendant's Motion to Compel

Witness Systems seeks to compel the production of "documents and

information from STS concerning financial, technical, and marketing aspects of

the products that embody the claims of the patents-in-suit and/or are marked

with the patents-in-suit." (Mem. in Supp. of Mot. to Compel [179] at 1.)

Witness Systems contends that this information is relevant to the validity of the

patents-in-suit, including the obviousness, enablement, and best mode defenses;

claim construction; and the range of equivalents to which the patents may be

entitled. (Id. at 2.) STS disputes that Witness Systems is entitled to production

of these documents on three grounds: (1) STS lacks the requisite control over

documents in the possession of its parent and sister corporations, NICE

Systems, Ltd. and NICE Systems, Inc.; (2) NICE products are not relevant to

any issue in the case; and (3) the production of NICE documents would unduly

burden STS. The Court addresses each in turn.

### 1. Control over the requested documents and information

A party "may serve on any other party a request (1) to produce and

permit the party making the request, or someone acting on the requestor's

behalf, to inspect and copy, any designated documents . . . which constitute or

contain matters within the scope of Rule 26(b) and which are in the possession,

custody or control of the party upon whom the request is served. . . ." FED. R.

CIV. P. 34.  The Eleventh Circuit has stated that "[c]ontrol is defined not only as

possession, but as the legal right to obtain the documents requested upon

demand."  Searock v. Stripling, 736 F.2d 650, 653 (11th Cir. 1984).  Rule 34

disclosures involving parent and subsidiary corporations present unique

challenges, however, and in this context "[c]ontrol has been construed broadly

by the courts as the legal right, authority, or practical ability to obtain the

materials sought upon demand."  S.E.C. v. Credit Bancorp, Ltd., 194 F.R.D.

469, 471 (S.D.N.Y. 2000); Camden Iron & Metal, Inc. v. Marubeni Am. Corp.,

138 F.R.D. 438, 441 (D.N.J. 1991) ("Federal courts construe 'control' very

broadly under Rule 34.").  The party seeking production bears the burden of

establishing the requisite control.  See, e.g., United States  v. Int'l Union of

Petroleum & Indus. Workers, AFL-CIO, 870 F.2d 1450, 1452 (9th Cir. 1989);

Camden Iron & Metal, Inc., 138 F.R.D. at 441.

28

Where the documents sought to be produced in a case involving a subsidiary corporation are in the possession of its parent, "the determination of control turns upon whether the [inter]corporate relationship establishes some legal right, authority or ability to obtain the requested documents on demand. Evidence considered by the courts includes the degree of ownership and control exercised by the parent over the subsidiary, a showing that the two entities operated as one, demonstrated access to documents in the ordinary course of business, and an agency relationship." Camden Iron & Metal, 138 F.R.D. at 442 (D.N.J. 1991); see also Gerling Intern. Ins. Co. v. C.I.R., 839 F.2d 131, 140-41 (3d Cir. 1988) (noting that control over documents in the possession of a parent corporation has been held to be appropriate where (1) the alter ego doctrine warranted "piercing the corporate veil"; (2) the subsidiary was an agent of the parent in the transaction giving rise to the lawsuit; (3) the relationship is such that the agent-subsidiary can secure documents of the principal-parent to meet its own business needs and documents helpful for use in litigation; (4) there is access to documents when the need arises in the ordinary course of business; and (5) the subsidiary was the marketer and servicer of parent's product in the United States).

29

In this case, the relationship between STS and NICE Systems, Ltd. ("NICE, Ltd.") and NICE Systems, Inc. ("NICE, Inc.") is extraordinarily close. Although each is a separate corporate entity, both STS and NICE, Inc. are wholly-owned subsidiaries of NICE, Ltd. NICE, Inc. markets, sells, and provides customer support for NICE, Ltd.'s products in the United States. STS has ceased all commercial activity, taken inactive status, and exists solely to hold the patents involved in this litigation. Its Board of Directors is comprised entirely of officers and directors of NICE, Ltd. STS neither makes, sells or offers for sale any product covered by its patents. Rather, all products are manufactured and sold by NICE, Ltd. or its subsidiary NICE, Inc. It appears that the applications which gave rise to U.S. Patent Nos. 6,865,604, 6,880,004, and 6,871,229 which STS alleges have been infringed by Witness Systems were, in fact, prosecuted by NICE, Ltd. and assigned to STS during the pendency of this litigation. Furthermore, NICE, Ltd. has been actively involved in this litigation. On December 5, 2005, Witness Systems deposed one of the inventors of the '665 patent in Israel under the Hague Convention. During his deposition, he was represented by the same firm that oversaw prosecution of the patents in suit on behalf of NICE, Ltd. Although counsel has

30

stated that his firm does not represent either NICE or STS, it appears that

counsel contacted the inventor unsolicited and provided representation free of

charge. No credible explanation for the unsolicited, uncompensated

involvement of NICE patent counsel in depositions in this case has been

offered. Additionally, it appears that, in preparing for his deposition, Mr. Bar

was in contact with a Motti Cory, the Director of Intellectual Property for NICE,

who despite apparently having no official relationship to STS, has executed

verifications of interrogatory responses both on behalf of STS in this case, and

on behalf of NICE in ongoing parallel litigation.

The Court finds that the intercorporate relationship between STS and the

NICE entities establishes a legal right, authority or ability to obtain the requested

documents on demand. The Court has no doubt that STS could secure the

documents in question from either NICE, Ltd. or NICE, Inc. if the need arose in

the ordinary course of business or if production were perceived to be beneficial

to STS in this litigation. In such circumstances, to allow either STS or the

related NICE entitles to thwart their obligations to provide relevant discovery

merely through the assignment of patent rights to a shell entity, all the while

initiating and maintaining control over the litigation involving those patents, is

31

contrary not only to the purpose and intent of the Federal Rules of Civil

Procedure and their broad discovery provisions, but also to basic notions of

fairness and justice.  Therefore, the Court concludes that STS exercises control

over documents in the possession of NICE Systems, Ltd. and NICE Systems,

Inc. within the meaning of Rule 34, and as such, the documents and information

requested, if relevant, must be produced.

   2. Relevance

   Federal Rule of Civil Procedure 26 governs the scope and limits of

discovery in civil actions.  In pertinent part, Rule 26 provides: "Parties may

obtain discovery regarding any matter, not privileged, that is relevant to the claim

or defense of any party. . . .   Relevant information need not be admissible at the

trial if the discovery appears reasonably calculated to lead to the discovery of

admissible evidence."  FED. R. CIV. P. 26(b)(1).  Although the scope of

discovery under the Federal Rules has generally been construed broadly, see,

e.g., Schlagenhauf v. Holder, 379 U.S. 104, 114-115 (1964) (discovery rules are

to be accorded a broad and liberal treatment to effect their purpose of

adequately informing the litigants in civil trials), it is not unlimited.  Oppenheimer

Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978) ("[D]iscovery, like all matters

32

of procedure, has ultimate and necessary boundaries.") (quoting Hickman v. Taylor, 329 U.S. 495, 507 (1947)).  For instance, Rule 26 requires that otherwise permissible discovery be limited in circumstances where the court concludes that "the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive[,]" or that "the burden or expense of the proposed discovery outweighs its likely benefit . . . ." FED. R. CIV. P. 26(b)(2)(I) & (iii).

Witness Systems asserts that the requested documents and information are relevant to the issues of obviousness, enablement, best mode defenses, claim construction, and the application of the doctrine of equivalents.  STS disputes each of these contentions.

a. Obviousness

Under 35 U.S.C. § 103, a patent is invalid "if the differences between the claimed subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art."  35 U.S.C. § 103(a). Obviousness is evaluated in light of four factual determinations: "(1) the scope

33

and content of the prior art, (2) the level of ordinary skill in the art, (3) the

differences between the claimed invention and the prior art, and (4) objective

indicia of nonobviousness." Merck & Co. v. Teva Pharms USA, 395 F.3d

1364, 1369 (Fed. Cir. 2005). Where a party challenging the validity of a patent

makes a prima facie showing of obviousness, the patentee may rebut this

showing with objective evidence of nonobviousness. See WMS Gaming, Inc. v.

Int'l Game Tech., 184 F.3d 1339, 1359 (Fed. Cir. 1999). Objective evidence of

nonobviousness may include "[s]uch secondary considerations as commercial

success, long felt but unsolved needs, failure of others, etc., [which] might be

utilized to give light to the circumstances surrounding the origin of the subject

matter sought to be patented." Graham v. John Deere Co.., 383 U.S. 1, 17-18,

86 S. Ct. 684, 15 L. Ed. 2d 545 (1966).

Where a patentee asserts that commercial success supports its claim of

nonobviousness, the patentee must establish that a sufficient nexus exists

between the merits of the claimed invention and the evidence of commercial

success. Iron Grip Barbell Co. v. USA Sports, Inc., 392 F.3d 1317, 1324 (Fed.

Cir. 2004). "[I]f the marketed product embodies the claimed features, and is

coextensive with them, then a nexus is presumed and the burden shifts to the

34

party asserting obviousness to present evidence to rebut the presumed nexus.

The presumed nexus cannot be rebutted with mere argument; evidence must be

put forth." <u>Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.</u>, 229

F.3d 1120, 1130 (Fed. Cir. 2000) (citations omitted).  In rebutting the nexus

between the claimed invention and commercial success, the challenging party

may come forward with evidence tending to show that the commercial success

is due to factors extraneous to the patented invention, such as advertising,

packaging, superior workmanship, or market share.  <u>Id.</u>; <u>J.T. Eaton & Co. v.

Atl. Paste & Glue Co.</u>, 106 F.3d 1563, 1571 (Fed. Cir. 1997).

In this case, Witness Systems asserts that the patents in issue are invalid

on obviousness grounds.  STS has represented that it will attempt to rebut any

showing of obviousness by relying solely on the commercial success of

Witness Systems products.  In light of its express intent to limit commercial

success evidence to Witness Systems products, STS argues that documents

and information relevant to the commercial success, or lack thereof, of other

products embodying the inventions disclosed in the STS patents is not

discoverable.  Witness Systems disputes this contention and argues that it is

entitled to documents and information reasonably calculated to lead to the

35

discovery of admissible evidence concerning the lack of any asserted nexus

between the asserted commercial success and claimed invention. According to

Witness Systems, such evidence would include financial data showing the

relative success or failure of products produced by NICE which embody the

claims of the STS patents, technical information sufficient to establish the extent

to which those products embody the claims at issue, and marketing information

showing how those products were marketed and promoted.

The Court concludes that Witness Systems is entitled to the discovery of

financial, technical, and marketing aspects of products produced by NICE

Systems, Ltd. and sold in the United States by NICE Systems, Inc. that

embody the claims of the patents-in-suit. The Federal Circuit has made clear

that in "determining the question of obviousness, inquiry should always be made

into whatever objective evidence of nonobviousness there may be." Iron Grip,

392 F.3d at 1323 (quoting Vandenberg v. Dairy Equip. Co., 740 F.2d 1560,

1567 (Fed. Cir. 1984)). The commercial success of products embodying the

patented invention, whether produced by the infringer, the patentee, or as in this

case, an entity closely related to the patentee, may be relevant to the issue of

obviousness. See Brown & Williamson, 229 F.3d at 1130; Gambro Lundia AB

v. Baxter Healthcare Corp., 110 F.3d 1573, 1579 (Fed. Cir. 1997).  Simply put,

where NICE products embody the claims of the STS patents, STS may not

unilaterally limit discovery as to the commercial success of those products by

merely "electing" to rely on the commercial success of the infringer's products.

If STS seeks to establish that its patented invention is nonobvious by

introduction of commercial success evidence, then Witness Systems is entitled

to the discovery it needs to meet that commercial success evidence by showing

that the success is due to some factor other than the patented invention.

Therefore, Witness Systems is entitled to discovery of financial, technical, and

marketing aspects of products produced by NICE Systems, Ltd. and sold in the

United States by NICE Systems, Inc. that embody the claims of the patents-in-

suit.

　　　STS makes much of the party/non-party distinction and argues that the

case law does not support the position "that a defense of obviousness entitles

the infringer to discovery regarding (or even to rely upon) a non-party's

products to rebut the commercial success of its own products."  (Resp. in

Opp. to Mot. to Compel [160-1] at 12.)  But, contrary to STS's contention,

nothing in Brown & Williamson limits discovery on commercial success to

products "produced by the same <u>entity</u>."  Furthermore, this argument is

especially unavailing when considered in light of the unique relationship between

STS and the NICE entities.  As discussed above, STS, the named party in this

action, is a wholly-owned, inactive holding corporation which produces no

product that embodies the patents in issue.  Rather, those products are

manufactured by its parent NICE Systems, Ltd., and marketed and sold by

NICE Systems, Inc.  The NICE products may represent the most relevant

embodiment of the STS patents and their success or failure is relevant to issues

of obviousness.  Therefore, the Court has little difficulty concluding that,

consistent with the broad discovery envisioned by the Federal Rules, Witness

Systems is entitled to discovery relevant to the commercial success of NICE

products.[2]

### 3.  The burden on STS

In a case such as this, where tens of thousands of documents have

already been produced, the Court finds little merit in STS's assertion that

production of the documents and information sought will be unduly

---

[2] Having concluded that the broad categories of documents and information sought
are discoverable as they may be relevant to the issue of nonobviousness, the Court need not
address Witness Systems' contentions with respect to either best mode or enablement.

38

burdensome.  Similar information has been the subject of motions to compel

and for contempt filed by STS and the Court finds no reason to relieve STS of

its obligation to provide relevant discovery in this case.

### 4.  Specific discovery requests

Local Rule 37.1 provides:

A. Form. A motion to compel a disclosure under LR 26.1 or to
compel a response to discovery conducted pursuant to the Federal
Rules of Civil Procedure shall:
(1) Include the certification of counsel with regard to the duty to
confer required by Fed.R.Civ.P. 37(a)(2)(A)(B);
(2) Quote verbatim each disclosure, interrogatory, deposition question,
request for designation of deponent, or request for inspection to which
objection is taken;
(3) State the specific objection;
(4) State the grounds assigned for the objection (if not apparent from
the objection); and
(5) Cite authority and include a discussion of the reasons assigned as
supporting the motion.

The motion shall be arranged so that the objection, grounds, authority,
and supporting reasons follow the verbatim statement of each specific
disclosure, interrogatory, deposition question, request for designation
of deponent, or request for inspection to which an objection is raised.

Witness Systems has provided the text of its requests, the STS responses

as well as argument and authority related to the general classes of materials

sought to be produced.  Witness Systems has not, however, provided any

39

argument or authority with respect to the specific requests raised in this motion as required by LR 37.1. Because the specific requests at issue here have not been adequately briefed, the Court declines at this time to issue an Order as to the entitlement of Witness Systems to the specific documents and information requested.

At a hearing held on January 4, 2006, the Court stated to the parties its intention to refer remaining discovery issues to a Special Master or to a Magistrate Judge. The parties are to provide their positions concerning such referral to the Court not later than January 13. The Court will refer this issue for determination by either the Special Master or the Magistrate to whom the discovery issues are referred.

## V. Plaintiff's Motion for Protective Order

STS seeks a protective order precluding discovery technical, marketing, and financial information related to products manufactured and produced by STS's corporate parent, NICE Systems, Ltd., and sold in the United States by STS's sister company, NICE Systems, Inc. For the reasons set forth in Part IV of this Order, Plaintiff's Motion for Protective Order is denied.

## Conclusion

Based on the foregoing, Plaintiff's Motion to Dismiss All Claims Relating to the '665 Patent for Lack of Subject Matter Jurisdiction [105] is hereby **DENIED**; Plaintiff's Motion for Protective Order [135] is hereby **DENIED**; Plaintiff's Motion for Contempt of the Court's Order of September 26, 2005 and for Sanctions [138] is hereby **DENIED**; Defendant's Motion for Modification of Patent LR Schedule [147] is hereby **GRANTED IN PART AND DENIED IN PART**; Plaintiff's Motion for Leave to file Surreply Declarations [180] is hereby **GRANTED**; and Defendant's Motion to Compel [148] is **GRANTED IN PART**. The Court refer determination on the specific discovery requests contained Defendant's Motion to Compel [148] to a Special Master or Magistrate Judge by subsequent order .

**SO ORDERED** this __6th__ day of January, 2006.

/s/ Richard W. Story
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

41

# EXHIBIT 42

| Express Mail Label No. | Dated: |
|---|---|

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

## DECLARATION FOR PATENT APPLICATION

As a below named inventor, I hereby declare that:

My residence, post office address and citizenship are as stated below next to my name.

I believe I am an original, first and joint inventor of the subject matter which is described and claimed and for which a patent is sought on the invention entitled:

## METHOD FOR STORING ON A COMPUTER NETWORK A PORTION OF A COMMUNICATION SESSION BETWEEN A PACKET SOURCE AND A PACKET DESTINATION

the specification of which is attached hereto.

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by an amendment, if any, specifically referred to herein. I do not know and do not believe that the same was ever known or used in the United States of America before my or our invention thereof or patented or described in any printed publication in any country before my or our invention thereof, or more than one year prior to this application, or in public use or on sale in the United States of America more than one year prior to this application, that the invention has not been patented or made the subject of an inventor's certificate issued before the date of this application in any country foreign to the United States of America on an application filed by me or my legal representatives or assigned more than twelve months prior to this application.

I acknowledge the duty to disclose all information known to me that is material to patentability in accordance with Title 37, Code of Federal Regulations, § 1.56.

## FOREIGN PRIORITY CLAIM

I hereby claim foreign priority benefits under Title 35, United States Code § 119(a)-(d) of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

[x] no such foreign applications have been filed

[ ] such foreign application have been filed as follows:

Attorney Docket No.:03331/1201982-US4

EARLIEST FOREIGN APPLICATION(S), IF ANY FILED WITHIN 12 MONTHS
(6 MONTHS FOR DESIGN) PRIOR TO THIS U.S. APPLICATION

| Application Number | Country | Date of Filing | Priority Claimed Under 35 USC 119 |
|---|---|---|---|
| | | | ___ Yes  No ___ |
| | | | ___ Yes  No ___ |
| | | | ___ Yes  No ___ |

ALL FOREIGN APPLICATION(S), IF ANY FILED MORE THAN 12 MONTHS
(6 MONTHS FOR DESIGN) PRIOR TO THIS U.S. APPLICATION

| Application Number | Country | Date of Filing |
|---|---|---|
| | | |
| | | |
| | | |

CLAIM FOR BENEFIT OF EARLIER U.S. PROVISIONAL APPLICATIONS

I hereby claim priority benefits under Title 35, United States Code §119(e), of any United States provisional patent application(s) listed below:

[ x ]  no such U.S. provisional applications have been filed.

[  ]  such U.S. provisional application have been filed as follows:

| Application Number | Date of Filing | Priority Claimed Under 35 USC 119 |
|---|---|---|
| | | ___ Yes  No ___ |
| | | ___ Yes  No ___ |
| | | Yes  No |

CLAIM FOR BENEFIT OF EARLIER U.S./PCT APPLICATION(S)

I hereby claim the benefit under Title 35, United States Code, §120 of the United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, §112, I acknowledge the duty to disclose all information that is material to patentability in accordance with Title 37, Code of Federal Regulations, §1.56 which became available to me between the filing date of the prior application and the national or PCT international filing date of this application:

☐ no such U.S./PCT applications have been filed.

☒ such U.S./PCT application have been filed as follows:

| Application Number | Date of Filing | Status (Patented/Pending/Abandoned) |
|---|---|---|
| 09/664,755 | 09-19-2000 | Pending |
| 09/140,453 | 08-26-1998 | Patented |
| PCT/US99/19505 | 08-26-1999 | Expired |

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

I hereby appoint the practitioners under Customer Number

**000040401**

jointly, and each of them severally, my attorneys at law/patent agent(s), with full power of substitution, delegation and revocation, to prosecute this application, to make alterations and amendments therein, to receive the patent, and to transact all business in the U. S. Patent and Trademark Office connected therewith.

Please mail all correspondence to Abraham Hershkovitz, whose address is:

> Abraham Hershkovitz
> 1725 I Street N.W.
> Suite 300
> Washington, D.C. 20006

Please direct telephone calls to: Abraham Hershkovitz at (703) 323-9330.

Please direct facsimiles to: (703) 323-6617

| | | |
|---|---|---|
| Full name of sole or first inventor<br>Mordechai Nisani | | Attorney Docket No.:03331/1201982-US4 |
| Sole or first inventor's signature | | |
| Residence<br>~~Tel Aviv, Israel~~ | | Date<br>11/10/2004 |
| Citizenship   Israel | | |
| Mailing Address<br>Visel 26/1<br>Tel Aviv<br>Israel | | |

Guildford UK

127 Stoke Road
Guildford, Surrey
UK GU11ET

| | | |
|---|---|---|
| Full name of second inventor, if any<br>Eitan Bar | | |
| Second inventor's signature | | |
| Residence<br>Tzoran, Israel | | Date |
| Citizenship   Israel | | |
| Mailing Address<br>DOLEV 6<br>TZORAN 42823<br>ISRAEL | | |

BEST AVAILABLE COPY

Attorney Docket No.:03331/1201982-US4

| Full name of sole or first inventor | |
|---|---|
| Mordechai Nisani | |
| Sole or first inventor's signature | Date |
| Residence | |
| Tel Aviv Israel | |
| Citizenship   Israel | |
| Mailing Address | |
| Visel 26/i<br>Tel Aviv<br>Israel | |

| Full name of second inventor, if any | |
|---|---|
| Eitan Bar | |
| Second inventor's signature | Date |
| Residence | 5/10/2004 |
| Tzoran, Israel | |
| Citizenship   Israel | |
| Mailing Address | |
| DOLEV 6<br>TZORAN 42823<br>ISRAEL | Harakafut 27<br>Even Yehuda   ISRAEL |

BEST AVAILABLE COPY

| Express Mail Label No. | Dated: |
|---|---|

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

## DECLARATION FOR PATENT APPLICATION

As a below named inventor, I hereby declare that:

My residence, post office address and citizenship are as stated below next to my name.

I believe I am an original, first and joint inventor of the subject matter which is described and claimed and for which a patent is sought on the invention entitled:

### METHOD FOR RESTORING A PORTION OF A COMMUNICATION SESSION TRANSMITTED OVER A COMPUTER NETWORK

the specification of which is attached hereto.

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by an amendment, if any, specifically referred to herein. I do not know and do not believe that the same was ever known or used in the United States of America before my or our invention thereof or patented or described in any printed publication in any country before my or our invention thereof, or more than one year prior to this application, or in public use or on sale in the United States of America more than one year prior to this application, that the invention has not been patented or made the subject of an inventor's certificate issued before the date of this application in any country foreign to the United States of America on an application filed by me or my legal representatives or assigned more than twelve months prior to this application.

I acknowledge the duty to disclose all information known to me that is material to patentability in accordance with Title 37, Code of Federal Regulations, § 1.56.

### FOREIGN PRIORITY CLAIM

I hereby claim foreign priority benefits under Title 35, United States Code § 119(a)-(d) of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

[x] no such foreign applications have been filed

[ ] such foreign application have been filed as follows:

{W:\03331\1201982us2\00265934.DOC *033311201982US2* }

1

Attorney Docket No.:03331/1201982-US2

EARLIEST FOREIGN APPLICATION(S), IF ANY FILED WITHIN 12 MONTHS
(6 MONTHS FOR DESIGN) PRIOR TO THIS U.S. APPLICATION

| Application Number | Country | Date of Filing | Priority Claimed Under 35 USC 119 |
|---|---|---|---|
| | | | ___ Yes No ___ |
| | | | ___ Yes No ___ |
| | | | ___ Yes No ___ |

ALL FOREIGN APPLICATION(S), IF ANY FILED MORE THAN 12 MONTHS
(6 MONTHS FOR DESIGN) PRIOR TO THIS U.S. APPLICATION

| Application Number | Country | Date of Filing |
|---|---|---|
| | | |
| | | |
| | | |

CLAIM FOR BENEFIT OF EARLIER U.S. PROVISIONAL APPLICATIONS

I hereby claim priority benefits under Title 35, United States Code §119(e), of any United
States provisional patent application(s) listed below:

☒ no such U.S. provisional applications have been filed.

☐ such U.S. provisional application have been filed as follows:

| Application Number | Date of Filing | Priority Claimed Under 35 USC 119 |
|---|---|---|
| | | ___ Yes No ___ |
| | | ___ Yes No ___ |
| | | ___ Yes No ___ |

CLAIM FOR BENEFIT OF EARLIER U.S./PCT APPLICATION(S)

I hereby claim the benefit under Title 35, United States Code, §120 of the United States
application(s) listed below and, insofar as the subject matter of each of the claims of this
application is not disclosed in the prior United States application in the manner provided by
the first paragraph of Title 35, United States Code, §112, I acknowledge the duty to disclose
all information that is material to patentability in accordance with Title 37, Code of Federal
Regulations, §1.56 which became available to me between the filing date of the prior
application and the national or PCT international filing date of this application:

Attorney Docket No.:03331/1201982-US2

☐ no such U.S./PCT applications have been filed.

☒ such U.S./PCT application have been filed as follows:

| Application Number | Date of Filing | Status (Patented/Pending/Abandoned) |
|---|---|---|
| 09/664,755 | 09-19-2000 | Pending |
| 09/140,453 | 08-26-1998 | Patented |
| PCT/US99/19505 | 08-26-1999 | Expired |

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

I hereby appoint the practitioners under Customer Number

**000040401**

jointly, and each of them severally, my attorneys at law/patent agent(s), with full power of substitution, delegation and revocation, to prosecute this application, to make alterations and amendments therein, to receive the patent, and to transact all business in the U. S. Patent and Trademark Office connected therewith.

Please mail all correspondence to Abraham Hershkovitz, whose address is:

Abraham Hershkovitz
1725 I Street N.W.
Suite 300
Washington, D.C. 20006

Please direct telephone calls to: Abraham Hershkovitz at (703) 323-9330.

Please direct facsimiles to: (703) 323-6617

044/044

Attorney Docket No.:03331/1201982-US2

| Full name of sole or first inventor | | |
|---|---|---|
| Mordechai Nisani | | |
| Sole or first inventor's signature | | |
| | | Date  11/10/2004 |
| Residence | | |
| Tel-Aviv Israel | Guildford    uk | |
| Citizenship    Israel | | |
| Mailing Address | | |
| Visel 26/6 | 127  Stoke Road | |
| Tel.Aviv | Guildford  Surrey | |
| Israel | uk    GU1 1ET | |

| Full name of second inventor, if any | | |
|---|---|---|
| Eitan Bar | | |
| Second inventor's signature | | |
| | | Date |
| Residence | | |
| Tzoran, Israel | | |
| Citizenship    Israel | | |
| Mailing Address | | |
| DOLEV 6 | | |
| TZORAN 42823 | | |
| ISRAEL | | |

BEST AVAILABLE COPY

Attorney Docket No.:03331/1201982-US2

| | |
|---|---|
| Full name of sole or first inventor | |
| Mordechai Nisani | |
| Sole or first inventor's signature | Date |
| Residence | |
| Tel Aviv Israel | |
| Citizenship   Israel | |
| Mailing Address | |
| Visel 26/6 Tel Aviv Israel | |

| | |
|---|---|
| Full name of second inventor, if any | |
| Eitan Bar | |
| Second inventor's signature | Date   5/10/2004 |
| Residence | |
| Tzoran, Israel | |
| Citizenship   Israel | |
| Mailing Address | |
| DOLEV 6 TZORAN 42823 ISRAEL | Harakafot 27. Even-Yehuda   ISRAEL |

BEST AVAILABLE COPY

| Express Mail Label No. | Dated: _____ |

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

## DECLARATION FOR PATENT APPLICATION

As a below named inventor, I hereby declare that:

My residence, post office address and citizenship are as stated below next to my name.

I believe I am an original, first and joint inventor of the subject matter which is described and claimed and for which a patent is sought on the invention entitled:

## METHOD FOR EXTRACTING A COMPUTER NETWORK-BASED TELEPHONE SESSION PERFORMED THROUGH A COMPUTER NETWORK

the specification of which is attached hereto.

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by an amendment, if any, specifically referred to herein. I do not know and do not believe that the same was ever known or used in the United States of America before my or our invention thereof or patented or described in any printed publication in any country before my or our invention thereof, or more than one year prior to this application, or in public use or on sale in the United States of America more than one year prior to this application, that the invention has not been patented or made the subject of an inventor's certificate issued before the date of this application in any country foreign to the United States of America on an application filed by me or my legal representatives or assigned more than twelve months prior to this application.

I acknowledge the duty to disclose all information known to me that is material to patentability in accordance with Title 37, Code of Federal Regulations, § 1.56.

### FOREIGN PRIORITY CLAIM

I hereby claim foreign priority benefits under Title 35, United States Code § 119(a)-(d) of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

[x] no such foreign applications have been filed

[ ] such foreign application have been filed as follows:

Attorney Docket No.:03331/1201982-US3

EARLIEST FOREIGN APPLICATION(S), IF ANY FILED WITHIN 12 MONTHS
(6 MONTHS FOR DESIGN) PRIOR TO THIS U.S. APPLICATION

| Application Number | Country | Date of Filing | Priority Claimed Under 35 USC 119 |
|---|---|---|---|
| | | | ___ Yes  No ___ |
| | | | ___ Yes  No ___ |
| | | | ___ Yes  No ___ |

ALL FOREIGN APPLICATION(S), IF ANY FILED MORE THAN 12 MONTHS
(6 MONTHS FOR DESIGN) PRIOR TO THIS U.S. APPLICATION

| Application Number | Country | Date of Filing |
|---|---|---|
| | | |
| | | |
| | | |

CLAIM FOR BENEFIT OF EARLIER U.S. PROVISIONAL APPLICATIONS

I hereby claim priority benefits under Title 35, United States Code §119(e), of any United
States provisional patent application(s) listed below:

[ x ]  no such U.S. provisional applications have been filed.

[  ]  such U.S. provisional application have been filed as follows:

| Application Number | Date of Filing | Priority Claimed Under 35 USC 119 |
|---|---|---|
| | | ___ Yes  No ___ |
| | | ___ Yes  No ___ |
| | | ___ Yes  No ___ |

CLAIM FOR BENEFIT OF EARLIER U.S./PCT APPLICATION(S)

I hereby claim the benefit under Title 35, United States Code, §120 of the United States
application(s) listed below and, insofar as the subject matter of each of the claims of this
application is not disclosed in the prior United States application in the manner provided by
the first paragraph of Title 35, United States Code, §112, I acknowledge the duty to disclose
all information that is material to patentability in accordance with Title 37, Code of Federal
Regulations, §1.56 which became available to me between the filing date of the prior
application and the national or PCT international filing date of this application:

Attorney Docket No.:03331/1201982-US3

☐ no such U.S./PCT applications have been filed.

☒ such U.S./PCT application have been filed as follows:

| Application Number | Date of Filing | Status (Patented/Pending/Abandoned) |
|---|---|---|
| 09/664,755 | 09-19-2000 | Pending |
| 09/140,453 | 08-26-1998 | Patented |
| PCT/US99/19505 | 08-26-1999 | Expired |

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

I hereby appoint the practitioners under Customer Number

000040401

jointly, and each of them severally, my attorneys at law/patent agent(s), with full power of substitution, delegation and revocation, to prosecute this application, to make alterations and amendments therein, to receive the patent, and to transact all business in the U. S. Patent and Trademark Office connected therewith.

Please mail all correspondence to Abraham Hershkovitz, whose address is:

Abraham Hershkovitz
1725 I Street N.W.
Suite 300
Washington, D.C. 20006

Please direct telephone calls to: Abraham Hershkovitz at (703) 323-9330.

Please direct facsimiles to: (703) 323-6617

Attorney Docket No.:03331/1201982-US3

| Full name of sole or first inventor | | | |
|---|---|---|---|
| Mordechai Nisani | | | |
| Sole or first inventor's signature | | Date | 11/10/2004 |
| Residence | | | |
| Tel Aviv Israel | Guildford uk | | |
| Citizenship  Israel | | | |
| Mailing Address | | | |
| Visel 26/8 Tel Aviv Israel | 127 Stoke Road Guildford, Surrey uk GU1 4ET | | |

| Full name of second inventor, if any | | | |
|---|---|---|---|
| Eitan Bar | | | |
| Second inventor's signature | | Date | |
| Residence | | | |
| Tzoran, Israel | | | |
| Citizenship  Israel | | | |
| Mailing Address | | | |
| DOLEV 6 TZORAN 42823 ISRAEL | | | |

BEST AVAILABLE COPY

Attorney Docket No.:03331/1201982-US3

| Full name of sole or first inventor | |
| --- | --- |
| Mordechai Nisani | |
| Sole or first Inventor's signature | Date |
| Residence | |
| Tel Aviv Israel | |
| Citizenship   Israel | |
| Mailing Address | |
| Visel 26/6 Tel Aviv Israel | |

| Full name of second inventor, if any | |
| --- | --- |
| Eitan Bar | |
| Second Inventor's signature | Date   5/10/2004 |
| Residence | |
| Tzoran, Israel | |
| Citizenship   Israel | |
| Mailing Address | |
| DOLEV/6 TZORAN 42823 ISRAEL | Harakafot 27 Even Yehuda  Israel |

BEST AVAILABLE COPY

# EXHIBIT 43

1

1    IN  THE  UNITED  STATES  DISTRICT  COURT.

2    FOR  THE  NORTHERN  DISTRICT  OF  GEORGIA

3    ATLANTA  DIVISION

4    CIVIL  ACTION  NO:  1:04-CV-2111-RWS

5                      1:04-CV-2531-CAP

6

7                              :
     STS  SOFTWARE  SYSTEMS,    :
8    LTD.                       :
                                :
9          Plaintiff,           :
                                :
10      vs.                     :
                                :        TELEPHONIC
11   WITNESS  SYSTEMS,  INC.,   :
                                :    STATUS  CONFERENCE
12                              :
           Defendant.          :
13                              :
      - and -                   :
14                              :
     WITNESS  SYSTEMS,  INC.,   :
15                              :
           Plaintiff,          :
16                              :
        vs.                     :
17                              :
     NICE  SYSTEMS,  INC.  &  NICE  :
18   SYSTEMS,  LTD.,            :
                                :
19          Defendant.          :
     - - - - - - - - - - - - - -

20

21

22

23

24

25

**2**

1    TRANSCRIPT of the stenographic notes of the
2  proceedings in the above-entitled matter, as taken by
3  and before LOU ANNE SPELLMAN, a Certified Shorthand
4  Reporter, License No. XIO1519, and Notary Public of
5  the State of New Jersey, held at the office of DOERNER
6  & GOLDBERG, INC., 5 Becker Farm Road, Roseland,
7  New Jersey, on Wednesday, March 1, 2006 commencing at
8  9:34 in the morning.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1  B E F O R E:
2     RODERICK R. MCKELVIE - SPECIAL DISCOVERY MASTER
       COVINGTON & BURLING, ESQS.
3     1201 Pennsylvania Avenue
       Washington, D.C. 20004-6020
4     (202)662-5195
5
6  A P P E A R A N C E S:
7     KAYE SCHOLER, LLP
       425 Park Avenue
8     New York, New York 10022-3598
       (212) 836-8000
9  BY: SCOTT G. LINDVALL, ESQ.
       PATRICIA J. CLARKE, ESQ.
10      GERALD WANG, ESQ.
       JASON FRANK, ESQ.
11  Attorneys for STS Software Systems, Ltd,
    NICE Systems, Inc. and NICE Systems, Ltd.
12
    FISH & RICHARDSON, PC
13  1230 Peachtree Street, Northeast
    19th Floor
14  Atlanta, Georgia 30309
    (404) 892-5005
15  BY: NAGENDRA (NICK) SETTY, ESQ.
       DANIEL A. KENT, ESQ.
16      CHRISTOPHER O. GREEN, ESQ.
    Attorneys for Witness Systems, Inc.
17
18
19
20
21
22
23
24
25

**4**

1    SDM MCKELVIE: I thought what we could do
2  would be to at least start today by addressing issues
3  that are pending between the parties, and typically
4  the pattern I like to follow is to give each side a
5  chance to pick a topic, we'll deal with that topic,
6  then the other side pick a topic, and we'll sort of
7  work through where we are, and at the end of process,
8  if we have open issues, we can agree on scheduling
9  another conference call to handle it or we can agree
10  on another procedure if it turns out that the
11  conference calls aren't working. We can sort of work
12  through what the issues are, and that way if people
13  would like, maybe the next time we have a conference
14  call we can agree on a structure where people can
15  write a letter at a certain time period before the
16  conference call to identify the issues they'd like to
17  put on the plate for the conference call, and separate
18  from that, if people don't think the conference calls
19  are working, they don't think they're productive,
20  please feel free to speak up and we'll see if we can
21  agree on a different structure going forward; all
22  right?
23    MR. LINDVALL: Yeah, that's fine.
24    SDM MCKELVIE: So I'll take out my former
25  judicial coin. Scott, you call heads or tails.

**5**

1    MR. LINDVALL: Heads.
2    SDM MCKELVIE: It's tails. Okay. Nick,
3  you get to pick the first topic.
4    MR. SETTY: Okay. So for the court
5  reporter's purposes, there are three people on the
6  line from this end. My name is Nick Setty. Chris
7  Green and Dan Kent are here. We're all from Fish &
8  Richardson on behalf of Witness Systems. If the other
9  folks speak, we will make sure for the court reporter
10  we will clarify who's speaking.
11    The first issue from my perspective is on
12  page 3 of our letter. We had laid out a table that
13  includes the current scheduling of the case, and there
14  is a wrinkle in the schedule, and let me see if I can
15  identify it. First, the parties -- STS requested and
16  we agreed to two extensions in the last week for the
17  LPR 6.2 disclosures. They were exchanged, but they
18  were only exchanged this Monday, so there's a modest
19  adjustment to the follow-on dates that results from
20  that. One question I have on that point, Judge
21  McKelvie, is would you like to be consulted on those
22  types of issues? In other words, if we're agreeing to
23  give each other a couple of extra days because of time
24  conflicts, would you like to be consulted on those?
25    SDM MCKELVIE: Scott?

6

1    MR. LINDVALL: I mean, my feeling -- this
2  is Scott Lindvall for NICE -- but my feeling is that
3  in that situation, if the parties agree, I have no
4  problem with just the parties agreeing, not bother you
5  with it.
6    SDM MCKELVIE: That's fine with me then.
7    MR. SETTY: Good. That's what we did
8  this time. I wanted to make sure we follow your
9  procedure. So with the modest adjustment of the dates
10 on that table by a number of days, if you look to the
11 fifth row on the table you'll see there is a row that
12 says April 25, 2006, close of fact discovery, and that
13 date begins all the way with -- all the way back to an
14 original presumed schedule in patent cases in the
15 Northern District of Georgia rules. So in July, when
16 the court allowed the first amended complaint, which
17 included the three new patents, there was a resetting
18 of the schedule. Since then we've had another
19 resetting, which was at the January 4, 2006 conference
20 with the judge. He restarted the 6.2 date, which was,
21 if I remember correctly, 20 days from the date of the
22 conference. That's how we ended up with the February
23 22nd date and all the follow-on dates. So there's a
24 wrinkle here, in that we have a close of fact
25 discovery that precedes many events on the schedule,

7

1  including, if you look further down, there's discovery
2  after claim construction, and the way the Northern
3  District of Georgia schedule works is you have two
4  tracks. You have regular discovery going on on track
5  one, and you have a claim construction series of
6  events in track two. So we can do this a number of
7  different ways. One is, given that the close of fact
8  discovery is normally presumed to be after all of
9  these events have occurred, we can leave that open for
10 now. Another way to handle the close of fact
11 discovery is to line it up with the close of discovery
12 after claim construction, which is, again, a date that
13 flows from whenever the claim construction ruling
14 comes in. Either of those is fine with us, whether
15 it's floating or linked to the close of discovery
16 after claim construction, and I don't think that's a
17 particularly controversial point, but it's the first
18 one I wanted to raise.
19    MR. LINDVALL: Okay. I don't think -- we
20 probably don't have a big dispute here. I do note
21 that under the Local Patent Rules at 6.7 there's a
22 rule that says, "Discovery After Claim Construction",
23 and it says, "If at the time the court issues -- if at
24 the time the court issues its claim construction
25 ruling there are fewer than 30 days left for discovery

8

1  pursuant to the discovery track to which the case was
2  assigned, the parties shall have an additional 45 days
3  in which to take discovery after the court files and
4  serves its claim construction ruling." I read that
5  affording -- as Nick pointed out, these are new rules,
6  but I read this as saying really fact discovery
7  doesn't close until 45 days after the claim
8  construction ruling comes out from the court, and
9  we're fine with that. I just wanted to clarify that
10 right now we have a date on the calendar that is
11 inconsistent with the rest of the schedule.
12    SDM MCKELVIE: So what we want to do is
13 agree that fact discovery will close 45 days after the
14 claim construction decision. Is that what we want to
15 do? Or 30 days?
16    MR. SETTY: Well, the rule says if you
17 have less than 30 days at that time on the discovery
18 track, then you default to 45 days.
19    SDM MCKELVIE: We'll do 45. Are you okay
20 on that?
21    MR. SETTY: Yes.
22    MR. LINDVALL: Yes.
23    SDM MCKELVIE: That's fine.
24 Incidentally, how do we want to record that decision?
25 People happy with a transcript or should we have a

9

1  written order implementing the decisions being made
2  during the course of the call?
3    MR. SETTY: I'd prefer a written order,
4  Judge McKelvie. Scott, do you have a preference?
5    MR. LINDVALL: It doesn't matter. A
6  written order will be fine with me. There's really no
7  preference for me, as long as it's clear on the
8  transcript.
9    SDM MCKELVIE: Why don't we do this: Why
10 don't Deanna and I do a brief order setting out the
11 decisions made during the course of the call, and then
12 once we have sent that order out, if people have any
13 issues you can come back to me on it on the next call.
14 That way we don't get into the issue of the party
15 preparing it and going back and forth about what I've
16 said and how I've said it.
17    MR. LINDVALL: Without violating the rule
18 on one issue per party, the same issue arises on the
19 next page of the letter, on page 4 of our letter. We
20 have the same close of fact discovery issue in the
21 NICE case, and I propose that we handle it the same
22 way, that, if you look at the table, row four on page
23 5 of our letter, there's an LPR 6.7 reference there,
24 and it would follow the same resolution on that issue
25 on that case.

3  (Pages 6 to 9)

10

1    SDM MCKELVIE: That's fine.
2  Procedurally, are these cases now consolidated for the
3  purpose of discovery?
4    MR. LINDVALL: They are not, your Honor.
5  The judge denied the consolidation motion that was
6  intended to consolidate all aspects of the case,
7  including trial. In a footnote in that denial, the
8  judge referenced that it may have been appropriate to
9  consolidate pretrial proceedings. I think your
10 existence on both cases means that we have a de facto
11 consolidation, but there's certainly no formal
12 consolidation. We have not revisited that with Judge
13 Story or Judge Pannell.
14   SDM MCKELVIE: Why don't we do this,
15 then: Why don't we prepare, at least from our
16 perspective, Deanna and me, why don't we prepare two
17 papers, one in each case, and theoretically they'll
18 mirror exactly what we had in each case. So we won't
19 have one caption, we'll have two separate captions
20 going forward, and then we'll see whether or not we'll
21 get an order to consolidate.
22   Is that okay with everybody?
23   MR. LINDVALL: Yes.
24   MR. SETTY: Yes.
25   SDM MCKELVIE: It's Scott's turn now.

11

1    MR. LINDVALL: I think the first issue I
2  wanted to bring up, which to STS Software is an
3  important issue, and this has to do with the discovery
4  relating to new products that Witness has introduced,
5  and let me give you a little bit of background. As
6  you know, we filed this lawsuit back in July of 2004,
7  STS Software did, against Witness Systems, alleging
8  infringement against a product called Contact Store,
9  and we also gave a generic description of products,
10 because we didn't know necessarily the names of all
11 the products. We proceeded on that basis, and Witness
12 took the position that the litigation only involved
13 Contact Store for IP, which is known as CSIP, and that
14 was it. We moved and asked for discovery on a product
15 which they co-developed with a company called Avaya,
16 and that's called Contact Store for Communication
17 Manager. At first they resisted discovery on that
18 product saying that we had to amend our disclosures
19 under the Patent Local Rules, our infringement
20 disclosures. We ultimately did so, and then they
21 ultimately, on a motion to compel, produced the source
22 code and the information relating to Contact, I mean
23 Contact Store for Communication Manager, which is the
24 co-developed product with Avaya. Since that time
25 frame, now Witness appears to have dropped their

12

1  Contact Store for IP from their product line and has
2  come out with a new product called Impact 360. Now,
3  from the information we can get through the public
4  sources, Impact 360 appears to be a package or a
5  software that has encompassed all of their previous
6  suites. For example, you may recall with Microsoft
7  had Word and Excel and had a couple of different
8  softwares. All of a sudden Microsoft thought it would
9  be a good idea to make Microsoft Office, which
10 included all these capabilities, and it appears that's
11 what Witness has done with Impact 360, has taken
12 Contact Store for IP and some of their other products,
13 quality management products, and incorporated them
14 into one suite called Impact 360. We have since asked
15 for discovery on Impact 360, the source code and what
16 have you, and Witness's position was we have to amend
17 our infringement contentions under the Patent Local
18 Rules. We did that, and what we did, based on the
19 best information we have, we believe that the
20 recording engine for the Impact 360 is essentially
21 Contact Store for IP, but now it's been rebranded as
22 Impact 360. So we basically said in our infringement
23 contentions we are incorporating by reference our
24 infringement contentions for Contact Store IP because
25 Impact 360 is just a rebranded product, and Witness

13

1  responded by saying we didn't properly respond to the
2  infringement contentions in the Local Patent Rules,
3  and therefore they're not going to give us the source
4  code or any discovery related to Impact 360. Now,
5  keep in mind that these products, Impact 360, are
6  software, and they -- really the nuts and bolts, and
7  really to understand how these products operate and
8  function you need to get the source code or you need
9  to get highly confidential documents which are not in
10 the public domain to be able to ultimately show how
11 these products operate and function. It's not like
12 buying a product off the shelf and examining it or
13 buying a chemical and analyzing it and being able to
14 develop your infringement contentions. We're
15 basically in a situation where, until they cooperated
16 and given the source code information can we then be
17 in a position where we can be more detailed in our
18 infringement contentions.
19   The other product which has come to light
20 too is a product which Witness has co-developed with
21 Nortel, and we have a document that Witness has
22 produced to us which specifically says the Nortel
23 product uses the Contact Store for IP recording engine
24 in that product, in the Nortel product. Again, we
25 have already alleged infringement for the Contact

14

1  Store for IP, and again, in our infringement
2  contentions for the Nortel product, we incorporate by
3  reference the Contact Store for IP recording engine.
4  There is no reason to just make a copy of the same
5  infringement contentions again. It would probably
6  help nobody to do that. We just incorporate by
7  reference. Witness responded by saying we haven't
8  properly set forth the infringement contentions for
9  the Nortel product, therefore they're not going to
10 give us the source code or any of the documents which
11 discuss how it operates and functions. Again, based
12 on the information and based on some Witness documents
13 which they have produced about the Nortel product
14 already, and I'll be happy to share with your Honor
15 one of the documents, but it specifically says that
16 they're rebranding the Contact Store for IP and
17 incorporating that into the Nortel product, and that
18 is the same recording engine which we've already
19 accused of infringement.
20      So the situation we basically have is it
21 appears we have two new products from Witness which
22 are really rebranded versions of earlier products
23 which we've already accused infringement, but now
24 we're at a loss to try to move on discovery on this
25 because Witness has taken the position that we haven't

15

1  given proper infringement contentions, and again we're
2  in a situation where these are source code or highly
3  confidential information type things. We can't go and
4  buy this product and analyze it until we get this
5  information. It's more difficult for us to be able to
6  give detailed infringement contentions. This is the
7  exact issue we had earlier with Judge Story, where
8  Judge Story granted our motion to compel on source
9  code for Communication Manager, the Avaya product, and
10 he said we would be -- STS could amend their
11 infringement contentions once we received the source
12 code and the other highly confidential information.
13      So what we're requesting from your Honor
14 is the discovery, and that Witness be required to
15 produce the source code and the other information that
16 they're required under the Local Patent Rules, and
17 also our discovery requests that we have specifically
18 on these products, that they be required to produce
19 this information to us as quickly as possible.
20      SDM MCKELVIE: Nick?
21      MR. SETTY: All right. Let's start with
22 the, I think the most important issue, which is the
23 source code and other materials that are required
24 under LPR 4.2(c), which specifically references source
25 codes, specifications, schematics, flow charts, et

16

1  cetera. Those are intended to be produced, will be
2  produced, but the goal of the Patent Local Rules here,
3  and we were involved in the drafting of those rules,
4  was to take us away from a combination of notice
5  pleading plus regular discovery and move us into a
6  Northern District of California style process where
7  there is a sequential set of contentions that are
8  court-ordered. The initial Rule 4.1 contention, which
9  is the patentee's infringement contention in this
10 case, the initial ones were the same style as the
11 third supplemental one that Scott is referring to. So
12 let me see if I can lay the groundwork. The initial
13 contentions for CSIP were also on a two-page document.
14 They did not include a detailed, element-by-element
15 comparison of the claims to the accused CSIP product.
16 We took that issue to Judge Story and said that that
17 is an insufficient Rule 4.1 disclosure, and Scott made
18 the point that he just made to your Honor just now,
19 which is that they needed the source code to give more
20 detailed contentions. Judge Story was involved in the
21 drafting of the local rules, and I argued at that time
22 that the Rule 4.1 obligation is not linked to having
23 the confidential materials. It's intended to be a
24 Rule 4.1 disclosure that gives the court and the
25 parties a feel for the patentee's infringement

17

1  contentions before they see the source code. That's
2  why 4.1(a)(3) specifically says that the chart must
3  identify where each element of each asserted claim is
4  found within each accused instrumentality. You have
5  to identify any 35 USC-Section 112, paragraph 6
6  elements. You have to identify supporting structures.
7  You have to say whether those elements are satisfied
8  in the accused instrumentality literally or under the
9  doctrine of equivalence under Section IV of that rule,
10 and only once you satisfy those you shift to LPR 4.2,
11 which requires that we respond with non-infringement
12 contentions and the basis therefore. If the basis is
13 in the code, in the specifications, you have to supply
14 that. So the question is not whether we're going to
15 produce it, we're going to. The question is whether
16 the third supplemental disclosure, which is, again, a
17 two-page document without a chart, is sufficient. As
18 I said, we've been down this road once before on the
19 initial 4.1, and Judge Story, in a conference just
20 just like this, agreed that the source code was not a
21 predicate to those contentions, they needed to be done
22 in a detailed manner, and that he would require STS to
23 do so. So all we've done here is follow the rule of
24 the case, which is that we need a claim chart that
25 does these things before we move to the 4.2 response,

5 (Pages 14 to 17)

18

1  and if Scott is saying that he needed access to the
2  CSIP source code to be able to do that, because he
3  believes that the two new products are simply
4  rebranded, he has the CSIP source code, and has had it
5  for many months, has copies of it that his expert has,
6  has a copy at his law firm. So if they believe that
7  these are the same product and that is the premise for
8  their infringement contention, then they should be
9  able to do a detailed recitation of that in a claim
10 chart. If they later learn, through an examination of
11 the source code, that there are distinctions between
12 the new products and the old ones, then they would
13 supplement the 4.1 at that time. So it's simply
14 following the local rules that we ask that there be a
15 detailed claim chart for these two new products, and
16 we go from there.
17        MR. LINDVALL: Judge McKelvie, if I may
18 quickly respond, I just want to reference that our
19 infringement contentions, our charts for infringement
20 contentions, where we laid out an element-by-element
21 analysis, is 98 pages long, and it's very detailed and
22 cites references to documents, and this is for CSIP
23 and for the Communication Manager products. So we
24 have provided such a document already. It doesn't
25 necessarily have the references to source code yet

19

1  because, as you may know, source code is extremely
2  complex, and our expert's had it for some period of
3  time now. He's been working diligently to try to
4  analyze it. He hasn't completed his analysis yet, and
5  until he completes his analysis we're not going to be
6  in a position to amend or add the source code, the
7  actual source code citations to Contact Store IP.
8  Notwithstanding that, we still have provided some very
9  detailed infringement contentions for Contact Store
10 for IP, and again, it's almost like hiding the ball.
11 We don't know, and I guess Mr. Setty's not in a
12 position to tell us if these are truly just rebranded
13 products today or if these are actually new recording
14 engines, but I guess we'll have to find out on our
15 own, but in any event, I'm sure the local rules, the
16 intention of the local rules in a situation, for
17 example, where you have source code, and I can think
18 of another situation, for example, where someone has
19 sued someone for an infringement of a chemical
20 process, where you can't find out exactly how that
21 process is unless you sneak into the plant and/or get
22 highly confidential information. Until you get that
23 information, can you be sure about what the
24 infringement is, or not infringement, and in that
25 situation where source code, or you have a process

20

1  which is secret, these local rules, under that
2  interpretation, would prohibit you from ever bringing
3  an infringement suit, because you couldn't necessarily
4  give detailed infringement contentions, and I don't
5  think the law states that. I think the Federal
6  Circuit has made it very clear that, in certain
7  circumstances, if the information is not publicly
8  available and the other side is not going to cooperate
9  in giving you the information, you have every right to
10 sue and seek discovery on that process to see if your
11 beliefs are correct or not, but notwithstanding that,
12 we've gone down this issue with Judge Story once
13 before. Judge Story ordered the production of the
14 source code. We've had the source code for a number
15 of months. Mr. Setty's absolutely right. It just
16 takes time for our expert to analyze it. I can't
17 analyze it myself, nor is anyone in the firm able to
18 analyze it. This is a highly complex source code to
19 analyze, and there's been a number of, I won't go into
20 the story, but some difficulties in our ability to
21 analyze it and understand it. Once we do that,
22 though, we will amend our infringement contentions as
23 we're required to do, but in any event, I hate to hold
24 this whole litigation up somehow because there's two
25 new products out in Impact 360 and this Nortel product

21

1  and we're not getting any discovery on it. I just
2  don't think that is the way to do it. We have
3  outstanding document requests. I don't know, these
4  could be design-arounds. If they're design-arounds,
5  we have a right to discovery on design-arounds. I'm
6  not sure what these --
7        SDM MCKELVIE: What's the nature of the
8  discovery you want?
9        MR. LINDVALL: The nature of the
10 discovery is what's required under both our document
11 requests and also the Local Patent Rules, which
12 requires them to produce the source code schematics,
13 specifications, other technical documents which
14 describe the function/operation of the product for
15 both Impact 360 and Nortel. Now, we did get some
16 Nortel documents, and that's where we got a view that
17 these are actually rebranded products, but we're not
18 absolutely positive until we actually get the
19 technical information.
20        SDM MCKELVIE: All right. So I think the
21 solution here is to expand the scope of discovery to
22 include the new products.
23        MR. LINDVALL: And we will modify our or
24 amend our infringement contentions, once we're able to
25 analyze that information, as we are required to.

22

1  MR. SETTY: Just to clarify, your Honor,
2  that means that even without the element-by-element
3  comparison to the new products, you want us to move on
4  to 4.2?
5  SDM MCKELVIE: I think what's going to
6  happen probably is Scott is going to come back and
7  amend 4.1 to the extent that it covers the new
8  products, then you move to 4.2; is that correct?
9  MR. LINDVALL: Well, what happens, your
10  Honor, under the local rules you have 4.1, where you
11  give your initial infringement contentions, which we
12  have done. We've incorporated the Contact Store for
13  IP by reference with these new products, and then
14  after we've done that, 30 days later Witness must do
15  their 4.2 disclosures, which include producing the
16  source code specifications and other technical
17  documents which describe the operation and function of
18  the accused products, and that's what we're asking for
19  right now, is that information to be produced to
20  us, and once we've analyzed that we will go back and
21  amend our 4.1 contentions.
22  SDM MCKELVIE: Right. We'll do that
23  then. I think you're up with No. 3.
24  MR. SETTY: Okay. If we can turn to page
25  8 of our letter, it's where we pick up on outstanding

24

1  suit, and based on that, under heading three they
2  would provide us financial information as to the
3  performance of those products. Four, they would
4  provide us with technical manuals and documentation
5  that relates to that. Five would be marketing
6  information. Six would be source code. That's all
7  wrapped up into the single notion of information that
8  relates to the embodying products. As the motion to
9  compel was drafted, it related to specific requests
10  for production that needed supplementation, because
11  the objections were that we were not entitled to any
12  information on the embodying products, and so although
13  we've laid it out here in prose, it reflects the
14  request for production numbers 4, 17, 19, 20, 21 and
15  16 and 18 on the source code. So this is a high-level
16  summary of what we were entitled to and what was
17  actually granted in terms of the motion to compel, and
18  Scott has already said that, in his letter, that they
19  would produce this information. We would just like to
20  get it moving so that there's an order requiring that
21  by a date certain we will have the interrogatory
22  response and the follow-on documents.
23  MR. LINDVALL: If I can respond to that,
24  your Honor?
25  SDM MCKELVIE: Sure.

23

1  discovery disputes, and the first one would be in the
2  STS case. I think everyone has had access now to the
3  June -- January 6, 2006 order from Judge Story that
4  granted certain motions and denied certain motions,
5  and that you also have the transcripts of the January
6  4th conference with the judge where he predicted what
7  his rulings would be, and also alluded to certain
8  discovery issues.
9  So starting there, under Roman numeral
10  III(b)(1), the first issue I want to raise is the
11  grant of the motion to compel and the denial of the
12  motion for protective order on STS's financial
13  performance information that relates to products that
14  embody the technologies in the patents in suit in the
15  STS case, and I think everyone will note that the
16  judge deferred ruling on specifically which
17  information should be produced responsive to our need
18  to investigate commercial success as a secondary
19  consideration. We have laid out what we think is
20  probably the most modest approach to getting
21  sufficient information on commercial success on page 9
22  of the letter under heading two. We think that an
23  interrogatory response in response to interrogatory
24  No. 8, where STS would identify all products that
25  embody any aspect of the technologies in the patent in

25

1  MR. LINDVALL: We have agreed to produce
2  this information. We have no problem. Let me just
3  give you a little background. We had resisted
4  producing this information because, as you may know,
5  we're not asserting damages in this case. The only
6  thing we're asking for is an injunction. So our
7  position initially was we were going to rely on
8  Witness Systems' commercial success to rebut their
9  assertion of non-obviousness so we didn't have to
10  produce all our documentations, and we thought it
11  would make the trial cleaner and more efficient.
12  Judge Story disagreed with us and he said no, that
13  Witness has a right to get discovery on commercial
14  success. We believe that left the door open now, if
15  we desired, we can use commercial success to rebut
16  their contentions, but notwithstanding that, we plan
17  on producing all of that documentation. There's one
18  caveat. There is some issues that we have with
19  theirs. I know it's not my turn, so I'm not going to
20  bring it up, but we will produce the information that
21  Mr. Setty's asking for.
22  SDM MCKELVIE: Did you want to propose a
23  deadline?
24  MR. LINDVALL: I think we can probably do
25  that -- we've already started the process, and I think

26

1  we can probably do it within about 15 days. I think
2  at least have the vast majority of it. I can't
3  guarantee every bit of it will be in 15 days, but I
4  think, since we've already started the process and
5  we've already received documentation here, we are just
6  processing it with production numbers, I think we can
7  start producing it almost within the next couple of
8  days, and then have it substantially complete within
9  the next 15 days. There may be some follow-on after
10 that 15 days. Mr. Setty and his crew will probably
11 review it and ask for other information, but -- if
12 there is something missing, but we plan on producing
13 this information to them.
14      SDM MCKELVIE: Anything, Nick?
15      MR. SETTY: 15 days is great. There
16 seems to be some wiggle room there, so I suppose what
17 I'd prefer is a date certain by which it would be
18 completed so we can move on to that side of factual
19 discovery, and if it can be done on a rolling basis no
20 later than 30 days, that would be fine with us.
21      MR. LINDVALL: Why don't we -- 30 days,
22 I'm sure we'll have everything that we can think of
23 produced by. I was trying to -- I'll try to get the
24 vast majority done by 15 days, but 30 days will be
25 when we believe that we're complete.

27

1      MR. SETTY: There is one related issue,
2  your Honor. When we get this information, a large
3  number of the 30(b)(6) topics were objected to on the
4  same basis, that we weren't entitled to information
5  pertaining to NICE products that embody the
6  technologies. So I just wanted to link that to this
7  issue, that we would need 30(b)(6) testimony from STS
8  on a wide range of topics. I have the numbers here.
9  They are -- there is an existing agreement with Kaye
10 Scholer that they will provide additional testimony on
11 topics 10, 12 and 19, because the 30(b)(6) witness
12 that they had put up, they withdrew him while we were
13 in London for those topics, and then in addition to
14 topics that there were objections to, which we have
15 never gotten testimony on, that are now superseded by
16 the ruling on the motion to compel, are topics 5, 7,
17 8, 11 and 17. So understanding that some of this may
18 be foreign witness testimony that we would get, I just
19 want to get that rolling as well. So that,
20 understanding there's been a significant delay on
21 deposition testimony, that if we're getting the
22 documents within 30 days, I'd like to have deposition
23 testimony, since 30(b)(6) was intended to be the
24 exploratory testimony that would allow us to do the
25 follow-on testimony, that we would get that, let's say

28

1  within, have dates set within 60 days from there, and
2  that we have also this issue that STS has taken the
3  position that our total 30(b)(6) time is seven hours,
4  and I would want to get the documents, get the
5  witnesses, and obviously not be limited to the one and
6  a half hours that STS says we still have with their
7  witnesses.
8      MR. LINDVALL: If I may respond to that,
9  your Honor? First, there's one housekeeping one. I
10 think Mr. Setty said topic No. 8, and topic No. 8 has
11 to do with the meaning and scope in terms of the
12 claim, and the Patent Local Rules specifically do not
13 permit that kind of discovery to be done other than
14 through the local rules.
15      MR. SETTY: I don't have -- you're right
16 on that one. So 8 would move to the expert phase.
17      MR. LINDVALL: Right.
18      MR. SETTY: Fine.
19      MR. LINDVALL: Right. So with 5, 7, 11,
20 17, we will produce a witness that will provide
21 testimony on those topics, and I think with the time
22 period, what Mr. Setty's referring to is that there's
23 an hour and a half left of his seven hours that we
24 believe he has. Mr. Setty addressed this topic with
25 Judge Story during a conference in October and asked

29

1  Judge Story his position on seven hours for Rule
2  30(b)(6) deposition, and Judge Story's practice is
3  that you provide your Rule 30(b)(6) topics. You
4  provide all the topics you can think of and you have
5  seven hours, and only if there's some special
6  circumstance can you exceed seven hours.
7  Notwithstanding Judge Story's practice on that and his
8  ruling, in light of the judge's motion to compel, I
9  have no problem allowing Mr. Setty some additional
10 hours on these particular topics, 5, 7, 11 and 17, and
11 I would, you know, suggest maybe four additional hours
12 to address those four topics out of their, I think 20
13 topics they had, and we will provide a witness who
14 will testify on those four topics.
15      MR. SETTY: Judge McKelvie, real quick,
16 I'll get you the transcript of that telephone
17 conference, but in fact, Judge Story said the opposite
18 of that. He said that, unless there was some
19 harassment involved in seeking additional time, that
20 he'd prefer that the attorneys work it out, and that
21 seven hours for a 30(b)(6) in a complex patent case,
22 in his experience, was not sufficient.
23      SDM MCKELVIE: Well, I'll read the
24 transcript. Why don't you all see if you can reach an
25 agreement on it. I can tell you, Nick, that I'm not a

30

1　big fan of too broad a discovery on commercial
2　success, and I think a reasonable amount is fair, but
3　don't push it too hard.
4　　　　MR. SETTY: I understand, your Honor.
5　These topics that we've identified cover commercial
6　success as well as technical aspects of the embodying
7　products, since one of them was constructed
8　simultaneously with the filing of the patent
9　application.
10　　　　SDM MCKELVIE: Right.
11　　　　MR. SETTY: So it goes beyond that, and
12　what we had proposed before was that, for these other
13　topics, that we would have an additional day. It's
14　just that if it's in Hebrew and if we end up with
15　those issues again, the seven hours disappears pretty
16　quickly.
17　　　　SDM MCKELVIE: Okay. You'll work it out.
18　I just want you to know I'd like you to be reasonable
19　in terms of the discovery in terms of commercial
20　success.
21　　　　MR. SETTY: Agreed.
22　　　　SDM MCKELVIE: Next topic. Scott?
23　　　　MR. LINDVALL: Okay. I think this topic
24　really relates to what we were just talking about,
25　commercial success. We're going to produce all of our

31

1　documentation on financial marketing, market share
2　information and what have you. To the contrary, on
3　Witness Systems, we've asked them for their sales
4　relating to their products, which show commercial
5　success, and the only thing on sales we received from
6　them is a one-page document, and this one-page
7　document that they've produced, it looks like
8　something they developed just for the litigation,
9　talks about some -- the number of customers by
10　quarter, Voiceover IP and a number of new sites, but
11　the document is very vague, and it's almost
12　incomprehensible to understand what it's delineating,
13　and what I would like to have is, maybe Nick and I can
14　work this out, is more additional information so that
15　I can understand what this document relates to. For
16　example, it says they have total number of new
17　customers in revenue, and they give a number for
18　quarter 2005, and then they have another column number
19　of new IT customers in revenue in first quarter '05.
20　I don't know if those new customers are customers that
21　have switched from the old system to the new system,
22　who those customers were, what they used before,
23　things like that, information that I'll need to know
24　to show that these customers switched to the Voiceover
25　IP, the accused product, as a result of the -- because

32

1　of the invention itself. It's very vague; and again,
2　maybe, if I can get some assurances from Nick, that
3　maybe we can work and get additional information about
4　these customers and what these customers were doing,
5　what they had before and things like that, we can work
6　it out. We're going to give Nick the same information
7　on our side. I would just like the same assurances,
8　that we can get some additional sales information
9　other than this one-page document.
10　　　　There's one other aspect too, was
11　their -- in a reference to one of their press releases
12　they have reference to a customer survey. They did an
13　internal analysis/customer survey on the customers who
14　want to migrate their products to this new Voiceover
15　IP product, and we have asked for this information
16　several times, and it should be within the compass of
17　Judge Story's order on our motion to compel, but
18　there's a specific reference in a press release to a
19　survey of Witness's customers about what their future
20　plans were and what the results of the survey were.
21　We would like to have this survey and the background
22　data that supports it, the conclusions, that's all.
23　　　　MR. SETTY: Okay. Judge McKelvie, do you
24　have the Exhibit H to Scott's letter to you?
25　　　　SDM MCKELVIE: I do.

33

1　　　　MR. SETTY: Okay. That is the one-page
2　document to which Scott is referring. It is a
3　document entitled Witness Systems Key Performance
4　Metrics, and it is not a document that was created for
5　the litigation. It is, in fact, a document that is
6　used for internal reporting purposes. So it's the
7　internal tracking at a product level of revenues. I
8　don't know how much experience you have with
9　software-only companies, but Witness Systems does
10　essentially a consolidation of all product lines for
11　the purpose of public reporting, and for internal
12　purposes it tracks, at this level of information,
13　product-specific performance. So we provided the same
14　document that, for example, the CFO would get, and the
15　deposition testimony that Scott would like of Witness
16　Systems, the notice that we received on December 27th,
17　includes a topic for the financial performance of
18　these products, and so we're going to have someone
19　that is knowledgeable about this, that will explain
20　the document to him, all aspects of it, as you would
21　expect in a deposition.
22　　　　Second is, when we provided this Key
23　Performance Metrics document, it was in response to
24　Scott's specific request on the level of information
25　he wanted on Witness Systems' commercial success. I'm

Doerner & Goldberg, New York, Inc.

212-564-8808

34

1  reading from a July 6, 2005 letter from Scott to us
2  where he says, quote, "We believe that Witness should
3  produce the following information: 1) Monthly revenue
4  for each product." We don't track it monthly, we
5  track it quarterly, as this report reflects. 2)
6  "Quantities of each product sold", which this document
7  gives you, in terms of number of seats and dollars and
8  sales projections for each product, and so this
9  document doesn't give sales projections, again because
10  the company doesn't have projections at the product
11  level. It does them in terms of the company-wide
12  performance on software. It essentially collapses all
13  software into new license revenue, and then it
14  separately collapses all related maintenance and
15  service revenue into service revenue, and we have
16  provided financial documents that support the
17  company-wide projections. So we've satisfied exactly
18  what Scott wanted, and to be clear, the first time we
19  heard that there was a complaint about this was in the
20  letter to you. So I think we've been complete. If
21  there is a request for additional information, we'll
22  entertain it, but I didn't know that we had an issue
23  until we got the letter.
24      MR. LINDVALL: Well, if I may quickly
25  respond, we brought this up in our motion papers

36

1  the background data or the data that's used to
2  generate this document, the sales information, and be
3  able to understand it better, so once I get in a
4  deposition I can spend maybe half an hour on it rather
5  than four hours. I just think that Witness is
6  obligated to produce more than one page of sales
7  information for our commercial success. I completely
8  agree with your Honor that I don't think we need a lot
9  of discovery on commercial success, but I think we
10  need more than this one page of the sales, because
11  ultimately someone's got to get up at trial and say
12  here's the sales made with these products, and these
13  customers, for example, migrated from the old type of
14  recording solution to a Voiceover IP solution, and
15  they migrated because of the invention and the
16  advantages that the invention had, and we can't get
17  that information just based on the information in this
18  document. Now, maybe I would suggest that I propose
19  that I send Mr. Setty a letter giving him some more
20  specifics of what I'd like to have and see if we can
21  negotiate out a solution and get some background
22  information, and if we can't negotiate a solution,
23  maybe we can come back to you.
24      SDM MCKELVIE: Nick, any comments?
25      MR. SETTY: Your Honor, I'm happy to

35

1  earlier with Judge Story after the same. The letter
2  that Mr. Setty's referring to was a letter where we
3  were trying to reach some kind of compromise, but we
4  ultimately had to go to court and ask the court for a
5  motion to compel, which the court granted, and without
6  any limitation. In any event, I'm not trying to get
7  into all of their financial, all of their sales
8  information. I just need to get another level besides
9  one page of their sales information. For example, if
10  you look at this sheet, I don't want to have to spend
11  seven hours of my 30(b)(6) topics going through this
12  sheet when I can get some background information that
13  was used for this sheet and already learn that
14  information, so I don't have to blow all my time in a
15  30(b)(6) deposition understanding what each of these
16  quantities are, and what they are and what they
17  aren't. If you're an internal person at Witness
18  Systems, like the CFO, he might very well understand
19  what all of these, this customer analysis and what
20  number of new customers and revenue means and what it
21  doesn't mean, but if you were giving it to me and
22  looking at me for the first time, I really can't
23  decipher what it means, and I prefer not to spend a
24  significant amount of time at a deposition trying to
25  understand something when I can actually get some of

37

1  negotiate. I hadn't had any request for
2  supplementation on this until now, so we thought we
3  had complied with, specifically with what Scott had
4  asked for. I'm happy to discuss what he's mentioned.
5  I do think that deposition testimony ought to go along
6  with this. We're 18 months into this case and Scott
7  hasn't taken any depositions, and so I do think that
8  it is reasonable to fill in explanations about how we
9  internally report financial data by deposing the
10  appropriate folks, and then if that requires more
11  information, we go from there.
12      One quick point on the survey that Scott
13  mentioned. We have asked as many times as you could
14  possibly ask for any documentation that the client has
15  on customer surveys. Again, the first time I'm
16  hearing that there's a specific reference to a survey
17  in a marketing document is today. So Scott, if you
18  provide us with that, we will go back and ask again.
19  Often when people refer to internal customer surveys
20  they're talking about meetings and discussions, and
21  again, a 30(b)(6) topic that Scott has identified is
22  for any internal collections of information that
23  relate to customer preferences in this industry.
24  We're going to be producing people that are in product
25  marketing that would be responsive to that. So all of

38

1  this is not going to be in documentation. We've done
2  more than a reasonable search for such information, we
3  just haven't found anything yet.
4       SDM MCKELVIE: Here's what I think we
5  should do first, Scott: I'll take you up on your
6  offer to have an additional discussion with Nick, and
7  then 2) if you go ahead with the 30(b)(6) deposition,
8  and during the course of the deposition you explore
9  what sits behind the document, what other documents
10 may be available, I'll give you additional time for
11 further deposition after you've got production of
12 those documents.
13      MR. LINDVALL: That would be fine. Okay,
14 your Honor. That's fine.
15      MR. SETTY: Okay. Get back to -- we
16 touched on the 30(b)(6) issue, and I appreciate that
17 Scott is going to provide us with witnesses that --
18 still there?
19      MR. LINDVALL: Yes.
20      SDM MCKELVIE: I got you.
21      MR. SETTY: We talked about the 30(b)(6)
22 issue, and I appreciate Scott is going to give us
23 additional witnesses on these topics to which --
24      SDM MCKELVIE: Keep going, Nick.
25      MR. LINDVALL: Should we try to call

39

1  back?
2       SDM MCKELVIE: No, it's okay.
3       MR. SETTY: It may be if you mute your
4  lines when you're not talking, that may help.
5       So let's turn to the individual
6  depositions. We had laid out on pages 11, 12, 13 the
7  depositions that relate to claim construction issues,
8  and even under the current schedule, if we stick to
9  every aspect of the current schedule, we still need to
10 finish the claim construction discovery before we get
11 into the Markman briefing, which would start, I
12 believe, in April.
13      So here's what we have: Mr. Nisani,
14 who's identified on page 11, one of the two inventors
15 on the patent, we did take his individual deposition
16 in London in approximately six hours in September.
17 Since then, we've received the source code for a
18 product that was developed contemporaneously with the
19 filing of the STS patent application. Mr. Nisani, in
20 his deposition, did testify that the development of
21 the source code postdated the filing of the patent
22 application, and STS has taken the position that,
23 therefore, the development of the source code was not
24 part of the actual reduction to practice. Then we
25 took the deposition testimony of Mr. Bar in Tel Aviv

40

1  in December, and he testified at page 49, line 16 to
2  20 of his deposition that the technologies were
3  developed simultaneously with the drafting of the
4  patent application. So we have looked at the source
5  code and, frankly, we have specific questions for the
6  inventors, specific questions for the inventors with
7  respect to the source code, and we'd like to have a
8  modest amount of time. The amount we proposed in the
9  letter was less than a full day, but we can even agree
10 that it's a half day. What we need is testimony on
11 the source codes, since it was part of the actual
12 reduction to practice.
13      Mr. Eitan Bar is the next of the claim
14 construction-related witnesses, and the issue there
15 was that we were in the middle of his examination. We
16 had taken many, many breaks in that deposition for him
17 to consult with his counsel, including an hour-long
18 break on whether he would answer in English, and
19 ultimately we didn't finish that deposition because
20 Mr. Bar stated on the record that he needed to go take
21 care of his children and that he would appear another
22 day. Now the position is that we don't get another
23 day with Mr. Bar, and we hadn't even gotten into many
24 of the claim terms with him at that point.
25      The other inventors of record in part D

41

1  on page 12 of our letter are Danny Shporer and Ilan
2  Yosef, Y-O-S-E-F. We need to take their testimony;
3  and then we have the attorneys of record on the
4  prosecution, Mr. Leason and Mr. Friedman. We have a
5  date now for Mr. Leason from Scott, which is March
6  15th, and we need to get a date from STS on Mr.
7  Friedman. So all of these depositions are in local
8  rules context, things that we either get or we lose
9  the opportunity to use that evidence under Local Rule
10 6.2. We raised this issue with Judge Story, and he
11 ordered that we should go forward with the 6.2
12 constructions at this point, but recognized that we
13 may need some of this extrinsic evidence, and that he
14 contemplated that we would supplement our 6.2
15 disclosures with that extrinsic evidence. So all we'd
16 need is an opportunity to complete this discovery in
17 the next month, if we're sticking to the regular
18 schedule, or, you know, with an additional modest
19 extension of a number of weeks we know we can get all
20 of this done, but we have got complete resistance from
21 STS on this, and they're going to also, as they've
22 taken in earlier discussions, the position that the --
23 some of these people are not under their control, and
24 if you read carefully Judge Story's order that deals
25 with these control issues, it's quite clear that NICE

11 (Pages 38 to 41)

42

1  has had access to any of these people whenever they've
2  wanted them, and that they are in a position to
3  produce these witnesses. So we would ask that we get
4  the depositions, regardless of whether it's in Tel
5  Aviv, London or the U.S. If you read our papers, then
6  obviously you know we have a preference for doing them
7  in the U.S. in English. We can't order people to
8  travel from Tel Aviv. I believe that we can handle
9  this as well there, but doing them in Hebrew with
10  English-speaking people, I think it was really a
11  significant delaying tactic that prevented us from
12  getting meaningful testimony, and it's frankly
13  recognized in Judge Story's order that it was not a
14  very productive deposition.
15       MR. LINDVALL: I'd like to respond.
16       SDM MCKELVIE: Yes.
17       MR. LINDVALL: Let's -- I'll go in order.
18  Let's talk about Mr. Nisani. We provided Mr. Nisani
19  in London for two days of depositions. One was an
20  individual deposition. The second one was him as a
21  30(b)(6), which, in reality, those topics had to do
22  with conception and reduction to practice, all the
23  same things that were -- Mr. Nisani was asked in his
24  individual deposition, so they didn't have to be
25  repeated in the 30(b)(6). So essentially, Witness had

43

1  two days with Mr. Nisani, and that deposition was in
2  English. Mr. Nisani had felt comfortable speaking
3  English, and the deposition was completely in English,
4  and there was no delays from that standpoint.
5       We had produced to Witness Systems
6  probably over a thousand pages of documents which were
7  the specification for this Logit code that, source
8  code that Mr. Setty's referring to, and none of those
9  specifications, which described the code and the
10  algorithms behind the code, none of those documents
11  were presented to Mr. Nisani at his deposition, nor
12  was any questions asked about those documents. Mr.
13  Setty was free to ask him about the Logit, the source
14  code. The source code was discussed during his
15  deposition. It's true that we have produced one
16  document since his deposition, STS, and that's this
17  Logit portion of the source code. Mr. Nisani, and I
18  don't think it's disputed by anyone, is the author of
19  that source code, and he testified under oath that he
20  started that source code after he filed the patent
21  application. Now, let me back up for a minute. Mr.
22  Setty says that the Logit source code has something to
23  do with construction and reduction to practice. I can
24  represent to you right now that we are relying on the
25  patent application, the filing of the patent

44

1  application for both conception and for constructive
2  reduction to practice. We are not relying on the
3  Logit source code for construction to practice,
4  because all of the information we have says that that
5  was created and finished and completed after the
6  patent application was filed. So we are not relying
7  on that document for construction -- for reduction to
8  practice. So our position on that, it has marginal
9  elements at best, but to open up a deposition with Mr.
10  Nisani and have to travel to London again just because
11  we subsequently produced one document, which is
12  actually a software program or portion of a software
13  program, I think is just unjustified. If we get into
14  this position and we start taking depositions of
15  Witness people, if all of a sudden we find out about
16  additional documents, does that mean every time that
17  we find out about some additional documents we are
18  going to open up depositions again? I don't think
19  that any litigation runs that way. We all understand
20  that there will maybe be some documents that are
21  produced after a witness's deposition, and that's --
22  it happens. It doesn't mean you have to reopen a
23  deposition again and all of the lawyers have to travel
24  to London to take a four-hour deposition of this. He
25  has had two days with this witness, and I don't think

45

1  there's any need to have anymore deposition time with
2  Mr. Nisani.
3       Now, to move onto three other witnesses,
4  and I'd like to group them together, Mr. Bar, Mr.
5  Shporer and Mr. Friedman, these -- all three of these
6  parties are third-parties. They're not in the control
7  of either NICE or STS. Judge Story did find that NICE
8  Systems had control over STS Software, because we had
9  taken the position that STS Software doesn't have
10  control over its parent company. Judge Story found
11  that that's not the case and that STS Software and
12  NICE, really we look at them as the same entity; okay?
13  I have no problem with that. Judge Story did not find
14  that we had control over either Mr. Bar -- the
15  address -- there was no issue with respect to Mr.
16  Shporer, because that was never even addressed in
17  Judge Story's decision, nor has he even been brought
18  up as an issue in the briefs. Mr. Friedman is a
19  patent attorney in Israel. We have no control over
20  him.
21       Just to give you a little bit of
22  background, Witness Systems back last July had gone to
23  the Hague Convention to seek the depositions of Mr.
24  Bar and Mr. Friedman, and the Israeli Judicial
25  Authority, the court there, granted Witness Systems

46

1  relief under the Hague Convention and through the
2  Israeli court granted or compelled Mr. Bar and Mr.
3  Friedman to be subject to a deposition, and they had
4  certain constraints on that deposition. They asked
5  them both to be provided in one day. Mr. Friedman was
6  available that day, but in any event, both of these
7  depositions, Mr. Bar and Mr. Friedman, were conducted
8  under the guise of the Israeli court. We don't have
9  any control over that. Under the Hague Convention,
10  the way these depositions are conducted, who conducts
11  them, how they're conducted, are all governed under
12  the procedures of the Israeli court. If you look at
13  Article IX of the Hague Convention, it says that it's
14  the judicial authority of where these depositions are
15  taking place is what rules. I don't have any problem
16  if Mr. Bar has another day of deposition. I'm not
17  going to resist. I'm not going to resist the
18  deposition of Mr. Shporer. It's just that I don't
19  have control to force these witnesses to show up for
20  another deposition. Mr. Setty, if he wants Mr.
21  Shporer, he could have gone through the Hague
22  Convention months ago and sought his deposition. He
23  knew who Mr. Shporer was. He was an inventor of the
24  continuation in part of these patents. He's not an
25  inventor of the patents of suit, he's an inventor of

47

1  the continuation in part, which is not a patent in
2  this suit, but in any event, whether he's relevant or
3  not, if Mr. Setty wanted to get Mr. Shporer, he should
4  have done what he did with Mr. Friedman and Mr. Bar,
5  gone to the Hague Convention to ask the Israeli court
6  to force their production. We do not have control
7  over these individuals. They work for different
8  companies now. Mr. Bar is the chief executive officer
9  of a company in Israel. He testified under oath, and
10  I have this from his deposition, when he was asked
11  about this litigation, his answer was, "I do what I
12  have to do in this regard because I derive no benefit
13  from it. Again, what I have to do, I shall do. If
14  the court issues a summons, I shall go there. I do
15  not volunteer to do anything."
16      That's what he said in his deposition
17  when queried about whether he showed up voluntarily or
18  not. Mr. Bar, I tried to contact him by e-mail. He
19  did not respond to my e-mails, and he didn't send any.
20  He didn't want anything to do with this litigation.
21  Ultimately the Israeli court issued a summons and told
22  him he had to show up to a deposition. When he got
23  that summons and showed up for the deposition, we
24  offered, STS Software offered to provide him counsel
25  at no expense, which we did. We gave him counsel at

48

1  no expense. It was to protect STS and NICE's
2  position, because he obviously didn't want to spend
3  money for his own counsel. So we did provide him
4  counsel and we paid for that counsel. I think that's
5  the natural thing to do for any company to protect its
6  own interests, but in any event, we don't have control
7  over Mr. Bar. I can't call up Mr. Bar tomorrow, or
8  Mr. Shporer or Mr. Friedman and say you have to show
9  up for this deposition. I just don't have that
10  authority to do that. I can't do it. They are three
11  third-party individuals. So that's our position on
12  that.
13      Mr. Yosef, NICE has -- I mean Witness has
14  noticed his deposition. We will produce him for a
15  deposition. There's no dispute about that; and Mr.
16  Leason, we have already provided a date for and we
17  plan on producing him, because he's agreed to be
18  represented and he's agreed to show up for the
19  deposition, but with respect to the three individuals,
20  Mr. Bar, Mr. Shporer and Mr. Friedman, I can represent
21  to you that we have no way of forcing these
22  individuals to show up for a deposition, and that's
23  our position. We can't -- Mr. Setty should go through
24  the Hague Convention or go through the Israeli court
25  if he wants additional time with Mr. Bar or wants to

49

1  take the deposition of Mr. Friedman or Mr. Shporer.
2      MR. SETTY: May I respond, Judge
3  McKelvie?
4      SDM MCKELVIE: Go ahead.
5      MR. SETTY: Let's take these one by one.
6  On the issue of the source code and its importance to
7  this dispute, Mr. Nisani, Mr. Nisani was, in fact, one
8  of the authors of the source code, and you just heard
9  very clearly from Mr. Lindvall that their position is
10  that the source code was -- postdates the filing of
11  the application and, therefore, is not relevant to
12  actual reduction to practice. We've looked at the
13  Logit source code, and there are clearly entries that
14  relate to the recording of calls, file management,
15  playback, even in 1997, introduced the H.323 protocol
16  to the source code, which is the protocol under which
17  one can do Voiceover IP recording in 1998, and so the
18  source code itself is consistent with Mr. Bar's
19  testimony that the technology was being developed
20  simultaneously with the application and that it does
21  relate to the actual reduction to practice. That's
22  why we want Mr. Nisani, who was the primary author of
23  this code, and all we need is a couple of hours with
24  him on how the code works and how it captures the call
25  data and how it manages it. It's directly relevant to

50

1 many of the statements made in the prosecution history
2 for the 665 patent, and it's directly contradictory to
3 his memory in his testimony that he started on this
4 work later. I mean, his own work on the code is
5 clearly before. So I think it's just a -- we need a
6 few hours with that witness. He travels to the U.S.
7 every month, according to his own testimony. He
8 prepared for his depositions in New York at Scott's
9 office, and then we all flew to London to do the
10 testimony. I think that we will do it wherever,
11 that's the bottom line, but we need a few hours with
12 him on his actual reduction to practice and source
13 code. It's important for you to know how we learned
14 about that source code. We didn't know that it
15 existed, because we asked for it before and it wasn't
16 produced. Mr. Nisani said that he was asked to
17 retrieve documents from a server at NICE in preparing
18 for his deposition, that he reviewed those documents
19 on the server in NICE in Israel, and that it included
20 this source code. So we only learned of its existence
21 through Mr. Nisani's testimony. There's no way we
22 could have done anything before that day of his
23 deposition to be better prepared for the fact that the
24 source code existed, and he did say clearly under oath
25 that he remembered it as being done after the

51

1 application was filed, it's just the code reflects
2 that he was wrong. So that's where we are. We have a
3 very clear record on that, that the code was developed
4 earlier and that the co-inventor remembered it that
5 way. That's Mr. Nisani.
6     SDM MCKELVIE: Why don't we do this: Why
7 don't you take the deposition of Mr. Nisani. You can
8 have up to two hours, and you can do it by telephone,
9 unless the parties can make other arrangements, unless
10 the parties agree to make other arrangements.
11     MR. LINDVALL: Judge McKelvie, may I make
12 one suggestion too, that I'm concerned that what's
13 happening here is the additional time is going to be
14 used on other topics other than the Logit source code,
15 that the topics -- that the questioning be limited to
16 just the source code?
17     MR. SETTY: Your Honor, we don't have a
18 problem with that in concept, as long as it's the
19 source code and any other aspect of reduction to
20 practice that comes out. In other words, now that we
21 know the code that we didn't have before was
22 written at that time, it may inform us on some related
23 documents, but we would be amenable to limiting it to
24 the reduction to practice efforts.
25     SDM MCKELVIE: Is that okay, Scott?

52

1     MR. LINDVALL: Yes. I'm just afraid that
2 he's using this as a vehicle to get additional
3 questions that he didn't -- he wishes he would have
4 asked earlier, and now this is a vehicle to open up
5 that door, but we'll live by that.
6     SDM MCKELVIE: Okay.
7     MR. SETTY: Your Honor, two hours, I've
8 heard you on this, I don't mean to revisit, but if you
9 thought it could be three or four? I frankly think
10 that going through the code is going to be a
11 relatively boring and slow process. If you thought
12 that we could have four hours -- we didn't even use
13 seven hours with him the first time.
14     MR. LINDVALL: Your Honor, if I may
15 respond? He had two days with this witness, and he
16 had the specifications for this code and he chose not
17 to ask him any questions on the specifications. I
18 think two hours is more than enough time to ask him
19 about the source code.
20     SDM MCKELVIE: Why don't you try two
21 hours. If it doesn't work, we'll talk.
22     MR. SETTY: All right. Good. Responding
23 on Mr. Bar, we think that Judge Story clearly
24 recognized that in-house people at NICE are talking to
25 Mr. Bar regularly. The head of IP for NICE, in fact,

53

1 has spoken with Mr. Bar regularly, including getting
2 him to sign papers that he needed signed during the
3 course of this lawsuit. Based on that, one can make a
4 credible argument that they have access to Mr. Bar,
5 but let's assume for a moment, although he's available
6 to NICE, that the court is not comfortable forcing
7 them to produce him. The alternative is a
8 recommendation from you that we get an additional four
9 hours or seven hours, whatever you think is
10 reasonable, by way of testimony with Mr. Bar and that
11 we can take to the Israeli court. Our Israeli
12 counsel, and just so you know, there were three
13 different Israeli law firms in the room at all of
14 these depositions. There were a total of eight
15 lawyers in the room on many of these issues. So no
16 one is going unrepresented here, but our Israeli
17 counsel has told us that, with a recommendation from
18 here that Judge Story signs off on, given that you, as
19 a special master, are not authorized to order
20 anything, you can recommend to Judge Story that we get
21 additional time with Mr. Bar, that you can recommend
22 that be done in English, since he was a software
23 developer in California at one point before he did
24 this, and that we just get clean four, five, six,
25 seven hours, whatever you feel comfortable with, with

54

1  this witness. It can still be in Tel Aviv, although
2  he also travels to the U.S. regularly for his job and
3  was in the U.S. the week before his deposition in Tel
4  Aviv. We'll just take it however you are willing to
5  give it to us. We will limit it to a set number of
6  hours. With that recommendation, we understand that
7  this judge will be amenable in Israel to ordering him
8  to appear again. So we don't have to deal with the
9  procedural issue if you're not comfortable ordering
10  it, but we need your recommendation on this. After
11  all, he's the CEO of STS and the first named inventor
12  on the patents.
13      MR. LINDVALL: Your Honor, I don't
14  have -- I mean, that's why I said if he goes to the
15  Israeli court, we have no objection. We don't control
16  it. So I have no objection to Mr. Setty's last
17  suggestion, where you provide a recommendation to
18  Judge Story. I mean, that's within his power, and we
19  won't object to that. I mean, if the Israeli court
20  permits it, the Israeli court permits it.
21      SDM MCKELVIE: That's fine. You want to
22  prepare a paper for me to sign then?
23      MR. SETTY: I will. It will cover both
24  the language issues and the recommendation. Will you
25  please tell me what you feel comfortable with in terms

55

1  of time we can write into that? In the letter we've
2  asked for seven hours, but I want to do whatever is
3  reasonable.
4      SDM MCKELVIE: All right.
5      MR. SETTY: My concern is if it's in
6  Hebrew, again, the seven hours goes by quickly.
7      SDM MCKELVIE: What about the other
8  witnesses?
9      MR. SETTY: You want to touch on Mr.
10  Shporer and Mr. Yosef?
11      SDM MCKELVIE: Do you want to?
12      MR. SETTY: Sure. Here are the
13  recommendations then that we would like: Mr.
14  Shporer -- Scott, is that the one that's no longer --
15  that's right. He actually works for Mr. Bar. He left
16  with Mr. Bar and works with him. Mr. Bar said that
17  he's an engineer on his staff. Again, a
18  recommendation that Mr. Shporer be ordered to appear
19  for one day of deposition testimony, again in English,
20  if he's English-speaking, would be preferable, and
21  what I understood from Scott is that he didn't have a
22  specific objection, he just wasn't willing to go
23  through the effort of producing that witness.
24      With Ilan Yosef, he is going to be
25  produced, and I'd want some discussion now about

56

1  format, whether English is acceptable and whether we
2  can do it in the U.S., or, if he travels here
3  regularly, or whether that would be in Tel Aviv.
4      MR. LINDVALL: Well, with Mr. Yosef, I
5  haven't talked to him. There's going to be some
6  witnesses at NICE, to be honest with you, that aren't
7  comfortable speaking in English. There are some that
8  are comfortable speaking in English and, you know,
9  there's nothing I can do about that. Some of them, as
10  you know, Hebrew's their native tongue, and they're
11  not comfortable sitting in a deposition in a secondary
12  language. They just don't feel comfortable that way.
13  There are some, like Mr. Nisani, who was comfortable
14  doing that. We're not doing this to be obstructive,
15  it's just the witness has a right to have a deposition
16  conducted in his native tongue if he or she believes
17  that that's what they want to do. I have to ask Mr.
18  Yosef, but we will produce him. What I would -- I'll
19  have to see if he has any planned business travel here
20  to the United States. I know you've noticed him in
21  both cases, and what I'd like to try to do is, once
22  you've taken his deposition, try to take it in both
23  cases if you can, because he is vice president of
24  product development, a very busy person, a very
25  valuable employee to NICE Systems, and time taken away

57

1  from his duties is tough on NICE.
2      MR. SETTY: Let me see if I can propose a
3  compromise, guys.
4      MR. LINDVALL: Okay.
5      MR. SETTY: We don't -- first of all, STS
6  brought the suit. The time employees have to invest
7  is obviously a part of the deal. Subject to that,
8  though, we want to be reasonable. Here's what I would
9  propose, your Honor, that if the witness is
10  English-speaking and comfortable in English, that the
11  submission I'm going to provide you to sign will say
12  that that testimony will be taken in English with the
13  U.S. counsel doing the questioning. That is the most
14  efficient way to go. If instead the testimony has to
15  be taken in Hebrew, that you still allow us, as U.S.
16  counsel, to take the testimony, but that instead of a
17  seven-hour limit it would be a 14-hour limit. If
18  you've been through translated depositions, you
19  understand that that's even hopeful, but we will agree
20  to that now. That way the witnesses have their choice
21  and they can be as proficient in English as they
22  choose to be.
23      MR. LINDVALL: Your Honor, if I can back
24  up for a minute? I don't think you have to give a
25  recommendation on this witness. He's an employee of

15 (Pages 54 to 57)

58

1  NICE, and we are going to produce him pursuant to the
2  notice.
3          MR. SETTY: I'm just trying to resolve
4  all these issues up front. Last time we ended up in
5  Israel and it was not a good procedure.
6          MR. LINDVALL: But that wasn't within our
7  control. This one is within our control, and to the
8  extent these witnesses really feel comfortable having
9  a deposition in English, we will provide them in
10  English, but there may be some instances, and I have
11  to check with Mr. Yosef what his preference is, if he
12  does it in Hebrew, I have no problem allowing
13  additional time, because I agree that the translation
14  does waste some of the deposition time. I don't think
15  the time needs to be doubled, though, but, you know, I
16  think we can deal with that issue when we find out
17  whether or not Mr. Yosef wants it in Hebrew or
18  English. If he wants it in Hebrew, we can decide how
19  much additional time you think is necessary because of
20  the translation. It may be that, I've done this
21  before, where sometimes witnesses, on some questions
22  they will go ahead and respond in English, but in some
23  questions they prefer to go in Hebrew because they
24  don't understand some of the technicalities of the
25  questions, and it can be a mixture of the two. It's

59

1  not fair to the witness to force the witness to have
2  to necessarily answer every question and understand
3  every question in a language which they're not
4  necessarily comfortable in understanding or working
5  with. The NICE Systems employees, a lot of them do
6  speak English, but again, it's not their native
7  tongue, and I just can't make any guarantees that any
8  particular given individual is going to want the
9  deposition in English, or Hebrew, or a mixture of the
10  two, but we're not going to use it as an obstructive
11  factor, and I think that we can visit that situation
12  when the time comes, and we will make reasonable
13  accommodations, when there's a lot of translation
14  going on, to give Mr. Setty additional time, if
15  necessary, with the witness.
16          MR. SETTY: Your Honor, my experience has
17  been that that doesn't work. I would just ask for
18  your input on what is a reasonable time if there's
19  translation involved.
20          SDM MCKELVIE: I really don't know. I
21  mean, you say seven?
22          MR. LINDVALL: I say -- we say, your
23  Honor, I would say seven hours if it's all in English.
24  If Mr. -- let's say, for example, Mr. Yosef, there's a
25  translator there and there's 30 questions which he

60

1  wants translated and answers in Hebrew. Well, that's
2  not really using much time. If half the deposition is
3  in Hebrew and translated, I agree with Mr. Setty, Mr.
4  Setty should have some additional time, because the
5  translation has eaten into his seven-hour period.
6  It's hard for, I think, you to come out with a ruling
7  that says if there's any Hebrew translation, which
8  there can only be two questions translated into
9  Hebrew, he gets an extra seven hours. I think we have
10  to wait and see, but all I can do is represent to you
11  that we're not going to use the language issue as an
12  obstructive tactic. We have as much -- we have a huge
13  incentive to get this case to trial as quickly as
14  possible. One of the reasons we're not asking for
15  damages is to make this case move quickly so that we
16  can get this case tried, and as a result of that, for
17  example not resisting this discovery, we're going to
18  give Mr. Setty everything he wants. We are going to
19  try to do things to move this case along, and --
20          SDM MCKELVIE: What happens if there are
21  translation issues that push it past seven hours,
22  though?
23          MR. LINDVALL: I think if there's
24  translation issues, we will work out a deal with Mr.
25  Setty. If 25 percent of the deposition has to be in

61

1  Hebrew, well, we'll give Mr. Setty a couple more
2  hours. I don't have any problem doing that. I agree
3  with him that, if the translation eats into his time,
4  that he gets additional time, but it could be -- I
5  know these, because I've dealt with them, the clients,
6  enough to know that some of these witnesses, I can
7  barely understand when I talk to them and their
8  English isn't very good. Some of their English is
9  very good and they have no problem communicating in
10  English. It's just that sometimes the combination,
11  and I can see in some of these depositions where the
12  witness, 80 percent of the time the witness's
13  deposition will be in English, but 20 percent of the
14  time the person will want a Hebrew translation. Maybe
15  in that case we give Mr. Setty an additional hour, two
16  hours or whatever we negotiate, but to say if there's
17  some translation that occurs that automatically he
18  gets another seven hours doesn't make any sense. It's
19  going to be --
20          SDM MCKELVIE: Go on the clock on the
21  translation and just add it to the deposition.
22          MR. LINDVALL: That would be fine.
23          MR. SETTY: Your Honor, the translations
24  are occurring question by question. That means
25  automatically someone has to clock every question. I

62

1  mean, I just went through this. It was just too hard
2  to do.
3      Here's what I propose: When we go
4  through these Israeli witnesses, if they're going to
5  be in Israel, the main conditions that we were looking
6  for was that we be allowed to do the questioning, that
7  the questioning be in English with translation, if
8  necessary, so that the question doesn't have to be
9  asked in Hebrew, it just gets translated to Hebrew.
10 Then what I'd ask, with these witnesses that are under
11 Scott's control, that they be cleared for the day the
12 deposition is scheduled and the following day. That
13 way, if we agree to additional time, we can go into
14 the next day without having to fly back to Israel to
15 do those next couple of hours or, as was offered last
16 time, start witnesses at six p.m. Israeli time. So if
17 those are reasonable conditions, we will just be open
18 on this issue, but I'd appreciate your guidance on it,
19 Judge McKelvie.
20     MR. LINDVALL: I don't -- what Mr. Setty
21 just proposed, I don't have any problem with, and we
22 can do that. The only caveat, and I think Mr. Setty
23 can ask it, with respect to Mr. Bar's transcript, what
24 he's referring to is the Israeli court ruled that it
25 was against Israeli law to have an English lawyer or a

63

1  lawyer from America to ask the questions. It had to
2  be an Israeli attorney, and that's because that was a
3  third-party situation. With respect to the witnesses
4  we have control on, we're not going to ask for that
5  rule to be enforced. Mr. Setty can ask directly the
6  witnesses the questions. He can ask the questions in
7  English, and if the witness understands his question,
8  the witness can answer the question. There may be
9  times when Mr. Setty's question is not understandable
10 to the witness and the witness may want to turn to a
11 translator and say can you translate that for me.
12     SDM MCKELVIE: Why don't we start with
13 the idea you get a targeted seven hours. If people
14 want to run a clock on the translation time, you can
15 add it on past seven hours. The witnesses can be
16 asked to clear the day after the deposition. To the
17 extent that you don't complete the deposition, you can
18 attribute to that translation issue, you can add the
19 time to the next day.
20     MR. SETTY: Let me just rattle through
21 the deposition issues so we can close this. For
22 Nisani, we're going to be two hours by phone or other
23 arrangement. Mr. Bar, we'll submit a recommendation
24 for you, Judge McKelvie, that deals with these
25 conditions. With Mr. Yosef, who's under the control,

64

1  it will be for seven hours, plus any translation
2  inefficiency, with the next day cleared. Mr. Shporer,
3  I'll submit a recommendation on that one so that we
4  can get it taken to the Israeli judge as well. Mr.
5  Friedman is the patent attorney, who is prepared,
6  according to Scott, to start at six p.m. that day.
7  We'd like a recommendation on him that we get a new
8  date. That's the only issue, is our Israeli counsel
9  needs a recommendation from your Honor.
10     SDM MCKELVIE: Okay.
11     MR. LINDVALL: With those three
12 individuals, they're in our control, so we don't have
13 any objection to such a recommendation being sent to
14 the Israeli court.
15     SDM MCKELVIE: That's fine.
16     MR. SETTY: I don't know if you want to
17 switch issues. There's one more deposition issue that
18 was on page 13 of our letter. We can do it however
19 you want.
20     SDM MCKELVIE: Why don't you go ahead and
21 do it.
22     MR. SETTY: The other witnesses that we
23 needed in the STS case have to do with many aspects of
24 the products themselves, the product management folks,
25 the technical people that the 30(b)(6)s have

65

1  identified, and there we have laid out five names on
2  page 13, and then there's a sixth, which is Shlomo
3  Shamir, S-H-L-O-M-O, S-H-A-M-I-R. I had agreed with
4  Scott that I wouldn't do Mr. Shamir until after these
5  witnesses were done, if we got the witnesses in by
6  year end. We haven't gotten there, and I don't mind
7  doing Mr. Shamir, who is the CEO, afterwards, but we
8  need some guidance from you, your Honor, on whether
9  STS, who has filed suit in the U.S., should bring
10 these witnesses here or whether we should do all of
11 these in Tel Aviv, and then the related issue of,
12 given that these are all current employees under the
13 control, just to make sure that we can do these with
14 me asking the questions in English, which makes it
15 most efficient, using the same caveat that, if they're
16 not comfortable and we do translation, that we get the
17 tacked-on time.
18     MR. LINDVALL: If I may respond? First
19 of all, the last part of, Mr. Setty, we can agree to
20 do the same thing with respect to the translations,
21 the same procedure we'll do for Mr. Yosef. I saw Mr.
22 Yosef in the same group as these individuals here.
23 He's a NICE employee. We are going to produce him.
24 They noticed him. We'll produce him like we do
25 normally in a litigation. What I would like to do,

17 (Pages 62 to 65)

66

1  though, these witnesses are all, in general, fairly
2  high-level employees at NICE, and these same
3  individuals were noticed by Witness in their case
4  where they sued NICE, these exact same individuals,
5  and we've already made these individuals available for
6  depositions in Tel Aviv back in December, and Mr.
7  Setty did not go forward with them at that time, and
8  that was in the other case, the Witness case. What I
9  propose we do, rather than have these individuals have
10 to all be brought to the United States, or to London
11 or wherever, where they'll lose at least two days of
12 travel right there, that we can arrange to have
13 all of these witnesses produced in Tel Aviv in a time
14 so that Mr. Setty can take these individuals one after
15 another, and we'll try to have some flexibility in
16 there, realizing that there's going to be -- there may
17 be times when we have to take one individual into the
18 next day if there's a Hebrew issue, a language issue,
19 but in any event, I think that we can arrange a time
20 span where these individuals can be made available.
21 What I would like to do, if possible, is have these
22 individuals, their depositions taken in both cases
23 during this time frame. I think it's the most
24 efficient way to do it for all the parties, and, for
25 example, all of these individuals on page 13 of Mr.

67

1  Setty's letter are all the same individuals noticed in
2  his case where Witness has sued NICE, and it makes
3  sense to me that these individuals have their
4  depositions taken, each seven hours in that situation,
5  and that would be the most efficient way to do it, and
6  do that in Tel Aviv. I will also try to find out in
7  advance whether these witnesses will agree to have
8  their deposition in English and let Mr. Setty know
9  that in advance, so maybe we can work out any
10 translation issues ahead of time and see whether we
11 can anticipate all of these problems.
12      There is one caveat in our case, the STS
13 Software case. As you know, your Honor, we're
14 alleging infringement. We're not alleging damages.
15 We're only asking for an injunction. It's a fairly
16 narrow-issued case because of that. It's only
17 infringement, and the way I count right now, Mr. Setty
18 has already requested over ten depositions in the STS
19 case, and our position is that both parties in both
20 cases have to follow the ten deposition rule. So I'm
21 just giving some advance warning now. I know Mr.
22 Setty may very well withdraw some of these names or
23 what have you, but we would insist on the ten
24 deposition rule, especially in the Voiceover IP case,
25 our case, because the issue really is just

68

1  infringement, and that's it. There's no damages
2  issues. Yes, there's commercial success, and we are
3  going to produce these witnesses on that, but I don't
4  think there's any need to take over ten depositions.
5  There's only two inventors on these patents in suit,
6  and that leaves eight other depositions. So I think
7  that should be sufficient.
8      MR. SETTY: If I may comment, your Honor?
9  The coordination of five depositions that may each be
10 more than one day and may each require testimony in
11 both cases means that we may be in Tel Aviv for as
12 many as 20 days to do these five depositions. The way
13 I count that is one day per each per case. If he, in
14 fact, wants to do them all in two separate issues,
15 with a total of five different patents on two
16 different sets of technology all at once, that's what
17 it would look like. I just don't want to agree that
18 we have to be in Tel Aviv for a month to do this. So
19 I don't think they have to be coordinated in that
20 manner. This is an Israeli software company that's
21 filed suit in the U.S. We're willing to eat the cost
22 of the travel to go there as needed. I just don't
23 want us to be agreeing to a coordinated schedule.
24      Second, the ten deposition issue and the
25 fact that this is a, quote, very simple,

69

1  straightforward case, let me just touch on that for a
2  moment. There are now three patents in suit. There
3  are the parent path, which now has been dismissed, and
4  the continuation in part application are both priority
5  documents for one of these patents. So unless STS
6  agrees that it will not rely on for priority the CIP,
7  that's where the other inventors come in. We didn't
8  do that. That was how they prosecuted these patents.
9  There's actually four inventors. That's the first
10 part.
11      The second is, with those three patents
12 that are left in this suit and the two patents in the
13 other suit, we have five patents, and we have about a
14 dozen products, different software products at issue.
15 They're so different in many cases that there are
16 different infringement contentions and different
17 claims asserted against the different products. So
18 it's not, unfortunately, not as straightforward as
19 that sounded. We did have with the court a discussion
20 about the ten deposition issue. We got the same
21 guidance from Judge Story that, frankly, I've gotten
22 from you before, Judge McKelvie, which is be
23 reasonable, but limiting to hours or number of
24 depositions is typically artificial. So that's our
25 position on that, and it's one we have already vented

70

1  with Judge Story. So I think we ought to work out
2  what is reasonable as opposed to an arbitrary ten
3  limit number.
4       MR. LINDVALL: If I can quickly respond
5  to that, the three patents in suit in the STS case all
6  have the same specification. If you compare that
7  specification with the CIP, you'll see that the new
8  matter in the CIP has been removed out of the
9  specification for these three new patents. These
10  three patents are relying on priority dates of its 665
11  patent, and they're not relying on the priority of the
12  CIP. Notwithstanding that, Witness Systems, in their
13  defense against STS software, they're taking
14  depositions of our technical people and our financial
15  people. The only conceivable reason they would take
16  the deposition of NICE Systems people, the parent
17  company, that's the software, is for commercial
18  success, and so they basically want to go in and take
19  depositions of technical individuals, financial
20  people, sales and marketing people, all to support
21  their commercial success rebuttal to -- well, I guess
22  to rebut our commercial success. I'm not sure what
23  they're going to do with the witnesses or what they're
24  going to use the depositions for, but from the
25  standpoint of our lawsuit, the STS lawsuit, I think

71

1  these witnesses at best are marginally relevant, but
2  it surely doesn't justify them taking over ten
3  depositions in this situation, especially when damages
4  are not even at issue in this situation. We are only
5  asking for an injunction. I don't know why a
6  technical person who gives testimony about NICE
7  Systems Voiceover IP loger, when that's not even an
8  issue except for maybe commercial success, why they
9  have to take all these depositions and exceed the ten
10  deposition rule, but I think we can just find out how
11  it goes.
12       SDM MCKELVIE: What do we expect they're
13  going to do in terms of exceeding ten? What's your
14  projection then?
15       MR. LINDVALL: Well, just counting these
16  individuals, what they've asked for already, I think
17  we're up to 12.
18       MR. SETTY: By the way, your Honor,
19  that's 12 notices. We have taken a partial deposition
20  of Bar in this case, a partial deposition of Nisani,
21  and a partial 30(b)(6).
22       MR. LINDVALL: Well, they've also taken
23  an individual deposition of one of the attorneys who
24  prosecuted the application. They've already taken the
25  basic four depositions of Mr. Nisani, the 30(b)(6) of

72

1  STS, deposition of one of the attorneys who prosecuted
2  the application, and --
3       SDM MCKELVIE: I think -- do you have any
4  sense of how many more you're going to want?
5       MR. SETTY: Yes. I think right now,
6  based on the witnesses we have identified, it is only
7  12 notices, and I have no reason to be expansive,
8  because it comes at a cost. I just don't want to be
9  limited at this point to ten. When we have vented
10  this issue with Judge Story, he asked us to work it
11  out and be reasonable, and we have done nothing but
12  try to do that. I mean, we've been trying to get
13  these witnesses for many, many months.
14       MR. LINDVALL: Again, we have offered
15  these witnesses for depositions in the other case.
16       MR. SETTY: Well, let's just touch on
17  that.
18       MR. LINDVALL: Mr. Setty, can I finish?
19       MR. SETTY: Go ahead.
20       MR. LINDVALL: Okay. The thing about
21  this, again I have to reiterate, we have three patents
22  in issue. They all have the same specification,
23  they're all related, and we sued Witness System on
24  this. We purposely did not ask for damages to make
25  this an efficient case. The situation we have now

73

1  where we've -- the two inventors have been deposed,
2  Mr. Bar, not for a complete seven hours. He went
3  through the Hague Convention for Mr. Bar. We produced
4  Mr. Nisani, a named inventor, for two days, and his
5  deposition has been taken. We have produced already
6  for deposition one of the attorneys involved in the
7  prosecution, that's been taken, and the 30(b)(6) has
8  been taken, and now Mr. Setty wants to take a variety
9  of witnesses of NICE Systems who are going to testify
10  about NICE's products, the products that they sell
11  today, and have the sales they sell today, which
12  really, to my own mind, except for maybe somehow being
13  somewhat related to commercial success, they're not
14  related to damages, because we are not asserting
15  damages. It tends to be a situation where we are
16  running up a lot of cost and a lot of time that we
17  don't need to be spending. I don't think these
18  depositions need to even be taken, but I'm not going
19  to resist the depositions, but I don't think that we
20  need to pass the ten deposition rule, at least at this
21  point in time, unless there's a real good cause shown,
22  and I don't think that Judge Story has addressed this
23  issue. I may be wrong, but I would ask Mr. Setty to
24  show me where in one of the transcripts that Judge
25  Story has done this.

19 (Pages 70 to 73)

74

1    MR. SETTY: Let me -- quick response,
2 just because I have to address this assertion that
3 these witnesses have been made available before and
4 that these witnesses are irrelevant. First, the names
5 came from the 30(b)(6) witness that STS put up as the
6 people to whom he would go to understand various
7 aspects of their technology and the products. In
8 other words, this inventor was put up as a 30(b)(6)
9 witness, but he hasn't developed any of the source
10 codes since 1998 that relates to any of these
11 products. We have questions that go to many of the
12 substantive issues in the case that I don't care to
13 preview for Scott. It's not just about commercial
14 success. That's one.
15    Second, it is correct that when we come
16 into these conferences we all sound reasonable and we
17 talk about how witnesses have been made available.
18 The schedule that was proposed for us to do these
19 witnesses were the two weeks before Christmas, in
20 which we did take the week in Israel. We were to fly
21 back to New York to do Mr. Leason and fly back to
22 Israel to do the other witnesses. We just thought
23 that that was an unreasonable schedule, and we
24 rejected it. We've asked for additional dates. We're
25 now coming up on March 1 here, and we have never

75

1 gotten those dates. So we are 20 months into this
2 case, and I've got the inventor for a partial day and
3 a 30(b)(6) on some topics, and then a person who
4 signed some of the papers at the PTO and testified
5 that he didn't do anything substantive. So we are
6 still left to do the lion's share of discovery in this
7 case.
8    MR. LINDVALL: I mean, your Honor, I have
9 to say we'll make these witnesses available as quickly
10 as possible. You can understand, since we're not
11 alleging damages, it's not in our interest to delay
12 this case. Every sale that Witness makes right now is
13 something that we believe that we should have made the
14 sale because they should be enjoined in making these
15 sales. So the longer this delays for Witness, the
16 better off they are, because we're not alleging
17 damages. They're not harmed by spending the time in
18 this litigation. We will do whatever we can to be
19 cooperative. What I propose to do is, rather than
20 waste time on this subject, is that we make some
21 witnesses available. We get up at the ten person
22 limit, ten deponent level, if we think that's an
23 issue, we'll come back and revisit it with you.
24    SDM MCKELVIE: All right. Why don't you
25 just come back then.

76

1    MR. SETTY: Okay. Scott, I would ask,
2 while we have Judge McKelvie on the line, as far as
3 these depositions, you all have been just giving us a
4 date per witness, and then if we reject it, we don't
5 get anything back for a few months. I'd like to work
6 out dates where we both look at our calendars and we
7 work out dates. I hope that's agreeable to you.
8    MR. LINDVALL: No, that's fine. Again, I
9 don't think that I necessarily agree with your
10 characterization, but I'll agree to do that.
11    SDM MCKELVIE: Why don't we move towards
12 terminating this call. You want to pick a date for
13 another call or are we okay?
14    MR. SETTY: There's a lot more to do,
15 unfortunately, your Honor. We haven't even touched on
16 the NICE case yet. So I'd ask that we set up another
17 hour sometime that's convenient for you.
18    SDM MCKELVIE: How about Friday?
19    MR. SETTY: I am wide open.
20    MR. LINDVALL: Your Honor, I'm going to
21 be at conference all day on Friday. I won't be
22 available at all.
23    SDM MCKELVIE: I'm going away Sunday, and
24 I'm away for the week. I'm not sure how much time --
25 I've got Thursday.

77

1    MR. SETTY: We have a good bit of
2 availability tomorrow as well, since Scott's busy
3 Friday.
4    SDM MCKELVIE: I don't have a whole lot
5 of time tomorrow, except maybe an hour, we can find an
6 hour about 4:30 or something like that?
7    MR. SETTY: That's perfect for us.
8    MR. LINDVALL: Your Honor, let me just
9 check my schedule for a minute. I think that that's
10 okay with me. I don't have it in front of me. It
11 will take me a couple of minutes.
12    4:30 tomorrow is fine with me.
13    MR. SETTY: Okay. Perfect. Judge
14 McKelvie, do you prefer that we use your dial-in or
15 should we be providing one?
16    SDM MCKELVIE: Either way. I mean, I'm
17 happy to have people use their own. That's fine with
18 me.
19    MR. SETTY: Okay. Then if you don't mind
20 for tomorrow, if we can use yours? And Scott, can we
21 use the same court reporter?
22    MR. LINDVALL: Yes.
23    SDM MCKELVIE: Can I ask that the court
24 reporter give us ASCII copies of the transcript?
25    (Whereupon the conference concluded at 11:09.)

20 (Pages 74 to 77)

78

1          CERTIFICATE

2

3          I, LOU ANNE SPELLMAN, a Notary Public and

4    C.S.R. of the State of New Jersey, do hereby certify

5    that the foregoing is a true and accurate transcript

6    of the testimony as taken stenographically by and

7    before me at the time, place and on the date

8    hereinbefore set forth.

9          I DO FURTHER CERTIFY that I am neither a

10   relative nor employee nor attorney nor counsel of any

11   of the parties to this action, and that I am neither a

12   relative nor employee of such attorney or counsel, and

13   that I am not financially interested in the action.

14

15   _____

16   Notary Public of the State of New Jersey

17   My Commission expires August 25, 2008

18   Dated: March 9, 2006

19

20

21

22

23

24

25

**A**

ability 20:20
able 13:10,13 15:5
    18:2,9 20:17
    21:24 36:3
above-entitled 2:2
absolutely 20:15
    21:18
acceptable 56:1
access 18:1 23:2
    42:1 53:4
accommodations
    59:13
accurate 78:5
accused 14:19,23
    16:15 17:4,8
    22:18 31:25
action 1:4 78:11,13
actual 19:7 39:24
    40:11 49:12,21
    50:12
add 19:6 61:21
    63:15,18
addition 27:13
additional 8:2
    27:10 29:9,11,19
    30:13 31:14 32:3
    32:8 34:21 38:6
    38:10,23 41:18
    44:16,17 48:25
    51:13 52:2 53:8
    53:21 58:13,19
    59:14 60:4 61:4
    61:15 62:13
    74:24
address 29:12
    45:15 74:2
addressed 28:24
    45:16 73:22
addressing 4:2
adjustment 5:19
    6:9
advance 67:7,9,21
advantages 36:16
affording 8:5
afraid 52:1
ago 46:22
agree 4:8,9,14,21
    6:3 8:13 36:8
    40:9 51:10 57:19
    58:13 60:3 61:2
    62:13 65:19 67:7
    68:17 76:9,10
agreeable 76:7
agreed 5:16 17:20
    25:1 30:21 48:17
    48:18 65:3
agreeing 5:22 6:4

68:23
agreement 27:9
    29:25
agrees 69:6
ahead 38:7 49:4
    58:22 64:20
    67:10 72:19
algorithms 43:10
alleged 13:25
alleging 11:7 67:14
    67:14 75:11,16
allow 27:24 57:15
allowed 6:16 62:6
allowing 29:9
    58:12
alluded 23:7
alternative 53:7
amenable 51:23
    54:7
amend 11:18 12:16
    15:10 19:6 20:22
    21:24 22:7,21
amended 6:16
America 63:1
amount 30:2 35:24
    40:8,8
analysis 18:21 19:4
    19:5 35:19
analysis/customer
    32:13
analyze 15:4 19:4
    20:16,17,18,19
    20:21 21:25
analyzed 22:20
analyzing 13:13
and/or 19:21
ANNE 2:3 78:3
answer 40:18
    47:11 59:2 63:8
answers 60:1
anticipate 67:11
anymore 45:1
appear 40:21 54:8
    55:18
appears 11:25 12:4
    12:10 14:21
application 30:9
    39:19,22 40:4
    43:21,25 44:1,6
    49:11,20 51:1
    69:4 71:24 72:2
appreciate 38:16
    38:22 62:18
approach 23:20
appropriate 10:8
    37:10
approximately
    39:16

April 6:12 39:12
arbitrary 70:2
argued 16:21
argument 53:4
arises 9:18
arrange 66:12,19
arrangement
    63:23
arrangements 51:9
    51:10
Article 46:13
artificial 69:24
ASCII 77:24
asked 11:14 12:14
    28:25 31:3 32:15
    37:4,13 42:23
    43:12 46:4 47:10
    50:15,16 52:4
    55:2 62:9 63:16
    71:16 72:10
    74:24
asking 22:18 25:6
    25:21 60:14
    65:14 67:15 71:5
aspect 23:25 32:10
    39:9 51:19
aspects 10:6 30:6
    33:20 64:23 74:7
asserted 17:3
    69:17
asserting 25:5
    73:14
assertion 25:9 74:2
assigned 8:2
assume 53:5
assurances 32:2,7
Atlanta 1:3 3:14
attorney 45:19
    63:2 64:5 78:10
    78:12
attorneys 3:11,16
    29:20 41:3 71:23
    72:1 73:6
attribute 63:18
August 78:17
author 43:18 49:22
authority 45:25
    46:14 48:10
authorized 53:19
authors 49:8
automatically
    61:17,25
availability 77:2
available 20:8
    38:10 46:6 53:5
    66:5,20 74:3,17
    75:9,21 76:22
Avaya 11:15,24

15:9
Avenue 3:3,7
Aviv 39:25 42:5,8
    54:1,4 56:3 65:11
    66:6,13 67:6
    68:11,18

**B**

B 3:1
back 6:13 9:13,15
    11:6 22:6,20
    36:23 37:18
    38:15 39:1 43:21
    45:22 57:23
    62:14 66:6 74:21
    74:21 75:23,25
    76:5
background 11:5
    25:3 32:21 35:12
    36:1,21 45:22
ball 19:10
Bar 39:25 40:13,20
    40:23 45:4,14,24
    46:2,7,16 47:4,8
    47:18 48:7,7,20
    48:25 52:23,25
    53:1,4,10,21
    55:15,16,16
    63:23 71:20 73:2
    73:3
barely 61:7
Bar's 49:18 62:23
based 12:18 14:11
    14:12 24:1 36:17
    53:3 72:6
basic 71:25
basically 12:22
    13:15 14:20
    70:18
basis 11:11 17:12
    17:12 26:19 27:4
Becker 2:6
begins 6:13
behalf 5:8
beliefs 20:11
believe 12:19 18:6
    25:14 26:25
    28:24 34:2 39:12
    42:8 75:13
believes 18:3 56:16
benefit 47:12
best 12:19 44:9
    71:1
better 36:3 50:23
    75:16
beyond 30:11
big 7:20 30:1
bit 11:5 26:3 45:21

77:1
blow 35:14
bolts 13:6
boring 52:11
bother 6:4
bottom 50:11
break 40:18
breaks 40:16
brief 9:10
briefing 39:11
briefs 45:18
bring 11:2 25:20
    65:9
bringing 20:2
broad 30:1
brought 34:25
    45:17 57:6 66:10
BURLING 3:2
business 56:19
busy 56:24 77:2
buy 15:4
buying 13:12,13

**C**

C 3:6
calendar 8:10
calendars 76:6
California 16:6
    53:23
call 4:9,14,16,17
    4:25 9:2,11,13
    17:19 38:25 48:7
    49:24 76:12,13
called 11:8,15,16
    12:2,14
calls 4:11,18 49:14
capabilities 12:10
caption 10:19
captions 10:19
captures 49:24
care 40:21 74:12
carefully 41:24
case 5:13 8:1 9:21
    9:25 10:6,17,18
    16:10 17:24 23:2
    23:15 25:5 29:21
    37:6 45:11 60:13
    60:15,16,19
    61:15 64:23 66:3
    66:8,8 67:2,12,13
    67:16,19,24,25
    68:13 69:1 70:5
    71:20 72:15,25
    74:12 75:2,7,12
    76:16
cases 6:14 10:2,10
    56:21,23 66:22
    67:20 68:11

69:15
cause 73:21
caveat 25:18 62:22
  65:15 67:12
CEO 54:11 65:7
certain 4:15 20:6
  23:4,4,7 24:21
  26:17 46:4
certainly 10:11
CERTIFICATE
  78:1
Certified 2:3
certify 78:4,9
cetera 16:1
CFO 33:14 35:18
chance 4:5
characterization
  76:10
chart 17:2,17,24
  18:10,15
charts 15:25 18:19
check 58:11 77:9
chemical 13:13
  19:19
chief 47:8
children 40:21
choice 57:20
choose 57:22
chose 52:16
Chris 5:6
Christmas 74:19
CHRISTOPHER
  3:16
CIP 69:6 70:7,8,12
Circuit 20:6
circumstance 29:6
circumstances 20:7
citations 19:7
cites 18:22
CIVIL 1:4
claim 7:2,5,12,13
  7:16,22,24 8:4,7
  8:14 17:3,24 18:9
  18:15 28:12 39:7
  39:10 40:13,24
claims 16:15 69:17
clarify 5:10 8:9
  22:1
CLARKE 3:9
clean 53:24
cleaner 25:11
clear 9:7 20:6
  34:18 41:25 51:3
  63:16
cleared 62:11 64:2
clearly 49:9,13
  50:5,24 52:23
client 37:14

clients 61:5
clock 61:20,25
  63:14
close 6:12,24 7:7
  7:10,11,15 8:7,13
  9:20 63:21
code 11:22 12:15
  13:4,8,16 14:10
  15:2,9,12,15,23
  16:19 17:1,13,20
  18:2,4,11,25 19:1
  19:6,7,17,25
  20:14,14,18
  21:12 22:16 24:6
  24:15 39:17,21
  39:23 40:5,7 43:7
  43:8,9,10,14,14
  43:17,19,20,22
  44:3 49:6,8,10,13
  49:16,18,23,24
  50:4,13,14,20,24
  51:1,3,14,16,19
  51:21 52:10,16
  52:19
codes 15:25 40:11
  74:10
coin 4:25
collapses 34:12,14
collections 37:22
column 31:18
combination 16:4
  61:10
come 9:13 12:2
  13:19 22:6 36:23
  60:6 69:7 74:15
  75:23,25
comes 7:14 8:8
  51:20 59:12 72:8
comfortable 43:2
  53:6,25 54:9,25
  56:7,8,11,12,13
  57:10 58:8 59:4
  65:16
coming 74:25
commencing 2:7
comment 68:8
comments 36:24
commercial 23:18
  23:21 25:8,13,15
  30:1,5,19,25 31:4
  33:25 36:7,9 68:2
  70:17,21,22 71:8
  73:13 74:13
Commission 78:17
communicating
  61:9
Communication
  11:16,23 15:9

18:23
companies 33:9
  47:8
company 11:13
  34:10 45:10 47:9
  48:5 68:20 70:17
company-wide
  34:11,17
compare 70:6
comparison 16:15
  22:3
compass 32:16
compel 11:21 15:8
  23:11 24:9,17
  27:16 29:8 32:17
  35:5
compelled 46:2
complaint 6:16
  34:19
complete 26:8,25
  34:20 41:16,20
  63:17 73:2
completed 19:4
  26:18 44:5
completely 36:7
  43:3
completes 19:5
complex 19:2
  20:18 29:21
complied 37:3
compromise 35:3
  57:3
conceivable 70:15
concept 51:18
conception 42:22
  44:1
concern 55:5
concerned 51:12
concluded 77:25
conclusions 32:22
conditions 62:5,17
  63:25
conducted 46:7,10
  46:11 56:16
conducts 46:10
conference 1:11
  4:9,11,13,16,17
  4:18 6:19,22
  17:19 23:6 28:25
  29:17 76:21
  77:25
conferences 74:16
confidential 13:9
  15:3,12 16:23
  19:22
conflicts 5:24
consideration
  23:19

consistent 49:18
consolidate 10:6,9
  10:21
consolidated 10:2
consolidation 10:5
  10:11,12 33:10
constraints 46:4
constructed 30:7
construction 7:2,5
  7:12,13,16,22,24
  8:4,8,14 39:7,10
  43:23 44:3,7
constructions
  41:12
construction-rel...
  40:14
constructive 44:1
consult 40:17
consulted 5:21,24
contact 11:8,13,16
  11:22,23 12:1,12
  12:21,24 13:23
  13:25 14:3,16
  19:7,9 22:12
  47:18
contemplated
  41:14
contemporaneou...
  39:18
contention 16:8,9
  18:8
contentions 12:17
  12:23,24 13:2,14
  13:18 14:2,5,8
  15:1,6,11 16:7,13
  16:20 17:1,12,21
  18:19,20 19:9
  20:4,22 21:24
  22:11,21 25:16
  69:16
context 41:8
continuation 46:24
  47:1 69:4
contradictory 50:2
contrary 31:2
control 41:23,25
  45:6,8,10,14,19
  46:9,19 47:6 48:6
  54:15 58:7,7
  62:11 63:4,25
  64:12 65:13
controversial 7:17
convenient 76:17
Convention 45:23
  46:1,9,13,22 47:5
  48:24 73:3
cooperate 20:8
cooperated 13:15

cooperative 75:19
coordinated 68:19
  68:23
coordination 68:9
copies 18:5 77:24
copy 14:4 18:6
correct 20:11 22:8
  74:15
correctly 6:21
cost 68:21 72:8
  73:16
counsel 40:17
  47:24,25 48:3,4,4
  53:12,17 57:13
  57:16 64:8 78:10
  78:12
count 67:17 68:13
counting 71:5
couple 5:23 12:7
  26:7 49:23 61:1
  62:15 77:11
course 9:2,11 38:8
  53:3
court 1:1 5:4,9
  6:16 7:23,24 8:3
  8:8 16:24 35:4,4
  35:5 45:25 46:2,8
  46:12 47:5,14,21
  48:24 53:6,11
  54:15,19,20
  62:24 64:14
  69:19 77:21,23
court-ordered 16:8
cover 30:5 54:23
covers 22:7
COVINGTON 3:2
co-developed
  11:15,24 13:20
co-inventor 51:4
created 33:4 44:5
credible 53:4
crew 26:10
CSIP 11:13 16:13
  16:15 18:2,4,22
  current 5:13 39:8,9
  65:12
customer 32:12
  35:19 37:15,19
  37:23
customers 31:9,17
  31:19,20,20,22
  31:24 32:4,4,13
  32:19 35:20
  36:13
C.S.R 78:4

D

D 40:25

damages 25:5
  60:15 67:14 68:1
  71:3 72:24 73:14
  73:15 75:11,17
Dan 5:7
DANIEL 3:15
Danny 41:1
data 32:22 36:1,1
  37:9 49:25
date 6:13,20,21,23
  7:12 8:10 24:21
  26:17 41:5,6
  48:16 64:8 76:4
  76:12 78:7
Dated 78:18
dates 5:19 6:9,23
  28:1 70:10 74:24
  75:1 76:6,7
day 30:13 40:9,10
  40:22,23 46:5,6
  46:16 50:22
  55:19 62:11,12
  62:14 63:16,19
  64:2,6 66:18
  68:10,13 75:2
  76:21
days 5:23 6:10,21
  7:25 8:2,7,13,15
  8:17,18 22:14
  26:1,3,8,9,10,15
  26:20,21,24,24
  27:22 28:1 42:19
  43:1 44:25 52:15
  66:11 68:12 73:4
de 10:10
deadline 25:23
deal 4:5 54:8 57:7
  58:16 60:24
deals 41:24 63:24
dealt 61:5
Deanna 9:10 10:16
December 33:16
  40:1 66:6
decide 58:18
decipher 35:23
decision 8:14,24
  45:17
decisions 9:1,11
default 8:18
Defendant 1:12,19
defense 70:13
deferred 23:16
delay 27:20 75:11
delaying 42:11
delays 43:4 75:15
delineating 31:12
denial 10:7 23:11
denied 10:5 23:4

deponent 75:22
deposed 73:1
deposing 37:9
deposition 27:21
  27:22 29:2 33:15
  33:21 35:15,24
  36:4 37:5 38:7,8
  38:11 39:15,20
  39:25 40:2,16,19
  42:14,20,24 43:1
  43:3,11,15,16
  44:9,21,23,24
  45:1 46:3,4,16,18
  46:20,22 47:10
  47:16,22,23 48:9
  48:14,15,19,22
  49:1 50:18,23
  51:7 54:3 55:19
  56:11,15,22 58:9
  58:14 59:9 60:2
  60:25 61:13,21
  62:12 63:16,17
  63:21 64:17 67:8
  67:20,24 68:24
  69:20 70:16
  71:10,19,20,23
  72:1 73:5,6,20
depositions 37:7
  39:6,7 41:7 42:4
  42:19 44:14,18
  45:23 46:7,10,14
  50:8 53:14 57:18
  61:11 66:6,22
  67:4,18 68:4,6,9
  68:12 69:24
  70:14,19,24 71:3
  71:9,25 72:15
  73:18,19 76:3
derive 47:12
describe 21:14
  22:17
described 43:9
description 11:9
design-arounds
  21:4,4,5
desired 25:15
detailed 13:17 15:6
  16:14,20 17:22
  18:9,15,21 19:9
  20:4
develop 13:14
developed 31:8
  39:18 40:3 49:19
  51:3 74:9
developer 53:23
development 39:20
  39:23 56:24
dial-in 77:14

different 4:21 7:7
  12:7 47:7 53:13
  68:15,16 69:14
  69:15,16,16,17
difficult 15:5
difficulties 20:20
diligently 19:3
directly 49:25 50:2
  63:5
disagreed 25:12
disappears 30:15
disclosure 16:17,24
  17:16
disclosures 5:17
  11:18,20 22:15
  41:15
discovery 3:2 6:12
  6:25 7:1,4,8,11
  7:11,15,22,25 8:1
  8:3,6,13,17 9:20
  10:3 11:3,14,17
  12:15 13:4 14:24
  15:14,17 16:5
  20:10 21:1,5,8,10
  21:21 23:1,8
  25:13 26:19
  28:13 30:1,19
  36:9 39:10 41:16
  60:17 75:6
discuss 14:11 37:4
discussed 43:14
discussion 38:6
  55:25 69:19
discussions 37:20
  41:22
dismissed 69:3
dispute 7:20 48:15
  49:7
disputed 43:18
disputes 23:1
distinctions 18:11
District 1:1,2 6:15
  7:3 16:6
DIVISION 1:3
doctrine 17:9
document 13:21
  16:13 17:17
  18:24 21:3,10
  31:6,7,11,15 32:9
  33:2,3,4,5,14,20
  33:23 34:6,9 36:2
  36:18 37:17 38:9
  43:16 44:7,11
documentation
  24:4 25:17 26:5
  31:1 37:14 38:1
documentations
  25:10

documents 13:9
  14:10,12,15
  18:22 21:13,16
  22:17 24:22
  27:22 28:4 34:16
  38:9,12 43:6,10
  43:12 44:16,17
  44:20 50:17,18
  51:23 69:5
DOERNER 2:5
doing 32:4 42:6,9
  56:14,14 57:13
  61:2 65:7
dollars 34:7
domain 13:10
door 25:14 52:5
doubled 58:15
dozen 69:14
drafted 24:9
drafting 16:3,21
  40:3
dropped 11:25
duties 57:1
D.C 3:3

E
E 3:1,1,6,6
earlier 14:22 15:7
  35:1 41:22 51:4
  52:4
eat 68:21
eaten 60:5
eats 61:3
efficient 25:11
  57:14 65:15
  66:24 67:5 72:25
effort 55:23
efforts 51:24
eight 53:14 68:6
Eitan 40:13
either 7:14 41:8
  45:7,14 77:16
element 17:3
elements 17:6,7
  44:9
element-by-elem...
  16:14 18:20 22:2
embody 23:14,25
  27:5
embodying 24:8,12
  30:6
employee 56:25
  57:25 65:23
  78:10,12
employees 57:6
  59:5 65:12 66:2
encompassed 12:5
ended 6:22 58:4

enforced 63:5
engine 12:20 13:23
  14:3,18
engineer 55:17
engines 19:14
English 40:18 42:7
  43:2,3,3 53:22
  55:19 56:1,7,8
  57:10,12,21 58:9
  58:10,18,22 59:6
  59:9,23 61:8,8,10
  61:13 62:7,25
  63:7 65:14 67:8
English-speaking
  42:10 55:20
  57:10
enjoined 75:14
entertain 34:22
entitled 24:11,16
  27:4 33:3
entity 45:12
entries 49:13
equivalence 17:9
especially 67:24
  71:3
ESQ 3:9,9,10,10,15
  3:15,16
ESQS 3:2
essentially 12:20
  33:10 34:12
  42:25
et 15:25
event 19:15 20:23
  35:6 46:6 47:2
  48:6 66:19
events 6:25 7:6,9
everybody 10:22
evidence 41:9,13
  41:15
exact 15:7 66:4
exactly 10:18
  19:20 34:17
examination 18:10
  40:15
examining 13:12
example 12:6
  19:17,18 31:16
  33:14 35:9 36:13
  59:24 60:17
  66:25
exceed 29:6 71:9
exceeding 71:13
Excel 12:7
exchanged 5:17,18
executive 47:8
Exhibit 32:24
existed 50:15,24
existence 10:10

50:20
existing 27:9
expand 21:21
expansive 72:7
expect 33:21 71:12
expense 47:25 48:1
experience 29:22
33:8 59:16
expert 18:5 20:16
28:16
expert's 19:2
expires 78:17
explain 33:19
explanations 37:8
exploratory 27:24
explore 38:8
extension 41:19
extensions 5:16
extent 22:7 58:8
63:17
extra 5:23 60:9
extremely 19:1
extrinsic 41:13,15
e-mail 47:18
e-mails 47:19

**F**

F 3:1
fact 6:12,24 7:7,10
8:6,13 9:20 29:17
33:5 49:7 50:23
52:25 68:14,25
facto 10:10
factor 59:11
factual 26:18
fair 30:2 59:1
fairly 46:1 67:15
fan 30:1
far 76:2
Farm 2:6
February 6:22
Federal 20:5
feel 4:20 16:25
53:25 54:25
56:12 58:8
feeling 6:1,2
felt 43:2
fewer 7:25
fifth 6:11
file 49:14
filed 11:6 43:20
44:6 51:1 65:9
68:21
files 8:3
filing 30:8 39:19,21
43:25 49:10
fill 37:8
financial 23:12

24:2 31:1 33:17
34:16 35:7 37:9
70:14,19
financially 78:13
find 19:14,20 44:15
44:17 45:7,13
58:16 67:6 71:10
77:5
fine 4:23 6:6 7:14
8:9,23 9:6 10:1
26:20 28:18
38:13,14 54:21
61:22 64:15 76:8
77:12,17
finish 39:10 40:19
72:18
finished 44:5
firm 18:6 20:17
firms 53:13
first 5:3,11,15 6:16
7:17 11:1,17 23:1
23:10 28:9 31:19
34:18 35:22
37:15 38:5 52:13
54:11 57:5 65:18
69:9 74:4
Fish 3:12 5:7
five 24:5 53:24
65:1 68:9,12,15
69:13
flew 50:9
flexibility 66:15
floating 7:15
Floor 3:13
flow 15:25
flows 7:13
fly 62:14 74:20,21
folks 5:9 37:10
64:24
follow 4:4 6:8 9:24
17:23 67:20
following 18:14
34:3 62:12
follow-on 5:19
6:23 24:22 26:9
27:25
footnote 10:7
force 46:19 47:6
59:1
forcing 48:21 53:6
foregoing 78:5
foreign 27:18
formal 10:11
format 56:1
former 4:24
forth 9:15 14:8
78:8
forward 4:21

10:20 41:11 66:7
found 17:4 38:3
45:10
four 9:22 24:3
29:11,12,14 36:5
52:9,12 53:8,24
69:9 71:25
four-hour 44:24
frame 11:25 66:23
FRANK 3:10
frankly 40:5 42:12
52:9 69:21
free 4:20 43:13
Friday 76:18,21
77:3
Friedman 41:4,7
45:5,18,24 46:3,5
46:7 47:4 48:8,20
49:1 64:5
front 58:4 77:10
full 40:9
function 13:8,11
22:17
functions 14:11
function/operation
21:14
further 7:1 38:11
78:9
future 32:19

**G**

G 3:9
general 66:1
generate 36:2
generic 11:9
Georgia 1:2 3:14
6:15 7:3
GERALD 3:10
getting 21:1 23:20
27:21 42:12 53:1
give 4:4 5:23 11:5
13:3 14:10 15:6
16:19 20:4 22:11
25:3 31:17 32:6
34:9 38:10,22
45:21 54:5 57:24
59:14 60:18 61:1
61:15 77:24
given 7:7 13:16
15:1 53:18 59:8
65:12
gives 16:24 34:7
71:6
giving 20:9 35:21
36:19 67:21 76:3
go 15:3 18:16
20:19 22:20 35:4
37:5,11,18 38:7

40:20 41:11
42:17 47:14
48:23,24 49:4
55:22 57:14
58:22,23 61:20
62:3,13 64:20
66:7 68:22 70:18
72:19 74:6,11
goal 16:2
goes 30:11 54:14
55:6 71:11
going 4:21 7:4 9:15
10:20 13:3 14:9
17:14,15 19:5
20:8 22:5,6 25:7
25:19 30:25 32:6
33:18 35:11
37:24 38:1,17,22
38:24 41:21
44:18 46:17,17
51:13 52:10,10
53:16 55:24 56:5
57:11 58:1 59:8
59:10,14 60:11
60:17,18 61:19
62:4 63:4,22
65:23 66:16 68:3
70:23,24 71:13
72:4 73:9,18
76:20,23
GOLDBERG 2:6
good 6:7 12:9
52:22 58:5 61:8,9
73:21 77:1
gotten 27:15 40:23
65:6 69:21 75:1
governed 66:11
grant 23:11
granted 15:8 23:4
24:17 35:5 45:25
46:2
great 26:15
Green 3:16 5:7
groundwork 16:12
group 45:4 65:22
guarantee 26:3
guarantees 59:7
guess 19:11,14
70:21
guidance 62:18
65:8 69:21
guise 46:8
guys 57:3

**H**

H 32:24
Hague 45:23 46:1
46:9,13,21 47:5

48:24 73:3
half 28:6,23 36:4
40:10 60:2
handle 4:9 7:10
9:21 42:8
happen 22:6
happening 51:13
happens 22:9
44:22 60:20
happy 8:25 14:14
36:25 37:4 77:17
harassment 29:19
hard 30:3 60:6
62:1
harmed 75:17
hate 20:23
head 52:25
heading 23:22 24:1
heads 4:25 5:1
heard 34:19 49:8
52:8
hearing 37:16
Hebrew 30:14 42:9
55:6 57:15 58:12
58:17,18,23 59:9
60:1,3,7,9 61:1
61:14 62:9,9
66:18
Hebrew's 56:10
held 2:5
help 14:6 39:4
hereinbefore 78:8
hiding 19:10
highly 13:9 15:2,12
19:22 20:18
high-level 24:15
66:2
history 50:1
hold 20:23
honest 56:6
Honor 10:4 14:14
15:13 16:18 22:1
22:10 24:24 27:2
28:9 30:4 36:8,25
38:14 51:17 52:7
52:14 54:13 57:9
57:23 59:16,23
61:23 64:9 65:8
67:13 68:8 71:18
75:8 76:15,20
77:8
hope 76:7
hopeful 57:19
hour 28:23 36:4
61:15 76:17 77:5
77:6
hours 28:3,6,23
29:1,5,6,10,11,21

30:15 35:11 36:5
39:16 49:23 50:6
50:11 51:8 52:7
52:12,13,18,21
53:9,9,25 54:6
55:2,6 59:23 60:9
60:21 61:2,16,18
62:15 63:13,15
63:22 64:1 67:4
69:23 73:2
hour-long 40:17
housekeeping 28:9
huge 60:12
H.323 49:15

I

idea 12:9 63:13
identified 30:5
37:21 39:14 65:1
72:6
identify 4:16 5:15
17:3,5,6 23:24
III(b)(1) 23:10
Ilan 41:1 55:24
Impact 12:2,4,11
12:14,15,20,22
12:25 13:4,5
20:25 21:15
implementing 9:1
importance 49:6
important 11:3
15:22 50:13
incentive 60:13
Incidentally 8:24
include 16:14
21:22 22:15
included 6:17
12:10 50:19
includes 5:13 33:17
including 7:1 10:7
40:17 53:1
incomprehensible
31:12
inconsistent 8:11
incorporate 14:2,6
incorporated
12:13 22:12
incorporating
12:23 14:17
individual 39:5,15
42:20,24 59:8
66:17 71:23
individuals 47:7
48:11,19,22
64:12 65:22 66:3
66:4,5,9,14,20,22
66:25 67:1,3
70:19 71:16

industry 37:23
inefficiency 64:2
inform 51:22
information 11:22
12:3,19 13:16
14:12 15:3,5,12
15:15,19 19:22
19:23 20:7,9
21:19,25 22:19
23:13,17,21 24:2
24:6,7,12,19 25:2
25:4,20 26:11,13
27:2,4 31:2,14,23
32:3,6,8,15 33:12
33:24 34:3,21
35:8,9,12,14 36:2
36:7,17,17,22
37:11,22 38:2
44:4
infringement 11:8
11:19 12:17,22
12:24 13:2,14,18
13:25 14:1,5,8,19
14:23 15:1,6,11
16:9,25 18:8,19
18:19 19:9,19,24
19:24 20:3,4,22
21:24 22:11
67:14,17 68:1
69:16
initial 16:8,10,12
17:19 22:11
initially 25:7
injunction 25:6
67:15 71:5
input 59:18
insist 67:23
instances 58:10
instrumentality
17:4,8
insufficient 16:17
intended 10:6 16:1
16:23 27:23
intention 19:16
interest 75:11
interested 78:13
interests 48:6
internal 32:13 33:6
33:7,11 35:17
37:19,22
internally 37:9
interpretation 20:2
interrogatory
23:23,23,24 27:1
introduced 11:4
49:15
invention 32:1
36:15,16

inventor 46:23,25
46:25 54:11 73:4
74:8 75:2
inventors 39:14
40:6,6,25 68:5
69:7,9 73:1
invest 57:6
investigate 23:18
involved 11:12
16:3,20 29:19
59:19 73:6
in-house 52:24
IP 11:13 12:1,12
12:21,24 13:23
14:1,3,16 19:7,10
22:13 31:10,25
32:15 36:14
49:17 52:25
67:24 71:7
irrelevant 74:4
Israel 45:19 47:9
50:19 54:7 58:5
62:5,14 74:20,22
Israeli 45:24 46:2,8
46:12 47:5,21
48:24 53:11,11
53:13,16 54:15
54:19,20 62:4,16
62:24,25 63:2
64:4,8,14 68:20
issue 5:11 9:14,18
9:18,20,24 11:1,3
15:7,22 16:16
20:12 23:10 27:1
27:7 28:2 34:22
38:16,22 40:14
41:10 45:15,18
49:6 54:9 58:16
60:11 62:18
63:18 64:8,17
65:11 66:18,18
67:25 68:24
69:14,20 71:4,8
72:10,22 73:23
75:23
issued 47:21
issues 4:2,8,12,16
5:22 7:23,24 9:13
23:8 25:18 30:15
39:7 41:25 47:14
53:15 54:24 58:4
60:21,24 63:21
64:17 67:10 68:2
68:14 74:12
IV 17:9
IX 46:13

J

J 3:9
January 6:19 23:3
23:5
JASON 3:10
Jersey 2:5,7 78:4
78:16
job 54:2
judge 5:20 6:20 9:4
10:5,8,12,13 15:7
15:8 16:16,20
17:19 18:17
20:12,13 23:3,6
23:16 25:12
28:25 29:1,2,7,15
29:17 32:17,23
35:1 41:10,24
42:13 45:7,10,13
45:17 49:2 51:11
52:23 53:18,20
54:7,18 62:19
63:24 64:4 69:21
69:22 70:1 72:10
73:22,24 76:2
77:13
judge's 29:8
judicial 4:25 45:24
46:14
July 6:15 11:6 34:1
45:22
June 23:3
justify 71:2

K

Kaye 3:7 27:9
keep 13:5 38:24
Kent 3:15 5:7
Key 33:3,22
kind 28:13 35:3
knew 46:23
know 11:6,10 19:1
19:11 21:3 25:4
25:19 29:11
30:18 31:20,23
33:8 34:22 41:18
41:19 42:6 50:13
50:14 51:21
53:12 56:8,10,20
58:15 59:20 61:5
61:6 64:16 67:8
67:13,21 71:5
knowledgeable
33:19
known 11:13

L

laid 5:12 18:20
23:19 24:13 39:6
65:1

language 54:24
56:12 59:3 60:11
66:18
large 27:2
law 18:6 20:5
53:13 62:25
lawsuit 11:6 53:3
70:25,25
lawyer 62:25 63:1
lawyers 44:23
53:15
lay 16:12
learn 18:10 35:13
learned 50:13,20
Leason 41:4,5
48:16 74:21
leave 7:9
leaves 68:6
left 7:25 25:14
28:23 55:15
69:12 75:6
letter 4:15 5:12
9:19,19,23 22:25
23:22 24:18
32:24 34:1,20,23
35:1,2 36:19 40:9
41:1 55:1 64:18
67:1
let's 15:21 27:25
39:5 42:17,18
49:5 53:5 59:24
72:16
level 33:7,12,24
34:11 35:8 75:22
license 2:4 34:12
light 13:19 29:8
limit 54:5 57:17,17
70:3 75:22
limitation 35:6
limited 28:5 51:15
72:9
limiting 51:23
69:23
Lindvall 3:9 4:23
5:1 6:1,2 7:19
8:22 9:5,17 10:4
10:23 11:1 18:17
21:9,23 22:9
24:23 25:1,24
26:21 28:8,17,19
30:23 34:24
38:13,19,25
42:15,17 49:9
51:11 52:1,14
54:13 56:4 57:4
57:23 58:6 59:22
60:23 61:22
62:20 64:11

65:18 70:4 71:15
71:22 72:14,18
72:20 75:8 76:8
76:20 77:8,22
line 5:6 7:11 12:1
40:1 50:11 76:2
lines 33:10 39:4
link 27:6
linked 7:15 16:22
lion's 75:6
literally 17:8
litigation 11:12
20:24 31:8 33:5
44:19 47:11,20
65:25 75:18
little 11:5 25:3
45:21
live 52:5
LLP 3:7
local 7:21 11:19
12:17 13:2 15:16
16:2,21 18:14
19:15,16 20:1
21:11 22:10
28:12,14 41:7,9
loger 71:7
Logit 43:7,13,17
43:22 44:3 49:13
51:14
London 27:13
39:16 42:5,19
44:10,24 50:9
66:10
long 9:7 18:21
51:18
longer 55:14 75:15
look 6:10 7:1 9:22
35:10 45:12
46:12 68:17 76:6
looked 40:4 49:12
looking 35:22 62:5
looks 31:7
lose 41:8 66:11
loss 14:24
lot 36:8 59:5,13
73:16,16 76:14
77:4
LOU 2:3 78:3
LPR 5:17 9:23
15:24 17:10

**M**

main 62:5
maintenance 34:14
majority 26:2,24
making 75:14
management 12:13
49:14 64:24

Manager 11:17,23
15:9 18:23
manages 49:25
manner 17:22
68:20
manuals 24:4
March 2:7 41:5
74:25 78:18
marginal 44:8
marginally 71:1
market 31:1
marketing 24:5
31:1 37:17,25
70:20
Markman 39:11
master 3:2 53:19
materials 15:23
16:23
matter 2:2 9:5 70:8
McKelvie 3:2 4:1
4:24 5:2,21,25
6:6 8:12,19,23
9:4,9 10:1,14,25
15:20 18:17 21:7
21:20 22:5,22
24:25 25:22
26:14 29:15,23
30:10,17,22
32:23,25 36:24
38:4,20,24 39:2
42:16 49:3,4 51:6
51:11,25 52:6,20
54:21 55:4,7,11
59:20 60:20
61:20 62:19
63:12,24 64:10
64:15,20 69:22
71:12 72:3 75:24
76:2,11,18,23
77:4,14,16,23
mean 6:1 11:22
35:21 44:16,22
48:13 50:4 52:8
54:14,18,19
59:21 62:1 72:12
75:8 77:16
meaning 28:11
meaningful 42:12
means 10:10 22:2
35:20,23 61:24
68:11
meetings 37:20
memory 50:3
mentioned 37:4,13
Metrics 33:4,23
Microsoft 12:6,8,9
middle 40:15
migrate 32:14

migrated 36:13,15
mind 13:5 65:6
73:12 77:19
minute 43:21 57:24
77:9
minutes 77:11
mirror 10:18
missing 26:12
mixture 58:25 59:9
modest 5:18 6:9
23:20 40:8 41:18
modify 21:23
moment 53:5 69:2
Monday 5:18
money 48:3
month 41:17 50:7
68:18
monthly 34:3,4
months 18:5 20:15
37:6 46:22 72:13
75:1 76:5
morning 2:8
motion 10:5 11:21
15:8 23:11,12
24:8,17 27:16
29:8 32:17 34:25
35:5
motions 23:4,4
move 14:24 16:5
17:25 22:3,8
26:18 28:16 45:3
60:15,19 76:11
moved 11:14
moving 24:20
mute 39:3

**N**

N 3:6
NAGENDRA 3:15
name 5:6
named 54:11 73:4
names 11:10 65:1
67:22 74:4
narrow-issued
67:16
native 56:10,16
59:6
natural 48:5
nature 21:7,9
necessarily 11:10
18:25 20:3 59:2,4
76:9
necessary 58:19
59:15 62:8
need 13:8,8 17:24
23:17 27:7 31:23
35:8 36:8,10 39:9
40:10 41:2,6,13

41:16 45:1 49:23
50:5,11 54:10
65:8 68:4 73:17
73:18,20
needed 16:19
17:21 18:1 24:10
40:20 53:2 64:23
68:22
needs 58:15 64:9
negotiate 36:21,22
37:1 61:16
neither 78:9,11
never 27:15 45:16
74:25
new 2:5,7 3:8,8
6:17 8:5 11:4
12:2 14:21 18:3
18:12,15 19:13
20:25 21:22 22:3
22:7,13 31:10,16
31:19,20,21
32:14 34:13
35:20 50:8 64:7
70:7,9 74:21 78:4
78:16
NICE 1:17,17 3:11
3:11 6:2 9:21
27:5 41:25 45:7,7
45:12 48:13
50:17,19 52:24
52:25 53:6 56:6
56:25 57:1 58:1
59:5 65:23 66:2,4
67:2 70:16 71:6
73:9 76:16
NICE's 48:1 73:10
Nick 3:15 5:2,6 8:5
15:20 26:14
29:25 31:13 32:2
32:6 36:24 38:6
38:24
Nisani 39:13,19
42:18,18,23 43:1
43:2,11,17 44:10
45:2 49:7,7,22
50:16 51:5,7
56:13 63:22
71:20,25 73:4
Nisani's 50:21
non-infringement
17:11
non-obviousness
25:9
normally 7:8 65:25
Nortel 13:21,22,24
14:2,9,13,17
20:25 21:15,16
Northeast 3:13

Northern 1:2 6:15
7:2 16:6
Notary 2:4 78:3,16
note 7:20 23:15
notes 2:1
notice 16:4 33:16
58:2
noticed 48:14
56:20 65:24 66:3
67:1
notices 71:19 72:7
notion 24:7
notwithstanding
19:8 20:11 25:16
29:7 70:12
number 6:10 7:6
20:14,19 27:3
31:9,10,16,17,18
34:7 35:20 41:19
54:5 69:23 70:3
numbers 24:14
26:6 27:8
numeral 23:9
nuts 13:6

**O**

O 3:1,16
oath 43:19 47:9
50:24
object 54:19
objected 27:3
objection 54:15,16
55:22 64:13
objections 24:11
27:14
obligated 36:6
obligation 16:22
obstructive 56:14
59:10 60:12
obviously 28:5
42:6 48:2 57:7
occurred 7:9
occurring 61:24
occurs 61:17
October 28:25
offer 38:6
offered 47:24,24
62:15 72:14
office 2:5 12:9 50:9
officer 47:8
okay 5:2,4 7:19
8:19 10:22 22:24
30:17,23 32:23
33:1 38:13,15
39:2 45:12 51:25
52:6 57:4 64:10
72:20 76:1,13
77:10,13,19

old 18:12 31:21
  36:13
once 9:12 15:11
  17:10,18 20:12
  20:21 21:24
  22:20 36:3 56:21
  68:16
ones 16:10 18:12
one-page 31:6,6
  32:9 33:1
open 4:8 7:9 25:14
  44:9,18 52:4
  62:17 76:19
operate 13:7,11
operates 14:11
operation 22:11
opportunity 41:9
  41:16
opposed 70:2
opposite 29:17
order 9:1,3,6,10,12
  10:21 23:3,12
  24:20 32:17
  41:24 42:7,13,17
  53:19
ordered 20:13
  41:11 55:18
ordering 54:7,9
original 6:14
ought 37:5 70:1
outstanding 21:3
  22:25

**P**

P 3:6,6
package 12:4
page 5:12 9:19,19
  9:22 22:24 23:21
  35:9 36:6,10
  39:14 40:1 41:1
  64:18 65:2 66:25
pages 18:21 39:6
  43:6
paid 48:4
Pannell 10:13
paper 54:22
papers 10:17 34:25
  42:5 53:2 75:24
paragraph 17:5
parent 45:10 69:3
  70:16
Park 3:7
part 39:24 40:11
  40:25 46:24 47:1
  57:7 65:19 69:4
  69:10
partial 71:19,20,21
  75:2

particular 29:10
  59:8
particularly 7:17
parties 4:3 5:15 6:3
  6:4 8:2 16:25
  45:6 51:9,10
  66:24 67:19
  78:11
party 9:14,18
pass 73:20
patent 6:14 7:21
  11:19 12:17 13:2
  15:16 16:2 21:11
  23:25 28:12
  29:21 30:8 39:15
  39:19,21 40:4
  43:20,25,25 44:6
  45:19 47:1 50:2
  64:5 70:11
patentee's 16:9,25
patents 6:17 23:14
  46:24,25 54:12
  68:5,15 69:2,5,8
  69:11,12,13 70:5
  70:9,10 72:21
path 69:3
PATRICIA 3:9
pattern 4:4
PC 3:12
Peachtree 3:13
pending 4:3
Pennsylvania 3:3
people 4:12,14,18
  5:5 8:25 9:12
  37:19,24 41:23
  42:1,7,10 44:15
  52:24 63:13
  64:25 70:14,15
  70:16,20,20 74:6
  77:17
percent 60:25
  61:12,13
perfect 77:7,13
performance 23:13
  24:3 33:3,13,17
  33:23 34:12
period 4:15 19:2
  28:22 60:5
permit 28:13
permits 54:20,20
person 35:17 56:24
  61:14 71:6 75:3
  75:21
perspective 5:11
  10:16
pertaining 27:5
phase 28:16
phone 63:22

pick 4:5,6 5:3
  22:25 76:12
place 46:15 78:7
Plaintiff 1:9,15
plan 25:16 26:12
  48:17
planned 56:19
plans 32:20
plant 19:21
plate 4:17
playback 49:15
pleading 16:5
please 4:20 54:25
plus 16:5 64:1
point 5:20 7:17
  16:18 37:12
  40:24 41:12
  53:23 72:9 73:21
pointed 8:5
portion 43:17
  44:12
position 11:12
  12:16 13:17
  14:25 19:6,12
  25:7 28:3 29:1
  39:22 40:22
  41:22 42:2 44:8
  44:14 45:9 48:2
  48:11,23 49:9
  67:19 69:25
positive 21:18
possible 15:19
  60:14 66:21
  75:10
possibly 37:14
postdated 39:21
postdates 49:10
power 54:18
practice 29:2,7
  39:24 40:12
  42:22 43:23 44:2
  44:3,8 49:12,21
  50:12 51:20,24
precedes 6:25
predicate 17:21
predicted 23:6
prefer 9:3 26:17
  29:20 35:23
  58:23 77:14
preferable 55:20
preference 9:4,7
  42:6 58:11
preferences 37:23
premise 18:7
prepare 10:15,16
  54:22
prepared 50:8,23
  64:5

preparing 9:15
  50:17
presented 43:11
president 56:23
press 32:11,18
presumed 6:14 7:8
pretrial 10:9
pretty 30:15
prevented 42:11
preview 74:13
previous 12:5
primary 49:22
priority 69:4,6
  70:10,11
probably 7:20 14:5
  22:6 23:20 25:24
  26:1,10 43:6
problem 6:4 25:2
  29:9 45:13 46:15
  51:18 58:12 61:2
  61:9 62:21
problems 67:11
procedural 54:9
Procedurally 10:2
procedure 4:10 6:9
  58:5 65:21
procedures 46:12
proceeded 11:11
proceedings 2:2
  10:9
process 4:7 16:6
  19:20,21,25
  20:10 25:25 26:4
  52:11
processing 26:6
produce 15:15,18
  17:15 21:12
  24:19 25:1,10,20
  28:20 30:25 34:3
  36:6 42:3 48:14
  53:7 56:18 58:1
  65:23,24 68:3
produced 11:21
  13:22 14:13 16:1
  16:2 22:19 23:17
  26:23 31:7 43:5
  43:15 44:11,21
  50:16 55:25
  66:13 73:3,5
producing 22:15
  25:4,17 26:7,12
  37:24 48:17
  55:23
product 11:8,14,18
  11:24 12:1,2,25
  13:12,19,20,23
  13:24,24 14:2,9
  14:13,17 15:4,9

16:15 18:7 20:25
  21:14 31:25
  32:15 33:7,10
  34:4,6,8,10 37:24
  39:18 56:24
  64:24
production 20:13
  24:10,14 26:6
  38:11 47:6
productive 4:19
  42:14
products 11:4,9,11
  12:12,13 13:5,7
  13:11 14:21,22
  15:18 18:3,12,15
  18:23 19:13
  20:25 21:17,22
  22:3,8,13,18
  23:13,24 24:3,8
  24:12 27:5 30:7
  31:4 32:14 33:18
  36:12 64:24
  69:14,14,17
  73:10,10 74:7,11
product-specific
  33:13
proficient 57:21
program 44:12,13
prohibit 20:2
projection 71:14
projections 34:8,9
  34:10,17
proper 15:1
properly 13:1 14:8
propose 9:21 25:22
  36:18 57:2,9 62:3
  66:9 75:19
proposed 30:12
  40:8 62:21 74:18
prose 24:13
prosecuted 69:8
  71:24 72:1
prosecution 41:4
  50:1 73:7
protect 48:1,5
protective 24:2
protocol 49:15,16
provide 24:2,4
  27:10 28:20 29:3
  29:4,13 37:18
  38:17 47:24 48:3
  54:17 57:11 58:9
provided 18:24
  19:8 33:13,22
  34:16 42:18 46:5
  48:16
providing 77:15
PTO 75:4

public 2:4 12:3
    13:10 33:11 78:3
    78:16
publicly 20:7
purpose 10:3 33:11
purposely 72:24
purposes 5:5 33:6
    33:12
pursuant 8:1 58:1
push 30:3 60:21
put 4:17 27:12 74:5
    74:8
p.m 62:16 64:6

Q
quality 12:13
quantities 34:6
    35:16
quarter 31:10,18
    31:19
quarterly 34:5
queried 47:17
question 5:20
    17:14,15 59:2,3
    61:24,24,25 62:8
    63:7,8,9
questioning 51:15
    57:13 62:6,7
questions 40:5,6
    43:12 52:3,17
    58:21,23,25
    59:25 60:8 63:1,6
    63:6 65:14 74:11
quick 29:15 37:12
    74:1
quickly 15:19
    18:18 30:16
    34:24 55:6 60:13
    60:15 70:4 75:9
quite 41:25
quote 34:2 68:25

R
R 3:1,2,6
raise 7:18 23:10
raised 41:10
range 27:8
rattle 63:20
reach 29:24 35:3
read 8:4,6 29:23
    41:24 42:5
reading 34:1
real 29:15 73:21
reality 42:21
realizing 66:16
really 8:6 9:6 13:6
    13:7 14:22 30:24
    35:22 42:10

45:12 58:8 59:20
    60:2 67:25 73:12
reason 14:4 70:15
    72:7
reasonable 30:2,18
    37:8 38:2 53:10
    55:3 57:8 59:12
    59:18 62:17
    69:23 70:2 72:11
    74:16
reasons 60:14
rebranded 12:21
    12:25 14:22 18:4
    19:12 21:17
rebranding 14:16
rebut 25:8,15
    70:22
rebuttal 70:21
recall 12:6
received 15:11
    26:5 31:5 33:16
    39:17
recitation 18:9
recognized 41:12
    42:13 52:24
recommend 53:20
    53:21
recommendation
    53:8,17 54:6,10
    54:17,24 55:18
    57:25 63:23 64:3
    64:7,9,13
recommendations
    55:13
record 8:24 40:20
    40:25 41:3 51:3
recording 12:20
    13:23 14:3,18
    19:13 36:14
    49:14,17
reduction 39:24
    40:12 42:22
    42:23 44:2,7
    49:12,21 50:12
    51:19,24
refer 37:19
reference 9:23
    12:23 14:3,7
    18:18 22:13
    32:11,12,18
    37:16
referenced 10:8
references 15:24
    18:22,25
referring 16:11
    28:22 33:2 35:2
    43:8 62:24
reflects 24:13 34:5

51:1
regard 47:12
regardless 42:4
regular 7:4 16:5
    41:17
regularly 52:25
    53:1 54:2 56:3
reiterate 72:21
reject 76:4
rejected 74:24
relate 37:23 39:7
    49:14,21
related 13:4 24:9
    27:1 34:14 51:22
    65:11 72:23
    73:13,14
relates 23:13 24:5
    24:8 30:24 31:15
    74:10
relating 11:4,22
    31:4
relative 78:10,12
relatively 52:11
release 32:18
releases 32:11
relevant 47:2
    49:11,25 71:1
relief 46:1
rely 25:7 69:6
relying 43:24 44:2
    44:6 70:10,11
remember 62:1
remembered 50:25
    51:4
removed 70:8
reopen 44:22
repeated 42:25
report 34:5 37:9
reporter 2:4 5:9
    77:21,24
reporter's 5:5
reporting 33:6,11
represent 43:24
    48:20 60:10
represented 48:18
request 24:14
    33:24 34:21 37:1
requested 5:15
    67:18
requesting 15:13
requests 15:17
    21:3,11 24:9
require 17:22
    68:10
required 15:14,16
    15:18,23 20:23
    21:10,25
requires 17:11

21:12 37:10
requiring 24:20
resetting 6:17,19
resist 46:17,17
    73:19
resistance 41:20
resisted 11:17 25:3
resisting 60:17
resolution 9:24
resolve 58:3
respect 40:7 45:15
    48:19 62:23 63:3
    65:20
respond 13:1 17:11
    18:18 24:23 28:8
    34:25 42:15
    47:19 49:2 52:15
    58:22 65:18 70:4
responded 13:1
    14:7
Responding 52:22
response 17:25
    23:23,23 24:22
    33:23 74:1
responsive 23:17
    25:25
rest 8:11
restarted 6:20
result 31:25 60:16
results 5:19 32:20
retrieve 50:17
revenue 31:17,19
    34:3,13,15,15
    35:20
revenues 33:7
review 26:11
reviewed 50:18
revisit 52:8 75:23
revisited 10:12
Richardson 3:12
    5:8
right 4:22 8:10
    15:21 20:9,15
    21:5,20 22:19,22
    25:13 28:15,17
    28:19 30:10
    43:24 52:22 55:4
    55:15 56:15
    66:12 67:17 72:5
    75:12,24
road 2:6 17:18
RODERICK 3:2
rolling 26:19 27:19
Roman 23:9
room 26:16 53:13
    53:15
Roseland 2:6
row 6:11,11 9:22

rule 7:22 8:16 9:17
    16:8,17,22,24
    17:9,23 29:1,3
    41:9 63:5 67:20
    67:24 71:10
    73:20
ruled 62:24
rules 6:15 7:21 8:5
    11:19 12:18 13:2
    15:16 16:2,3,21
    18:14 19:15,16
    20:1 21:11 22:10
    28:12,14 41:8
    46:15
ruling 7:13,25 8:4
    8:8 23:16 27:16
    29:8 60:6
rulings 23:7
run 63:14
running 73:16
runs 44:19

S
S 3:6
sale 75:12,14
sales 31:3,5 32:8
    34:8,9 35:7,9
    36:2,6,10,12
    70:20 73:11
    75:15
satisfied 17:7
    34:17
satisfy 17:10
saw 65:21
saying 8:6 11:18
    13:1 14:7 18:1
says 6:12 7:22,23
    8:16 13:22 14:15
    17:2 28:6 31:16
    34:2 43:22 44:4
    46:13 60:7
schedule 5:14 6:14
    6:18,25 7:3 8:11
    39:8,9 41:18
    68:23 74:18,23
    77:9
scheduled 62:12
scheduling 4:8
    5:13
schematics 15:25
    21:12
Scholer 3:7 27:10
scope 21:21 28:11
Scott 3:9 4:25 5:25
    6:2 9:4 16:11,17
    18:1 22:6 24:18
    30:22 33:2,15
    34:1,18 37:3,6,12

37:17,21 38:5,17
38:22 41:5 51:25
55:14,21 64:6
65:4 74:13 76:1
77:20
**Scott's** 10:25 32:24
33:24 50:8 62:11
77:2
**SDM** 4:1,24 5:2,25
6:6 8:12,19,23
9:9 10:1,14,25
15:20 21:7,20
22:5,22 24:25
25:22 26:14
29:23 30:10,17
30:22 32:25
36:24 38:4,20,24
39:2 42:16 49:4
51:6,25 52:6,20
54:21 55:4,7,11
59:20 60:20
61:20 63:12
64:10,15,20
71:12 72:3 75:24
76:11,18,23 77:4
77:16,23
**search** 38:2
**seats** 34:7
**second** 33:22 42:20
68:24 69:11
74:15
**secondary** 23:18
56:11
**secret** 20:1
**Section** 17:9
**see** 4:20 5:14 6:11
10:20 16:12 17:1
20:10 29:24
36:20 56:19 57:2
60:10 61:11
67:10 70:7
**seek** 20:10 45:23
**seeking** 29:19
**sell** 73:10,11
**send** 36:19 47:19
**sense** 61:18 67:3
72:4
**sent** 9:12 64:13
**separate** 4:17
10:19 68:14
**separately** 34:14
**September** 39:16
**sequential** 16:7
**series** 7:5
**server** 50:17,19
**serves** 8:4
**service** 34:15,15
**set** 14:8 16:7 28:1

54:5 76:16 78:8
**sets** 68:16
**setting** 9:10
**Setty** 3:15 5:4,6 6:7
8:16,21 9:3 10:24
15:21 22:1,24
26:10,15 27:1
28:10,15,18,24
29:9,15 30:4,11
30:21 32:23 33:1
36:19,25 38:15
38:21 39:3 43:13
43:22 46:20 47:3
48:23 49:2,5
51:17 52:7,22
54:23 55:5,9,12
57:2,5 58:3 59:14
59:16 60:3,4,18
60:25 61:1,15,23
62:20,22 63:5,20
64:16,22 65:19
66:7,14 67:8,17
67:22 68:8 71:18
72:5,16,18,19
73:8,23 74:1 76:1
76:14,19 77:1,7
77:13,19
**Setty's** 19:11 20:15
25:21 28:22 35:2
43:8 54:16 63:9
67:1
**seven** 28:3,23 29:1
29:5,6,21 30:15
35:11 52:13 53:9
53:25 55:2,6
59:21,23 60:9,21
61:18 63:13,15
64:1 67:4 73:2
**seven-hour** 57:17
60:5
**Shamir** 65:3,4,7
**share** 14:14 31:1
75:6
**sheet** 35:10,12,13
**shelf** 13:12
**shift** 17:10
**Shlomo** 65:2
**Shorthand** 2:3
**show** 13:10 31:4,24
46:19 47:22 48:8
48:18,22 73:24
**showed** 47:17,23
**shown** 73:21
**Shporer** 41:1 45:5
45:16 46:18,21
46:23 47:3 48:8
48:20 49:1 55:10
55:14,18 64:2

**side** 4:4,6 20:8
26:18 32:7
**sign** 53:2 54:22
57:11
**signed** 53:2 75:4
**significant** 27:20
35:24 42:11
**signs** 53:18
**simple** 68:25
**simply** 18:3,13
**simultaneously**
30:8 40:3 49:20
**single** 24:7
**sites** 31:10
**sits** 38:9
**sitting** 56:11
**situation** 6:3 13:15
14:20 15:2 19:16
19:18,25 59:11
63:3 67:4 71:3,4
72:25 73:15
**six** 24:6 39:16
53:24 62:16 64:6
**sixth** 65:2
**slow** 52:11
**sneak** 19:21
**software** 1:7 3:11
11:2,7 12:5 13:6
34:12,13 44:12
44:12 45:8,9,11
47:24 53:22
67:13 68:20
69:14 70:13,17
**softwares** 12:8
**software-only** 33:9
**sold** 34:6
**solution** 21:21
36:14,14,21,22
**someone's** 36:11
**somewhat** 73:13
**sort** 4:6,11
**sought** 46:22
**sound** 74:16
**sounded** 69:16
**source** 11:21 12:15
13:3,8,16 14:10
15:2,8,11,15,23
15:24 16:19 17:1
17:20 18:2,4,11
18:25 19:1,6,7,17
19:25 20:14,14
20:18 21:12
22:16 24:6,15
39:17,21,23 40:4
40:7,11 43:7,13
43:14,17,19,20
43:22 44:3 49:6,8
49:10,13,16,18

50:12,14,20,24
51:14,16,19
52:19 74:9
**sources** 12:4
**span** 66:20
**speak** 4:20 5:9 59:6
**speaking** 5:10 43:2
56:7,8
**special** 3:2 29:5
53:19
**specific** 24:9 32:18
33:24 37:16 40:5
40:6 55:22
**specifically** 13:22
14:15 15:17,24
17:2 23:16 28:12
37:3
**specification** 43:7
70:6,7,9 72:22
**specifications**
15:25 17:13
21:13 22:16 43:9
52:16,17
**specifics** 36:20
**SPELLMAN** 2:3
78:3
**spend** 35:10,23
36:4 48:2
**spending** 73:17
75:17
**spoken** 53:1
**staff** 55:17
**standpoint** 43:4
70:25
**start** 4:2 15:21
26:7 39:11 44:14
62:16 63:12 64:6
**started** 25:25 26:4
43:20 50:3
**starting** 23:9
**State** 2:5 78:4,16
**stated** 40:20
**statements** 50:1
**states** 1:1 20:5
56:20 66:10
**STATUS** 1:11
**stenographic** 2:1
**stenographically**
78:6
**stick** 39:8
**sticking** 41:17
**Store** 11:8,13,16
11:23 12:1,12,21
12:24 13:23 14:1
14:3,16 19:7,9
22:12
**story** 10:13 15:7,8
16:16,20 17:19

20:12,13,20 23:3
25:12 28:25 29:1
29:17 35:1 41:10
45:7,10,13 52:23
53:18,20 54:18
69:21 70:1 72:10
73:22,25
**Story's** 29:2,7
32:17 41:24
42:13 45:17
**straightforward**
69:1,18
**Street** 3:13
**structure** 4:14,21
**structures** 17:6
**STS** 1:7 3:11 5:15
11:2,7 15:10
17:22 23:2,15,24
27:7 28:2,6 39:19
39:22 41:6,21
43:16 45:7,8,9,11
47:24 48:1 54:11
57:5 64:23 65:9
67:12,18 69:5
70:5,13,25 72:1
74:5
**STS's** 23:12
**style** 16:6,10
**subject** 46:3 57:7
75:20
**submission** 57:11
**submit** 63:23 64:3
**subsequently**
44:11
**substantially** 26:8
**substantive** 74:12
75:5
**success** 23:18,21
25:8,14,15 30:2,6
30:20,25 31:5
33:25 36:7,9 68:2
70:18,21,22 71:8
73:13 74:14
**sudden** 12:8 44:15
**sue** 20:10
**sued** 19:19 66:4
67:2 72:23
**sufficient** 17:17
23:21 29:22 68:7
**suggest** 29:11
36:18
**suggestion** 51:12
54:17
**suit** 20:3 23:14
24:1 46:25 47:2
57:6 65:9 68:5,21
69:2,12,13 70:5
**suite** 12:14

suites 12:6
summary 24:16
summons 47:14,21
  47:23
Sunday 76:23
superseded 27:15
supplement 18:13
  41:14
supplemental
  16:11 17:16
supplementation
  24:10 37:2
supply 17:13
support 34:16
  70:20
supporting 17:6
supports 32:22
suppose 26:16
sure 5:9 6:8 19:15
  19:23 21:6 24:25
  26:22 55:12
  65:13 70:22
  76:24
surely 71:2
survey 32:12,13,19
  32:20,21 37:12
  37:16
surveys 37:15,19
switch 64:17
switched 31:21,24
system 31:21,21
  72:23
Systems 1:7,11,14
  1:17,18 3:11,11
  3:11,16 5:8 11:7
  25:8 31:3 33:3,9
  33:16,25 35:18
  43:5 45:8,22,25
  56:25 59:5 70:12
  70:16 71:7 73:9
S-H-A-M-I-R 65:3
S-H-L-O-M-O
  65:3

T

table 5:12 6:10,11
  9:22
tacked-on 65:17
tactic 42:11 60:12
tails 4:25 5:2
take 4:24 8:3 16:4
  38:5 39:15 40:20
  41:2 44:24 49:1,5
  51:7 53:11 54:4
  56:22 57:16
  66:14,17 68:4
  70:15,18 71:9
  73:8 74:20 77:11

taken 2:2 12:11
  14:25 28:2 37:7
  39:22 40:16
  41:22 45:9 56:22
  56:25 57:12,15
  64:4 66:22 67:4
  71:19,22,24 73:5
  73:7,8,18 78:6
takes 20:16
talk 42:18 52:21
  61:7 74:17
talked 38:21 56:5
talking 30:24
  37:20 39:4 52:24
talks 31:9
targeted 63:13
technical 21:13,19
  22:16 24:4 30:6
  64:25 70:14,19
  71:6
technicalities
  58:24
technologies 23:14
  23:25 27:6 40:2
technology 49:19
  68:16 74:7
Tel 39:25 42:4,8
  54:1,3 56:3 65:11
  66:6,13 67:6
  68:11,18
telephone 29:16
  51:8
TELEPHONIC
  1:10
tell 19:12 29:25
  54:25
ten 67:18,20,23
  68:4,24 69:20
  70:2 71:2,9,13
  72:9 73:20 75:21
  75:22
tends 73:15
terminating 76:12
terms 24:17 28:11
  30:19,19 34:7,11
  40:24 54:25
  71:13
testified 40:1 43:19
  47:9 75:4
testify 29:14 39:20
  73:9
testimony 27:7,10
  27:15,18,21,23
  27:24,25 28:21
  33:15 37:5 39:25
  40:10 41:2 42:12
  49:19 50:3,7,10
  50:21 53:10

55:19 57:12,14
57:16 68:10 71:6
78:6
theirs 25:19
theoretically 10:17
they'd 4:16
thing 25:6 31:5
  48:5 65:20 72:20
things 15:3 17:25
  31:23 32:5 41:8
  42:23 60:19
think 4:18,19 7:16
  7:19 10:9 11:1
  15:22 19:17 20:5
  20:5 21:2,20 22:5
  22:23 23:2,15,19
  23:22 25:24,25
  26:1,4,6,22 28:10
  28:21 29:4,12
  30:2,23 34:20
  36:5,8,9 37:5,7
  38:4 42:10 43:18
  44:13,18,25 48:4
  50:5,10 52:9,18
  52:23 53:9 57:24
  58:14,16,19
  59:11 60:6,9,23
  62:22 66:19,23
  68:4,6,19 70:1,25
  71:10,16 72:3,5
  73:17,19,22
  75:22 76:9 77:9
third 16:11 17:16
third-parties 45:6
third-party 48:11
  63:3
thought 4:1 12:8
  25:10 37:2 52:9
  52:11 74:22
thousand 43:6
three 5:5 6:17 24:1
  45:3,5 48:10,19
  52:9 53:12 64:11
  69:2,11 70:5,9,10
  72:21
Thursday 76:25
time 4:13,15 5:23
  6:8 7:23,24 8:17
  11:24 16:21
  18:13 19:3 20:16
  28:3,21 29:19
  34:18 35:14,22
  35:24 37:15
  38:10 40:8 44:16
  45:1 48:25 51:13
  51:22 52:13,18
  53:21 55:1 56:25
  57:6 58:4,13,14

58:15,19 59:12
59:14,18 60:2,4
61:3,4,12,14
62:13,16,16
63:14,19 65:17
66:7,12,13,19,23
67:10 73:16,21
75:17,20 76:24
77:5 78:7
times 32:16 37:13
  63:9 66:17
today 4:2 19:13
  37:17 73:11,11
told 47:21 53:17
tomorrow 48:7
  77:2,5,12,20
tongue 56:10,16
  59:7
topic 4:5,5,6 5:3
  28:10,10,24
  30:22,23 33:17
  37:21
topics 27:3,8,11,13
  27:14,16 28:21
  29:3,4,10,12,13
  29:14 30:5,13
  35:11 38:23
  42:21 51:14,15
  75:3
total 28:3 31:16
  53:14 68:15
touch 55:9 69:1
  72:16
touched 38:16
  76:15
tough 57:1
track 7:4,6 8:1,18
  34:4,5
tracking 33:7
tracks 7:4 33:12
transcript 2:1 8:25
  9:8 29:16,24
  62:23 77:24 78:5
transcripts 23:5
  73:24
translate 63:11
translated 57:18
  60:1,3,8 62:9
translation 58:13
  58:20 59:13,19
  60:5,7,21,24 61:3
  61:14,17,21 62:7
  63:14,18 64:1
  65:16 67:10
translations 61:23
  65:20
translator 59:25
  63:11

travel 42:8 44:10
  44:23 56:19
  66:12 68:22
travels 50:6 54:2
  56:2
trial 10:7 25:11
  36:11 60:13
tried 47:18 60:16
true 43:15 78:5
truly 19:12
try 14:24 19:3
  26:23 38:25
  52:20 56:21,22
  60:19 66:15 67:6
  72:12
trying 26:23 35:3,6
  35:24 58:3 72:12
turn 10:25 22:24
  25:19 39:5 63:10
turns 4:10
two 5:16 7:3,6
  10:16,19 14:21
  18:3,15 20:24
  23:22 39:14
  42:19 43:1 44:25
  51:8 52:7,15,18
  52:20 58:25
  59:10 60:8 61:15
  63:22 66:11 68:5
  68:14,15 69:12
  73:1,4 74:19
two-page 16:13
  17:17
type 51:3 36:13
types 5:22
typically 4:3 69:24

U

ultimately 11:20
  11:21 13:10 35:4
  36:11 40:19
  47:21
understand 13:7
  20:21 30:4 31:12
  31:15 35:18,25
  36:3 44:19 54:6
  57:19 58:24 59:2
  61:7 74:6 75:10
understandable
  63:9
understanding
  27:17,20 35:15
  59:4
understands 63:7
understood 55:21
unfortunately
  69:18 76:15
United 1:1 56:20

66:10
unjustified 44:13
unreasonable 74:23
unrepresented 53:16
USC-Section 17:5
use 25:15 41:19 52:12 59:10 60:11 70:24 77:14,17,20,21
uses 13:23
U.S 42:5,7 50:6 54:2,3 56:2 57:13 57:15 65:9 68:21

**V**
vague 31:11 32:1
valuable 56:25
variety 73:8
various 74:6
vast 26:2,24
vehicle 52:2,4
vented 69:25 72:9
versions 14:22
vice 56:23
view 21:16
violating 9:17
visit 59:11
Voiceover 31:10 31:24 32:14 36:14 49:17 67:24 71:7
voluntarily 47:17
volunteer 47:15
vs 1:10,16

**W**
wait 60:10
WANG 3:10
want 8:12,14,24 18:18 21:8 22:3 23:10 25:22 27:19 28:4 30:18 32:14 35:10 47:20 48:2 49:22 54:21 55:2,9,11 55:25 56:17 57:8 59:8 61:14 63:10 63:14 64:16,19 68:17,23 70:18 72:4,8 76:12
wanted 6:8 7:18 8:9 11:2 27:6 33:25 34:18 42:2 47:3
wants 46:20 48:25 48:25 58:17,18

60:1,18 68:14 73:8
warning 67:21
Washington 3:3
wasn't 50:15 55:22 58:6
waste 58:14 75:20
way 4:12 6:13,13 7:2,10 9:14,22 21:2 44:19 46:10 48:21 50:21 51:5 53:10 56:12 57:14,20 62:13 66:24 67:5,17 68:12 71:18 77:16
ways 7:7
Wednesday 2:7
week 5:16 54:3 74:20 76:24
weeks 41:19 74:19
went 62:1 73:2
weren't 27:4
we'll 4:5,6,20 8:19 10:19,20,20 19:14 22:22 26:22 34:21 52:5 52:21 54:4 61:1 63:23 65:21,24 66:15 75:9,23
we're 5:7,22 8:9 13:14 14:24 15:1 15:13 17:14,15 19:5 20:23 21:1 21:17,24 22:18 25:5,6 26:25 27:21 30:25 32:6 33:18 37:6,24 41:17 56:14 59:10 60:11,14 60:17 63:4,22 67:13,14,15 68:21 71:17 74:24 75:10,16
we've 6:18 14:18 14:23 17:18,23 20:12,14 22:12 22:14,20 24:13 25:25 26:4,5 30:5 31:3 34:17,20 38:1 39:17 49:12 55:1 66:5 72:12 73:1 74:24
wide 27:8 76:19
wiggle 26:16
willing 54:4 55:22 68:21
wishes 52:3

withdraw 67:22
withdrew 27:12
witness 1:11,14 3:16 5:8 11:4,7 11:11,25 12:11 12:25 13:20,21 14:7,12,21,25 15:14 22:14 25:8 25:13 27:11,18 28:20 29:13 31:3 33:3,9,15,25 34:2 35:17 36:5 42:25 43:5 44:15,25 45:22,25 48:13 50:6 52:15 54:1 55:23 56:15 57:9 57:25 59:1,1,15 61:12 63:7,8,10 63:10 66:3,8 67:2 70:12 72:23 74:5 74:9 75:12,15 76:4
witnesses 28:5,7 38:17,23 40:14 42:3 45:3 46:19 55:8 56:6 57:20 58:8,21 61:6 62:4 62:10,16 63:3,6 63:15 64:22 65:5 65:5,10 66:1,13 67:7 68:3 70:23 71:1 72:6,13,15 73:9 74:3,4,17,19 74:22 75:9,21
witness's 12:16 32:19 44:21 61:12
Word 12:7
words 5:22 51:20 74:8
work 4:7,11 29:20 30:17 31:14 32:3 32:5 47:7 50:4,4 52:21 59:17 60:24 67:9 70:1 72:10 76:5,7
working 4:11,19 19:3 59:4
works 7:3 49:24 55:15,16
wouldn't 65:4
wrapped 24:7
wrinkle 5:14 6:24
write 4:15 55:1
written 9:1,3,6 51:22
wrong 51:2 73:23

**X**
XIO1519 2:4

**Y**
Yeah 4:23
year 65:6
York 3:8,8 50:8 74:21
Yosef 41:2 48:13 55:10,24 56:4,18 58:11,17 59:24 63:25 65:21,22
Y-O-S-E-F 41:2

**0**
05 31:19

**1**
1 2:7 34:3 74:25
1:04-CV-2111-R... 1:4
1:04-CV-2531-C... 1:5
10 27:11
10022-3598 3:8
11 27:17 28:19 29:10 39:6,14
11:09 77:25
112 17:5
12 27:11 39:6 41:1 71:17,19 72:7
1201 3:3
1230 3:13
13 39:6 64:18 65:2 66:25
14-hour 57:17
15 26:1,3,9,10,15 26:24
15th 41:6
16 24:15 40:1
17 24:14 27:17 28:20 29:10
18 24:15 37:6
19 24:14 27:11
19th 3:13
1997 49:15
1998 49:17 74:10

**2**
2 34:5 38:7
20 6:21 24:14 29:12 40:2 61:13 68:12 75:1
20004-6020 3:3
2004 11:6
2005 31:18 34:1
2006 2:7 6:12,19 23:3 78:18

2008 78:17
202)662-5195 3:4
21 24:14
212 3:8
22nd 6:23
25 6:12 60:25 78:17
27th 33:16

**3**
3 5:12 22:23
30 7:25 8:15,17 22:14 26:20,21 26:24 27:22 59:25
30(b)(6) 27:3,7,11 27:23 28:3 29:2,3 29:21 35:11,15 37:21 38:7,16,21 42:21,25 71:21 71:25 73:7 74:5,8 75:3
30(b)(6)s 64:25
30309 3:14
35 17:5
360 12:2,4,11,14 12:15,20,22,25 13:4,5 20:25 21:15

**4**
4 6:19 9:19 24:14
4th 23:6
4.1 16:8,17,22,24 17:19 18:13 22:7 22:10,21
4.1(a)(3) 17:2
4.2 17:10,25 22:4,8 22:15
4.2(c) 15:24
4:30 77:6,12
404 3:14
425 3:7
45 8:2,7,13,18,19
49 40:1

**5**
5 2:6 9:23 27:16 28:19 29:10

**6**
6 17:5 23:3 34:1
6.2 5:17 6:20 41:10 41:11,14
6.7 7:21 9:23
60 28:1
665 50:2 70:10

**7**

**7** 27:16 28:19
  29:10

**8**

**8** 22:25 23:24
  27:17 28:10,10
  28:16
**80** 61:12
**836-8000** 3:8
**892-5005** 3:14

**9**

**9** 23:21 78:18
**9:34** 2:8
**98** 18:21

# EXHIBIT 44

1

2

3                                    *E-FILED 2/15/06*

4

5

6

7

8
                        IN THE UNITED STATES DISTRICT COURT
9
                       FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
                                    SAN JOSE DIVISION
11

12   WITNESS SYSTEMS, INC.,                          NO. 05-mc-80298 JF (RS)

13              Plaintiff,                            **ORDER DENYING MOTION
                                                     FOR PROTECTIVE ORDER
14       v.                                          AND GRANTING MOTION
                                                     TO COMPEL**
15   NICE SYSTEMS, INC., ET AL.,

16              Defendants.
                                            /
17

18                                   I. INTRODUCTION

19       Third-party Netopia, Inc. ("Netopia") seeks a protective order concerning the production of

20   its trade secret source code to plaintiff Witness Systems, Inc. ("Witness") in an underlying patent

21   infringement action which is currently pending between Witness and defendants Nice Systems, Inc.

22   and Nice Systems, Ltd. (collectively, "Nice").  Although a protective order has been entered in the

23   infringement case, Netopia contends that such order is insufficient to protect its highly confidential

24   trade secrets, especially in light of the fact that Witness collaborates with Expertcity, Inc.

25   ("Expertcity"), a direct competitor of Netopia.  As a result, Netopia asks the Court to enter its

26   proposed protective order to ensure that its source code is not revealed to its competitors.

27       Witness not only opposes the entry of an additional protective order, but also moves to

28   compel production of Netopia's source code materials, as requested in the subpoena it issued to

*United States District Court*
*For the Northern District of California*

1    Netopia. Witness contends that the protective order proposed by Netopia is too restrictive and costly,

2    and is unnecessary in light of the orders existing in the underlying litigation. Witness also contends

3    that Netopia cannot now object to the production of its source code materials since it previously

4    agreed to provide those materials when the parties' negotiated an amendment to the existing

5    protective order.

6          The motions were fully briefed and heard by the Court on February 15, 2006.  Based on all

7    papers filed to date, as well as on the oral argument of counsel, the Court denies the motion for a

8    protective order and grants the cross-motion to compel, finding that the amended protective order

9    and additional security protocols noted below provide reasonable security to protect Netopia's source

10   code.

11                                    II.  BACKGROUND

12         Witness and Nice directly compete in providing monitoring tools that record customer

13   interactions, through both computer screen and voice capture, for quality control purposes.  Third-

14   parties Expertcity and Netopia are also direct competitors in providing remote control software

15   utilized by Witness and Nice.

16         Witness owns two patents, both entitled "Method and Apparatus for Simultaneously

17   Monitoring Computer User Screen and Telephone Activity from a Remote Location," which it

18   contends are infringed by the software sold by Nice. As a result, Witness and Nice are engaged in

19   litigation in the Northern District of Georgia and discovery is proceeding in that action. The

20   software sold by Nice, as discovered by Witness, incorporates a remote control software product

21   designed by Netopia called "Timbuktu."  Since the Timbuktu software is an integral component of

22   the Nice products which are alleged to infringe the patents-in-suit, Witness served a subpoena on

23   Netopia in this district on January 12, 2005, pursuant to Fed. R. Civ. Pro. 45.

24         The subpoena issued to Netopia demands the production of various documents and

25   information, all of which Netopia has apparently produced, with the exception of its source code

26   materials. Netopia refuses to provide that material, claiming that inadequate safeguards have been

27   implemented to protect against the dissemination of its trade secret source code to its direct

28                                          2

United States District Court
For the Northern District of California

1    competitors, such as Expertcity, who collaborate with Witness. Netopia requests, therefore, that the

2    Court enter its proffered protective order before compelling it to provide its source code to the

3    parties in the underlying action. Witness responds that the protective order already in place, coupled

4    with conditions added to that order by an amendment specifically negotiated with, and agreed to by,

5    Netopia, addresses fully Netopia's concerns and ensures that its source code cannot be improperly

6    disclosed to any third parties, including Expertcity. Witness requests, therefore, that Netopia's

7    motion for entry of a protective order be denied, and that Netopia be compelled to provide its source

8    code materials to Witness.

9                                   III. STANDARDS

10        Rule 45 of the Federal Rules of Civil Procedure governs subpoenas duces tecum for the

11    production of documents with or without the taking of a deposition. Pursuant to Rule 45, the

12    nonparty served with the subpoena duces tecum may make objections to the subpoena within 14

13    days after service. Fed. R. Civ. Pro. 45(c)(2)(B). "Only the witness can prevent disclosure by

14    objection. The party to whom the subpoenaed records pertain cannot simply object. Rather, a

15    protective order or motion to quash the subpoena is required." McCoy v. Southwest Airlines

16    Company, Inc., 211 F.R.D. 381, 384 (C.D. Cal. 2002). Fed. R. Civ. Pro. 45(c)(3)(A)(iv) provides

17    that a court may quash or modify an issued subpoena if it "subjects a person to undue burden." Non-

18    parties have standing to assert that subpoenas seek non-relevant information. Compaq Computer

19    Corp. v. Packard Bell Elecs., Inc., 163 F.R.D. 329, 335-36 (N.D. Cal. 1995).

20        Entry of a protective order is warranted where the moving party establishes "good cause" for

21    an order and justice so requires to protect a party or person from annoyance, embarrassment,

22    oppression or undue burden or expense. Fed. R. Civ. Pro. 26(c). "For good cause to exist, the party

23    seeking protection bears the burden of showing specific prejudice or harm will result if no protective

24    order is granted." Phillips v. General Motors Corp., 307 F.3d 1206, 1210-11 (9th Cir. 2002).

25    "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not

26    satisfy the Rule 26(c) test." Beckman Industries, Inc. v. Int'l Ins. Co., 966 F.2d 470, 476 (9th Cir.

27    1992). Responding parties are, however, "entitled to protection from 'undue burden' in discovery,

28                                        3

*United States District Court*
*For the Northern District of California*

United States District Court

For the Northern District of California

1    including protection from misuse  of trade secrets by competitors." Brown Bag Software v.

2    Symantec Corp., 960 F.2d 1465, 1470 (9th Cir. 1992).

3                                      IV.  DISCUSSION

4            Netopia concedes that on March 23, 2005, it executed an amendment to the Consent

5    Protective Order entered in the underlying infringement action.  See Motion at p. 5, lines 25-26. That

6    amendment states, in relevant part, that Netopia agrees amendments "....to the provisions of the

7    Consent Protective Order shall govern the conduct of discovery" between Witness, Nice, and

8    Netopia.  See Declaration of Christopher Green, Exh. D, at p.1.  The Consent Protective Order sets

9    forth two-and-a-half pages of procedures and security protocols to be utilized in connection with the

10   production of computer source code.  Id., Exh. C, pp. 10-12.  Witness notes that a party who has

11   agreed to a protective order will not later be heard to complain that the order is not justified.  See

12   Bayer Ag and Miles, Inc. v. Barr Laboratories, Inc., 162 F.R.D. 456, 466 (S.D.N.Y. 1995).

13           Nonetheless, Netopia states that, because it had always objected to the production of its

14   source code, the parties knew it did not intend to include such material in the context of its

15   negotiations concerning the production of other non-trade secret items. All parties understood,

16   according to Netopia, that it was agreeing only to the production of additional, non-source code

17   materials which had been requested by Witness.[1]

18           Even assuming that Netopia did not agree to produce its source code under the terms of the

19   protective order entered in the underlying patent litigation, the issue presented in this motion is

20   whether that order provides adequate protections to preserve the confidentiality of its trade secret

21   source code or if, as Netopia contends, additional safeguards must be added.  Netopia complains that

22   not only does the current protective order lack necessary security protocols, but contends that

23   Witness implicitly conceded as much both by amending the order and by orally agreeing to

24   implement additional security measures not covered in the orders. Those actions, according to

25

26           [1]  The correspondence submitted by both Witness and Netopia reflects Netopia's consistent refusal to provide its
         trade secret source code to Witness, absent additional protections and safeguards.  See e.g., Exhibits to Declarations of
27       Christopher Green and Mitchell Blakely.

28                                              4

1   Netopia, coupled with the initial failure by Witness when it disclosed its experts to ensure that such

2   experts executed the amendment to the protective order, require entry of an additional protective

3   order.

4       "Courts have presumed that disclosure [of trade secrets] to a competitor is more harmful than

5   disclosure to a noncompetitor." American Standard Inc. v. Pfizer, Inc., 828 F.2d 734, 741 (Fed. Cir.

6   1987). As a result, the court must balance the need for discovery of trade secrets against the claim

7   of injury or undue burden resulting from such disclosure. Id. In this instance, there is no dispute

8   that the source code is a trade secret or that Netopia, as a third party to the underlying dispute, has a

9   heightened expectation that its proprietary information be protected. At the same time, Netopia

10  concedes that its source code is relevant and necessary to the underlying patent litigation since it is

11  admittedly incorporated into the Nice products which are accused of infringement. The crux of the

12  dispute lies, therefore, in striking a balance between permitting Witness access to the information it

13  needs to pursue its claims while at the same time protecting that information from unwarranted

14  disclosure.

15      The proposed protective order proffered by Netopia imposes undue burdens and costs upon

16  Witness, especially in light of the fact that Witness agrees to abide by several additional security

17  protocols. Moreover, Netopia's offer to make its source code available for *inspection* rather than

18  simply agreeing to produce the code to Witness is inconsistent not only with the protective orders

19  entered in the underlying case, but with the Patent Local Rules promulgated in both this district and

20  in the District of Georgia. See e.g., Green Decl., ¶ 12, Exh. F, Georgia Patent L.R. 4.2(b); N. D. Cal.

21  Patent L.R. 3.4(a). It is reasonable to require Netopia to produce its source code to Witness, rather

22  than simply requiring it to make the code available for inspection. Since the source code must be

23  produced, the additional security measures proposed by Netopia, such as allowing inspection to

24  occur at its outside counsel's office located in Palo Alto, California, and providing a person to

25  monitor the requesting party's inspection do not come into play. Instead, Netopia must provide its

26  source code on a suitable disk or CD-ROM, as provided in the Consent Protective Order entered in

27  the underlying action.

28

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    In addition, the additional security protocols agreed to by the parties in the underlying

2  infringement action and pursuant to which those parties produced their source codes to each other,

3  shall be implemented by Witness with respect to Netopia's production of its source code. Witness is,

4  therefore, ordered to provide a Second Amendment to the Consent Protective Order which reflects

5  all additional security protocols implemented in the underlying action, as well any further measures

6  to which Witness and Netopia may agree, to Netopia within five (5) days of the date of this order.

7  Netopia and Witness shall execute that amendment and file it with the Court within ten (10) days of

8  the date of this order so that Netopia may then provide its source code to Witness.

9                                 V.  CONCLUSION

10    For the reasons stated above, the Court denies the motion for entry of the protective order

11  regarding third party Netopia and grants the cross-motion to compel production of the source code

12  materials. Netopia shall provide the source code information requested by Witness, pursuant to the

13  terms and conditions contained in the Consent Protective Order filed in the underlying action on

14  March 17, 2005, the Stipulated Amendment to the Consent Protective Order filed on March 23,

15  2005, and the Second Amendment to the Consent Protective Order to be entered by this Court,

16  within thirty (30) days of the date of this order.

17  IT IS SO ORDERED.

18  Dated: February 15, 2006

RICHARD SEEBORG
United States Magistrate Judge

6

**THIS IS TO CERTIFY THAT NOTICE OF THIS ORDER HAS BEEN DELIVERED TO:**

Mitchell M. Blakely     mblakely@morganlewis.com

David C. Bohrer dbohrer@morganlewis.com, giyer@morganlewis.com;
tbrewster@morganlewis.com

Katherine D. Prescott     prescott@fr.com, horsley@fr.com

**Dated: 2/15/06**                          **Chambers of Judge Richard Seeborg**

                                       **By:**    /s/ BAK

United States District Court
For the Northern District of California

# EXHIBIT 45

# FISH & RICHARDSON P.C.

1230 Peachtree Street, NE
19th Floor
Atlanta, Georgia
30309

Telephone
404 892-5005

Facsimile
404 892-5002

Web Site
www.fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

**VIA EMAIL**

May 31, 2006

Scott G. Lindvall, Esq.
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022

Noah Graubart
(404) 942-2761

Email
Graubart@fr.com



ATLANTA

AUSTIN

BOSTON

DALLAS

DELAWARE

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

Re:     *Witness Systems, Inc. v. Nice Systems, Inc. and Nice Systems Ltd.*
         USDC-N.D. Ga. (Atlanta) - Civil Action No. 1:04-CV-2531 (CAP)

Dear Scott:

I write to address Witness Systems, Inc.'s ("Witness Systems") depositions of NICE Systems, Inc. ("NICE, Inc.") and NICE Systems Ltd. ("NICE Ltd.") (collectively "NICE") pursuant to Federal Rule of Civil Procedure 30(b)(6).

   1.  Deposition of NICE Systems, Inc.

On November 10, 2005, Witness Systems' counsel, Jose A. Duthil, wrote to you to address the Rule 30(b)(6) deposition of NICE Systems, Inc. In that letter, Mr. Duthil outlined the various topics left unsatisfied by the testimony of Aviad Abiri. As the November 10, 2005 letter painstakingly details, Mr. Abiri was unable (by his own admission) to testify to myriad of the noticed topics.

Despite our request that you designate witnesses and provide dates for the continuation of this deposition, no response has been forthcoming. Indeed, this silence is despite your promise of over fifteen months ago that you would "shortly" provide dates for the continuation of NICE Systems, Inc.'s Rule 30(b)(6) deposition. (Letter of S. Lindvall to N. Setty of February 28, 2005).

Accordingly, please provide by June 7, 2006 dates for continuing the deposition.

   2.  Deposition of NICE Systems Ltd.

On May 26, 2005, Witness Systems served its Notice of Rule 30(b)(6) Deposition of NICE Systems Ltd. On October 14, 2005, not having received a response, Witness Systems' counsel, Nick Setty, wrote to you requesting dates for that deposition and enclosing a list of supplemental topics. These overtures were eventually answered by Patricia Clarke's December 13, 2005 letter, in which NICE Ltd. "confirm[ed]" that the deposition of Eyal Danon, as NICE Ltd.'s Rule 30(b)(6) witness for a number of topics, would take place on December 21, 2005. Unfortunately, just three days later,

FISH & RICHARDSON P.C.

Scott G. Lindvall, Esq.
May 31, 2006
Page 2

by letter of Sarah W. Saunders, your firm withdrew Mr. Danon as NICE Ltd.'s Rule 30(b)(6) designee, and no alternate individuals have been designated in his place.

To date, therefore, Witness Systems has had no opportunity to depose any witness testifying on behalf of NICE Systems Ltd.—despite the fact that over a year has passed since the Rule 30(b)(6) deposition notice was served.

Accordingly, by June 7, 2006, please also provide dates for the taking of NICE Systems Ltd.'s Rule 30(b)(6) deposition.

3. Financial Topics

As your letter to Nick Setty on February 28, 2005 concedes, Mr. Abiri's ability to testify on the "financial and accounting methodologies practiced at Nice as they related to screen capture-related products" was deficient. We note also that the Rule 30(b)(6) topics provided for the depositions of both NICE, Inc. and NICE Ltd. seek information regarding not only the sales of NICE's accused products, but also the "distribution, implementation, customization and/or installation of any NICE accused product . . . ." As such, we expect that NICE will provide witnesses capable of speaking to the "financial and accounting methodologies" utilized with respect to both the accused products and NICE's implementation, customization and installation services.

Thank you for your prompt attention to these matters.

Very truly yours,

Noah C. Graubart

# EXHIBIT 46

DARBY &
DARBY

PROFESSIONAL
CORPORATION

INTELLECTUAL PROPERTY LAW

NEW YORK
805 THIRD AVENUE
NEW YORK, NY 10022-7513
TEL 212.527.7700
FAX 212.753.6237

SEATTLE
1191 SECOND AVENUE
SEATTLE, WA 98101-3404
TEL 206.262.8900
FAX 206.262.8901

February 28, 2005

Reference: 03331/6002998-000

SCOTT G. LINDVALL
PRINCIPAL
212.527.7663
slindvall@darbylaw.com

**VIA E-MAIL
AND FIRST CLASS MAIL**

Nagendra Setty, Esq.
Jones Day
1420 Peachtree Street, NE, Suite 800
Atlanta, GA 30309-3053

Re:  *Witness Systems, Inc. v. NICE Systems, Inc.*
     Civil Action No. 1:04-CV-2531-CAP

Dear Nick:

I write in response to your letters of February 2, February 8 and February 25.

First, we would appreciate if you would wait until we have finished our production before demanding "detailed responses" on purported deficiencies in Nice Systems, Inc.'s ("Nice") production.  You have unnecessarily expanded the scope of discovery to include documents having no relevance to the technical issue at the heart of this litigation, namely, screen capture.  While we have to some degree obliged your overly broad demand for documents, you should understand that preparing such an expansive document production is time consuming.  This is especially so because Witness has requested we image every document in a specified electronic format.  The imaging step alone introduces weeks of delay into the process.

Moreover, it is difficult to answer your allegations concerning Nice's document production when you fail to specify with which of Witness' document requests Nice allegedly has failed to comply.  Nice believes that many of the documents you demand do not fall within the scope of any of Witness' document requests.

As to your specific requests, you ask for documentation relating to NICE Perform, NICE Universe 4.1 and 4.2, NICE Universe 8.x and NICE Advantage product suites, among others, and complain that with respect to certain of these products you have received only "some manuals."  Moreover, you further seek "source code and design documents" for all of these products.  Subject to its objections to Witness' document requests, Nice has and continues to produce responsive technical documents in its possessions, custody and control, or that it uses in the ordinary course of its business, even for the above-noted irrelevant Nice products.

DARBY &
DARBY

Nagendra Setty, Esq.
February 28, 2005
Page 2

However, Nice does not have possession, custody or control, nor does it use or access in its ordinary course of its business, source code or design documents for any Nice products. As we have stated previously, Nice Systems, Inc. is not involved or responsible for the decision and development of these products. Therefore, Nice Systems, Inc., does not have possession, custody or control of related design documents or source code, nor does it use or access such materials in the ordinary course of its business.

Your repeated accusations that Nice has "abdicated" its responsibility to produce technical documents to third parties is misplaced. Nice is fully aware of, and long ago acknowledged, its obligation to produce technical documents in its own possession, custody and control, or that it uses in the ordinary course of its business. However, Nice has no obligation or responsibility to seek out documents from third parties, including from Nice Systems, Ltd. or Netopia that it does not otherwise use or access in conducting its business.

As for Netopia and its objections to the subpoena that Witness has served on it, we fail to see the reason for your advising us as to Netopia's position on this or any other matter. Nice has no control over Netopia and has no business relationship with Netopia. Accordingly, we see no need to respond to your characterization of Netopia's beliefs as to documents it thinks are held by Nice or Nice Systems, Ltd. We advise (again) that Nice does not have possession, custody or control of Netopia's source code, nor does it use or access the source code in the ordinary course of its business.

You also request documentation concerning the "development and integration" of IBS software with Nice products relating to screen capture. Again, because Nice is not involved with the development of Nice screen capture products or the integration of such products with third party products, it has no documentation concerning the same. To the extent such documentation is within the possession, custody or control of Nice concerning IBS, it has or will be produced.

In your February 8 and February 25 letters, you request comprehensive reports from Oracle, PeopleSoft and Vantive databases utilized by Nice concerning financial and sales information of Nice products. The scope of your requests as detailed in your letters is over broad and invasive. We created the original summary spreadsheet of financial information as a courtesy and in the interest of expediting discovery and minimizing expense incurred by both parties. In that same spirit, we are willing to negotiate the scope of the additional information you seek and provide you with relevant information from these databases. Please note, however, the Federal Rules do not require parties to specifically prepare "reports."

DARBY &
DARBY

Nagendra Setty, Esq.
February 28, 2005
Page 3

Further, we have made available for inspection (approximately 100 boxes) much of the documentation which you request.

Please take note that, consistent with Mr. Abiri's testimony, the data in the Oracle database dates back only until to the beginning of 2001.

You also request email communications among Nice, Nice subsidiaries and Nice Systems, Ltd. personnel concerning various aspects of screen capture-related information. Nice has already made printouts of emails available for inspection to the extent such printouts are found in customer sales files. We have and will continue to search electronic and paper files for relevant emails.

In your February 8 letter, you request the continuation of the 30(b)(6) deposition on the issue of financial and accounting methodologies practiced at Nice as they related to screen capture-related products. We will provide you with dates shortly. However, your request to continue the deposition for purposes of inquiring as to "any topic touched upon by the documents NICE failed to produce in advance of the deposition as detailed above" is improper. As you know, it is the topics listed in Witness' 30(b)(6) deposition notice to Nice that define the scope of the deposition, not the topics touched upon by document production.

Nice has produced almost 30,000 pages of documentation. Moreover, Nice has made over 100,000 pages of other documents available for Witness' inspection. Quite simply, Nice produced and will continue to produce what it has, but cannot produce what it does not have. Many of the documents you request are either not relevant or do not fall within the scope of Witness' document requests. Further, document production has been delayed weeks as a result of Witness' request for production to be done electronically.

Sincerely,

Scott G. Lindvall

SGL:pld

# EXHIBIT 47

STS 1-4-06 Status Conference.txt

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

STS SOFTWARE SYSTEMS,       ) DOCKET NO. 1:04-CV-2111-RWS
LTD.                        )
            PLAINTIFF       ) ATLANTA, GEORGIA
                            ) JANUARY 4, 2006
            V.              )
                            )
WITNESS SYSTEMS, INC.       )
                            )
            DEFENDANT.      )
                            )
                            )

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:          SCOTT G. LINDVALL, ESQ.
                            ANGELA SIMPSON BLACKWELL, ESQ.
                            WILLIAM B. HILL, JR., ESQ.


FOR THE DEFENDANT:          NAGENDRA SETTY, ESQ.
                            DANIEL A. KENT, ESQ.




COURT REPORTER:             SHARON D. UPCHURCH
                            2114 U. S. COURTHOUSE
                            ATLANTA, GEORGIA 30303-3361
                            (404) 215-1354


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
PRODUCED BY COMPUTER.


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

STS 1-4-06 Status Conference.txt

2

1               P R O C E E D I N G S

2          (JANUARY 4, 2006; IN OPEN COURT)

3          THE COURT:  GOOD AFTERNOON.  I WANTED TO HAVE

4    EVERYONE COME IN TODAY SO THAT WE COULD DETERMINE WHERE WE ARE

5    WITH THE LITIGATION AND HOW WE'RE PROCEEDING FROM WHERE WE ARE.

6    OF COURSE, I HAVE ENTERED THE ORDER ON THE MOTION TO

7    CONSOLIDATE THE CASES AND HAVE DENIED THAT MOTION; AND SO JUDGE

8    PANNELL WILL BE PICKING UP OR CONTINUING WITH HIS CASE.

9          BUT BEFORE ENTERING THE ORDER, I CONFERRED WITH JUDGE

10   PANNELL ABOUT THE ORDER AND WHAT I WAS PLANNING TO DO AND HAD

11   SOME DISCUSSION WITH HIM; AND HE HAS ASKED THAT I HAVE THIS

12   MEETING AS WELL SO THAT I COULD INDICATE TO YOU BOTH HIS AND MY

13   THOUGHTS TO SOME EXTENT ABOUT HOW WE NEED TO PROCEED WITH THE

14   CASE.

15         BECAUSE WE WERE DEALING WITH DIFFERENT PATENTS AND I

16   FELT THERE WERE A LOT OF LEGAL ISSUES DOWN THE ROAD THAT COULD

17   NOT JUSTIFY ONE JUDGE NECESSARILY BEING MORE EFFICIENT IN

18   HANDLING THE CASE SERVED AS THE BASIS FOR MY MOST RECENT

19   RULING.  BUT I AT THE SAME TIME FELT THAT THERE WERE SOME

20   EFFICIENCIES THAT COULD PERHAPS BE GAINED THROUGH A

21   COORDINATION OF DISCOVERY AND OTHER -- PERHAPS SOME OTHER

22   PRETRIAL MATTERS.

23         I MENTIONED THAT TO JUDGE PANNELL AND SAID THAT I

24   THOUGHT THAT I WAS GOING TO STRONGLY CONSIDER IN MY CASE THE

25   APPOINTMENT OF A SPECIAL MASTER FOR PURPOSES OF PRESIDING OVER

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

3

STS 1-4-06 Status Conference.txt

1    DISCOVERY AND HELPING TO FACILITATE DISCOVERY IN MY CASE.

2    JUDGE PANNELL VOICED A STRONG INCLINATION TO DO LIKEWISE.  AND

3    I THINK IT'S FAIR, I THINK I'M FAIRLY REFLECTING OUR

4    CONVERSATION TO SAY THAT HE IS SOMEWHAT INCLINED AT THIS POINT

5    BEYOND THE PRETRIAL ASPECT OF THE CASE TO HAVE A SPECIAL MASTER

6    BE INVOLVED WITH THIS CASE PERHAPS THROUGH MARKMAN AND EVEN

7    PERHAPS BEYOND.

8            I'M NOT THERE YET; AND I'LL BE HONEST WITH YOU, I'LL

9    BE REAL HONEST WITH YOU ABOUT WHY.  JUDGE PANNELL SHARED WITH

10   ME ANOTHER PATENT CASE HE HAS IN WHICH HE USED A SPECIAL MASTER

11   TO CONDUCT THE MARKMAN AND THE SPECIAL MASTER'S REPORT WAS 400

12   PAGES LONG.  I SAID I'D JUST AS SOON CONDUCT THE HEARING MYSELF

13   AS READ A 400-PAGE SPECIAL MASTER'S REPORT.  SO I'M NOT

14   COMMITTED YET TO THE SPECIAL MASTER AT THAT LEVEL, BUT I AM AT

15   LEAST AT THIS STAGE.  AND I WANTED TO MAKE YOU AWARE OF THAT

16   AND TO MAKE YOU AWARE THAT JUDGE PANNELL IS THINKING IN THOSE

17   SAME TERMS.  AND WHILE I DO NOT THINK THAT NECESSARILY A SINGLE

18   JUDGE SHOULD HANDLE THE ENTIRE CASE, A SINGLE SPECIAL MASTER

19   COULD, I THINK, VERY APPROPRIATELY HANDLE THE DISCOVERY ASPECT.

20           UNDER THE RULES, OF COURSE, I'VE GOT THE AUTHORITY TO

21   APPOINT A SPECIAL MASTER.  I HAVE TO GIVE YOU NOTICE OF THAT,

22   AND I'M GIVING YOU NOTICE.  I KNOW THIS IS THE FIRST YOU'VE

23   HEARD OF IT, AND I'M NOT GOING TO INSIST THAT YOU WAIVE YOUR

24   OBJECTIONS UNLESS YOU VOICE THEM TODAY.  I WILL GIVE YOU A

25   CHANCE TO THINK ABOUT THIS.


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER



                                                            4


1            I ALSO WANT TO GIVE YOU A CHANCE TO TALK IF YOU WOULD

2    LIKE ABOUT PROPOSING A SPECIAL MASTER.  OBVIOUSLY, IF THE

STS 1-4-06 Status Conference.txt

3    PARTIES CAN AGREE UPON A SPECIAL MASTER, THAT WOULD BE MY

4    PREFERENCE.  I AM WILLING TO UTILIZE ANY METHODS YOU WANT TO

5    CHOOSE.  IF YOU CAN AGREE, THAT'S MY FIRST CHOICE.  IF YOU

6    CANNOT AGREE AND WANT TO BOTH SUBMIT NAMES, WE CAN DO THAT.  IF

7    YOU WOULD LIKE FOR ME TO GIVE YOU SOME NAMES AND GIVE YOU AN

8    OPPORTUNITY TO STRIKE NAMES, WE CAN DO THAT.  I DO THINK THAT

9    UNLESS ONE OF YOU SEES A PROBLEM WITH HAVING A SINGLE SPECIAL

10   MASTER, JUDGE PANNELL IS FAVORABLE TOWARD OUR SELECTING A

11   SPECIAL MASTER WHO WOULD HANDLE THIS.

12        BECAUSE JUDGE PANNELL IS AT LEAST AT THIS POINT

13   INCLINED TO USE A SPECIAL MASTER BEYOND DISCOVERY, AND I MAY BE

14   WILLING TO DO THAT AND INCLINED TO DO THAT AS WE GET FURTHER

15   INTO THE CASE, A SELECTION OF A SPECIAL MASTER, I THINK, NEEDS

16   TO BE CONSIDERED WITH THAT IN MIND IN TERMS OF THE

17   QUALIFICATIONS OF THE SPECIAL MASTER.  WE PERHAPS NEED SOMEONE

18   WHO WOULD HAVE THE QUALIFICATIONS TO PERHAPS ENGAGE IN A

19   MARKMAN ANALYSIS AND PERHAPS SOMETHING BEYOND THAT IF HE OR SHE

20   WERE CALLED UPON TO PARTICIPATE AT THAT LEVEL.

21        WHAT I WOULD LIKE TO DO IS GIVE YOU THE OPPORTUNITY

22   TO DISCUSS THAT, TO CONFER WITH ONE ANOTHER, TO LET ME KNOW

23   YOUR WISHES IN TERMS OF HOW YOU WISH TO PROCEED.  IF YOU CAN'T

24   AGREE ON HOW TO PROCEED, WHAT I WILL PROBABLY DO IS GIVE YOU

25   TWO OR THREE NAMES AND LET YOU VOICE OBJECTIONS IF YOU HAVE


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER



5


1    THEM TO THOSE NAMES.  THAT'S OUR FAIL-SAFE IF WE CAN'T AGREE ON

2    A METHOD.

3        I KNOW THERE ARE A NUMBER OF PENDING MOTIONS.  I HAVE

Page 4

STS 1-4-06 Status Conference.txt

4  DECIDED THOSE MOTIONS; BUT WE HAVEN'T FINISHED THE WRITTEN

5  ORDER YET, AND THAT'S WHY I HAD HOPED TO HAVE THAT IN YOUR

6  HANDS TODAY, BUT WE JUST COULDN'T GET IT FINISHED.  I FULLY

7  EXPECT I'LL PROBABLY HAVE IT IN YOUR HANDS TOMORROW.

8          I'M GOING TO TELL YOU, THOUGH, NOW WHERE I AM ON

9  THESE ISSUES AND ESSENTIALLY WHAT MY RULING IS GOING TO BE.

10  BUT I'M GOING TO GIVE YOU THE PART THAT I ASSUME YOU WOULD

11  ACTUALLY READ AND THE PART I READ ABOUT THE APPELLATE

12  DECISIONS; I'M GOING TO FLIP TO THE LAST PAGE AND GIVE YOU TO

13  THE LAST LINE.  THAT'S WHAT WE ALL LOOK FOR ANYWAY.

14          MR. SETTY:  YOUR HONOR, WE READ EVERY FOOTNOTE.

15          THE COURT:  I DO TOO, LATER.

16          BUT ON THE MOTIONS THAT ARE PENDING, THE MOTION BY

17  STS TO DISMISS THE CLAIMS RELATING TO THE 665 PATENT, I AM

18  GOING TO DENY THAT MOTION.

19          THE DOCKET NUMBER 135, STS'S MOTION FOR PROTECTIVE

20  ORDER, AND 148, WITNESS SYSTEMS' MOTION TO COMPEL, I AM GOING

21  TO GRANT THE MOTION TO COMPEL.  BUT I HAVE SOME RESERVATIONS

22  ABOUT THE BREADTH OF SOME OF THE REQUESTS THAT HAVE BEEN MADE

23  BY WITNESS SYSTEMS; AND WHILE I'M GOING TO RULE ON THOSE

24  INITIAL ISSUES ABOUT CONTROL AND ABOUT WHETHER NICE SYSTEMS

25  PRODUCTS ARE SUBJECT TO DISCOVERY OR THEIR RECORDS ARE SUBJECT


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER



6


1  TO DISCOVERY, I'M GOING TO RULE ON THOSE AND FIND THAT THEY

2  ARE.  BUT I AM GOING TO LEAVE TO THE SPECIAL MASTER TO RESOLVE

3  WHETHER SOME OF THESE REQUESTS ARE STILL TOO BROAD AND GO

4  BEYOND WHAT IS APPROPRIATE.  SO I'M NOT GOING TO RESOLVE THAT

5  ISSUE COMPLETELY BUT WILL LEAVE THAT PORTION OF IT TO THE

Page 5

STS 1-4-06 Status Conference.txt

6    SPECIAL MASTER.

7           THE MOTION FOR CONTEMPT WHICH IS AT DOCKET NUMBER 138

8    I AM GOING TO DENY.  I WANT TO -- AND I WILL STATE THIS IN THE

9    ORDER.  I DO THINK AND RECOGNIZE THAT WITNESS SYSTEMS, I

10   BELIEVE, WAS LATE IN COMPLYING WITH THE COURT'S ORDER.  BY THE

11   SAME TOKEN, I THINK THERE ARE SOME ISSUES AS A PART OF THE

12   CONTEMPT ON WHICH WITNESS SYSTEMS TOOK A DEFENSIBLE POSITION.

13   I THINK SOME, AGAIN, I THINK THEY WERE LATE AND THERE'S NOT A

14   VALID EXCUSE FOR BEING LATE ON SOME; BUT I THINK THERE WERE

15   OTHER ISSUES RAISED ON WHICH THEY DID HAVE A VALID POSITION.

16   AND FOR THAT REASON I'M NOT GOING TO FIND CONTEMPT AND IMPOSE

17   SANCTIONS IN THE CASE.

18          THE MOTION TO MODIFY THE PATENT RULES, THE LOCAL

19   PATENT RULES, OF COURSE, THAT HAS BEEN DE FACTO GRANTED TO THIS

20   POINT BECAUSE WE'VE DELAYED WAITING FOR THE COURT TO RULE ON

21   THESE MOTIONS.  HOWEVER, I AM GOING TO DENY THE MOTION

22   BEGINNING NOW AND REQUIRE THAT THE 6.1 DISCLOSURES BE MADE

23   WITHIN 20 DAYS.  THAT WILL BE, OF COURSE, WHERE YOU IDENTIFY

24   THE TERMS THAT YOU FEEL SHOULD BE SUBJECT TO CONSTRUCTION.

25   THOSE WILL NEED TO BE PROVIDED WITHIN 20 DAYS, AND YOU JUST


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


7


1    PLUG RIGHT INTO THE LOCAL RULES PICKING UP AT THAT POINT.

2           I WILL ACKNOWLEDGE IN MY ORDER THAT IT IS POSSIBLE

3    THAT SOME OF THE DISCOVERY THAT WITNESS SYSTEMS DESIRES TO

4    PURSUE MAY RESULT IN ADDITIONS TO OR SUPPLEMENTATION OF THE

5    POSITIONS THAT ARE ULTIMATELY TAKEN ON CLAIM CONSTRUCTION, AND

6    I ACKNOWLEDGE THAT AND RECOGNIZE THAT THE PARTIES THROUGH

STS 1-4-06 Status Conference.txt

7   DISCOVERY MAY NEED TO SUPPLEMENT; AND CERTAINLY THEY WOULD BE

8   PERMITTED TO, ASSUMING IT'S NEW MATTER THAT THEY GET THROUGH

9   DISCOVERY THAT HAS NOT YET BEEN COMPLETED.

10          I THINK ONCE I HAVE ENTERED THAT ORDER AND RULED ON

11  THOSE MOTIONS, IT DOES PUT THE CASE IN A POSTURE WHERE A

12  SPECIAL MASTER COULD ASSIST IN GETTING US ON THROUGH TO CLOSE

13  DISCOVERY.  AND I DO THIS AND I STATE THIS FOR THE RECORD, I

14  THINK -- WELL, I KNOW UNDER THE RULES I CAN DO IT WITHOUT

15  CONSENT OF THE PARTIES.  TYPICALLY I DO NOT DO THAT.  TYPICALLY

16  I LIKE TO ENGAGE YOU IN A DECISION TO APPOINT A SPECIAL MASTER.

17          BUT I AM NOT GOING TO BE VERY AVAILABLE FOR SEVERAL

18  MONTHS; AND SO THIS CASE, I THINK, IS GOING TO REQUIRE, BASED

19  ON ITS HISTORY, THE INVOLVEMENT OF SOMEONE TO KEEP THE CASE

20  MOVING.  I AM ABOUT TO BEGIN A LENGTHY CRIMINAL TRIAL AND I

21  WILL BE UNAVAILABLE.  I HAVE TWO TRIALS THAT ARE CLAMORING FOR

22  TRIAL, EACH SUGGESTING SIX- TO EIGHT-WEEK TRIALS, CRIMINAL

23  CASES AGAIN THAT WILL PERHAPS FOLLOW ON THE HEELS OF THE

24  EIGHT-WEEK TRIAL I'M ABOUT TO START.  SO I COULD BE SEVERAL

25  MONTHS BEFORE I'M READY TO PICK UP AND DO MUCH.


                SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


                                                        8


1           THAT'S ONE OF THE REASONS I'M RESERVING WHETHER I USE

2   A SPECIAL MASTER ON THE MARKMAN ASPECT OF THIS.  TO KEEP THE

3   CASE MOVING, I MAY, IN FACT, DECIDE TO LET THE SPECIAL MASTER

4   HAVE A ROLE IN THAT.  BUT I'M RESERVING THAT PART OF IT.  AT

5   THIS POINT ALL I AM STATING I'M GOING TO USE THE SPECIAL MASTER

6   FOR IS FOR THE DISCOVERY ISSUES TO ASSIST IN DISCOVERY IN MY

7   CASE.

8           THE NEXT STEP, AS I SEE IT, IS WORD FROM COUNSEL IN
                            Page 7

STS 1-4-06 Status Conference.txt

9    TERMS OF WHAT YOU WANT ME TO DO; YOU WANT ME TO GIVE YOU SOME

10    NAMES, YOU'VE AGREED ON SOMEONE, OR WHATEVER THE CASE MAY BE.

11    AND I WOULD JUST -- I WOULD LIKE TO HEAR FROM YOU CERTAINLY NO

12    LATER THAN NEXT WEEK IN TERMS OF WHERE YOU ARE ON THAT SO THAT

13    I CAN GO AHEAD AND BE READY.  IN FACT, I WILL PROBABLY GO AHEAD

14    AND BE EXPLORING WITH SOME FOLKS SOME POSSIBLE SPECIAL MASTERS.

15         ONE PROBLEM I'VE GOT AND I WANT TO MAKE YOU AWARE OF

16    THIS:  I'M MORE WORRIED ABOUT FINDING SOMEONE THAT YOU'RE

17    COMFORTABLE WITH ON PATENT MATTERS.  I'VE GOT A COUPLE OF

18    PEOPLE IN MIND THAT I WOULD FEEL VERY COMFORTABLE HANDLING THE

19    DISCOVERY END OF THINGS, BUT I'M NOT CONFIDENT THAT THEY HAVE

20    EXPERTISE IN PATENT MATTERS THAT WE WOULD LIKE FOR THEM TO

21    HAVE.  SO I REALLY WOULD APPRECIATE IT IF YOU ARE ABLE TO AGREE

22    ON SOMEONE THAT HAS THE EXPERTISE IN THE FIELD THAT WOULD MAKE

23    YOU COMFORTABLE.

24         IS THERE ANYTHING -- I'LL GIVE EACH SIDE A CHANCE TO

25    BE HEARD IF THERE'S ANYTHING FURTHER THAT YOU WOULD LIKE TO


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

9

1    ADDRESS TODAY.

2         MR. SETTY:  I DON'T KNOW IF YOU WANT IT TO BE

3    INFORMAL OR IF WE SHOULD COME TO THE PODIUM.

4         THE COURT:  IF YOU'LL COME TO THE PODIUM JUST BECAUSE

5    IT'S EASIER TO TAKE IT ON THE RECORD.

6         MR. SETTY:  I'VE NEVER UNDERSTOOD THIS PART OF THE

7    STANDARD OPERATING PROCEDURE OF THE NORTHERN DISTRICT OF

8    GEORGIA, SO I WILL PREFACE IT THAT WAY.  BUT IN MANY OF THE

9    DISTRICTS FOR THE DISCOVERY ASPECTS OF WHAT YOU'RE TALKING

STS 1-4-06 Status Conference.txt

10  ABOUT, WE COULD BE IN FRONT OF A MAGISTRATE JUDGE.  AND THERE'S

11  OBVIOUSLY AN EXPENSE ASSOCIATED WITH A SPECIAL MASTER DEVOTED

12  SOLELY TO DISCOVERY ISSUES.  AND WITH THE POSSIBILITY THAT YOU

13  WOULDN'T USE ONE ON THE TECHNICAL OR MARKMAN ISSUES AND THE

14  GENERAL PRICE RANGE OF A SENIOR-PARTNER-TYPE WHO WOULD HAVE THE

15  EXPERTISE WE'RE TALKING ABOUT, IS IT POSSIBLE TO USE A

16  MAGISTRATE JUDGE ON DISCOVERY?

17          THE COURT:  I DO THINK IT IS ON DISCOVERY.  MY ONLY

18  CONCERN IS I HAVE -- I DON'T WANT TO SPEAK FOR JUDGE PANNELL ON

19  THAT AND ESPECIALLY IF JUDGE PANNELL ANTICIPATES THAT THE

20  PERSON WILL DO MORE THAN DISCOVERY, WHETHER THERE IS SOME

21  EFFICIENCY IN HAVING THAT PERSON GET IN AT THE FRONT END AND AT

22  LEAST BE FAMILIAR WITH THE CASE FROM WORKING THE DISCOVERY PART

23  OF IT.

24          I DON'T KNOW THAT THAT'S NECESSARILY REQUIRED.  A

25  MAGISTRATE COULD OVERSEE THE DISCOVERY AND THEN IF JUDGE


            SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

                                                        10


1   PANNELL WANTED TO APPOINT A SPECIAL MASTER FOR PURPOSES OF THE

2   MARKMAN, I THINK THAT WOULD STILL BE A POSSIBILITY; AND IF I

3   CHOSE NOT TO HAVE ONE, THEN, YOU KNOW, THAT WOULD WORK.  AND

4   CERTAINLY THERE WOULD BE -- IT WOULD BE NO CHARGE FOR THAT.

5           THE DOWNSIDE TO IT IS THAT OBVIOUSLY THE MAGISTRATES

6   HAVE BUSY DOCKETS, AS WELL.  IF YOU'RE PAYING A SPECIAL MASTER

7   TO DO IT, YOU GET MOVED UP THE PRIORITY LIST.  WITH A

8   MAGISTRATE, YOU WON'T BE AS HIGH ON THE PRIORITY.  THEY WILL

9   CERTAINLY ADDRESS IT AND GET TO IT AS BEST THEY CAN.

10          AND I AM WILLING IN MY CASE TO ASSIGN IT TO A

11  MAGISTRATE FOR THAT PURPOSE OR TO REFER IT TO A MAGISTRATE FOR

                            Page 9

STS 1-4-06 Status Conference.txt

12    THAT PURPOSE.  BUT THAT WOULD BE MY ONLY CONCERN IS I DON'T

13    THINK IT WOULD BE APPROPRIATE TO PUT THE MARKMAN ON A

14    MAGISTRATE.

15          MR. SETTY:  GIVEN THAT THOSE ARE OPEN ISSUES, IS IT

16    ACCEPTABLE THAT WHEN WE GET BACK WITH YOU, THAT I'VE CONFERRED

17    WITH MR. LINDVALL ON THAT ISSUE AS WELL --

18          THE COURT:  YES.

19          MR. SETTY:  -- AT LEAST WITH RESPECT TO YOUR CASE AS

20    TO WHETHER A MAGISTRATE JUDGE WOULD BE APPROPRIATE?

21          THE COURT:  ABSOLUTELY.

22          MR. SETTY:  AND WE WOULD BOTH CONSENT TO HAVING

23    DISCOVERY HANDLED IN THAT WAY?

24          THE COURT:  YES.  IF YOU BOTH CONSENT TO HAVING

25    DISCOVERY HANDLED IN THAT WAY, I CAN TELL YOU NOW I WILL DO IT.


                SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

                                                      11

1    WHAT THE TWO OF YOU CONSENT TO I WILL PROBABLY AGREE TO AND

2    BECAUSE I DON'T THINK THAT CLOSES THE DOOR TO MY STILL PUTTING

3    IT WITH A SPECIAL MASTER FOR MARKMAN AND BEYOND BECAUSE THIS IS

4    THE DISCOVERY PART OF IT AND YOU DON'T HAVE TO BE INVOLVED IN

5    THE DISCOVERY TO DO A MARKMAN.  AND, I MEAN, THERE'S AN

6    ARGUMENT TO BE MADE YOU'RE BETTER OFF DOING THE MARKMAN IF YOU

7    WEREN'T INVOLVED IN THE DISCOVERY.  YOU MAY COME IN MORE

8    UNBIASED.

9          MR. SETTY:  OKAY.  AND WITH RESPECT TO THE

10   COORDINATION WITH JUDGE PANNELL, IS THAT AN ISSUE THAT YOU

11   WOULD RATHER TAKE UP WITH HIM ON THE DISCOVERY ASPECT OF HOW IT

12   OUGHT TO BE HANDLED AND THEN WE COULD EITHER HEAR FROM YOU OR

                            Page 10

STS 1-4-06 Status Conference.txt

13   WHEN WE GET BACK TO YOU, YOU COULD TELL US WHETHER THAT'S AN

14   ACCEPTABLE ALTERNATIVE TO HIM, AS WELL?

15        THE COURT:  YES.  WHAT I WOULD LIKE FOR YOU TO DO, I

16   THINK, AND I THINK THIS IS CONSISTENT WITH MY CONVERSATION WITH

17   JUDGE PANNELL, IS IF YOU -- I THINK YOU SHOULD LOOK AT THIS

18   FROM THE PERSPECTIVE THAT JUDGE PANNELL'S SPECIAL MASTER IS

19   DEFINITELY GOING TO DO MORE THAN JUST DISCOVERY.  AND IF IN

20   YOUR CONFERRING YOU DECIDE THAT FOR THAT REASON YOU WOULD LIKE

21   TO GO AHEAD AND GET SOMEONE WHO COULD GO THE DISTANCE IN THAT

22   CASE BUT CONSIDER A MAGISTRATE FOR MY CASE, TELL ME THAT, I

23   WILL SO ADVISE JUDGE PANNELL, AND THAT WOULD BE FINE.

24        HOWEVER, IF YOU WOULD LIKE TO HAVE THE OPPORTUNITY TO

25   HAVE A MAGISTRATE OVERSEE BOTH, REALIZING THAT AFTER THE


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

                                              12

1   DISCOVERY IS COMPLETE -- OR ACTUALLY, THEY WOULD ACTUALLY RUN

2   AT THE SAME TIME; THERE'S GOING TO BE DISCOVERY ONGOING WHILE

3   SOME OF THIS MARKMAN IS TAKING PLACE -- BUT THAT THERE WOULD BE

4   A SEPARATE PERSON TO HANDLE NONDISCOVERY SPECIAL MASTER DUTIES,

5   COMMUNICATE THAT WITH ME AND THEN I WILL CONFER WITH JUDGE

6   PANNELL, JUST BECAUSE I TOLD HIM I WILL HANDLE THIS PART OF IT,

7   NOT IN ANY WAY TO SUGGEST I'M GOING TO MAKE THAT DECISION.

8   OBVIOUSLY, IT'S HIS CASE AND HE WILL DECIDE WHETHER HE'S

9   COMFORTABLE WITH THAT OR NOT.

10        BUT I THINK FOR OUR PRESENT PURPOSES, IT'S OKAY FOR

11   YOU TO COME BACK TO ME AND SAY IF THAT'S WHAT YOU WOULD LIKE TO

12   DO, AND I WILL TAKE IT TO JUDGE PANNELL AND THEN HE'LL PROBABLY

13   TAKE IT FROM ME AND DEAL WITH YOU DIRECTLY ON IT AT THAT POINT.

14        MR. SETTY:  THANK YOU.

Page 11

STS 1-4-06 Status Conference.txt

15          MR. LINDVALL:  YOUR HONOR, ONE COMMENT.  I'M WILLING

16     TO DO ANYTHING TO MAKE THIS CASE MOVE QUICKLY.  SO IF A SPECIAL

17     MASTER WILL DO IT AND WE GET A SPECIAL MASTER WHO WILL RESOLVE

18     THE DISCOVERY ISSUES OR ANYTHING ELSE, WE'RE GOING TO BE FOR

19     IT.

20          THE COURT:  AND I REALLY DO THINK THAT'S OUR BEST

21     HOPE, ESPECIALLY WITH MY PRESENT CALENDAR SITUATION.  I JUST --

22     I KNOW THAT I AM NOT GOING TO BE ABLE TO GIVE YOU THE TIME OR

23     ATTENTION THAT YOU NEED, AND I JUST THINK THAT IT WOULD BE

24     HELPFUL TO HAVE SOMEONE THAT YOU COULD REACH BY PHONE TO

25     RESOLVE ISSUES IN DEPOSITIONS AND THINGS LIKE THAT THAT WOULD


                  SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


                                                  13


1     JUST KEEP THE CASE MOVING FORWARD FOR BOTH SIDES.  BOTH SIDES

2     HAVE INDICATED THEY WANT TO SEE IT MOVE FORWARD, AND I REALLY

3     DO THINK THIS WOULD BE THE WAY TO ACCOMPLISH THAT.

4          MR. LINDVALL:  THANK YOU.

5          MR. HILL JUST HANDED ME A NOTE.  HE SUGGESTED IF YOU

6     COULD SHARE YOUR LIST OF PEOPLE THAT YOU ALREADY HAVE ON YOUR

7     MIND, IF POSSIBLE, WITH US.

8          THE COURT:  I WILL.  I'LL BE HAPPY TO GIVE YOU THOSE

9     NAMES.  AND AS I MENTIONED A MOMENT AGO, I KNOW THAT ONE IS

10    NOT -- ONE IS NOT A PATENT ATTORNEY.  I'M NOT SURE IF THE OTHER

11    HAS DONE PATENT WORK OR NOT.  THESE ARE TWO ATTORNEYS THAT I

12    HAVE TALKED WITH WHO HAVE PREVIOUSLY EXPRESSED AN INTEREST IN

13    DOING SOME SPECIAL MASTER WORK.  THEY'RE BOTH EXPERIENCED

14    LAWYERS, AND I HAVE SOME CONFIDENCE THAT THEY WOULD MANAGE THE

15    CASE AND WOULD KEEP IT MOVING.  AND SO I WILL PROVIDE THOSE

STS 1-4-06 Status Conference.txt

16    NAMES TO YOU, TO BOTH COUNSEL, AND SO THAT YOU CAN HAVE THEM

17    FOR PURPOSES OF YOUR DISCUSSION.  THEY MAY BE NAMES THAT YOU

18    CAN AGREE UPON.

19          I HAVE NOT TALKED WITH THEM ABOUT WHAT THEIR RATES

20    WOULD BE; AND CERTAINLY BEFORE YOU AGREE TO ANYTHING, WE WOULD

21    WANT TO KNOW WHAT THEY WERE GOING TO CHARGE.  AND I DON'T MIND

22    IF YOU HAVE AN INTEREST IN ONE OR BOTH OF THEM, YOU CAN LET ME

23    KNOW; AND I WILL CONFER WITH THEM TO SEE WHAT RATE THEY WOULD

24    CHARGE BEFORE YOU'RE COMMITTED TO THEM, AS WELL.  AND I WILL

25    GET THOSE TO YOU.


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

14

1          ANY OTHER MATTERS?  I'M SORRY TO BRING Y'ALL HERE FOR

2    SUCH A SHORT MATTER; BUT WHEN I TALKED WITH JUDGE PANNELL, HE

3    AND I AGREED THAT WE SHOULD SIT DOWN FACE-TO-FACE AND TALK

4    ABOUT IT SO THAT YOU WOULD UNDERSTAND FROM OUR PERSPECTIVE, HE

5    AND I BOTH FEEL THAT THE CASE NEEDS SOMEONE GIVING IT SOME

6    DIRECT ATTENTION.  IT HAS BOGGED DOWN TO SOME EXTENT, AND I

7    ACCEPT PART OF THE RESPONSIBILITY FOR THAT BECAUSE I HAVEN'T

8    BEEN ABLE TO ACT IMMEDIATELY ON SOME OF THE ISSUES THAT HAVE

9    ARISEN.  I BELIEVE A SPECIAL MASTER COULD DO THAT BETTER THAN I

10    CAN, ESPECIALLY IN THE NEAR FUTURE.

11          SO I'LL GET THOSE NAMES TO YOU, AND THEN I'D LIKE TO

12    HEAR FROM YOU NO LATER THAN NEXT WEEK AND WE'LL PROCEED FROM

13    THERE.

14          THANK YOU VERY MUCH.  HAVE A GOOD DAY.

15          (PROCEEDINGS CONCLUDED.)

16                              * * *

17                    REPORTER'S CERTIFICATION
                          Page 13

STS 1-4-06 Status Conference.txt

18    I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE
      RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.
19

20
                                        _____
21                                      SHARON D. UPCHURCH, RPR
                                        OFFICIAL COURT REPORTER
22                                      UNITED STATES DISTRICT COURT
                                        NORTHERN DISTRICT OF GEORGIA
23

24

25    DATE: _____


            SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

# EXHIBIT 48

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CASHEDGE, INC.,                           :
                                          :
            Plaintiff,                    :
                                          :
      v.                                  :
                                          : Civil Action No. 06-170-JJF
YODLEE, INC.,                             :
                                          :
            Defendant.                    :

---

Arthur G. Connolly, III, Esquire, of CONNOLLY BOVE LODGE & HUTZ
LLP, Wilmington, Delaware.
Of Counsel: Drew M. Wintringham, III, Esquire, and Mark W. Rueh,
Esquire, of CLIFFORD CHANCE ROGERS & WELLS LLP, New York City,
New York.
Attorneys for Plaintiff.

William J. Marsden, Jr., Esquire, and Kyle Wagner Compton,
Esquire, of FISH & RICHARDSON, P.C., Wilmington, Delaware.
Of Counsel: David M. Barken, Esquire, and Craig R. Compton,
Esquire, of FISH & RICHARDSON, P.C., Redwood City, California.
Attorneys for Defendant.

---

## MEMORANDUM OPINION

July 19, 2006
Wilmington, Delaware

Farnan, District Judge.

Pending before the Court is Defendant's Motion To Transfer (D.I. 12). For the reasons discussed, the Motion will be granted.

## I. BACKGROUND

Plaintiff was issued United States Patent No. 7,013,310 ("the '310 patent"), entitled "Method And Apparatus For Retrieving And Processing Data" on March 14, 2006. That same day, Plaintiff filed its Complaint in this Court, alleging infringement of the '310 patent. (D.I. 1). Defendant filed its Answer and Counterclaim on April 4, 2006, and stated its intent to file a motion to transfer. (D.I. 5). On May 4, 2006, Defendant filed its Motion to Transfer. (D.I. 12).

Defendant's Motion to Transfer is based on a pending action in the Northern District of California, Case No. C-05-1550-SI. On April 14, 2005, Defendant filed a patent infringement action in the Northern District of California, alleging that Plaintiff infringed several of its U.S. Patents. In response, Plaintiff filed an action in the same court, seeking a declaratory judgment of non-infringement, invalidity, and unenforceability of the patents asserted in Defendant's case and additional patents. Those two actions were consolidated into one nine-patent case ("the California action"). The California court conducted a Markman hearing on April 26, 2006.

1

## II. PARTIES' CONTENTIONS

By its Motion, Defendant contends that, pursuant to 28 U.S.C. § 1404(a), the Court should transfer this action to the Northern District of California.  In support of this contention, Defendant argues that Plaintiff's allegations of infringement of the '310 patent are related to the allegations in the California action.  Further, Defendant contends that certain patents in the California action are prior art to Plaintiff's '310 patent and form the basis of Defendant's inequitable conduct defense.[1]  In response, Plaintiff contends that the Court should deny the Motion because Plaintiff chose Delaware, the California action is unrelated, and judicial economy would not be served by transfer.

## III. DISCUSSION

Under 28 U.S.C. § 1404(a), "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a). Since it is undisputed that Plaintiff could have brought the instant action in the Northern District of California, the Court's only task is to determine whether the factors enumerated in Section 1404(a) warrant a transfer under the circumstances.

---

[1] Defendant alleges that, at a minimum, United States Patent Nos. 6,317,783 ("the '783 patent"), 6,199,077 ("the '077 patent"), and 6,412,073 ("the '073 patent") are material prior art to Plaintiff's '310 patent.  (D.I. 5 at ¶ 23).

2

The Third Circuit has set forth a list of factors for district courts to consider when deciding whether or not to transfer venue. Jumara v. State Farm Ins. Co., 55 F.3d 873, 879-80 (3d Cir. 1995). These factors include six private interests: (1) the plaintiff's forum preference as evidenced by his or her original choice, (2) the defendant's preference, (3) whether the claim arose elsewhere, (4) the convenience of the parties due to their relative physical and financial condition, (5) the convenience of the expected witnesses, but only so far as the witnesses might be unavailable for trial if the trial is conducted in a certain forum, and (6) the location of books and records, to the extent that the books and records could not be produced in a certain forum. Id. at 879. The factors also include six public interests for courts to consider: (1) the enforceability of the judgment, (2) practical considerations regarding the ease, speed, or expense of trial, (3) the administrative difficulty due to court congestion, (4) the local interest in deciding local controversies in the home forum, (5) the public policies of the two fora, and (6) the trial judge's familiarity with the applicable state law in diversity cases. Id. at 879-80. District courts must balance all of the relevant factors and determine whether a transfer of venue would best serve all the aforementioned interests. Id. at 883. The burden is on the movant to establish that the balance of the interests weighs in favor of the requested transfer, and a transfer will be

3

denied if the factors are evenly balanced or weigh only slightly in favor of the transfer.  Continental Cas. Co. v. Am. Home Assurance Co., 61 F. Supp. 2d 128, 131 (D. Del. 1999).

A.    PRIVATE INTERESTS

Although the plaintiff's choice of forum is entitled to substantial deference and should not be lightly disturbed, Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1920), when the plaintiff lacks a rational and legitimate reason to litigate in the forum, the transfer of a case to a more appropriate forum is less inconvenient.  Brunswick Corp. v. Precor Inc., 2000 U.S. Dist. LEXIS 22222, at *7 (D. Del. Dec. 12, 2000);  See Waste Distillation Tech., Inc. v. Pan Am. Res., Inc., 775 F. Supp. 759, 764 (D. Del. 1991).  A corporation's decision to incorporate in a particular state is a rational and legitimate reason to choose to litigate in that state.  Stratos Lightwave, Inc. v. E2O Communs., Inc., 2002 U.S. Dist. LEXIS 5653, C.A. No. 01-309 JJF, at *7 (D. Del. March 26, 2002).  Accordingly, the first factor weighs against transfer, and Defendant must demonstrate that the other Jumara factors strongly favor a transfer to California.

The Court concludes that the other private interest factors weigh in favor of transfer.  Here, both parties are Delaware corporations with principal places of business outside Delaware. Plaintiff is headquartered in New York City, and Defendant is headquartered in Redwood City, California.  Both parties maintain offices in the Northern District of California.  Also, there are

4

likely witnesses, such as former employees, that still reside in the Northern District of California.  The location of books and records is neutral as neither party has argued that it would be unable to produce documents in either forum.

Importantly, the same parties are currently litigating in the Northern District of California.  Although the Court understands that the California action and this action are different,[2] the technologies at issue all relate to data extraction, retrieval, or presentation through Internet technologies, such as web sites and web pages.  The Northern District of California is more convenient for the parties because the parties and potential witnesses are located in that district, the parties have proven capable to litigate there, and the court is already familiar with the parties and their technologies.

B.  **PUBLIC INTERESTS**

The Court also concludes that the public interest factors weigh in favor of transfer.  Where related lawsuits exist, "it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court."  Brunswick, 2000 U.S. Dist. LEXIS 22222, at *8.  Factors supporting a decision to transfer include whether the litigation in the target forum

---

[2] This action requires claim construction of the claim language of the '310 patent, which is not part of the California action.  However, Defendant's patents-in-suit in the California action are relevant to its defenses and counterclaim in this action.

5

involves: (1) the same parties, (2) related or similar technologies for the judge to become familiar with, and (3) a common field of prior art.

In this case, judicial efficiency regarding the ease, speed, or expense of trial strongly weigh in favor of transfer. The California action involves the same parties, similar technologies, and related patents-in-suit. The parties in the California action have already conducted a two-hour technology tutorial on April 19, 2006, argued Markman issues in nine patents on April 26, 2006, and commenced discovery on seemingly related products and technologies. Additionally, the Court concludes that public interests such as enforceability of the judgment, familiarity with state law in diversity actions, local interests in deciding local controversies, and court congestion are neutral or non-applicable factors in this case. Jumara, 55 F.3d at 879-880. Accordingly, the interests of judicial efficiency and justice are best served by transferring this case to the Northern District of California.

**IV. CONCLUSION**

In sum, for the reasons discussed, the Court concludes that the balance of the private and public interest factors support transferring this case to the Northern District of California where related litigation is pending. Accordingly, the Court will grant Defendant's Motion To Transfer (D.I. 12).

An appropriate Order will be entered.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CASHEDGE, INC.,                          :
                                         :
            Plaintiffs,                  :
                                         :
     v.                                  :
                                         : Civil Action No. 06-170-JJF
YODLEE, INC.,                            :
                                         :
            Defendants.                  :

ORDER

At Wilmington, the _19_ day of July 2006, for the reasons

set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that the Defendant's Motion To Transfer

(D.I. 12) is **GRANTED**.


_____
UNITED STATES DISTRICT JUDGE

# EXHIBIT 49

## Thomson StreetEvents℠

### NICE - Q2 2006 NICE Systems Earnings Conference Call

Event Date/Time: Aug. 02. 2006 / 8:30AM ET

THOMSON    www.streetevents.com    Contact Us

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call

## CORPORATE PARTICIPANTS

**Daphna Golden**
*NICE Systems - Director of IR & Corporate Development*

**Haim Shani**
*NICE Systems - CEO*

**Ran Oz**
*NICE Systems - Corporate VP and CFO*

## CONFERENCE CALL PARTICIPANTS

**Bill Benton**
*William Blair - Analyst*

**Shaul Eyal**
*CIBC - Analyst*

**Paul Coster**
*JP Morgan - Analyst*

**Daniel Meron**
*RBC - Analyst*

**Joseph Wolf**
*UBS - Analyst*

**Brian Ruttenbur**
*Morgan Keegan - Analyst*

**Mike Latimore**
*Raymond James Associates - Analyst*

**Dan Harverd**
*Deutsche Bank - Analyst*

**Daniel Ives**
*FBR - Analyst*

**Jeff Nevins**
*First Analysis - Analyst*

## PRESENTATION

**Operator**

Ladies and gentlemen, thank you for standing by. Welcome to the NICE Systems second quarter 2006 results conference call.

[OPERATOR INSTRUCTIONS]

I would now like to turn this presentation over to Ms. Daphna Golden, Director of Investor Relations and Corporate Development. You may begin.

---

**Daphna Golden** - *NICE Systems - Director of IR & Corporate Development*

Thank you, operator, and good day, everyone. With me on the call are Haim Shani, Chief Executive Officer, and Ran Oz, Corporate Vice President and Chief Financial Officer.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call

Before we start, I would like to mention that this call contains forward-looking statements in accordance with the Safe Harbor Provisions of the Private Securities Litigation Reform Act of 1995. Please be advised that the Company's actual results could differ materially from these forward-looking statements. Additional information that could cause actual results to differ materially is contained under the subheading "Forward-Looking Statements" in the Company's 2005 annual report on Form 20-F as filed with the Securities and Exchange Commission on May 17, 2006.

Such factors include, but are not limited to, changes in technology and market requirements; decline in demand for the company's products; inability to timely develop and introduce new technologies, products and applications; difficulties or delays in absorbing and integrating acquired operations, products, technologies and personnel; growth of market share; pressure on pricing results resulting from competition and inability to maintain certain marketing and distribution arrangements which could cause the actual results or performance of the company to differ materially from these forward-looking statements. The company undertakes no obligation to update these forward-looking statements.

During today's call, Haim Shani will present our strategy and overview of our business, and Ran Oz will present a more detailed discussion of our second quarter 2006 results and financial guidance. Following our comments, there will be an opportunity for questions.

Let me remind you that, unless otherwise noted on this call, we will be commenting on our adjusted results of operations which differ in certain respects from generally accepted accounting principles. Please refer to our press release for a reconciliation of our GAAP and pro forma results discussed on the call.

With that, I will now turn the call over to Haim Shani. Haim?

---

**Haim Shani** - NICE Systems - CEO

Thank you, Daphna. Good day, and thank you all for joining us for a review of our 2006 second quarter results. I'm pleased to report that this was another record quarter for NICE, with revenues coming in at 97.7 million and earnings per diluted share at $0.28, both at the high-end of our June 22 pre-announcement.

These results reflect very strong market demand for our Insight from Interactions solutions, coming in from all regions and all market segments. In addition to the strong performance on the Security side, also strong this quarter was demand for our Enterprise Interactions Solutions, which showed dramatic growth relative to the same quarter last year. This strong demand continues the trend we saw during the first quarter of this year.

We have completed the acquisitions of Performix and IEX and are well underway with the integration process according to plan. Following on success with previous acquisitions, we're confident that once again professionalism on all forms will deliver successful results. This is a very exciting time for our industry and for us as well. As we introduced a paradigm shift in how strategic decisions are made to improve performance at the Contact Center and enterprise levels.

Organizations are focusing on improving effectiveness and efficiency. They're looking for ways to leverage the message of market and customer intelligence that comes into the Contact Center every day. They're looking to provide proactive versus reactive customer care. They want to apply KPI driven management principles and procedures. And they are still seeking the best way to adapt to the new Voiceover IP world and to address key challenges in regulatory compliance and corporate governance.

The combined offering that we have with NICE Perform, IEX and Performix Solutions is the answer to this and other related needs and challenges. Together, we help Contact Center and enterprises achieve operational efficiencies as well as strategic effectiveness. And by offering a modular solution and opportunity to implement, each as a standalone, as plug and play or as an integrated hold, the breadth and best of opportunities for improvement is unlike anything that is seen before.

| THOMSON | www.streetevents.com | Contact Us | 2 |

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call

Over the past several weeks, we have met with many customers, who are planning to implement the combined offering in its various options. In fact, we see customers planning to replace the Legacy Solutions they have in the Contact Centers through a joint purchase of NICE with either IEX or Performix Solutions or both. Many more customers are being addressed together by collaborative sales teams. And we have many partners who have already hit the pavement and presented this new paradigm and expanded solution.

Needless to say, the market response is extremely positive. In fact, I had the pleasure of receiving this first feedback firsthand from a great many customers at our recent NICE User Group summit. This was a very exciting event for us with over 420 customers, NICE customers in attendance. The overwhelming message is that our market is indeed changing.

Our customers need the tools and solutions to help them meet the challenges of change and the offering we are introducing with IEX and Performix Solutions address these needs. This summit was a wide-ranging event, strong sold by some of the world's leading companies such as Avaya, EMC and Microsoft. And with NICE partners and customers, such as GE, Liberty Mutual, Coca-Cola and Charles Schwab, delivering key presentations on the topics that are foremost on our customers' agenda.

At this same occasion we also handle first NICE User Executive summit which was attended by senior level executives from NICE customer companies that are worldwide industry leaders. They all came in to discuss the growing demand for generating insights from customer interactions to improve business performance and increase competitiveness. Nice Perform continues to enjoy wide market acceptance. Six months ago we announced that Convergys has selected Nice Perform for tens of thousands of agents replacing two Legacy systems they have in place.

Now, ETS, a leading global technology services company, has decided to standardize its global Contact Centers on Nice Perform also replacing Legacy technology. Another important recent event was the unveiling of powerful new capabilities with Nice Perform for Contac Centers and enterprise, especially as we introduced our regulatory compliance and risk management suite for corporate and investment banking.

For the first time, the power of interaction analytics is being harnessed to address key challenges such as preventing insider trading breaches, ensuring best execution and detecting irregularities. We are already seeing the first orders coming in from the world's top tier banks.

We also introduced this quarter the Voice-over IP recording gateway, a breakthrough Voice-over IP technology for branch recording and IP trunking. This technology enables organizations to implement centralized recording in their main sites and to capture customers' interactions coming in from dozens of remote offices.

The deployment of Voice-over IP continues to represent important opportunities for NICE. In fact, Voice-over IP business more than doubled over the same quarter last year, representing over 10% of our enterprise business. More and more large scale orders are coming in. For example, one of Scandinavia's largest banks placed the following order to expand its implementation of NICE Voice-over IP solutions as it was looking to centralize its recording for all of its European branches.

In the public safety and security market, we are seeing the need to better protect citizens from potential threats continue. In the US, the Federal Aviation Administration is stepping into its Homeland Security budget to improve aviation safety and security. And through Lockheed Martin, we see the multimillion dollar contracts from the FAA to supply advanced analytic tools to help them improve flight planning accuracy at administration-automated flight service stations.

For our first responders' customers, we announced last month our collaboration with Motorola to develop a public safety IP trans-radio recording solution. As fire, police and EMS transmission to Voice-over IP, this solution offers first responders enhanced support for interoperability among agencies on IP networks. As we are the leading IP interactions solutions in all of our sectors, we are ideally positioned towards this Motorola on IP initiatives. These joint solutions was recently released for shipment, and the first orders had already been received by Motorola.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call

As regards to our smart video security solutions, we are seeing increasing demand coming out of Asia Pacific. In Q1 of this year, we announced that Beijing Metro will be implementing NICE smarts biggest solutions in portions of its city's subway system. And last month, we won another major bid with Beijing Metro. Our technology is now securing commuters on additional lines and NICE has become an integral part of how Beijing will insure its citizens' safety during the upcoming World Games.

As we continue to expand in Asia, we are winning more and more security business throughout the region, such as a recent win in Japan to protect marine transportation facilities at one of its ports. In fact, we are seeing an increase in aerospace overall demand and project for our solutions in the transportation and facilities security markets. As a result, we are receiving more and more orders during the second quarter, for example, from transportation authorities in the US and Europe, and two major banks in Western Europe.

In Q2, we experienced strong momentum in our partnership with Honeywell for our video security solutions. Only several months after initiating this partnership, following the completion of the FAST acquisition, we have seen this channel go significantly, and we are looking forward to many more opportunities and increasingly growing pipeline.

In conclusion, Q2 was both a record and important quarter for NICE. We are well tuned into the needs of our customers in each market and in every geography and are continually providing them the solution they need to be competitive and lead. This spills into a continual increase in demand for our Insight from Interactions Solutions, accelerating momentum across the board, and giving us results.

I would like now to turn this call over to our CFO, Ran Oz, for a discussion of our financial performance.

---

**Ran Oz** - *NICE Systems - Corporate VP and CFO*

Thanks, Haim. I am pleased to provide you with an analysis of the financial results for the second quarter of 2006 as well as our outlook for the second half of the year. As Haim indicated, we had another record quarter. Revenues for the second quarter were $97.7 million, up 35.3% from $72.2 million in Q2 '05.

Enterprise sector revenues were $72.6 million in the second quarter, representing an increase of 33.7% year-over-year. Growth in the enterprise sector reflects, in part, NICE's expanding leadership position in the growing market for interaction analytics solutions and the technology research cycle, which includes the increased migration to Voice-over IP.

In the public safety and security sector, revenues in the second quarter were at $25.1 million, representing a 40.2% increase over Q2 '05. Growth in the public safety and security sector reflects in part the strong momentum of our next generation security solutions and increasing budgets that are driving new related projects.

Q2 saw our strongest bookings ever. We completed Q2 2006 with a book to bill greater than one for the ninth consecutive quarter, even with such strong revenues. And we enter Q3 with a strong backlog that gives better visibility than ever before.

Revenue by geography for Q2 '06 was as follows. The Americas accounted for $56.9 million, a 55% increase over Q2 '05. Europe, Middle East and Africa accounted for $27.8 million, and Asia Pacific accounted for $30 million.

Gross margin for Q2 was the highest ever, which is 59.8%, up from 56.7% in the same period of 2005. Product gross margin also reached a record at over 70% for the first time. The increase in gross margin is a direct result of the continuing shift in our product mix towards software based products, including NICE Perform Voice-over IP, quality monitoring and video analytics.

Operating expenses were at $43.8 million or 44.8% of revenues, down from 46.9% in Q2 '05. This improvement is a result of the leverage of our infrastructure. We recorded an increase in operating margins, which is new high with Q2 operating margin at 14.9%.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call

Net income for the second quarter was $14.6 million, up 99.6% from the $7.3 million reported in Q2 '05. This reflects the leverage of our business model, where top-line growth of 75% in the quarter translated into a much high growth in the bottom line.

Any pressure in the second quarter of 2006 was $0.28, up from $0.18 in Q2 of last year [from] Street. The company's balance sheet continues to be strong with cash and equivalents at the end of second quarter at $421.1 million with no debt. This follows the approximately $30 million that were paid for Performix during the quarter and does not include $200 million NICE paid for IEX on July 6th.

DSO at the end of June was 69 days, slightly better than our long-term guidance of 70 to 80 days. Following a very strong first half of 2006, the increasing demand for our insights, from interaction solution and a growing backlog, we are raising previously announced full year guidance for 2006. With revenue at $408 million to $417 million, up from $395 million to $405 million. And proforma EPS at the range of 106 to 115, up from $1 to 106 per fully diluted share from Street.

We also provide first time Q3 '06 guidance as follows. We expect the revenue to be between $108 million to $112 million. And proforma EPS per fully diluted share in the range of 27 to 31.

That's concludes my comments. I'll now turn the call over to questions. Operator?

## QUESTIONS AND ANSWERS

**Operator**

[OPERATOR INSTRUCTIONS]

Please standby while we poll your questions. The first question is from Bill Benton of William Blair. Please go ahead.

**Bill Benton** - *William Blair - Analyst*

Good afternoon to you guys -- Good morning -- no one else. Congratulations on the excellent quarter. I just wanted to check in, I guess, the gross margin split, obviously that increased pretty substantially. And I know you talked about software being a big part of that. So I suspect that we should think about that is being kind of a sustainable level going forward?

**Ran Oz** - *NICE Systems - Corporate VP and CFO*

Yes. We believe that this level is sustainable. And coming into Q3 results announcements, we'll talk more into the outlook of 2007. But for the near-term, that's definitely the level we should expect.

**Bill Benton** - *William Blair - Analyst*

Okay. And then R&D increased sequentially. Is there anything that you're signaling there? Are you doing anything incrementally there that is notable?

**Ran Oz** - *NICE Systems - Corporate VP and CFO*

The increase in R&D as a combination of the addition of Performix that added many talented people to our R&D side. And more investment that we are doing to meet our advantage over other players in our market, more visible.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call

**Bill Benton** - *William Blair - Analyst*

Haim, I guess talked about increased activity in VoIP in call centers, and also talked larger systems, the things we're selling better than smaller and medium-sized systems. Can you comment on whether that is consistent with kind of-- obviously the VoIP side is obviously consistent is what you're seeing. And then you could comment maybe further on that whether you've seen any acceleration there and also with the kind of larger systems versus the smaller systems?

**Haim Shani** - *NICE Systems - CEO*

Hi Bill this is Haim. Obviously, we're seeing the same trends and our results are a reflection of these trends, increased demand, larger system, which is actually where we come to play, this is where we have the clear advantage. We are on the leading in the market in large system, large scale implementations. And if you would like, these are the micro plans behind our result so far and also going forward.

**Bill Benton** - *William Blair - Analyst*

Okay. How much -- how important is VoIP? I know there is a lot of different in NICE Perform and VoIP or other drivers in the business. How important is a VoIP driver specifically? Is there any way that -- can you give us a sense of-- if that is important?

**Haim Shani** - *NICE Systems - CEO*

I'm not sure how to quantify, I can only qualify. The voice is a major opportunity because it does two things. A: of course, it churns faster older technologies, and B: it opens the markets for new applications that did not exist before, especially, in the back office and other areas.

So overall voice is a driver, if you would like both short-term to replace legacy systems and also longer term in terms of new applications. So it is a defiantly a nice and important driver. Not the only one because we are enjoying several, if you would like, those driver. This is one the other is being directional analytic switch.

We are leading the markets and basically set the tone and this is again a new direction that the contact center is -- the contact center and the enterprise is having. And the overall contact center business performance, which is the combination of NICE Perform and IEX and Performix. The combination of the three is also a very strong growth driver moving forward.

So we cannot separate each one with its specific number, but this is definitely behind our results so far and also our guidance for the future.

**Bill Benton** - *William Blair - Analyst*

Okay. And could you give us sense in what percentage your base has maybe migrated to VoIP because is kind of an indicator?

**Haim Shani** - *NICE Systems - CEO*

A very -- still a very small percentage. The vast majority of the enterprise today exiting the installed base is still BDM.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call

**Bill Benton** - *William Blair - Analyst*

Okay. Then is the quick comment on how the current conflict over there is impacting your business at all, obviously you guidance is strong, so it possess not much right now?

**Haim Shani** - *NICE Systems - CEO*

Are you talking about the gun conflict in the Middle East?

**Bill Benton** - *William Blair - Analyst*

Yes.

**Haim Shani** - *NICE Systems - CEO*

There is no effect whatsoever on our business.

**Bill Benton** - *William Blair - Analyst*

Okay. Thank you very much.

**Haim Shani** - *NICE Systems - CEO*

Okay.

**Operator**

Our next question is from Shaul Eyal of CIBC. Please go ahead.

**Shaul Eyal** - *CIBC - Analyst*

Thank you. Hi, good afternoon, guys, and good quarter. Congratulations on the guidance. A couple of quick questions for me. I want to start first on the competitive landscape and kind of -- it's a question being asked, not that we have nothing to ask. But we need to try and understand what's happening, because I think that we could be seeing some sort of shift.

One of your main apples-to-apples com announced results that were, you know, okay, at the best. What are you guys doing that is different from these guys? Is that a product issue? Is that a technology? Is that execution issue? What's happening on the competition landscape?

**Haim Shani** - *NICE Systems - CEO*

Hi, Shaul. Thank you. I would not like to comment on a specific company, but I can say that, you know, all this -- our results and the growth in our results and growth in the enterprise numbers overall, I guess, indicate that we are increasing our market share quite significantly. This comes almost from doing mathematics.

From a strategy point of view, we have set up strategy a few weeks ago basically in terms of where we're heading. We have launched Insight from Interactions. Initially, region, then we have backed it up 10s of millions of dollars of development in R&D,

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call

which translated into a significant major suite that NICE performed. So it's very well accepted by the customers. And we're seeing customers buying it and replacing legacy -- either replacing legacy competitor product or upgrading their own -- the previous versions of NICE.

I have also talked about Voice-over IP, which is a trend. We have patented technology -- a very strong patented technology in our own Voice-over IP, which again is adopted very well by the market. So this is probably behind our results. We have also set up reasonably strong operation around the world in all the regions. So we are not dependent on only one specific geography. And so I would say we have a relatively good coverage of the entire regions. So I guess these are all behind our results.

---

**Shaul Eyal** - *CIBC - Analyst*

Fair enough. Well, I have you maybe on that --same company. It also kind of announced last week some stock options issued that we were looking into, given the fact that everything is absolutely fine fundamentally very, very flawless. Have you guys looked into, you know, your own kind of stock options, so could be like, you know, nothing in the -- coming in the future just to make sure?

---

**Haim Shani** - *NICE Systems - CEO*

We don't have any issue with stock option. NICE had always had very strict procedure of granting the stock options at board meetings and based on the last known price.

---

**Shaul Eyal** - *CIBC - Analyst*

Okay. That's good. Haim, you mentioned before kind of the -- I think the new product, the branch Voice-over IP recorder. Just want to understand is that a product you guys are developing by the request of your customers? Are you being kind of pushed into the market or is this something about that you're coming up with it from an innovative kind of standpoint and kind of going ahead, going ahead into the market?

---

**Haim Shani** - *NICE Systems - CEO*

Combination of the two together. In terms of the underlying demand, the underlying need for a solution, obviously it comes when talking to customer on the spending what are their needs, what are the issues in terms of sufficiency? How to address without going too technical?

How to address issues with the new IP trunking and how to have a much more efficient management of recording in a centralized location. So the need, if you like the underlying need, is by talking to many of our customers that the commodity itself is, this is the head, if you would like, it will be ideas of our engineers, so innovative in terms of the commodity to address this need. So it's a combination of the two.

---

**Shaul Eyal** - *CIBC - Analyst*

Got it. I guess one final question. Just to make sure that I heard correctly on the public safety, was it 25.1 million for the quarter?

---

**Ran Oz** - *NICE Systems - Corporate VP and CFO*

Yes.

---

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call

---

**Shaul Eyal** - *CIBC - Analyst*

Got it. Was this kind of slightly down from last quarter if I am correct. And if so it was just, you know, a shift given the fact that it was a good performer this quarter?

---

**Ran Oz** - *NICE Systems - Corporate VP and CFO*

I think that's growing 40% over the same quarter last year. It's something that we won't sign for the next coming years.

---

**Shaul Eyal** - *CIBC - Analyst*

Okay.

---

**Ran Oz** - *NICE Systems - Corporate VP and CFO*

We are not [inaudible] sequentially.

---

**Shaul Eyal** - *CIBC - Analyst*

All right. Thank you very much. Congratulations.

---

**Haim Shani** - *NICE Systems - CEO*

Thank you.

---

**Operator**

We're now going to move on to Paul Coster, JP Morgan. Please go ahead.

---

**Paul Coster** - *JP Morgan - Analyst*

Yes. Good afternoon gentlemen. A couple of quick questions around, first of all, the tax rate going forward. We were into quarter buyback. What should we expect through the remainder of this year?

---

**Ran Oz** - *NICE Systems - Corporate VP and CFO*

We expect to have kind of 20%-21% tax rate. We said that with effect of the last two acquisitions, we are going to face a slightly higher tax rate.

---

**Paul Coster** - *JP Morgan - Analyst*

Okay. Got you. And mostly was it CapEx this quarter that is going forward?

---

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call

**Ran Oz** - *NICE Systems - Corporate VP and CFO*

CapEx is usually on quarterly basis around $2 million. This quarter specifically, it was slightly shy of 2 million at 1.9.

---

**Paul Coster** - *JP Morgan - Analyst*

Okay. Your prior guidance or your thought was to achieve 60% gross margins. Well, it seems to fit your target. So can you provide us with an update on your long-term objectives in terms of the business model here?

---

**Ran Oz** - *NICE Systems - Corporate VP and CFO*

Yes. Well, our long-term target was to be across the 60%. So we still have some basis points to achieve. On the tariff side, we intend to come after Q3 and not just to give outlook for 2007. We have a clear plan in targets, but also to set the right targets in terms of metrics on the gross margin and operating margin that we would look for.

---

**Paul Coster** - *JP Morgan - Analyst*

Okay. Got it. How important is the pending litigation on VoIP technology, I think late this summer?

---

**Haim Shani** - *NICE Systems - CEO*

We have a very significant weapon, as I said. And since we believe that these weapons are enforceable, we have initiated this litigation to make sure that our rights are protected. So, of course, if this will be approved by the court, it means that we have -- that our rights will be protected. And it's very important.

---

**Paul Coster** - *JP Morgan - Analyst*

What is the -- sorry, Haim. What is the timing for the litigation?

---

**Haim Shani** - *NICE Systems - CEO*

We expect this to be concluded not later than the end of the year.

---

**Paul Coster** - *JP Morgan - Analyst*

Okay. Great. I'm set. Thank you.

---

**Haim Shani** - *NICE Systems - CEO*

Thank you.

---

**Operator**

Our next question is from Daniel Meron of RBC. Please go ahead.

---

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call

**Daniel Meron** - *RBC - Analyst*

Thanks, Haim and Ran, and congratulations on a very good performance and outlook. A quick question kind of on the updates regarding your partnership that you had with SAS. Also you had a product lunch with Motorola, if you can give us a sense there. On other front, what are your strategic thoughts on partnerships? How do you view that? Do you think that you can expand more with IBM? I believe that you just had a contract signed with them that you announced just recently?

---

**Haim Shani** - *NICE Systems - CEO*

I mean on all these partners, they are extremely important. We have there, I would say, partners, which support our existing day-to-day business, and we have partners that will support our expansion into new areas such as the SAS relationship, so each one has a little bit different label.

SAS was a major sponsor of this year of our summit. They had the boost there. We had many joint meetings with customers. And we are now starting to see, if you would like, and the plans for initial implementation of this joint vision. So this is one example with IBM, I would say, probably on the same direction.

And with Motorola, we have an ongoing business relationship, which is generating immediate business, ongoing business, on the PBM phone, from their voice PBM phone front. And now, we have extend this partnership also to Voice-over-IP. So as they move -- as they condition their technology we are there at significant part there of this move.

So this is what we're, obviously looking into the future as we expand our product portfolio. As we expand our product reach, we might be looking to have additional partnership corporation. Partnership is not necessarily a distribution agreement, partnership can be also technological alliance.

And this is something that we're actively doing. Speaking right now to settle our, if you like, potential new partners that are relevant, and if and when we'll have something to announce we will.

---

**Daniel Meron** - *RBC - Analyst*

Great. Thanks. And maybe can you provide some color on where you are as far as M&A strategy? Are you taking a pause here for a quarter to or do you continue to looking for more acquisitions at least the same skill that you seen so far?

---

**Haim Shani** - *NICE Systems - CEO*

We'll answer you half jokingly but we don't have the time for that prose. Seriously speaking, obviously we have now concluded two very important acquisitions in the enterprise sector, which position us, we believe, in a very strong in this part.

And in terms of priority, and I would say more proactive we are looking to expand our security portfolio and security offering, also through organic growth and acquisitions. So this is something that we're proactively looking at. I won't exclude also acquisitions on the enterprise front if and when from an opportunistic basis they will appear.

But in terms of our first priority for, I would say, the coming future, it's obviously going to be more on the Security side. I would say that a more of a general answer -- our strategy remains the same to combine organic growth with strategic acquisitions. Nothing has changed in this respect.

---

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call

**Daniel Meron** - *RBC - Analyst*

Great. Thanks. And one couple of question for Ran is that the mix of services versus products were a bit tired this quarter. How should we look at it next couple quarters?

**Ran Oz** - *NICE Systems - Corporate VP and CFO*

We believe that going forward, more long-term, it should stabilize around 65 product and 35 service and maintenance, give or take.

**Daniel Meron** - *RBC - Analyst*

Okay. So this quarter would -- what accounts for the strength of this quarter?

**Ran Oz** - *NICE Systems - Corporate VP and CFO*

As you know, we have experienced a stronger quarter than we have originally anticipated. And we gave the pre announcement before the end of the quarter due to the demand that we were facing. This is also the reason we have raised our guidance for the rest of the year.

**Daniel Meron** - *RBC - Analyst*

Great. And then, also this quarter, I'll start with the product gross margins were slightly -- the product gross margin were strongly up but the actual cost of the goods were down. Was it -- is because of higher share of software within your products?

**Ran Oz** - *NICE Systems - Corporate VP and CFO*

Yes.

**Daniel Meron** - *RBC - Analyst*

Okay. Thanks, Ran. Good luck going forward.

**Ran Oz** - *NICE Systems - Corporate VP and CFO*

Thank you.

**Operator**

Well, then we'll move on to Joseph Wolf of UBS. Please go ahead.

**Joseph Wolf** - *UBS - Analyst*

Thank you. Just a quick question. If I look at the guidance and the raised guidance, could you give us a sense of -- some of that is obviously driven by success in the second quarter. I'm just wondering if you could kind of tell us how much of the success and 2Q is rolling over into 3Q as being optimistic?

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call |
| --- |

And how much of is just, in fact, that you beat the second quarter. And Related to that, in connection to the prior question, could you tell us where the upside surprise came to your guidance in 2Q based on either market segment or product?

---

**Ran Oz** - *NICE Systems - Corporate VP and CFO*

If you go from the mathematics direction you'll see that the raised guidance for the second half of the year is definitely coming from a stronger results in the second half of the year. And not relating to what the actual Q2 was already, because we already reported.

I think that you'll feel so that growth that we are focusing to have in the second half of the year versus the second half of '05 is going to be significant one. The fact that we're putting such a high guidance is based on stronger bookings we experienced in the first half of the year, which gave us much better visibility into this half and stronger pipelines and opportunities that we are facing. Does this answer your question?

---

**Joseph Wolf** - *UBS - Analyst*

I guess a vaguely, yes. I just - probably look at the midpoint of the range and I look at where consensus was it seems to me the midpoint of the range is kind of where people who're already expecting. And that was after the pre -- after the positive preannouncement.

---

**Ran Oz** - *NICE Systems - Corporate VP and CFO*

You probably need to ask the people will come up with the midpoint of the analyst expectation. What we gave is a raise which is significant compared to our previous guidance, which is much higher than a just the Q2 results.

---

**Joseph Wolf** - *UBS - Analyst*

Okay. Could you maybe spend some time going through some of the details were there was some surprise from were you looking into the 2Q when you gave guidance? And how it came out?

---

**Ran Oz** - *NICE Systems - Corporate VP and CFO*

Yes. We saw surprise over upside coming from both sides of our business. We didn't expect neither the enterprise to grow at 33% nor the security to grow over 40%. So on both sides we see the upside and that's the reason Q2 came in, I would say, more than $5 million or almost $6 million higher than the original guidance.

---

**Joseph Wolf** - *UBS - Analyst*

Okay. Thanks.

---

**Ran Oz** - *NICE Systems - Corporate VP and CFO*

Anything else?

---

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call

**Joseph Wolf** - *UBS - Analyst*

No, I am done.

---

**Operator**

Our next question is from Brian Ruttenbur of Morgan Keegan. Please, go ahead.

---

**Brian Ruttenbur** - *Morgan Keegan - Analyst*

Yes. Just one quick question, a lot of my questions are already been answered. Great quarter, by the way. Just want to know was your internal growth was in the period?

---

**Ran Oz** - *NICE Systems - Corporate VP and CFO*

The organic growth and the company through the years was about mid-teens. It's really hard to calculate it in every given point of time, given the fact that most of the acquired company's become organic parts of NICE. But we can definitely say that in the last two quarters or the first half of 2006 the organic growth was much, much higher than the normal level that we experienced. It was definitely about 20%.

---

**Brian Ruttenbur** - *Morgan Keegan - Analyst*

Okay. You just said mid teens, and then you said 20% and historically you've been 8% to 10%. I'm a little confused what organic growth is?

---

**Ran Oz** - *NICE Systems - Corporate VP and CFO*

Organic growth for the company in the last several years was around midteens. It can be 13%, it can be 14%, it can be 16%. It is moving from one quarter to another. Specifically in the last two quarters it was much stronger than that.

---

**Brian Ruttenbur** - *Morgan Keegan - Analyst*

Okay. Well, thank you very much. I appreciate.

---

**Ran Oz** - *NICE Systems - Corporate VP and CFO*

Thank you.

---

**Operator**

Our next question is from Mike Latimore of Raymond James Associates. Please go ahead.

---

**Mike Latimore** - *Raymond James Associates - Analyst*

Yes. Good morning. And have a nice quarter. Just to clarify comment early. You said that your Voice-over IP deals on average have a higher ASPs in your TDM based deals?

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call

---

**Haim Shani** - *NICE Systems - CEO*

I don't. This is Haim, I don't recall that I said so. All I said that it is the potential in terms of Voice-over IP is for two things, one is to grow replace legacy systems and b, to enable no applications and that still the vast majority of our installed base is TDM. As for today ASP this is a question that I won't recall I was asked before.

---

**Mike Latimore** - *Raymond James Associates - Analyst*

Okay. I just thought you said in reference to a buyer being larger deals around VoIP but you're also seeing larger deals around VoIP.

---

**Haim Shani** - *NICE Systems - CEO*

Correct. But we didn't discuss the specifics of ASPs. I -- in other environments I was seeing -- I'd say much more Voice-over IP deals than in the past and this is something that contribute it to our growth.

---

**Mike Latimore** - *Raymond James Associates - Analyst*

Okay. Great. And then just -- will be the impact of the IEX acquisition would, should we assume the enterprise, public safety mix remains roughly. What it is this quarter going forward?

---

**Haim Shani** - *NICE Systems - CEO*

I would say that in the second half of the year, we would see the contribution of IEX taking the enterprise there even higher and more towards the 75% of business. But in the longer-term it will probably go back to around 70/30.

---

**Mike Latimore** - *Raymond James Associates - Analyst*

And then in the IEX market, the workforce management market, would you expect the higher growth rate to come out of sort of enterprise large company deals or a higher growth rate to come out of the small mid-size business market?

---

**Haim Shani** - *NICE Systems - CEO*

I would say that the growth will come from, A; the IEX product line or business gaining market share on its own by having the most advance and reach in terms of feature functionalities for multi skills and complex environments. This is one part, and the second part, it will grow from the synergy and a leverage it will have from the NICE distribution or integration primarily outside the United States but also in the US.

---

**Mike Latimore** - *Raymond James Associates - Analyst*

Yes. In terms of a large company versus a small company, it seems like there's more penetration in a large market. I'm wondering if maybe the growth rate obviously has a small base, out of a small mid-size and might exceed that opportunity of a large market?

---

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call

**Haim Shani** - *NICE Systems - CEO*

Not necessarily. First of all, I agree with you there is an opportunity in the mid-range, obviously, but you'd be surprised that even in the large market opportunities, A; still our customers that have menial operations there and, B; we have now a tendency of replacing legacy systems that are much less and functionality and companies that are now turning much more to IEX to replace quite a lot of legacy system being here. So even if it's penetrating by in many phases nonfunctional systems.

**Mike Latimore** - *Raymond James Associates - Analyst*

Okay. All right. Thank you.

**Operator**

We'll now move on to Dan Harverd of Deutsche Bank. Please go ahead.

**Dan Harverd** - *Deutsche Bank - Analyst*

Hi, Good afternoon and congratulations on the quarter. There are couple of times when you mentioned the replacement and upgrade cycle. Where do you think we are on that cycle and how long can it last in enterprise side?

**Haim Shani** - *NICE Systems - CEO*

I mentioned this primarily in the context of Voice-over IP and as I said in terms of Voice-over IP specifically, still the vast majority of the Compact(tm) Center has TDM. So obviously we're just at the beginning.

**Dan Harverd** - *Deutsche Bank - Analyst*

So you're saying NICE Perform is the driver for upgrades or is it primarily Voice-over IP or to what extent are the two intertwined?

**Haim Shani** - *NICE Systems - CEO*

Okay. First of all, they are combined, of course, because NICE Perform and analytics runs and analytics coaching, quality monitoring and so on runs on top of both TDM and Voice-over IP. So they're connected. But in terms of business drivers -- they're too different business drivers. One is the Voice-over IP as I said of the convergent from TDM to Voice-over IP.

And the second is the value -- the business of value that NICE Perform combined with Performix and IEX brings into the Compact(tm) Center and analytics and so on which is a new vision, a new technology and new solution to our customers and the penetration there is again, it's just the beginning.

**Dan Harverd** - *Deutsche Bank - Analyst*

Okay. Just moving on to the subject of large deals. In the process given some metric on that, do you think you could give an indication of what percentage of the business is driven by large deals? How you define large deals?

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call

**Haim Shani** - *NICE Systems - CEO*

The metrics we usually used when asked was mainly how many seven digit deals we had. This quarter, we had 13 deals which is I think the highest ever. Definitely much higher than previous quarters and this is only one element of the growth that we see in our business.

**Dan Harverd** - *Deutsche Bank - Analyst*

Okay. That's all. I just want to move back to the question of consolidation. Obviously, you've made a relatively large acquisition recently in the call center market. Can you track acquisitions within the enterprise space, could you see acquisitions of that size enough or are they more likely to be smaller in size going forward?

**Haim Shani** - *NICE Systems - CEO*

I'm not sure that I would be able to qualify that [mail] I would say that our primary focus at this point of time is to expand our security related business, so strategic acquisitions. This is I'd sound short and midterm. Within the enterprise side, we've just completed two acquisitions. We think we have a very strong opportunity for our technology combines solutions and so on. On the longer term basis, I would not rule out that we will continue to expand also for digital positions?

**Dan Harverd** - *Deutsche Bank - Analyst*

Okay. And then just one final question from me. The operating cash flow was a little bit weaker than in recent quarters, so what was behind that or was it just a quarterly blip or should we see this as a level going forward?

**Haim Shani** - *NICE Systems - CEO*

It's more on the first half of the year being about $30 million of free cash-flow from operations, which is about our run rate. It's just a matter of collection moving from one quarter to another.

**Dan Harverd** - *Deutsche Bank - Analyst*

Okay. Thank you.

**Haim Shani** - *NICE Systems - CEO*

Thank you.

**Operator**

And I move on it to Daniel Ives of FBR. Please go ahead?

**Daniel Ives** - *FBR - Analyst*

Yes. One question. The New York City MTA contract video surveillance piece have you won their contract and if so can you maybe just give us detail in terms of timing or then pieces or your competition? Thanks.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call

**Haim Shani** - *NICE Systems - CEO*

We cannot give any specifics on customers unless we have announced it in public. So since we didn't make any announcement on this specific customer, I cannot comment on a specific customer. The only thing that we share that in the City of New York we are -- in the area of New York, if you'd like we are seeing some of our video technology being deployed. We did not specific which customer was it.

**Daniel Ives** - *FBR - Analyst*

Okay. What is problem with video surveillance Yechiam can you talk to the competitive environment on video surveillance? And there are a lot of smaller players and there are a lot of smaller players fragmented, and just how that environment changing maybe just insurance on your raw transportation or video surveillance market? Thanks.

**Haim Shani** - *NICE Systems - CEO*

There are quite a lot -- you mentioned for actually the several of players in the video surveillance, a few little public -- very few little publics, many others are either part of larger organizations like GE, and also smaller companies. So this is at this point of time relatively fragmented market.

We have really focused reports on focusing on growing areas, areas where we can leverage our scalable solutions those that implement analytics and also very high-end technology, as well as our voice -- our video over IP technology that was acquired from part. And this is primarily; not only in political facilities, transportation and gaming and then these I would say high-end part of the market. We are seeing a lot of demand and a lot of growth, and a lot of momentum in the business. But obviously we are not along the other companies competing for this segment.

**Haim Shani** - *NICE Systems - CEO*

That answers your question?

**Daniel Ives** - *FBR - Analyst*

Thanks.

**Operator**

And we have a question from Jeff Nevins with First Analysis. Please go ahead.

**Jeff Nevins** - *First Analysis - Analyst*

Good morning. I want to just hit on a question from earlier caller about the organic growth. By my calculation it looks like in the second quarter your organic growth accelerated quite significantly.

The organic growth from first quarter of '06 as maybe around 10% in this quarter it accelerated to the upper 20s. And it appears as if there was some sort of deal movement from Q1 to Q2, could you provide any color as to why it appears as if the organic growth and did accelerate so significantly the in the second quarter?

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call

**Haim Shani** - *NICE Systems - CEO*

Again, we do not know exactly how you calculate and as we said, carving out the exact organic growth is always difficult, because we are integrating the acquired companies into our business. And in many cases, like we've done both with [inaudible] in the past we've actually really placed many of the technology with the NICE platform. So an exact calculation of the organic growth is difficult, but from a qualitative point of view.

Yes, we have seen acceleration in the second half and more so even in the second quarter in our growth in general. And this was attributed both for organic growth and through acquisitions. I guess that the strategy that we accept for the company was well accepted by customers. And there is no doubt as simple as that. More Voicenet been more NICE performance, more customers adapting detail. So its competitive wins, the combination importantly contributed to this organic growth.

**Jeff Nevins** - *First Analysis - Analyst*

Okay. So there's nothing from the first quarter that what's into the second quarter that is significant?

**Haim Shani** - *NICE Systems - CEO*

No, it's not, no.

**Jeff Nevins** - *First Analysis - Analyst*

Okay. And then just following-up on that, you look out into the September quarter, and I know my calculations they are not perfect. But what implies if organically you're expecting the September quarter to be about flat may be even down a little bit once you add IEX in [Performix] which will add to the tune of $13 million or $15 million in the September quarter. Is that how you're thinking about the outlook for the September quarter?

**Haim Shani** - *NICE Systems - CEO*

We do believe that Q3 is usually flattish and a slightly up, in this case we actually we do see increase. Not just if Q2 was higher than expectation. We do believe that above this and normally we can see Q3 even exceeding it. When we gave the first-time guidance, for [Performix] IEX together, it was for operating to $30 million for the second-half of the year, meaning less then half of reaching Q3. So there is still room for sequential growth, although we usually look at more year-over-year, that would present a significant growth over Q3 '05.

**Jeff Nevins** - *First Analysis - Analyst*

It's fair enough. Thanks.

**Haim Shani** - *NICE Systems - CEO*

Thank you.

**Operator**

[OPERATOR INSTRUCTIONS]

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call

We have a follow-up question from Daniel Ives of FBR. Please go ahead.

**Daniel Ives** - *FBR - Analyst*

Hi, guys. I assume you should elaborate geographic breakout. Can you give those numbers again?

**Haim Shani** - *NICE Systems - CEO*

Yes. America accounted for $56.9 million and.

**Daniel Ives** - *FBR - Analyst*

Because I think what you have it will say you just near 27 [inaudible] authority?

**Haim Shani** - *NICE Systems - CEO*

It's 13.

**Daniel Ives** - *FBR - Analyst*

13. Okay, good. Thanks sir.

**Haim Shani** - *NICE Systems - CEO*

Thank you.

**Operator**

And we have another follow-up question from Jeff Nevins of First Analysis. Please go ahead.

**Jeff Nevins** - *First Analysis - Analyst*

Final question, guys. On the security segment, what's your, I guess kind of a prognosis on what's happening out there. I mean, obviously it was improved quite significantly you have fast video in their, which helped some of the growth. You see that sector growing 25% plus over the next several months? Are there any challenges or opportunities that are changing anything in the landscape?

**Haim Shani** - *NICE Systems - CEO*

It is quite significantly compared to the first half of last year. We expected to continue and grow and this is of course both of our guidance for the second half of the year for the full year. In terms of the dynamics, the dynamics was prevailing, mainly the governments and cities need to protect citizens and invest in technology first responders need to upgrade their technology to address many challenges.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Aug. 02. 2006 / 8:30AM, NICE - Q2 2006 NICE Systems Earnings Conference Call

So if you would like the gross drivers and the dynamics that affected the growth so far. I don't think they are going to change into the next quarter or not in the next two years. So in this respect, corporations and governments and cities and states will continue to invest in technology to improve the security.

**Jeff Nevins** - *First Analysis - Analyst*

Okay. Thanks.

**Operator**

There are no further questions at this time. Before I ask Mr. Oz to go ahead with his closing statement, I would like to remind participants that a replay of this call is scheduled to begin in two hours time. In the US, please call 1-866-276-1485. In Israel, please call 03-925-5930, and internationally please call 972-39-255-930. Mr. Oz?

**Haim Shani** - *NICE Systems - CEO*

Actually, this is Haim Shani, operator. I would just like to use this opportunity to thank all of NICE employees for the hard work and dedication to make this the most successful quarter for the company and it's only with their real motivation that we were able to achieve this great results. I would like to thank everyone for participating in this call. And we look forward to having you join us on next quarter's call. Have a good day. Thank you.

**Operator**

Thank you. This includes NICE Systems second-quarter 2006 results conference call. Thank you for your participation. You may go ahead and disconnect.

DISCLAIMER

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2006, Thomson Financial. All Rights Reserved.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

# EXHIBIT 50



UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
WASHINGTON, D.C. 20231
www.uspto.gov

Bib Data Sheet

| SERIAL NUMBER 09/664,755 | FILING DATE 09/19/2000 RULE _ | CLASS 709 | GROUP ART UNIT 2153 | ATTORNEY DOCKET NO. 1385/4 |
|---|---|---|---|---|

**APPLICANTS**

Mordechai Nisani, Sde Hemed, ISRAEL;
Danny Shporer, Rehovot, ISRAEL;
Ilan Yosef, Pardesiya, ISRAEL;

** CONTINUING DATA *************************
THIS APPLICATION IS A CIP OF 09/140,453 08/26/1998 PAT 6,122,665

** FOREIGN APPLICATIONS ********************

IF REQUIRED, FOREIGN FILING LICENSE
GRANTED ** 11/08/2000

| Foreign Priority claimed ☐ yes ☒ no | | | |
|---|---|---|---|
| 35 USC 119 (a-d) conditions met ☐ yes ☒ no ☐ Met after Allowance | STATE OR COUNTRY ISRAEL | SHEETS DRAWING 9 | TOTAL CLAIMS 28 | INDEPENDENT CLAIMS 2 |
| Verified and Acknowledged    Examiner's Signature    Initials | | | |

**ADDRESS**

Dr Mark Friedman Ltd
c/o Anthony Castproma
2001 Jefferson Davis Highway
Suite 207
Arlington ,VA 22202

**TITLE**

Communication management system for computer network based telephones

| FILING FEE RECEIVED 834 | FEES: Authority has been given in Paper No. _____ to charge/credit DEPOSIT ACCOUNT No. _____ for following: | ☐ All Fees |
|---|---|---|
| | | ☐ 1.16 Fees ( Filing ) |
| | | ☐ 1.17 Fees ( Processing Ext. of time ) |
| | | ☐ 1.18 Fees ( Issue ) |
| | | ☐ Other _____ |
| | | ☐ Credit |