## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NICE SYSTEMS, INC. and
NICE SYSTEMS, LTD.,

     *Plaintiff*,

     v.

WITNESS SYSTEMS, INC.,

     *Defendant*.

Civil Action No. 06-311-JJF

## DEFENDANT WITNESS SYSTEMS, INC.'S
## OPENING CLAIM CONSTRUCTION BRIEF

Dated:  this 11th day of May, 2007

Respectfully submitted,

FISH & RICHARDSON P.C.
William J. Marsden, Jr. (#2247)
Kyle Wagner Compton (#4693)
919 N. Market Street, Suite 1100
P. O. Box 1114
Wilmington, DE  19899-1114

Nagendra Setty (*pro hac vice*)
Daniel A. Kent (*pro hac vice*)
Noah C. Graubart (*pro hac vice*)
1180 Peachtree Street, N.E.
21st Floor
Atlanta, GA 30309

**ATTORNEYS FOR DEFENDANT
WITNESS SYSTEMS, INC.**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................XX

I.      INTRODUCTION ...........................................................................1

II.     NATURE AND STAGE OF THE PROCEEDINGS ................................2

III.    OVERVIEW .................................................................................2

        A.      The Parties & Their Technology ..........................................2

        B.      Patents-In-Suit ...............................................................3

IV.     ANALYSIS ...................................................................................4

        A.      '570, '345 and '370 Patents:  The Single-Object Call Database
                Patents ..........................................................................4

                1.      "Telephone Call" ...................................................5

                2.      "Telephone Call Segment"......................................5

                3.      "Segment" .............................................................6

                4.      "Telephony Event"..................................................7

                5.      "Data Representation(s)," "Representation of a Lifetime of
                        the Telephone Call," "Call Record," and "Master Call
                        Record," .................................................................9

                6.      (a) "Constructing a Data Representation of a Lifetime of the
                        Telephone Call …."& (b) "Wherein Said Data
                        Representations Are Constructed Using Data Regarding
                        …." ......................................................................13

                7.      "Matching a Received Telephony Event with a Constructed
                        Call Record."........................................................14

                8.      "Combining Said Updated Call Record with Data
                        Indicating One or More Locations of Recorded Audio Data
                        for Two or More Segments of the Call" .....................15

        B.      '371 Patent – "Endless Loop" Digital Logger ..........................16

                1.      "Buffer" & "Digital Audio Tape" ...............................16

                2.      "Writing the Audio Data from the Buffer onto a Digital

Audio Tape and a Random Access Storage Device" ....................18

3.     (a) "Pair of Pointers" and (b) "the First of Said Pointers Operative for Transmitting Audio Data to Said Random Access Storage Device from Said Buffer and the Second of Said Pointers Being Operative to Send Audio Data From Said Random Access Storage Device to Said Controller." ............20

C.     '738 Patent – Voice and Audio Signal Processing Cards ..........................23

1.     "Audio Processor" ..........................................................23

2.     "Digital Signal Processor" & "Application Processor" .................24

D.     '005 Patent – A Modular Logger ................................................26

1.     "Circuit Modules . . . for Converting" & "A Circuit . . . for Compressing" ........................................................................26

2.     "Analog Voice Signals" .................................................28

3.     "Digital Audio Tape" ...................................................28

E.     '372 Patent – Multi-Stage Logging System ................................29

1.     "Telecommunications ("Telecom") Stage .....................30

2.     "Wherein at Least Two Stages of the System Are Physically Separable and in Operation Can Be Located Wide Distances Apart." ........................................................................31

3.     "Web server" .................................................................32

F.     '920 Patent – Remote-Access Logging System .........................33

1.     "Web Server" .................................................................33

2.     "Receiving a Request for Retrieval of Stored Data," "Retrieving Stored Data," & "Transferring the Retrieved Data" ........................................................................34

3.     "Digital Logger" ..............................................................35

4.     "Record of an Input Channel" & "Record of a Communication Channel" ........................................................36

G.     '079 Patent – Voice & Screen Recording System .....................37

|  |  | 1. | "Event Manager" | .................................................37 |
|  |  | 2. | "Predefined Monitoring Condition" | ........................39 |
|  | H. | | '109 Patent – An IP-Based Conference Recorder | .....................40 |
|  |  | 1. | "Conference Controller" & "Through a Conference Controller" | ...........41 |
|  |  | 2. | "Recording Device" | ..........................................44 |
|  |  | 3. | "Entering the Recording Device to Said Conference Call as an Additional Participant" | ...........45 |
|  |  | 4. | "IP Data Session" | ...........................................46 |
|  |  | 5. | "The Portion of the IP Data Session" | ................47 |
| V. | | | CONCLUSION | ..................................................50 |

12019720.DOC

# TABLE OF AUTHORITIES

## CASES

*Budde v. Harley-Davidson, Inc.,*
    250 F.3d 1369 (Fed. Cir. 2001)....................................................................................27

*CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG,*
    224 F.3d 1308 (Fed. Cir. 2000).........................................................................16, 18, 43

*Chef America, Inc. v. Lamb-Weston, Inc.,*
    358 F.3d 1371 (Fed. Cir. 2004)....................................................................................22

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.,*
    424 F.3d 1293 (Fed. Cir. 2005)...............................................................................27, 28

*Deal v. United States,*
    508 U.S. 129 (1993)......................................................................................................19

*Gillette Co. v. Energizer Holdings, Inc.,*
    405 F.3d 1367 (Fed. Cir. 2005)....................................................................................45

*Honeywell International, Inc. v. ITT Industrial, Inc.,*
    452 F.3d 1312 (Fed. Cir. 2006).........................................................................11, 12, 29

*Jonsson v. Stanley Works,*
    903 F.2d 812 (Fed. Cir. 1990)........................................................................................5

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed. Cir. 1995).........................................................................................40

*Omega Engineering, Inc. v. Raytek Corp.,*
    334 F.3d 1314 (Fed. Cir. 2003).......................................................................................8

*In re Paulsen,*
    30 F.3d 1475 (Fed. Cir. 1994).......................................................................................48

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005).........................................................................19, 20, 21

*Rexnord Corp. v. Laitram Corp.,*
    274 F.3d 1336 (Fed. Cir. 2001)...............................................................................21, 22

*Rheox, Inc. v. Enact, Inc.,*
    276 F.3d 1319 (Fed. Cir. 2002).....................................................................................32

**STATUTES**

35 U.S.C. § 112...................................................................................................................27

**OTHER REFERENCES**

*Dictionary of Multimedia*, 52 (1997) ----------------------------------------------------------18, 19, 29

*Web Page, Dictionary of Computer and Internet Terms* 545 (8th ed. 1997)----------- 32, 35, 37, 38

# I.     INTRODUCTION

This case is unusual in several key ways.  First, because of NICE's "kitchen sink" litigation strategy—suing Witness on a hodgepodge of patents—some that issued to NICE and some that issued to Dictaphone Corporation over the last decade or more. Many claimed technologies apply only to legacy products that customers have either phased out already or which Witness has stopped supporting altogether.  Many of the asserted patents, plainly, do not claim currently important technology.

Second, Dictaphone asserted one of these patents against NICE,[1] which NICE claimed to be unenforceable for inequitable conduct.  Forgetting that history and evidence of unenforceability, NICE now drags this injured patent before this Court, using the same counsel who earlier argued the patent's fatal defects.  Some of the more interesting passages below relate to the duplicitous approach NICE now advances—leaving Witness today to adopt *in toto* many of NICE's claim construction positions from *Dictaphone*.

Third, because NICE has thrown so much unrelated subject matter at Witness in scattershot manner, there are some forty-six terms in dispute, across 72 claims, across ten patents.  Even when Witness quoted a NICE construction from *Dictaphone*, NICE did not acquiesce, apparently arguing now that the term means something new and different.

Because of these vicissitudes and the inherent complexities of a ten patent case, the briefing below is an unusual combination of length without as much depth as each issue deserves.  Unless and until the sheer number of issues is reduced, this action will continue to be unwieldy for the Court or a jury.

---

[1] *Dictaphone Corp. v. NICE Systems, Ltd.,* 3:00-CV-1143 (D. Ct.) ("*Dictaphone*").

## II.    NATURE AND STAGE OF THE PROCEEDINGS

On May 10, 2006, NICE sued alleging that a wide range of Witness products infringe ten patents.[2]  The parties have engaged in extensive discovery, including document exchanges in the ten-million-page range by March 2, 2007.  Fact discovery closes on May 30, 2007.  The claim construction hearing is June 26, the pre-trial conference is December 6, 2007, and trial is scheduled for January 14, 2008.

## III.    OVERVIEW

### A.    The Parties & Their Technology

Both Witness and NICE provide systems that allow companies to monitor, record, and analyze phone calls between customers and customer service agents.  Put another way, when you hear the phrase, "[t]his call may be recorded for quality assurance purposes," you are likely encountering a Witness or NICE product. Witness and NICE products enable precise recreation of employee interactions and meaningful review.

Recording a single call can be simple and straightforward, but in large call centers that employ 4,000+ agents, highly sophisticated systems are required.  These systems for capturing, recording, monitoring, and/or analyzing telephone calls include certain core components, including: (1) telephony equipment, such as a switch that can interface with the public telephone network with the call center; (2) a computer-based controller to

---

[2] U.S. Patent No. 6,249,570 ("the '570 Patent") [Ex. 8]; U.S. Patent No. 6,728,345 ("the '345 Patent") [Ex. 10]; U.S. Patent No. 6,785,370 ("the '370 Patent") [Ex. 15]; U.S. Patent No. 5,396,371 ("the '371 Patent") [Ex. 5]; U.S. Patent No. 5,274,738 ("the '738 Patent") [Ex. 2]; U.S. Patent No. 5,819,005 ("the '005 Patent") [Ex. 7]; U.S. Patent No. 6,775,372 ("the '372 Patent") [Ex. 13]; U.S. Patent No. 6,870,920 ("the '920 Patent") [Ex. 18]; U.S. Patent No. 6,959,079 ("the '079 Patent") [Ex. 20]; and U.S. Patent No. 7,010,109 ("the '109 Patent") [Ex. 22].

manage system functions and operations; (3) a recording unit to record calls and

accompanying data; and (4) a replay component to allow review by call center managers.

### B.    Patents-In-Suit

NICE describes the ten asserted patents as follows:

(1) U.S. Patents 5,274,738 [Ex. 2]; 5,819,005 [Ex. 7]; 6,775,372 [Ex. 13]; and 6,870,920 [Ex. 11] generally disclose *a voice processing and recording system* that is made up of connected modules and can be easily expanded and used over a computer network . . .

(2) U.S. Patent 5,396,371 [Ex. 5] generally discloses *a system that can simultaneously record data and retrieve stored data* associated with a communication such as a telephone call . . .

(3) U.S. Patents 6,249,570 [Ex. 8]; 6,728,345 [Ex. 10]; and 6,785,370 [Ex. 15] generally disclose *a system that can record and reconstruct call "segments" of a telephone call.* A call is in "segments" if, for example, the call is answered by an operator (segment I), who then transfers the call to a customer service staffer (segment II), who ultimately passes the call on to a supervisor (segment III). The system records, stores and can reconstruct for playback the entirety of the call . . .

(4) U.S. Patent 6,959,079 [Ex. 20]generally discloses a telephone monitoring system useful for recording data generated during a telephone call between, for example, a customer and an employee who is entering data on a computer screen based on information from the customer. In response to the information entered into the computer, the system *records the audio data and the screen data entered on the employee's computer*. . ., and

(5) U.S. Patent 7,010,109 [Ex. 22]generally *discloses a specific method of recording an internet protocol (IP) data session* among participants, such as a conference call placed over the internet, where a recording device is connected to the call in the same manner as participants in the session . . . .

(NICE Oppos. to Witness' Mot. for Trans. 8-9 (emphasis added).) The '079 and '109

Patents originate with NICE, the rest with Dictaphone. After settling the litigation, NICE

purchased Dictaphone—the eight asserted Dictaphone patents were part and parcel.

IV.    **ANALYSIS**

A.    **'570, '345 and '370 Patents:  The Single-Object Call Database Patents**

Recording and replaying telephone calls is fairly simple and not novel.  But, organizing many calls for later review can be challenging, particularly calls that are passed from one agent to another and thus "segmented."  Collectively, the '570, '345 and '370 Patents ("the Single-Object Call Database Patents") approach that problem by creating a single data representation of a call for its entire "lifetime."  The patents teach gathering metadata—*i.e.*, information about recorded calls and the events therein.  The desired result is a ***single*** data illustration of a call to allow one to see ***all*** events that transpired.  By aggregating all call data within a single instance in a database, the claimed systems allow retrieval and replay without reconstruction—the process of retrieving many recorded segments, from different database locations, to reconstruct segmented calls.

The claimed systems were not the first simply to gather metadata about telephone calls.  For instance, the Peavey reference,[3] on which the examiner relied in initially rejecting the '345 claims, describes recording and organizing calls using certain identifying information, such as the phone number of the caller.  In contrast, the patents-at-issue teach gathering information about certain "events" occurring during a call (*e.g.,* "on hook," "off hook," "transfer") and aggregating those events into a single call record.

The patents are closely related, sharing identical specifications and inventors, and the '345 Patent is a direct continuation of the '570 Patent.[4]  Therefore, arguments

---

[3] U.S. Patent No. 5,533,103.

[4] All three patents claim the same priority date, and share the same specification, the same inventors, and have many common claim terms.

concerning common claim terms are relevant and useful across the related patents.

*Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990).

### 1. "Telephone Call"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| receiving audio data regarding one or more telephone call segments relating to one or more **telephone calls**, | "Telephone calls" has a plain meaning that is clear and does not require further construction. | Entire conversation with an entity from a caller's perspective, including transfers and conferences. |

In common parlance, "telephone call" has a general meaning.  However, NICE[5]

attributed a ***particular*** meaning to the phrase "telephone call" in these patents.  In the

specification, NICE explains that a "telephone call," refers to "entire conversation[s]":

> [R]ecording is managed in a call-centric (rather than event-centric) fashion.  This corresponds with the typical caller's point of view, in which ***a call is the entire conversation*** with a business entity, even if the conversation involves transfers to other agents or conferencing of multiple parties.

'570 Pat. 8:8-11[Ex. 8]; '370 Pat. 8:16-19 [Ex. 15]; '345 Pat., 8:8-11 [Ex. 15] (emphasis

added).  When referring to an entire conversation, beginning to end, including holds,

transfers and conferences, NICE used the broad phrase, "telephone call."  When the

patents speak of some smaller segment, they do so explicitly.  *See, e.g.,* '570 Pat., Claim

6 ("a lifetime of the ***telephone call*** using data regarding telephony events associated with

the ***telephone call segments*** of the telephone call" (emphasis added)).

### 2. "Telephone Call Segment"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| receiving audio data regarding one or more **telephone call segments** relating to one or | Pieces of an entire telephone call. | Portion of a phone call that is bounded by telephony events. |

---

[5] Dictaphone was the original patentee, and NICE is the successor-in-interest.  Thus, Witness refers to all prosecution action as having been taken by "NICE."

| more telephone calls, | | |
|---|---|---|

A phone call might be divided in many ways.  The Single-Object Call Database Patents, however, particularly refer to "segments" divided by certain "events."  NICE underscored that a "telephone call segment" is not just any piece of a call, but a discrete portion bounded by "telephony events," a term discussed *infra*.  NICE's proposed construction today blurs this distinction it worked hard to have the examiner adopt.

The examiner initially rejected the '370 application in light of Peavey and other references.  In response, NICE clarified that the specification defined two kinds of "segments":  (1) audio data segments; and (2) telephone call segments.

> *As described in the specification ['370 patent, 63:60-65],* [Ex. 15] *a segment of a telephone call is a portion of a phone call that is bounded by telephony events* such as the initiation of the call, the addition or removal of callers, the transfer of the phone call, of the termination of the call.  *These "telephone call segments" should not be confused with "audio data segments"* which are small slices of audio data, which, when combined, form the whole of a recording of a telephone call.  As the specification describes ['370 patent, 63:60-65] [Ex. 15], the audio recordings do not necessarily correlate with the telephone call segments.

'370 Pros. Hist., 2nd Prelim. Amend., 6 (emphasis added) (WSNSDE0010056) [Ex. 14].

Without "telephone call segments" defined as such, the claims would not have issued.

NICE cannot now ignore that history and the definition on which the Patent Office relied.

### 3.    "Segment"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| constructing a call record for a telephone call comprising two or more **segments**; | The claim term "segment" is used in the claims and the specification in the phrase "segment of the call."  This claim term has a plain meaning that is clear and does not require further construction. | Portions of a phone call that is bounded by telephony events. |

The '370 Patent is not faithful to the distinction between "telephone call segment" and "audio data segment," as the claims also use "segment" alone.  In prosecution, NICE chastised the examiner for "appear[ing] to misinterpret the definition of the word 'segment,'" and explained the difference between an "audio data segment," which includes audio,  and "telephone call segment," which is bounded by telephony events. '370 Pros. Hist., 2nd Prelim. Amend., (WSNSDE0010056) [Ex. 14].  NICE's proposed construction now reintroduces the ambiguity it attempted to remove during prosecution.

In the context of the claim, the term "segment" takes on meaning.  Here, by using "segment" to identify part of a "telephone call," NICE evidenced it was using "segment" in the same way as "telephone call segment" in the section above.  Claim 1 contains a method step for "combining the uploaded call record with ***data indicating the location of recorded audio data for the segment of the call***…."  For claim 1 to make sense, "segment" must mean a "telephone call segment," for which pointers indicate the location of corresponding audio data.  If the term "segment" meant an "audio data segment," which NICE defined during prosecution as "slices of audio data," then the step of claim 1 would essentially read "indicating the location of recorded audio data for the slices of audio data of the call . . . ." Such a reading renders the term "audio data" superfluous. Thus, the Court should construe "segment" to be a "telephone call segment," which in turn is a "portion of a phone call that is bounded by telephony events."

### 4.    "Telephony Event"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| **telephony events** associated | Actions or occurrences (*e.g.*, called party numbers, trunk and | Actions or occurrences detected by a computer program and that are related to what happens to a phone call (such as the initiation of the call, the |

| with said telephone call segments; | channel ID, date and time or agent ID), which are related to telephone calls, that are detected by a computer program. | addition or removal of callers, the transfer of the phone call, or the termination of the call), and are not identifying numbers.  Agent-entered information is not data regarding telephone events. |
|---|---|---|

NICE's proposed construction for "telephony event" is totally divorced from plain meaning and runs counter to the unambiguous disclaimers made to the PTO.  NICE starts on the right track by construing "telephony events" as "actions or occurrences," but then turns to data, unrelated to "actions or occurrences," as examples:  "*e.g.*, called party and calling party numbers, trunk and channel ID, date and time or agent ID."   NICE's approach ignores altogether the unequivocal disclaimers made in prosecution.

An "event" is something that happens, unlike someone's telephone number which is a piece of data and not at all an event.  NICE plainly understood this distinction and took pains to explain it to the examiner to avoid prior art, unequivocally disclaiming the construction it now seeks—that an identifying number, such as a telephone number, can be a "telephony event":

> Peavey's use of a telephone number as a key for a telephone call recording does not anticipate the claimed invention because ***the telephone number is not a telephony event.***  The telephone number is not an action or occurrence that relates to telephony that was detected by a computer.  ***The telephone number is just an identifier that is retrieved from a database.  Calling the telephone number a telephony event would be similar to calling a basketball player's number a basketball event.  Michael Jordan dunking the ball is a basketball event.  His player number 23 is not.***

'345 Pat. Pros. Hist., 2nd Prelim. Amend., 9-10 (WSNSDE0009486 – 98) [Ex. 9]

(emphasis added).  *See, e.g., Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324

(Fed. Cir. 2003) ("[W]here the patentee has unequivocally disavowed a certain meaning

to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender.")

NICE also ignores the argument to the examiner based on "telephony events such as the initiation of a call . . . [or] the termination of a call." '345 Pat. Pros. Hist., 2nd Prelim. Amend., 6 (WSNSDE0009486 – 98) [Ex. 9]. NICE used "telephony event" to mean an action or occurrence used for bounding segments of a call in a way that a telephone number cannot be used.

> ***None of the agent entered information is telephony event data***, since a telephony event is an action or occurrence, ***captured by a computer***, relating to a telephone call.

*Id.* at 4. An agent ID and other "agent entered information," therefore cannot serve as a telephony event, and the Court should adopt Witness' proposed construction.

### 5. "Data Representation(s)," "Representation of a Lifetime of the Telephone Call," "Call Record," and "Master Call Record"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| **data representation**[6] | Digital representation of data. | Data structure that represents an object as a single identifiable entity. |
| **data representation of a lifetime of the telephone call** | Data (*e.g.*, voice information and/or metadata) representing an entire telephone call. | Call-centric data record of the telephone call that includes a detailed cumulative start-to-finish history of a telephone call, including all telephony events and participants. The data representation represents only the telephone call, is not event-centric, and is not constructed on a 1-to-1 basis for the events during the total lifetime of a call. |
| constructing a **call record** for at least one telephone call | Data regarding telephony events for one or more segments of a | Call-centric data record of the telephone call that includes a detailed cumulative history of a telephone call, including all telephony events and participants. Each call record represents only a single call, is not event-centric, and is not |

---

[6] The '570 Patent uses the singular term "data representation," while the '345 and '370 Patents use the plural, "data representations." Witness addresses them together here, as the arguments apply equally to the plural.

| | telephone call. | constructed on a 1-to-1 basis for the events during the total lifetime of the call. |
|---|---|---|
| **master call record** representing the lifetime of the telephone call. | A record containing information about the location of all telephone call segments of an entire telephone call. | Call-centric data record of the telephone call that includes (a) data matching the call with the segments that make up the call; (b) data indicating the location of a recording for each segment; and (c) a detailed cumulative start-to-finish history of a telephone call, including all telephony events and participants. Each master call record represents only a single call, is not event-centric, and is not constructed on a 1-to-1 basis for the events during the total lifetime of a call. |

All three patents teach that a "data representation" is a single identifiable object that chronicles a complete "telephone call;"[7] that is a chronology that includes all telephony events and participants and may contain the location of where audio data is stored. Indeed, the specification repeats this theme:

> The Call Record Generator 150 integrates that data into a ***single call record***, which is updated after every event during the call, so that at the end of the call, ***the call's entire history is contained in the call record***. . . .

> The CRG is responsible for collecting data from different sources with respect to portions of a call on various recording input channels, and merging them together into a ***unified call record***. . . .

> The Call Record Generator is responsible for merging CTI search data and a multitude of voice recording segments together into a ***single manageable unit of data***…***Once combined, the call record can be managed as a single entity***, which greatly simplifies and reduces the work necessary to perform search, retrieval, and archival operations. . . .

> The main purpose of the assembly process is to leverage the information coming from the CTI server in such a way that ***the entire phone call is assembled into one Master Call Record (MCR) . . . .  The MCR holds information accumulated for all events received necessary for archiving to the local data store.***

'570 Pat., 7:12-16, 26:17-20, 28:40-48, 36:23-46 (emphasis added) [Ex. 8].

---

[7] The '345 and '570 patents claim the "data representations of the lifetimes of the calls," while the '370 patent claims a method for creating "data representations of the lifetime of the calls" by associating telephony events and audio data with a "call record" to form a

-10-

NICE repeatedly distinguished its "single object" model over prior art,
disclaiming unpackaged, "event-centric" data collections on a "1-to-1 basis" with events,
one event per record, versus all events in one record over the lifetime of a call:

> [In previous recording systems, i]ndividual database records were constructed on
> a 1-to-1 basis for the events occurring during the total lifetime of a phone call.
> The interpretation of the series of events was left to the end user. . . .  To resolve
> this problem, the CTI server of the preferred embodiment maintains and
> accumulates information within a data model of telephony activity. . . .  During
> the active lifetime of a call, real-time information is accumulated within a
> historical call record that tracks each participant within the call. . . .
>
> ***The system data model is call-centric, containing a detailed cumulative ("cradle
> to grave") history, rather than event-centric, which would place the burden of
> work on the receiving applications.***

'570 Pat, 20:34-64, 30:19-28 [Ex. 8] (emphasis added).  *See Honeywell Int'l, Inc. v. ITT*

*Indus., Inc.*, 452 F.3d 1312, 1319 (Fed. Cir. 2006) ("[W]here the specification makes

clear that the invention does not include a particular feature, that feature is deemed to be

outside the reach of the claims of the patent . . . .").

NICE's construction of "data representation of a lifetime of the telephone call,"

attempts to turn this model on its head.[9]  NICE's construction is so loose it would cover

the "voice information" or "audio data" alone, rendering optional the metadata (via the

---

"master call record."

[8] The '570 Patent is replete with descriptions pertaining to this single-object data model
and how this single object data model differs from the prior art.  *See* '570 Pat., 5:20-23;
6:10-11; 7:11- 28; 8:1-16; 8:35-47; 20:34-60; 21:31-35; 21:59-22:1; 25:52-55; 26:16-20;
27:18-24; 28:40-29:15; 30:19-23; 33:17-20; 36:23-27; Figs. 16, 16B[Ex. 8*]*.

[9] *See, e.g.*, Claim 6 of the '570 Patent, which recites five steps: (a) receiving audio and
telephony event data; (b) & (c) storing that data; (d) identifying which data relates to a
single call; and finally (e) "***constructing a data representation*** of a lifetime of the
telephone call."  In that final step, the claimed system constructs a single "data
representation" by combining the data stored in steps (b) and (c) to create a single
manageable unit of data.

"and/or" clause).  NICE therefore ignores altogether the metadata-based story—the
chronicle of events and telephone call segments—on which the examiner relied heavily.

     The "call record" and "master call record," too, are unitary structures tied to a
single telephone call.  As discussed above, NICE argued that prior art systems collected
recorded events in a database on a "1-to-1 basis," with each event representing a new
database entry, with subsequent replay of multiple records for multiple events.[10]  A caller
who is transferred three times, in prior art systems, would generate three different audio
recordings and three different metadata files (*e.g.*, how long it was, when it started,
ended, who was on the call, etc.).   According to NICE, the key advantage of the claimed
systems is combining those three separate segments and putting them together in one data
representation, *i.e.*, a "single call record." '570 Pat., 7:12-16 [Ex. 8].[11]  With respect to
the "master call record," NICE's construction ignores the necessary audio recording
location data.  The '370 Patent claims the matching of "telephony event" data and
"location data" for telephone call segment "***to obtain a master call record representing
the lifetime of the telephone call***."  '370 Pat., Claim 1 (emphasis added).  Thus, the
"master call record" contains all data in the "call record" (or, as the '570 and '345 Patents
describe it, "data representation") and also the location of audio data for each segment.

---

[10] NICE distinguished its invention from prior art systems by noting that, previously,
"[i]ndividual database records were constructed on a 1-to-1 basis for the events occurring
during the total lifetime of a call," thus, "[f]ollowing and tracing the history of events for
a complete call . . . could require much manual and repetitive searching." '570 Pat.,
20:34-63 [Ex. 1].
[11] *See also id.* at 20:34-63.

6.    (a) "Constructing a Data Representation of a Lifetime of the Telephone Call . . . ."& (b) "Wherein Said Data Representations Are Constructed Using Data Regarding . . . ."

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| constructing a data representation of a lifetime of the telephone call using data regarding telephony events associated with the telephone call segments of the telephone call | NICE has provided constructions for [certain words within this term]. The remaining words have a plain meaning that is clear and do not require further construction. | Using data regarding telephony events to associate telephone call segments of a telephone call to form a data representation of the lifetime of the telephone call, and not using an identifier or key to form the data representation. |
| wherein said data representations are constructed using data regarding telephony events associated with telephone call segments | NICE has provided constructions for [certain words within this term]. The remaining words have a plain meaning that is clear and do not require further construction. | Using data regarding telephony events to associate two or more segments of a telephone call to form a data representation of the lifetime of the telephone call, and not using identifiers or keys to form the data representation. |

The patents claim a master call record—a unitary data representation of the lifetime of the call.  But, how are the various segments put together?

One possible solution, in Peavey, used a unique identifier from a database (such as telephone number) that is common across segments.  NICE used this precise distinction to disclaim the prior art.  Peavey relied on identifiers or keys, such as telephone numbers, while the claimed invention relied on events, *i.e.*, "actions or occurrences":

> Peavey does not anticipate the claimed invention because Peavey does not teach a system, method or software . . . *for using data regarding telephony events to associate telephone call segments of the telephone call to form a data representation of the lifetime of the call.*
>
> Peavey teaches the recording of outgoing telephone calls using the customer's telephone number or a separate customer identification number as a key to associate the recording of the telephone call with the customer data record (co1.3, ln.48 - co1.4, ln.48).  Peavey's use of a telephone number *as a key for a telephone call recording does not anticipate the claimed invention*.  The *claimed invention has the limitation that the processor uses data regarding telephony events*

associated with the telephone call segment to construct a data representation of a lifetime of the telephone call.

'345 Pros. Hist., 2nd Prelim. Amend., 9-10 (emphasis added) [Ex. 9].  NICE again

attempts to reclaim what it surrendered.  The Court should reject NICE's attempt and

hold it to the positions argued to obtain the claims-at-issue.

> 7.    "Matching a Received Telephony Event with a Constructed Call Record."

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| **matching a received telephony event with a constructed call record.** | NICE has provided constructions for [certain words within this term].  The remaining words have a plain meaning that is clear and do not require further construction. | Performing a calculation to resolve an ambiguity between the received telephony event and the constructed call record. |

Because the claimed system does not rely on unique identifiers, such as the

caller's phone number, but collects telephony event data about a call, *i.e.*, actions or

occurrences, matching each newly captured telephony event with an existing call record,

as it occurs, is "not a trivial task." '570 Pat., 8:51-52 [Ex. 8].  If the system is recording

and collecting data regarding many calls at once, the absence of a unique identifier to link

new telephony events with a previously created call record presents a significant hurdle.

To match events and records, the patent describes a detailed, weighted formula—

an algorithm—that "yields a numerical confidence factor that can be used to select the

best apparent match candidate." '570 Pat., 9:29-10:35 [Ex. 8].  The specification talks at

length about how to actually perform this calculation.

Although the particular algorithm described in the specification may represent

only a preferred embodiment, the prosecution history reveals that the use of ***some***

***calculation*** is crucial to any iteration of the claimed invention.  NICE argued, "Peavey

-14-

does not anticipate the claimed invention's use of a confidence factor to perform the calculation."[12]  The confidence factor was discussed with respect to a dependent claim, but the antecedent is the "matching" limitation of issued claim 1.  In other words, "matching" is different from simply using a unique identification number and requires some calculation to point event data to existing call records.[13]

8.    "Combining Said Updated Call Record with Data Indicating One or More Locations of Recorded Audio Data for Two or More Segments of the Call"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| **combining said updated call record with data indicating one or more locations of recorded audio data for two or more segments of the call,** to obtain a master call record | NICE has provided constructions for [certain words within this term].  The remaining words have a plain meaning that is clear and do not require further construction. | Storing data indicating one or more locations of recorded audio data for two or more segments of the call in an updated call record, where the updated call record does not have data indicating one or more locations of recorded audio data for two or more segments of the call. |

The "combining" step is intended "to obtain a master call record," by adding to the "updated call record" the stored audio data location.  NICE concedes that a "master call record" contains audio recording location data.  Thus, to accomplish the "combining" step's purpose—converting the "updated call record" into the "master call record"—the system must add location data to the "updated call record."  Witness' construction highlights for the jury that a call record lacks location data before the "combining" step.

---

[12] '370 Pat. Pros. Hist., Second Prelim. Amend., 4 [Ex. 12].

[13] *Id.* ("Peavey uses customer identification numbers to identify data received from inputs (col. 3 ln.50-57). Any merger of records occurs only if the records have identical customer identification numbers. This matching does not constitute the use of a confidence factor. ***The use of a confidence factor implies that an algorithm must be used to determine the significance of the data***." (emphasis added)).

-15-

### B.    '371 Patent – "Endless Loop" Digital Logger

In *Dictaphone*, NICE argued that this patent was unenforceable due to a failure to disclose a public use or sale of a digital logger, material to patentability, sold or offered in the U.S.  NICE then bought Dictaphone and asserted the flawed patent against Witness.

The '371 Patent claims a digital audio logger, a device that can retrieve audio while recording.  '371 Pat., 1:18-20 [Ex. 5].  Prior art loggers achieved this result by recording to primary and secondary tapes that could be removed for playback of audio. *See id.* at 1:23-31.  In contrast, the '371 Patent teaches a digital logger that retrieves audio while also recording, but without the second tape.  It does this by writing audio simultaneously to a digital audio tape (DAT) and a random access storage device (RAS), at the same time audio is retrieved from the RAS, obviating the prior art second tape.

### 1.    "Buffer" & "Digital Audio Tape"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| writing the audio data from the **buffer** onto a digital audio tape and a random access storage device | Memory used for temporary storage of data. | Device in communication with the digital audio tape and the random access storage device that temporarily stores data. |
| writing the audio data from the buffer onto a **digital audio tape** and a random access storage device | Tape used to store digital data. | Magnetic tape designed for storage of audio in digital form. |

Claim 1 recites a buffer that writes audio data onto both a DAT and a RAS device. To accomplish those tasks, the buffer must communicate with the DAT and RAS.  The same claim language also establishes that the buffer must be a structure distinct from the RAS device.  That is, by choosing separate terms, the patentee is presumed to have attributed distinct meanings.  *See CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000).

12019720.DOC

In *Dictaphone*, NICE agreed with what Witness Systems proposes here. "Thus, the claim construction for 'buffer' should be limited to a single and particular temporary storage area designated for communication directly with the DAT and [RAS] hard disk." NICE *Markman* Brief, 15-17, NSDE014581 [Ex. 1]. NICE's construction in *Dictaphone* tracks the specification, which confirms that the buffer is in communication with the RAS and the DAT. In a passage touting the key purported innovations, the specification states,

> Apparatus and method have been devised wherein information can be received from a digital audio logger as the logger continues to receive audio. The audio logger is provided with a buffer that receives audio in real time and temporarily stores the same in the buffer. **A digital audio tape (DAT) and a random access storage (RAS) device are in communication with the buffer** to simultaneously receive data when the buffer down loads data.

'371 Pat., 1:45-53 (emphasis added); 2:40-53 [Ex. 5]. In fact, Figure 1 shows the buffer, RAS and DAT as separate structures in communication with each other. Thus, the Court should adopt Witness' proposed construction of "buffer."

NICE's proposed construction of "digital audio tape" eliminates one of the words in the disputed term. The claim specifically recites a "digital *audio* tape," not tape storage for other types of data. To read "digital audio tape" to cover any form of tape storage improperly reads out the term "audio."

NICE's position finds no support in the intrinsic record, and is in fact repeatedly contradicted.[14] The specification uses the acronym "DAT" to mean "digital audio

---

[14] Although NICE cites to the abstract, the abstract only further supports the notion that the DAT stores only audio data. Certain sentences of the abstract use the word "data" in isolation. Nevertheless, the first sentence of the abstract expressly describes a "digital audio tape (DAT) for permanent storage *of audio data*," and thus any later references to "data" that is retrieved from the buffer are plainly references to audio data.

tape."[15]  "DAT" is a common abbreviation, and when the application for the '371 patent

was filed, a person of ordinary skill in the art would have understood "DAT" to mean a

magnetic medium designed for audio.  In 1997, "DAT" was understood as such.  *See*

*Dictionary of Multimedia*, 52 (1997) (DAT "records and plays back digital audio on

magnetic tape cassettes that are smaller than common audio cassettes.").

The specification does ***not*** teach that the logger was designed to capture and store

any sort of data other than audio.[16]  A DAT is simply a digital tape designed for audio.

### 2.  "Writing the Audio Data from the Buffer onto a Digital Audio Tape and a Random Access Storage Device"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| **writing the audio data from the buffer onto a digital audio tape and a random access storage device** | NICE has provided constructions for "buffer" and "digital audio tape."  The remaining words have a plain meaning that is clear and do not require further construction. | Transferring audio data from the buffer directly to both a digital audio tape and a random access storage device simultaneously. |

The dispute is whether this step requires audio data to be transferred to the DAT

and RAS at the same time.  Witness' proposed construction tracks the claim language, the

patent specification, and, notably, NICE's proposed construction in *Dictaphone*.  NICE's

new construction, on the other hand, violates the Federal Circuit's explicit direction that

patent claim terms should be read in their total context.

In *Dictaphone*, NICE agreed with Witness Systems' current construction.  NICE

*Markman* Brief, at 20, NSDE014581 [Ex. 1] ("after a prescribed amount of audio data is

---

[15] *See, e.g., id*. at col. 1:50-53 [Ex. 5*]* ("A digital audio tape (DAT) and a random access storage (RAS) device are in communication with the buffer to simultaneously receive data when the buffer down loads data."); *id.* at 2:47-48.

[16] "Audio loggers are well known devices that are used for the purpose of obtaining

stored in the buffer, the audio data is downloaded *simultaneously* to the DAT and RAS"
(emphasis added)). As NICE argued, this construction is perfectly "consistent with the
origin of the invention" and the goal of obviating the prior art loggers' use of two tapes to
record simultaneously, where "some data could be lost when exchanging the secondary
tape." *Id.* Without the ability to write to the DAT and RAS simultaneously, NICE
correctly argued that the benefit of dual recordings—better data integrity—would be lost.

Claim 1's next step—"retrieving audio from the random access storage device
*while audio data is written into the digital audio tape and the random access storage
device*"—confirms the simultaneity requirement. '371 Pat., 4:52-54 (emphasis added)
[Ex. 5]. Because audio is written to the DAT and RAS *while* retrieving, writing to the
DAT and RAS must take place concurrently. "A digital audio tape (DAT) and a random
access storage (RAS) device are in communication with the buffer *to simultaneously
receive data* when the buffer down loads data." *Id.* at 1:50-53 (emphasis added).

In this context, the claim language plainly requires simultaneous writing. The
Court must find "ordinary meaning" in light of the specification, which the Federal
Circuit finds to be "the single best guide" to claim construction. *Phillips v. AWH Corp.*,
415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*) (the specification is "the single best
guide" to claim construction). No less a committed textualist than Justice Scalia has
explained that it is a "fundamental principle . . . of language itself[] that the meaning of a
word cannot be determined in isolation, but must be drawn from the context in which it is
used." *Deal v. United States*, 508 U.S. 129, 132 (1993). The Federal Circuit echoed this

---

records of voice communications by recording audio on a tape." '371 Pat., 1:6-9 [Ex. 5].

admonition in *Phillips*, instructing district courts to read claim terms in the context of the entire patent—as "part of fully integrated written instrument."  415 F.3d at 1315.

> **3.    (a)  "Pair of Pointers" and (b) "the First of Said Pointers Operative for Transmitting Audio Data to Said Random Access Storage Device from Said Buffer and the Second of Said Pointers Being Operative to Send Audio Data From Said Random Access Storage Device to Said Controller."**

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| a **pair of pointers** providing communication between said buffer and random storage device, . . . | Digital information used to read data from and write data to a storage component. | Two pointers facilitating the simultaneous retrieval of data from the random access storage device and the writing of data thereto. |
| **. . . the first of said pointers operative for transmitting audio data to said random access storage device from said buffer and the second of said pointers being operative to send audio data from said random access storage device to said controller.** | The first pointer is used to transmit audio data from the buffer to the random access storage device and the second pointer is used to send audio data from random access storage device under the control of the controller. | The first pointer transmits audio data to the random access storage device at the same time the second pointer retrieves the audio data from the random access storage device and sends it to the controller. |

While claim 1 generally covers the simultaneous "read" and "write" operation at the heart of the purported invention, claim 5 covers an embodiment with a "pair of pointers."  Claim 8 covers the RAS itself, on which the simultaneous read and write operations are performed, and therefore claims the "pair of pointers."

The pointers are specific structures for carrying out the simultaneous read and write operations on the random access storage device.  A "pointer" is a term of art in database parlance, referring to a directional item that points to an address, memory location, function, etc.   The pointers here are responsible for the retrieval of audio from the RAS while audio is written thereto.  The first pointer must therefore transmit data to

-20-

the RAS at the same time the second pointer retrieves data from the same RAS and

transmits it to the controller.  '371 Pat., 1:55-68 [Ex. 5].

> The data retrieving pointer first goes to the header of the RAS device for determining the location of data stored at a particular time.  After the printer reads the location of data from the header, it will then contact the location at which the desired information is written.  The recording will be played back so that the sought after information can be retrieved.  ***As such retrieving is taking place, the second pointer allows the RAS device to continuously receive data at the same time as the DAT.***

'371 Pat. 1:59-68 (emphasis added) [Ex. 5].  Therefore, the pointers must simultaneously

facilitate retrieval from the RAS and writing thereto.  *Phillips*, 415 F.3d at 1315.

NICE's new construction is unmoored from the claim language, unlike its

construction in *Dictaphone*.  NICE's construction not only ignores the simultaneity

requirement, but also ignores the word "pair."  The pair of pointers, plural, disclosed

refers to two specific items that facilitate writing and retrieval of data to and from the

buffer and the RAS.

NICE's construction also morphs the second pointer's task from sending audio

data from the RAS "to the controller," into a wholly different task—sending audio data

from the RAS "***under the control of the controller***."  NICE's construction even conflicts

with its construction of the first part of the term, in which it construes "transmitting audio

data ***to*** said random access storage device from the said buffer" to mean "transmit audio

data from the buffer ***to*** the random access storage device."  By suddenly interpreting "***to***

said controller" to mean "***under the control of*** the controller," NICE's proposed

construction is internally inconsistent.  Terms should be construed consistently, especially

when the same word appears within the very same disputed term.  *See Rexnord Corp. v.*

-21-

*Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("term should be construed consistently with its appearance in other places in the same claim . . . .").

The intrinsic record confirms Witness' construction. No other meaning of "to" is found in the intrinsic record. Although the specification mentions that the second pointer may be under the control of the controller, it certainly does not refute—and is consistent with—the claim's requirement that the second pointer send data *to* the controller. *See* '371 Pat., 2:48-54 [Ex. 5]. The specification confirms that even in the embodiment where the second pointer is under the control of the controller, the data is still sent from the RAS *to* the controller. *Id.* at 2:48-54, 4:1-3 ("A second pointer 34 is also in communication with the RAS device 23 and is under control of the controller 20 in response to input from the supervisor 21 . . . The supervisor 21 can communicate with the controller 20 for the purpose of obtaining data from the RAS device 23.").

Moreover, if NICE intended to claim the specific embodiment where the second pointer is "under the control of the controller," it should have used that language, instead of claiming "*to the controller*." Either (1) NICE meant "towards" when it drafted the claims and now is simply changing its tune; or (2) NICE meant to claim "under the control of the controller," but was imprecise when it drafted the claims. Even if the latter is correct, courts may not rewrite a patent's claims to remedy a patentee's poor choice of language. "It is the job of the patentee, and not the court, to write patents carefully and consistently. The court cannot rewrite the patent . . . ." *Chef America*, *Inc. v. Lamb-Weston, Inc.* 358 F.3d 1371, 1373 (Fed. Cir. 2004).

C.    '738 Patent – Voice and Audio Signal Processing Cards

Modern computer-based call center systems do not merely record calls, but also include software applications that provide the ability to review and analyze recorded calls, *e.g.*, to monitor customer service. However, traditional telephone signals had to first be converted into a data format suitable for such purposes.

The '738 Patent [Ex. 2] claims a system including multiple cards containing processors for converting telephone audio into data that can be transmitted to a computer for recording, review, etc. Figure 1 of the patent (best viewed from right-to-left) shows a series of "audio cards" that manipulate data signals received from telephone lines. First, the interface chip converts the signal from analog to digital; second, the audio processor processes the digital signals; and third, the TDM chip prepares the signal for transmission to the voice processing card. Once the signal is received at the voice processing card, it is manipulated by a digital signal processor ("DSP"), which performs basic functions, such as compressing or expanding the data, detecting the presence of a voice, recognizing whether a "touch-tone" sound is present, etc. The DSP then passes the signal to an application processor, which then performs complex software functions such as dictation, transcription, voice mail, etc. Lastly, the data the application processor produces is passed to a host computer terminal where it can be stored, viewed, or used by a person.

1.    "Audio Processor"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| at least one audio card including . . . an **audio processor** . . . and a second interface in communication with said audio processor, said second interface having a plurality of ports that provide communication with communication lines | A processor that processes audio signals. | Device that receives from the interface a digitized, impedance balanced, optimized signal. |

-23-

NICE's construction of "audio processor" does not assist the jury in understanding what an "audio processor" is, and renders another term, "interface," superfluous. Under NICE's construction, the audio processor could accomplish a multitude of tasks, including those the patent specifically dedicates to the interface. The patent teaches that by the time the audio processor receives the signals, the telephone signals have already been digitized, impedance balanced, and optimized by the interface. Telephone signals are first intercepted by an interface (described in the claim as "a second interface") with "ports that provide communication" with the telephone lines. '738 Pat., Claim 1(e) [Ex. 5]. If these threshold functions—digitizing, optimizing, etc.—were not performed by the interface, the "interface" element would be superfluous.

The specification confirms that the interface, not the audio processing card, performs those functions:

> **The analogue interface 50 transforms incoming analogue signals to digital signals, balances the impedance of the telephone 20 system to that of the system 10, and optimized signal integrity.** A digital signal will be sent to the audio processor 48 which is a fast acting signal processing chip.

'738 Pat., 3:60-4:9 [Ex. 2]; *see also id.* at Fig. 1, 1:39-52, 2:4-11, 3:3-25 (emphasis added). Witness' construction tracks the patent's teaching of functions, as allocated between the interface and the audio processor.

### 2.    "Digital Signal Processor" & "Application Processor"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| a voice processing card having at least one **digital signal processor** . . . . | A specialized processor that processes digital data. | Special purpose processor that performs low-level functions on voice signals. |
| a voice processing card having at least one digital signal processor and at least one **application** | A processor that processes information received from the | Processor that implements high level applications of the system. |

-24-

| **processor** in communication with said at least one digital signal processor . . . . | digital signal processor. | |
| --- | --- | --- |

Once the interface and audio processor on the audio card process the signal, the signal passes to the voice processing card, where ***two separate devices*** perform two sets of functions—the "digital signal processor" and the "application processor." Here, the claims are ambiguous as to which device performs which functions—though the specification clarifies. NICE's proposed construction does not distinguish between those two devices, merely offering that the digital signal processor ("DSP") processes digital data and that the application processor processes the data received from the DSP.

The DSP, the first device on the voice processing card through which the signals pass, performs basic, low-level functions that prepare the signal for further manipulation by the application processor. For example, the DSPs expand or compress the signal, detect tones, detect voices, adjust volume levels, etc. *See* '738 Pat., 2:53-3:2 (DSPs "perform voice compression and expansion, . . . tone detection, voice activated operation, VOX, voice operated recording, automatic gain control, control information decoding and telephone call processing") [Ex. 2*]*; *see also id.* at 4:25-29.

The claims explain that the application processor and the DSP are distinct elements—distinct devices—yet NICE's constructions do not distinguish between their functions. Witness' construction clarifies that the application processor is the device that performs the systems' "high-level application[s]." *Id.* at 4:28-29.

In NICE's purported invention, "[t]he application software resides in [voice processing cards] that are coupled to a host computer so that the software can be changed as applications require and the number of boards can be increased readily for greater

-25-

capacity." *Id.* 1:32-36. That is, the software applications do not reside on the host computer—they reside on the voice processing card, specifically in the form of the application processor. As a result, upgrading the software does not require replacing an entire system; it can be accomplished by the simple replacement of the card.

The specification describes some of the software application functions that the claimed "application processor" can perform. "The application processor 38 performs high level application such as dictation, transcription, voice mail, voice response, medical records, and the like. Each application processor 38a, 38b can run any of the different types of application processing and can run two applications of the same type simultaneously." *Id.* at 4:28-34. The Court should adopt Witness' construction, which attributes "high-level" and "low-level" functions to the "application processor" and "DSP," respectively.

### D.    '005 Patent – A Modular Logger

The '005 patent [Ex. 7] is similar to the '738 patent [Ex. 2], teaching a form of digital logger hardware. However, it adds the ability to remotely retrieve recorded data from two or more recorders, and adds a DAT for archiving purposes.

#### 1.    "Circuit Modules . . . for Converting" & "A Circuit . . . for Compressing"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| at least two **circuit modules** in said housing **for converting** analog voice signals to digital voice signals | A packaged assembly of electronic components that converts analog voice signals to digital voice signals. | Means for converting analog voice signals to digital voice signals. |
| **a circuit** in said housing **for compressing** said digital voice | An assembly of electronic components that compresses digital voice signals. | Means for compressing that is separate from the means for converting analog voice signals to digital voice signals and contained |

-26-

| signals. | | within the same housing. |
|---|---|---|

NICE's constructions blur the lines between different elements. The claims include multiple elements, each with a different function. One element is "circuit modules . . . for converting analog voice signals to digital voice;" another element requires "a circuit in said housing for compressing said digital voice signals." NICE's construction of these terms fails, however, because it abstracts these specific circuits into a generic "assembly of electronic components."

Both of these disputed "circuits" are part of a means-plus-function element under 35 U.S.C. § 112, ¶ 6. Although the claims refer generically to "circuit modules" and "a circuit" that, respectively, convert voice signals from analog to digital and compress the resulting digital signal, the claims fail to disclose a sufficiently definite structure to accomplish that function. Instead, the claims define these elements solely by their function (*e.g.,* "converting analog voice signals to digital . . ."). Accordingly, § 112, ¶ 6 demands that the patentee, as "quid pro quo for the convenience of employing" the means- plus-function format, disclose a definite structure for the function.[17]

Although the '005 Patent is ambiguous as to what structures are linked to the functions recited in these means-plus-function elements, the specification appears to dedicate the functions to (a) an "audio card," and (b) an "application card," alternatively called the "main card." For example, the '005 Patent describes the analog-to-digital conversion in one embodiment as follows:

---

[17] *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376-77 (Fed. Cir. 2001); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1308-09 (Fed. Cir. 2005) ("structure disclosed in the specification . . . [must] clearly link[] or associate[] that structure to the function recited in the claim." (citations omitted)).

> The **audio card** serves the main functions of . . . ***converting received analog signals to digital signals*** and directing the audio signals . . . ***to the main, or application card***.

'005 Pat., 1:40-44 (emphasis added) [Ex. 7]; *see also id.* at 3:12-15 ("audio card 12 converts the analog signals . . . from analog to digital").  Similarly, the specification speaks of an application card that compresses the voice signals.  *Id.* at 1:45-52 ("The application card packages received data, executes speech compression and expansion, performs VOX and performs other functions."); *id.* at 3:25-30 ("The main card 14 receives the digital audio signals from the audio cards 12 and compresses the data . . . .").

### 2.    "Analog Voice Signals"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| at least two circuit modules in said housing for converting **analog voice signals** to digital voice signals . . . . | An electronic wave used to convey voice information. | Plain language. |

NICE's construction of "analog voice signals" potentially captures both analog and digital voice signals, taking an otherwise easily understood distinction and rendering it ambiguous.  Although not every juror may be able to articulate the precise differences between analog and digital voice signals, one who reads the disputed claim can see that there is indeed a difference between the two; otherwise the claimed system would not need to convert one to the other.  NICE's construction, however, attempts to straddle the fence by construing the term to include all "electronic wave[s] used to convey voice information."  Because even digital voice signals travel on carrier waves, the Court should reject NICE's construction in favor of the plain language.

### 3.    "Digital Audio Tape"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| **a digital audio tape** (DAT) | Tape used to store | Magnetic tape designed for |

| drive for storing said compressed voice data. | digital data. | storage of audio in digital form. |
|---|---|---|

NICE specifically claimed the use of a DAT—a term with a well-known meaning in the art, as discussed above—but now seeks to broaden. NICE seeks to expand the specific claim term to *any form* of digital tape.

A digital audio tape or "DAT," is a specific storage medium designed to store audio.[18] Of course, other storage media existed at the time NICE claimed its invention, ranging from vinyl records to traditional audio cassettes to CDs. NICE could have broadly claimed the use of any of these storage media—"suitable tape media." Instead, NICE specifically claimed the use of one well-known form, a DAT.

Throughout the specification, NICE teaches that the DAT is part of the invention, never mentioning alternative media. *See*, *e.g.*, '005 Pat., 2:36-45 ("The SCSI host adaptor 18 communicates with a pair of tape drives 26a, 26b each of which is capable of driving a digital audio tape (DAT) . . . .") [Ex. 7*]*. NICE even touts the functional advantages of a DAT over other storage media. *Id.* at 3:34-59 ("Because DAT recording is relatively fast compared to channel data rates *i.e.*, the DATs are capable of receiving data faster than data is digitized by the system . . . ."). *See Honeywell,* 452 F.3d at 1319.

### E.    '372 Patent – Multi-Stage Logging System

The '372 patent claims a multi-stage logging system, where stages are distributed in multiple locations and accessed via the Internet. The patent describes the stages as, (1) a "telecommunications ("telecom") stage" for capturing voice signals; (2) a "recorder

---

[18] In 1997, "DAT" was defined as a "professional-quality-audio format developed by Sony . . . [which] records and plays back digital audio on magnetic tape cassettes that are smaller than common audio cassettes." *Dictionary of Multimedia* 52 (1997) [Ex. 23].

stage" for storing captured data; and (3) a "distribution stage" for retrieving stored data

and distributing it "in humanly recognizable form." '372 Pat., 11:42-45 [Ex. 13].

## 1.  "Telecommunications ("Telecom") Stage

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| a **telecommunications ("telecom") stage** receiving input from a plurality of communications channels; | The stage that serves to capture and pre-process signals from two or more communications channels and interfaces with the recorder stage. | Device that receives input from communication channels passively, and is not part of the communications system. |

Both parties agree that the telecom stage collects data from the communications

system (*e.g.,* a telephone line)—that is, it captures calls for recording. The question is,

"How?" During prosecution, NICE disclaimed all but one method of recording, yet now

wishes to recapture the other methods.

NICE disclaimed all but "passive" methods of recording. The examiner initially

rejected NICE's application based on prior art, Knitl, which "teaches a multi-stage data

logging system comprising: a) a telecommunications ('telecom') stage . . . receiving

input from a plurality of input channels . . ." '372 Pros. Hist., Office Action at 3, dated

Mar. 14, 2001. NICE responded that its telecom stage was special. Unlike Knitl, which

used a "PBX" switch, NICE "monitor[s] information transmitted on communication

channels ***but are not part of the communication system and thus do not affect the***

***transfer of information*."  *Id.*, Amend. at 9-10, dated Sep. 24, 2001 (WSNSDE0009690-

704) (emphasis added) [Ex. 11]. That special method NICE describes is known in the art

as "passive" recording because it uses "wiretapping" instead of the "switch."

Witness' construction incorporates the passive method NICE claimed and is fully

supported by the specification. '372 Pat., 7:60-8:5 [Ex. 13] ("[T]elecom stage 102

incorporates a first interface . . . that allows for passive tapping of the phone lines.").

     2.    **"Wherein at Least Two Stages of the System Are Physically Separable and in Operation Can Be Located Wide Distances Apart."**

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| **wherein at least two stages of the system are physically separable and in operation can be located wide distances apart** | At least two of the stages are physically separable and are capable of functioning if physically separated by substantial distance. | Wherein the telecom stage and recorder stage are physically separable and can be located wide distances apart, and wherein the distribution stage can be physically separable and located wide distances from the telecom and/or recorder stage. |

To avoid prior art, NICE argued that a key distinction of its invention was that the

distribution stage was physically separable from the recorder and/or telecom stage. The

examiner believed a previous NICE patent disclosure, "Disk-Based Audio

Storage/Retrieval Systems—DSN-1000" anticipated NICE's claims here. In response, to

distinguish this art that had telecom and recorder stages in the same box, NICE

disclaimed the use of a combination telecom/recorder stage. '372 Pros. Hist., Resp. at 3-

4, dated June 18, 2003 (WSNSDE0009769-75) [Ex. 12] (The prior NICE device

provided "a telephone interface to the monitored communication channels [telecom

stage], processing the received signals, and storing the processed signals [recorder stage]

for retrieval by users" ***in the same device***.).

The specification confirms this disclaimer, explaining, "[S]ince telecom stage 102

is separated from the remaining components of the logger . . . the stage can be

implemented in a separate physical unit." '372 Pat., 9:40-50 [Ex. 13]. Thus, separation

of the telecom and distribution stages was a lynchpin of NICE's claimed invention.

-31-

Although the claim language appears broad, and the specification describes other examples outside of Witness' construction, NICE unmistakably relinquished that additional claim coverage to obtain allowance. *See Rheox, Inc. v. Enact, Inc.*, 276 F.3d 1319, 1327 (Fed. Cir. 2002) (Claim will be construed to exclude even preferred embodiments where patentee makes express disclaimer during prosecution.).

### 3. "Web server"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| the network server is a **Web server**. | A component that provides access to information accessible from a computer connected to the Internet or an intranet. | A computer that receives a request for stored data, retrieves the stored data, and transfers the data over the World Wide Web |

NICE's construction of "Web server" reads out the word "Web," and contradicts the claimed invention's supposed purpose. A "Web server" is a well-known device that serves as a conduit between an internal network (like an "intranet") and an external network, like the World Wide Web. The ordinary meaning of "Web" is the "World Wide Web." The capitalized "W" in "Web server" indicates that NICE intended a gateway server between an internal network and the World Wide Web—"a computer that is attached to the Internet . . . that can be viewed using a web browser. Every web page resides on a web server somewhere. The web server has to be connected to the Internet continuously . . . ." *See* World Wide Web; Web Page, *Dictionary of Computer and Internet Terms* 545 (8th ed. 1997) [Ex. 30].

The prosecution history confirms Witness' construction. To avoid the examiner's rejection based on at least two references, NICE emphasized the importance of the "Web" aspects of its invention. As NICE argued, "The prior art of record simply does not disclose, teach or even suggest a method for accessing information in a logger, where

-32-

users communicate requests for stored data over a 'Web' in the sense of a communications network like the Internet. '372 Pros. Hist., Amend., 13, dated Sept. 24, 2001 (WSNSDE0009690-704) [Ex. 11]. NICE's proposed construction ignores the positions taken before the PTO—that access over the "Web" was a crucial feature.

### F.    '920 Patent – Remote-Access Logging System

This patent also claims systems for recording, storing, and retrieving phone calls in a distributed fashion—*i.e.*, the various components "can be located wide distances apart." '920 Pat., Abstract. The patent dedicates functions to specific components, each of which may be located in different places. Via the Internet, a user may access the system from yet another remote location, and the system has a "Web server," a "digital logger," and "client." The client could be the computer terminal of an end user; the Web server is a gateway between the World Wide Web (through which the client/user can access the rest of the system); and the digital logger is the device on the internal network where audio recordings are stored and to which the "client" seeks access.

### 1.    "Web Server"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| at a **Web server** having access to said at least one digital logger | A component that provides access to information accessible for a computer connected to the Internet or an intranet. | Computer that receives a request for stored data, retrieves the stored data, and transfers the data over the World Wide Web. |

As with the '372 Patent, NICE's construction ignores the plain meaning of "Web server" and entirely nullifies one word, *i.e.*, **Web**. Yet, NICE touted the novelty of its purported invention by emphasizing that prior systems did not allow Internet-access:

> Multiple channel data recording, and particularly voice loggers, are known in the art. . . . From the distribution perspective in the last few years Internet technology

-33-

is becoming standard.  However, to the best of this inventor's knowledge, there is *no suggestion in the past of combining these two paradigms in a multi-stage distributed logger*, a next-generation product that brings together the most desirable features of these technologies.

'920 Pat., 6:56-65 (emphasis added) [Ex. 18].  Convinced, the examiner explained that the feature of that overcame the prior art was the Web server that allows "a client to access [] digital recorder system from the Web."  '920 Pros. Hist., Notice of Allowance at 2, dated Oct. 2, 2004 (WSNSDE0010330-32) [Ex. 17].  The Court should hold NICE to the system it claimed and reject NICE's proposed construction.

**2.  "Receiving a Request for Retrieval of Stored Data," "Retrieving Stored Data," & "Transferring the Retrieved Data"**

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| at a Web server having access to said at least one digital logger, **receiving a request for retrieval of stored data** from a client . . . | This claim phrase has a plain meaning that is clear and does not require construction. | The Web server receives a request for retrieval of data stored in the digital logger. |
| at a Web server having access to said at least one digital logger . . . **retrieving stored data** in accordance with the received request | This claim phrase has a plain meaning that is clear and does not require construction. | The Web server retrieves data stored in the digital logger. |
| at a Web server having access to said at least one digital logger . . . **transferring the retrieved data** to the client. | This claim phrase has a plain meaning that is clear and does not require construction. | The Web server sends the data retrieved from the digital logger. |

Because the claims require that various functions take place "at a Web server," the claims plainly require that the Web server "receive" requests for stored data, "retrieve" the data, and "transfer" the data back to the client.  *See, e.g.*, '920 Pat., Claim 1 [Ex. 18].  These requirements are consistent with the ordinary meaning of a "Web server" and its role as a gateway between an internal network and the World Wide Web.  A "web server may also need to run special software (such as a CGI script) in response to a client's

request." World Wide Web; Web Page, *Dictionary of Computer and Internet Terms* 545 (8th ed. 1997); s*ee, e.g.,* '920 Pat., 13:14-28 ("Web server accesses the loggers directly, or it causes a process to access data in a database of the recorder stage through a common gateway interface (CGI); and sends the requested files to the requesting client . . . .") [Ex. 18*]*; *Id.* at 15:17-20 ("Web server 280 elicits user information . . . and other administrative data necessary for ensuring that the user is an authorized user.").

### 3.    "Digital Logger"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| A method for accessing information in at least one **digital logger** . . . . | A device, system, or software for recording, in digital form, audio data representing multiple concurrent telephone calls. | A device, system or software for recording audio in digital form. |

NICE's proposed construction introduces a new concept not in the claims—the ability to record audio data "representing multiple concurrent telephone calls." Not only is this limitation absent from the claims, but NICE finds no support in the intrinsic record. For example, NICE cites a passage of the specification that explains that the use of "at least one digital logger" can accept input "from a plurality of input channels." '920 Pat., 5:1-12 [Ex. 18]. Of course, where more than one of the "at least one" digital loggers are employed, the multiple loggers can record more than one telephone call. But, there is no suggestion in the intrinsic record that each of the "at least one digital logger[s]" *must* record more than one call concurrently.

### 4.    "Record of an Input Channel" & "Record of a Communication Channel"

| Disputed Term[19] | NICE's Construction | Witness Systems' |
|---|---|---|

---

[19] Claims 3 and 6 refer to a "record of an ***input*** channel," while claims 18 and 21 recite a "record of a ***communication*** channel." The parties construe these terms equivalently, and

| | | Construction |
|---|---|---|
| accessing call information for a **record of an input [a communication] channel** made by said at least one digital logger. | Stored voice and/or call information received from an input [a communication] channel. | A record identified by an input [a communication] channel. |

The claim's inclusion of the phrase, "of an input channel," establishes that the logger accesses call information identified by its input channel. The patent touts the advantages of being able to identify a call's input channel—essentially the called telephone number or extension. By linking each recording with its input channel, stored calls may be "identified by the call record information and contain, for example, information about the caller ID," etc. '920 Pat., 11:18-22 [Ex. 18].

NICE's construction reads the phrase "of an input channel" out of the claims, and suggests the phrase, "of an input channel," was included simply to reiterate that the claimed record is received from an input channel. All records, however, are received from input channels. Emphasizing this fact served no purpose whatsoever and would render meaningless the phrase "of an input channel." The surrounding claim language recites retrieval as "accessing call information for a record of an input channel." Under NICE's construction, this limitation would be redundant and mean "accessing call information for a record that was incidentally received from an input channel." This contradicts the ordinary meaning of this phrase.

Witness' proposed construction tracks the specification, which explains that the recorder stores "***records that correspond to different input channels appear to the user as separate files having unique record addresses.***" '920 Pat., 11:14-19 (emphasis

---

thus the discussion of this term will focus in "input" channels, but the arguments apply with equal force to "communication" channels.

added) [Ex. 18]; *see also id.* at 11:44-47 ("[T]he recorder stage can have two or more recorders, each processing ***information about a particular set of input channels***.").

### G.    '079 Patent – Voice & Screen Recording System

The '079 Patent [Ex. 20]claims a system for recording both voice data and "video screen" data for a telephone call, allowing a supervisor to "see and hear" an agent during a call.  Claim 1 requires three separate elements—(1) a voice logger; (2) a screen logger; and (3) an event manager that controls both loggers.

The "event manager" determines whether the agent's "interactions with the computer during the telephone call meet" a predetermined business rule, such as whether the agent has typed into a "cancel subscription" field on her computer screen.  When a rule triggers recording, the "event manager" directly controls the two devices tasked with recording the voice and video screen data—the "voice logger" and "screen logger."

### 1.    "Event Manager"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| A monitoring system . . . comprising . . a voice logger to receive and record audio of a telephone call of said agent; a screen logger to receive and record video screen data associated with interactions of said agent with a computer during the telephone call; and an **event manager** to determine whether said interactions with the computer during the telephone call meet at least one predefined monitoring condition. | A component, which as a result of receiving input, controls the recording of audio and/or screen data or the playback of audio and/or screen data. | Device that controls the voice logger and screen logger to begin recording audio and video screen data of the telephone call. |

The "event manager" acts as a conductor—directing two devices to begin recording if and when certain predefined conditions are met.  Both NICE and Witness

agree that the event manager exerts "control."   NICE ignores the objects of that control,

arguing that the event manager control abstract concepts, "recording" or "playback."

     The claim language confirms that event manager directs physical devices, not

abstract processes.  The claim recites three devices:  a voice logger, a screen logger, and

an event manager.  When events trigger a recording condition, the event manager directs

the two loggers to begin recording.  Were it otherwise, the claim's recitation of the first

two elements, the loggers, would be superfluous.

> *[E]vent manager 32 signals voice logger 28 to select* any of the telephone calls at
> random (step 700) *and record* some or all of the audio of the selected calls (step
> 800) and *screen logger 30 to record* in synchronicity with the audio recordings of
> voice logger 28 some or all of the selected agent's interactions with the agent's
> workstation during the telephone call, preferably in the form of screen data
> captures (step 900).

'079 Pat., 8:24-33 (emphasis added) [Ex. 20]; *see also id.* at 4:53-65.  Figure 1 of the

patent confirms this understanding, displaying an event manager with arrows flowing

towards two devices, the screen and voice loggers.  *Id.* at Fig. 1.

     NICE's construction also ignores the event manager's explicit tasks from

controlling *both* the screen and voice loggers to ambiguous control over recording "audio

*and/or* video data."  If, for example, the event manager controlled only the voice logger's

recording of audio data, what would control the screen logger's recording of screen data?

The specification confirms that the event manager must control both devices.  *Id.* at 3:29-

33; 4:59-65; 8:24-31.  The claimed system simply would not work under NICE's

disjunctive construction of event manager.

### 2.      "Predefined Monitoring Condition"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| an event manager to determine whether | A condition set prior to the telephone call | A monitoring condition established prior to the call, where a predefined |

| said interactions with the computer during the telephone call meet at least one **predefined monitoring condition**. | which is used to determine whether to record audio and/or screen data related to the telephone call. | monitoring condition does not include: (1) schedules of agents, including the 'log-on' of an agent or the beginning of shift or other automated action initiated before an agent receives a call, and (2) a number of calls to be recorded in a predefined period of time. |
|---|---|---|

NICE's proposed construction seeks to recapture claim coverage it specifically disclaimed both in the claims themselves and in the prosecution history. The predefined monitoring condition must be an "interaction with the computer during a telephone call." This limitation is found in the claim, immediately prior to the term in question, *i.e.*, the event manager determines whether "said interactions with the computer" meet the predefined monitoring condition. Witness' construction thus excludes operations that are not based on "interactions with the computer."

During prosecution, NICE specifically disclaimed the notion that things such as (1) the schedule of agents, etc. or (2) a number of calls to be recorded in a given period of time, could constitute "interactions with the computer during the telephone call":

> The "log on" operations [described in the prior art NICE sought to avoid] cannot be considered "interactions with the computer during the telephone call" . . . as the "log on" operation is a single operation at the beginning of a shift, which take [sic] place before the agent begins receiving or initiating any telephone call.

'079 Pros. Hist., Amend. dated Jan. 24, 2005, 5-6 (emphasis in original) [Ex. 19].[20]

---

[20] In the specification, NICE includes things that do not take place during the telephone call, such as "scheduling information," or the number of calls to be recorded in a given period. *See, e.g.,* '079 Pat., 3:43-4:10; 5:58-61 [Ex. 20]. Nevertheless, during prosecution, distinguished prior art that was "directed to the schedules of agents and the number of calls to be recorded in a predefined period of time," thereby disclaiming those from claim coverage. '079 Prosecution History, Amend. dated Jan. 24, 2005, [Ex. 19].

-39-

### H.    '109 Patent – An IP-Based Conference Recorder

Unlike the previous nine patents, the '109 patent [Ex. 22] is directed only to an

*IP-based* conference recorder for recording Voice Over IP data sessions among

participants.  IP ("Internet Protocol") communications are transmitted over networks in

"packets," *i.e.,* "formatted block[s] of data."  This model, also known as a "packet-

switched network," differs from traditional "circuit-switched networks" that require a

dedicated connection between endpoints.  Instead, packet-switched networks "are routed

between nodes over data links shared with other traffic."[21]  Data in the '109 patent is

transmitted as part of "IP data session[s]."  As NICE explained in a related patent, a

"session" constitutes "transmissions between two or more computational devices . . . *in

the form of transmitted packets of data.*"[22]

The '109 Patent claims methods of recording IP data sessions, implemented as

"conference calls."  As used in the patent, however, "conference call" does not carry its

ordinary meaning, *i.e.,* a call involving at least three people.  Instead, NICE acted as its

own lexicographer, defining "conference call," as a session that includes *two* or more

participants, one of which may be the recording device.  '109 Pat., 3:34-43 [Ex. 22];

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995).

In the claimed method, the recording device connects to the conference call "as a

participant," *i.e.*, the recorder connects in the same manner that any other caller connects,

and it receives the portion of the telephone call to be recorded "from each of the . . .

participants" on the call.  '109 Pat., Claim 1 [Ex. 22].  All packets emanating from each

---

[21] *See* Wikipedia, *Packet*, http://en.wikipedia.org/wiki/Packets (as of May 9, 2007); *id.* at *Packet switching*, http://en.wikipedia.org/wiki/Packet_switched (as of May 9, 2007).

caller's phone during the call pass through a "conference controller," before traveling to another caller's phone.  When the system records a call, the conference controller intercepts the packets and copies them to the third "participant"—the recorder.

### 1.    "Conference Controller" & "Through a Conference Controller"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| implementing the data session as a conference call through a **conference controller** . . . . | A component that initiates, enables and/or establishes a conference call. | Device that initiates, establishes and enables a conference call. |
| implementing the data session as a conference call **through a conference controller** . . . . | By use of a conference controller. | The data packet transmissions of the IP data session pass through the conference controller. |

NICE's construction gives short shrift to a central aspect of the "conference controller."  Although NICE's construction concedes that the conference controller *may* "enable" conference calls, the patent and prosecution history plainly requires that the conference controller *must* enable conference calls.  Because NICE qualifies the "enable" requirement with the disjunctive "and/or," the Court should reject NICE's construction.

First, the descriptive figures in the patent illustrate and highlight the conference controller's enablement role.  As Figure 3 demonstrates, a conference controller sits



between the two displayed callers (12 and 34) and conveys the transmitted packets to the recording device.  The packets emanating from one caller must flow (through one of the "A" arrows)

---

22 U.S. Pat. Pub. No. 2005/0018622 (dated Jan. 27, 2005) (emphasis added) [Ex. 24].

through the conference controller to the other caller, and vice versa (through one of the "B" arrows).  Similarly, when the recorder is a participant, the packets emanating from each of the callers must flow through the conference controller for copies to be sent to the recorder (through one of the "C" arrows).  In all of those scenarios, all of the arrows flow through the conference controller, which thus "enables" the call.  Explaining this figure, the specifications states:

> Conference controller 30 enables recording device 24 to participate in the conference call, as well as preferably enabling the conference call itself.

'109 Pat., 6:21-23 [Ex. 22].

Second, the prosecution history confirms this "enable" requirement.  During prosecution of this patent's "parent" application, NICE added the "through the conference controller" limitation in response to two novelty rejections over U.S. Pat. No. 5,841,977 ("the Ishizaki reference") and U.S. Pat. No. 6,535,909 ("the Rust reference").  '106 Pat. Pros. Hist., Resp., dated Apr. 14, 2005 [Ex. 28].  These amendments were provided in response to an interview with the examiner, and NICE explained that "[d]uring the interview, the step in claim 1 of 'implementing the data session as a conference call through a conference controller was discussed *as the basis* for having the first and second communication devices connected as respective first and second participants.'"  '106 Pat. Pros. Hist., Resp., 9, dated Apr. 14, 2005 (WSNSDE051208-16) [Ex. 28] (second emphasis added).[23]  Again, under any reading of the phrase "through a conference controller," the device provides the infrastructure that "enables" the conference call.

---

[23] Essentially, the "parent" '106 patent and the "child" '109 Patent's claims differ only in that the '106 claimed the use of a *remotely located* recording device.

Witness' proposed construction is based on the specification and NICE's representations to the examiner.

Likewise, "through a conference controller" plainly means that the data packets in question "pass through the conference controller." NICE now asks the Court to construe that term to mean "by use of a conference controller." However, the claim language, the prosecution history and the specification contradict NICE's construction.

First, claim 1 highlights that all of the IP data packets to be recorded pass through the conference controller. The claim language is "implementing the data session as a conference call through a conference controller." '109 Pat., Claim 1 [Ex. 22]. When NICE meant "by use of" the conference controller, it said so explicitly and in the next claim limitation. Immediately after the "implementing the data session as a conference call *through a conference recorder*" step, the next step begins with "using the conference controller." '109 Pat., Claim 1. This "using the conference controller" language describes putting the conference controller to use, *i.e.*, "by use of." But, where NICE was claiming packets flowing through the conference controller, it said "through." Different claim terms are presumed to convey distinct meanings. *See CAE Screenplates, Inc.,* 224 F.3d at 1317.

Second, NICE's use of the preposition "through" in the prosecution history and the specification contradicts NICE's construction. NICE consistently used the term "through" to mean "flow through" and not "by use of." During prosecution of the parent '106 patent, the examiner initially rejected the claims as anticipated by the Rust reference, which taught a system that broadcast presentations (such as online training sessions) over the Internet and recorded them for later review. NICE distinguished Rust as a "control

-43-

server" that did not allow all participants to send data back through it—it was a one-way

street. Using the now-disputed "through" language, NICE argued that a key difference

between Rust's control server and its conference controller was that in Rust the data from

the presenter "passed directly along to the attendee clients . . . ***through the control***

***server***," but data never flowed the other direction. '106 Pros. Hist., Resp., 21 n.5, dated

Sept. 11, 2005 (emphasis added) [Ex. 29].[24]

   Third, in the '109 specification, NICE uses the preposition "through" to describe

data passing "through" an object. Figure 3 is again illustrative—only the data packets

"***passing through*** arrows 'A' and 'B' . . . is recorded." '109 Pat., 6:23-26 [Ex. 22].

    **2.  "Recording Device"**

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| selectively entering the **recording device** to said conference call as an additional participant, . . . . | A device which records IP audio and/or video data. | Participant to a session that receives data for recording and monitoring and does not require an additional connection or port in the network. |

   In a foreign counterpart to the '109 Patent's parent, NICE distinguished the prior

art by specifically disclaiming all recording devices except those that could be connected

to a conference call as a participant, "without any need to change the number of

connected extensions, etc." EPO Proceedings, File Hist. for W02001IL0100805, Amend.,

3, dated May 10, 2006. (WSNSDE054371-463) ("[T]he present invention allows

connect[ing] the recording device as a participant, without any need to change the number

of connected extensions, etc.") [Ex. 32]. This European Patent Office counterpart

---

[24] These comments were made in the parent '106 application. Within one month of those
comments, NICE submitted the same amendments to the '109 application, accompanied
by a similar, truncated version of the arguments made with respect to the '106 Patent.

application was virtually identical to the parent '106 patent, and thus the disclaimers should apply with equal force to the child '109 Patent. *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005).

### 3. "Entering the Recording Device to Said Conference Call as an Additional Participant"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| Implementing the data session as a conference call . . . **entering the recording device to said conference call as an additional participant** | NICE has provided constructions for "recording device," "conference call," and the parties have agreed to a construction for "participant." The remaining words have a plain meaning that is clear and do not require further construction. | Joining the recording device to the conference call as an additional participant after the conference call has been established between the first and second participants. |

The text and structure of the claims require that the data packets of the conference call "enter[] the recording device" after the conference call has already been established between the original participants. The claimed method's first step is "initiating the data session"; its second, "implementing the data session as a conference call . . . so that the first and second communication devices are connected, respectively, as first and second participants"; and third, "entering the recording device to said conference call as ***an additional*** participant." '109 Pat., claim 1. Thus, by the time the recording device enters the conference call, the call is already established.

The claim's description of the recording device as an "additional participant" buttresses this construction. If "said conference call" were not already in existence at the time the recording device was added, the recording device could hardly be said to be an "additional" participant.

### 4.    "IP Data Session"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
|---|---|---|
| receiving the portion of the **IP data session** from each of the first and second participants; . . . . | Communication which includes transmission of IP audio and/or video data. | The plurality of data packet transmissions between any two or more communication devices |

In an IP telephony environment, an "IP data session" is not an abstract, continuous "communication which includes . . . audio and/or video data." Data transmissions in IP communications are, by definition, comprised of discrete IP data packets. NICE's construction takes "IP data session"—a relatively specific term, though perhaps unfamiliar to a jury—and abstracts it to the point that it means very little. Witness' construction explains for the jury just what IP data session means as used in the claims.

NICE's construction treats the IP data session, *i.e.*, the set of transmissions between the participants, as an amorphous whole. But, the claim language requires that the recorder receive two distinct streams of data packets: one "***from each*** of the first and second participants." '109 Pat., Claim 1 (emphasis added) [Ex. 22]. Thus, the claimed IP data session is composed of two streams of data packets; one from each participant in the call. Because the claim requires that the recorder receive IP data packets "from each" of the participants, Witness' construction—"the plurality of data packet transmissions" between the participants—should be adopted.

Both the specification and prosecution history confirm this construction. Figure 3 displays each stream of data packets emanating from each participant (arrows "A" and "B"). According to the specification, only the information "from each" of the phones is recorded. '109 Pat., 6:23-26 [Ex. 22]. Moreover, during prosecution of the parent '106 Patent, NICE explained that the recorded "data session" was the "the data exchanged"

-46-

between the call's participants. '106 Pros. Hist., Resp. 6, dated Dec. 19, 2004

(WSNSDE051165-72) [Ex. 27].  NICE later amended the '106's claims to recite "IP data

session," rather than "data session."  *Id.* at 9, dated Apr. 14, 2005 (WSNSDE051208-16)

[Ex. 28].  Thus, the prosecution history confirms that an "IP data session" is the "data

exchanged" between participants of the call.  Because the data exchanged is necessarily in

the form of data packets, NICE's statements confirm that Witness' construction is correct.

   In another related application, NICE went further and explicitly adopted language

almost identical to Witness' construction.  NICE specifically defined a "session" as:

> Hereinafter, the term "session" refers to a ***plurality of transmissions between any***
> ***two or more computational devices***, which may optionally include more than one
> type of data, and which may also optionally (additionally or alternatively) include
> transmissions in the form of transmitted ***packets of data***."

U.S. Pat. Pub. No. 2005/0018622 (WSNSDE050731-51) (emphasis added) [Ex. 24].

### 5.    "The Portion of the IP Data Session"

| Disputed Term | NICE's Construction | Witness Systems' Construction |
| --- | --- | --- |
| **the portion of the IP data session** from each of the first and second participants | At least a part of one or more of a plurality of IP data sessions. | All the data packets transmitted between the first and second participants during the part of the IP data session being recorded. |

   Witness' construction gives meaning to the word, "portion."   In the claimed

method, the recorder does not necessarily record entire calls.  The final step of the claim

explains that the recorder will record those packets "received" from the participants, and

the preceding step (beginning "using the conference recorder") clarifies that only "the

portion of the IP data session" will be "receive[d]."  Although the "IP data session" is

made up of all of the data packets transmitted between the participants to the call, the

recorder only records some portion thereof.  The question is, "Which portion?"

NICE's construction fails to answer that question for two reasons. First, NICE's construction merely states that a "part" of the IP data session is recorded. Yet that construction ignores that the claim modifies the "portion" with a definite article: "***the*** portion." NICE does not attempt to mark the bounds of that definite scope.

More importantly, NICE construes the term to include "a part of ***one or more*** of a plurality of IP data sessions," despite the claimed steps' explicit application to only one IP data session. The preamble states that the method can record numerous IP data sessions at once. ***But,*** the preamble then explains that the claimed steps apply "for each IP data session."[25] Furthermore, the step in question speaks of recording "the portion of the IP data session" between the first and second participants. Thus, all steps apply the receiving and recording operations to one and only one IP data session. The first step initiates "the data session," and the second step implements "the data session," yet under NICE's construction, in the third step the recorder receives for recording "a part of one or more of a plurality of IP data sessions." This nonsensical construction contradicts the whole structure of the claim.[26]

"The portion of the IP data session," therefore, cannot be some ambiguous "part" of the packets transmitted between the participants and cannot involve more than one IP

---

[25] *See In re Paulsen*, 30 F.3d 1475, 1479 (Fed. Cir. 1994) ("[T]erms appearing in a preamble may be deemed limitations of a claim when they 'give meaning to the claim and properly define the invention.'" (citations omitted)),

[26] NICE's construction is also undercut by the specification's description of Figure 3, which states, "Only information passing through A and B, respectively, is recorded." Plainly, data packets flowing between two unrelated participants to a different call are not recorded, but only the packets transmitted between the participants to the present IP data session are recorded.

data session; Witness' construction preserves those limitations, defining the "portion" as all of the data packets transmitted during the time that an IP data session is recorded.

NICE even emphasized this feature during prosecution.  To further distinguish Rust, NICE conceded that the recorder "receives as the additional participant at least the portion of the IP data session from each of the first and second participants":

> [Nothing in Rust] is akin to establishing a connection with a second communication device and then "implementing the data session as a conference call" in which a remote recording device can receive "at least (a) portion of the data session from each of the first and second participants."
>
> The method of [issued claim 1] has an IP data session implemented as a conference call through a conference controller.  The claimed method recites the step of "using the conference controller, selectively entering the recording device to said conference call as an additional participant." The amendment to [issued claim 1] clarifies that the recording device, while being remote from the first and second communication devices that are in the IP data session, <u>receives as the additional participant at least the portion of the data session <i>from each of the first and second participants</i></u> so that it can record that portion of the session which it <u>received as the additional participant</u> of said conference call.

'109 Pros. Hist., Amend. 27, dated Oct. 6, 2005 (WSNSDE0010597-625) (emphasis in original) [Ex. 21].

Defining "portion" to mean those packets transmitted after a "record" instruction is the only way to view the element sensibly.  The claimed method requires the recorder to join the conference call as a "participant."  As a participant (joined just like an additional caller), the recorder must be receiving all of the data packets, otherwise it would not be able to understand the conversation it was receiving.  Witness' construction follows from the claim language, specification, and prosecution history.

## V.     CONCLUSION

For the foregoing reasons, this Court should adopt Witness Systems' proposed claim constructions for each disputed term of the patents-in-suit.[27]

Dated:  May 11, 2007                     FISH & RICHARDSON P.C.

                                    By:  */s/ Kyle Wagner Compton*
                                         William J. Marsden, Jr. (#2247)
                                         Kyle Wagner Compton (#4693)
                                         919 N. Market Street, Suite 1100
                                         P. O. Box 1114
                                         Wilmington, DE  19899-1114
                                         Tel:  (302) 652-5070

                                         Nagendra Setty (*pro hac vice*)
                                         Daniel A. Kent (*pro hac vice*)
                                         Noah C. Graubart (*pro hac vice*)
                                         1180 Peachtree Street, NE
                                         21st Floor
                                         Atlanta, GA 30309
                                         Tel: (404) 892-5005

                                         ATTORNEYS FOR DEFENDANT
                                         WITNESS SYSTEMS, INC.

---

[27] NICE has proposed constructions of additional claim terms that Witness has not addressed in this brief, but expressly reserves the right to respond through the Responsive Claim Construction Brief. Also, all of the evidence cited in the Joint Claim Construction chart supports Witness' proposed constructions.  Although Witness does not again cite all applicable evidence in this brief, Witness hereby incorporates by reference the evidence cited in the Joint Claim Construction chart.

12019720.DOC

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of May, 2007, I electronically filed with the Clerk of Court the foregoing **Defendant Witness Systems, Inc.'s Opening Claim Construction Brief** using CM/ECF which will send electronic notification of such filing(s) to the below-listed Delaware counsel.  In addition, the filing will also be sent via hand delivery to:


Josy W. Ingersoll                          *Attorneys for Plaintiffs*
Melanie K. Sharp                           *Nice Systems Ltd. and Nice Systems, Inc.*
Karen E. Keller
Young, Conaway, Stargatt & Taylor, LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899

I hereby certify that on May 11, 2007, I have sent by electronic mail and First Class Mail, the document(s) to the following non-registered participants:


Scott G. Lindvall                          *Attorneys for Plaintiffs*
Daniel DiNapoli                            *Nice Systems Ltd. and Nice Systems, Inc.*
Joseph M. Drayton
Robert R. Laurenzi
Jason Frank
Steven Chin
Kaye Scholer LLP
425 Park Avenue
New York, NY  10022


*/s/Kyle Wagner Compton*
Kyle Wagner Compton