# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NICE SYSTEMS, INC., a Delaware Corporation, and )
NICE SYSTEMS, LTD., an Israeli Corporation, )
           )
                Plaintiffs, )
                  v. )      Civil Action No. 06-311-JJF
           )
WITNESS SYSTEMS, INC, a Delaware Corporation, )
           )
              Defendant. )

## PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Melanie K. Sharp (No. 2501)
Karen E. Keller (No. 4489)
Mary F. Dugan (No. 4704)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

P.O. Box 391
Wilmington, DE 19899
(302)571-6681
msharp@ycst.com

KAYE SCHOLER LLP
Scott G. Lindvall
Joseph M. Drayton
425 Park Avenue
New York, NY 10022
(212)836-8000

*Attorneys for Plaintiffs Nice Systems, Inc. and Nice Systems, Ltd.*

Dated: May 11, 2007

**TABLE OF CONTENTS**

Page

I.    **Background to the Patents-in-Suit** ...................................................................1

II.   **The Law of Claim Construction** ....................................................................2

III.  **The Disputed Claim Terms** ...........................................................................4

   A.    The `371 Patent ..........................................................................................4
         1.    Technical Background ...................................................................4
         2.    The Parties' Proposed Constructions ............................................5

   B.    The `109 Patent ........................................................................................10
         1.    Technical Background .................................................................10
         2.    The Parties' Proposed Constructions ..........................................10

   C.    The `079 Patent ........................................................................................15
         1.    Technical Background .................................................................15
         2.    The Parties' Proposed Constructions ..........................................15

   D.    The `372 Patent ........................................................................................17
         1.    Technical Background .................................................................17
         2.    The Parties' Proposed Constructions ..........................................17

   E.    The `920 Patent ........................................................................................21
         1.    Technical Background .................................................................21
         2.    The Parties' Proposed Constructions ..........................................21

   F.    The `570 and `345 Patents .......................................................................25
         1.    Technical Background .................................................................25
         2.    The Parties' Proposed Constructions ..........................................26

   G.    The `370 Patent ........................................................................................33
         1.    Technical Background .................................................................33
         2.    The Parties' Proposed Constructions ..........................................34

   H.    The `738 Patent ........................................................................................41
         1.    Technical Background .................................................................41
         2.    The Parties' Proposed Constructions ..........................................41

   I.    The `005 Patent ........................................................................................44
         1.    Technical Background .................................................................44
         2.    The Parties' Proposed Constructions ..........................................44

CONCLUSION ......................................................................................................50

DB02:5971725.1                                                          065251.1001

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Acumed LLC v. Stryker Corp.,*
   2007 U.S. App. LEXIS 8375 (Fed. Cir. Apr. 12, 2007) ...................................3, 22

*Cellnet Data Sys., Inc. v. Itron, Inc.*,
   17 F. Supp. 2d 1100 (N.D. Cal. 1998) ...................................................... 45, 47-49

*CollegeNet, Inc. v. ApplyYourself, Inc.*,
   418 F.3d 1225 (Fed. Cir. 2005).....................................................................2, 7

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*,
   460 F.3d 1349 (Fed. Cir. 2006)................................................................16, 26, 37

*Database Excelleration Sys., Inc. v. Imperial Tech,. Inc.*,
   48 U.S.P.Q. 2d (BNA) 1533 (N.D. Cal. 1998) .........................................45, 47, 49

*Harmonic Design Inc. v. Hunter Douglas, Inc.*,
   88 F. Supp. 2d 1102 (C.D. Cal. 2000) ...................................................... 45, 47-48

*JVW Enters. v. Interact Accessories, Inc.*,
   424 F.3d 1324 (Fed. Cir. 2005)....................................................................2

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
   382 F.3d 1354 (Fed. Cir. 2004)................................................................ 45, 47-48

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995)....................................................................2

*Nilssen v. Magnetek, Inc.*,
   1999 U.S. Dist. LEXIS 16718 (N.D. Ill. Oct. 22, 1999)........................... 45, 47-49

*On-Line Techs., Inc. v Bodenseewerk Perken-Elmer GMBH*,
   386 F.3d 1133 (Fed. Cir. 2004)...................................................................11

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)................................................................ 2-4, 26

*Rexnord Corp. v. Laitram Corp.*,
   274 F.3d 1336 (Fed. Cir. 2001).....................................................................3

*Varco, L.P. v. Pason Sys. USA Corp.*,
   436 F.3d 1368 (Fed. Cir. 2006)......................................................................2

Page(s)

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*
239 F.3d 1225 (Fed. Cir. 2001).............................................................................4

iii

Plaintiffs NICE Systems, Inc. and NICE Systems Ltd. (collectively "NICE") hereby submit their opening brief in support of their proposed constructions of disputed claim terms.

## I.    Background to the Patents-in-Suit

NICE sued Witness Systems, Inc. ("Witness") for infringement of U.S. Patent Nos. 5,274,738 (the "'738 patent"); 5,396,371 (the "'371 patent"); 5,819,005 (the "'005 patent"); 6,249,570 (the "'570 patent"); 6,728,345 (the "'345 patent"); 6,775,372 (the "'372 patent"); 6,785,370 (the "'370 patent"); 6,870,920 (the "'920 patent"); 6,959,079 (the "'079 patent") and 7,010,109 (the "'109 patent"), collectively referred to as the "Patents-in-Suit."  Each of these patents claims a method or apparatus related to the telephone call monitoring and recording technology.  This technology, for example, can be used in call centers by law enforcement, financial institutions, retail sales organizations and customer service divisions and other commercial enterprises to receive, record, process and store large numbers of telephone calls, which may be monitored during the call or played back at a future time.

The Patents-in-Suit relate to five distinct technological advances.  First, the '371 patent claims a method that allows audio data to be retrieved from a digital audio logger while audio data continues to be recorded.  Second, the '109 patent claims a method of recording a telephone call by conferencing a recording device as an additional participant into the call.  Third, the '079 patent claims a telephone monitoring system useful for recording data generated during a telephone call between, for example, a customer and an employee who is entering data on a computer screen based on information from the customer.  Fourth, the '738, '005, '372 and '920 patents claim modularized and networked voice processing and recording systems.  Fifth, the '570, '345 and '370

patents claim systems that can record, store and reconstruct every aspect of a telephone call, including the various participants who may enter and exit a call, such as a customer service supervisor at a call center.

## II.    The Law of Claim Construction

Claim construction is a question of law exclusively for the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388-90 (1996). To ascertain the meaning of a patent claim term, a court should, in the first instance, look to the literal language of the claim, the patent specification and the prosecution history. *Markman*, 52 F.3d at 979 (internal citations omitted). Of these sources, the specification is considered "dispositive; it is the single best guide to the meaning of a disputed term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1170 (2006) (internal citations omitted).

The specification is always highly relevant to claim construction because statutorily the words of the claim must be based on the descriptive part of the specification. *Id.*; *see also Markman*, 52 F.3d at 979 (explaining that "[c]laims must be read in view of the specification, of which they are part"). When using the specification to determine the proper context of a disputed claim term, however, a court may "not at any time import limitations from the specification into the claims." *Varco, L.P. v. Pason Sys. USA Corp.*, 436 F.3d 1368, 1373 (Fed. Cir. 2006) (citing *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005)); *see also JVW Enters. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005) (noting that the Federal Circuit "do[es] not import limitations into claims from examples or embodiments appearing only in a patent's written description").

2

The prosecution history represents a patentee's attempt to explain his invention and obtain a patent and as such, provides evidence of how the inventor and the United States Patent and Trademark Office ("PTO") understood the patented invention. *Phillips*, 415 F.3d at 1317. However, because the prosecution history embodies the "ongoing negotiation between the PTO and the applicant," and not "the final product of that negotiation, it often lacks the clarity of the specification," making it "less useful for claim construction purposes." *Id.*

Apart from the specification and the prosecution history, the claims themselves provide substantial insight into the meaning of particular claim terms. *Id.* at 1314. The context in which a term is used in a disputed claim can be instructive. *Id.* Other patent claims can also aid in determining the meaning of a term. *Id.* Ordinarily, a "claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).

In other situations, "[d]ifferences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. For example, "[t]he presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim. That presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *Acumed LLC v. Stryker Corp.*, 2007 U.S. App. LEXIS 8375, at *12 (Fed. Cir. Apr. 12, 2007) (internal citations omitted) (Exhibit A). "Claim differentiation . . . is clearly applicable

3

when there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, and that limitation is the only meaningful difference between the two claims." *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001).

Although the literal language of the claim, the patent specification and the prosecution history are of primary importance, it is within the sound discretion of a court to use extrinsic evidence, including expert and inventor testimony, dictionaries, and learned treatises, as an aid in claim construction. *Phillips*, 415 F.3d at 1318-19. Extrinsic evidence may be helpful in understanding the underlying technology of the invention, the meaning of the claim terms to one skilled in the art, and how the invention works. *Id.* However, extrinsic evidence is considered less reliable and less useful in claim construction than the patent and its prosecution history. *Id.* (noting that extrinsic evidence "is unlikely to result in a reliable interpretation of a patent claim scope unless considered in the context of the intrinsic evidence").

## III.    The Disputed Claim Terms

For each of the patents-in-suit, provided below is a side-by-side comparison of the parties' proposed constructions of the disputed claim terms followed by an analysis of NICE's basis for its proposed constructions. Where helpful, NICE has highlighted in bold italics the aspects of Witness's proposed constructions which are the focus of each of the disputes.

### A.    The `371 Patent

#### 1.    Technical Background

The `371 Patent is directed to a method of storing and retrieving audio data from a digital logger. The method of the `371 invention allows audio data to be retrieved from a

digital logger while the digital logger continuously records incoming audio data (*i.e.*, recorded audio data can be retrieved from a digital logger without interrupting or interfering with the continuous recording of incoming audio data).

### 2.    The Parties' Proposed Constructions

**"buffer" (claims 1, 5)**

| NICE's Construction | Witness's Construction |
|---|---|
| Memory used for temporary storage of data. | *Device in communication with the digital audio tape and the random access storage device that* temporarily stores data. |

Witness and NICE are in agreement that, as the specification clearly states, a buffer "temporarily stores data." (col. 2:42-43; col. 3:64-65.) While Witness does not dispute the definition of "buffer," it seeks to read a limitation into the claim as to how the buffer relates to other components of the claimed method: *i.e.*, that the buffer is "in communication with" the digital audio tape and the random access storage device. The relationship between the buffer and other components recited in the claim can be determined from the plain meaning of the claim language without the need to read limitations into the claim. Since the only issue for the Court is the construction of the term "buffer," NICE's construction should be adopted.

**"digital audio tape" (claims 1, 5)**

| NICE's Construction | Witness's Construction |
|---|---|
| Tape used to store digital data. | *Magnetic* tape *designed* for storage of audio in digital form. |

NICE construes "digital audio tape" ("DAT") to mean "tape used to store digital data" while Witness construes it to mean "magnetic tape designed for storage of audio in digital form." Witness seeks to read in limitations that are not supported by the claim language or the specification. There is no support in the specification that the tape must

5

be "magnetic" or "designed" to store audio.  Accordingly, NICE's construction should be

adopted.

**"writing the audio data from the buffer onto a digital audio tape and a random access storage device" (claim 1)**

| NICE's Construction | Witness's Construction |
|---|---|
| NICE has provided constructions for "buffer" and "digital audio tape." The remaining words have a plain meaning that is clear and do not require further construction. NICE notes that Witness has withdrawn "random access storage device" as a claim term in need of construction. | Transferring audio data from the buffer *directly* to both a digital audio tape and a random access storage device *simultaneously*. |

This claim language should be construed by its plain meaning, which is

"transferring audio data from a buffer to a digital audio tape ("DAT") and to a random

access storage ("RAS") device," *e.g.*, a hard disc (*see* Figure 1 showing a hard disc as an

RAS device.)

The claims are directed to a method in which audio data is buffered, *i.e.*,

temporarily stored, and transferred to a digital audio tape (for archival storage) and to a

random access storage device (so that audio data can be accessed and played back upon

request).  Witness seeks to read into this language two non-existent limitations -- that the

transfer of audio data from a buffer to the DAT and to the RAS device occurs "directly"

and "simultaneously."

In the first instance, Witness does not explain what it means by "directly" and

"simultaneously."  If by "directly," Witness means that audio data is transferred from a

buffer to the DAT or to the RAS device without any intermediate steps, such a limitation

is not supported by the language of the claim.  The claim merely requires that the audio

data is transferred to a DAT and to an RAS device.  Similarly, if by "simultaneously,"

Witness means that audio data is transferred to the DAT and to the RAS device at the

065251.1001

same time, such a limitation is not supported by the language of the claim. While the specification uses the word "simultaneous" ("A . . . DAT and a RAS device are in communication with the buffer to simultaneously receive data when the buffer downloads data," at col. 1:50-53; "the data being received simultaneously by these two units 23, 24," at col. 3:67-68),[1] the claim does not. One skilled in the art would understand that, as claimed, the transfer of audio data to the DAT and to the RAS device need not be at the same time.

The invention provides the ability to access audio data from the RAS device while audio data continues to be transferred to the RAS device and to the DAT. The claimed method uses the transitional phrase "comprising," which means that the claim is "open" to the inclusion of steps which would make the transfer of data to either the DAT or the RAS device "indirect" or which would delay the transfer of data to either the DAT or the RAS device so that the transfer was not "simultaneous."[2]

Accordingly, the Court should adopt NICE's proposed construction.

---

[1]    The specification also states that "[a]s such retrieving is taking place, the second pointer allows the RAS device to continuously receive data at the same time as the DAT." (col. 1:65-67.) This does not mean that the claim requires that the transfer to the DAT and the RAS be "simultaneous." It simply means that both the RAS device and DAT can continuously receive data even when data is being retrieved from the RAS device.

[2]    "The transitional term 'comprising' ... is inclusive or open-ended and does not exclude additional, unrecited elements or method steps. A drafter uses the term 'comprising' to mean 'I claim at least what follows and potentially 'more'." *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1235 (Fed. Cir. 2005) (internal citations omitted).

065251.1001

**"pair of pointers" (claim 5, 8)**

| NICE's Construction | Witness's Construction |
|---|---|
| Digital information used to read data from and write data to a storage component. | Two pointers facilitating the *simultaneous* retrieval of data from the random access storage device and the writing of data thereto. |

NICE construes "pair of pointers" to mean "digital information used to read data from and write data to a storage component." A "pointer" is digital information that refers to (or "points to") a value stored at another location. In the `371 patent, the claimed invention includes pointers that can be used when transferring digital information to a particular location on the RAS device and pointers that can be used to locate digital information that has been stored on the RAS device when retrieving that information from the RAS device. (col. 1:55-68; col. 4:1-38.)

Witness seeks to limit the system of claim 5 and the device of claim 8 to one in which the writing of data to the RAS device is "*simultaneous*" with the reading of data from the RAS device. This construction makes no sense. As described in the `371 patent's specification, data is continuously being written to the RAS device. (col. 1:65-67, describing that the pointer "allows the RAS device to continuously receive data.") However, data is only retrieved from the RAS device when desired and "[u]pon input of the time and date of the data to be retrieved." (col. 4:3-4.) Moreover, "[t]he request for the retrieving of data has no affect [sic] on the pointer 30 which continues to transmit data to the RAS device . . ." (col. 4:13-15.) In other words, the writing and reading pointers operate independently of each other. There is certainly no requirement that they function "*simultaneously*." Accordingly, NICE's construction should be adopted.

8

**"the first of said pointers operative for transmitting audio data to said random access storage device from said buffer and the second of said pointers being operative to send audio data from said random access storage device to said controller" (claim 5)**

| NICE's Construction | Witness's Construction |
|---|---|
| The first pointer is used to transmit audio data from the buffer to the random access storage device and the second pointer is used to send audio data from the random access storage device under the control of the controller. | The first pointer transmits audio data to the random access storage device *at the same time* the second pointer retrieves the audio data from the random access storage device and sends it to the controller. |

NICE construes this language to mean that "[t]he first pointer is used to transmit audio data to the random access storage device, and the second pointer is used to send audio data from the random access storage device under the control of the controller." Witness seeks to require that the first pointer "transmits audio data from the random access storage device *at the same time* the second pointer retrieves audio data from the random access storage device and sends it to the controller."

Witness seeks to improperly read limitations into the claim to require that the second pointer be used to retrieve data from the RAS device "*at the same time*" that the first pointer is used to transmit data to the RAS device. Witness's construction has no support in the claim language or the specification.

The specification states that "[t]he pointer 34 [the read pointer] will go to such location [on the primary partition as directed by the controller] so that the data can be played back through the speaker 17. The request for the retrieving of data has no affect [sic] on the pointer 30 [the write pointer] which continues to transmit data to the RAS device . . ." (col. 4:11-18.) The claimed invention permits accessing audio data from the RAS device while data is being written on it (col. 1:55-59), but there is no requirement (as Witness seeks to impose) that the writing of data to the RAS device occurs "*at the*

9

*same time*" as the retrieving of data from the RAS device, if and when such a request is made. Therefore, NICE's proposed construction should be adopted.

### B.    The `109 Patent

#### 1.    Technical Background

The `109 patent is directed to a method for recording telephone calls, *i.e.*, communications between two or more communication devices (including both IP and non-IP telephones). The invention of the `109 patent provides for recording telephone calls by entering a recording device as a participant in the call using a conference controller so that the recording device receives, by use of a data network, the telephone call.

#### 2.    The Parties' Proposed Constructions

**"IP data session" (claim 1)**

| NICE's Construction | Witness's Construction |
|---|---|
| Communication which includes transmission of IP audio and/or video data. | The plurality of data packet transmission between any two or more communication devices. |

The `109 patent is directed to recording a part of an "IP data session." IP data can be "multimedia," including audio and/or video, and an "IP data session" involves the communication of IP audio and/or video data, fully supporting NICE's construction. (col. 1:40-41; col. 4:49-52.)

The specification clearly states that the communication devices can be either IP or non-IP telephony devices and that in a preferred embodiment of the invention, "the IP multi-media session may also include one or more non-IP telephony devices." (col. 3:52-56.) Figure 1 shows an embodiment including the non-IP telephony device 20 which connects to the LAN through the PSTN. While IP devices, such as IP telephones,

10

transmit and receive data in the form of packets, non-IP telephones do not transmit or receive "data packets."

Witness's proposed construction, "[t]he plurality of data packet transmission between any two or more communication devices" seeks to exclude this preferred embodiment because "data packets" (a term not even used in the specification) do not originate from non-IP telephones. *See On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct") (internal citations omitted).

Rather, as the specification explains: "if a telephony device 20 communicating through a PSTN 22 is contacted by IP telephone 12 to initiate the multimedia call and/or if telephony device 20 initiates the call . . ., communication to and from telephony device 20 passes through a gateway 42, for example in order to translate regular PSTN 22 communication to IP-based communication." (col. 6:4-11.)  When a non-IP telephone is one of the communication devices of the claimed method, data packets are neither transmitted from nor received by the non-IP telephone.

Accordingly, NICE's construction should be adopted.

**"conference controller" (claim 1)**

| NICE's Construction | Witness's Construction |
|---|---|
| A component that initiates, enables and/or establishes a conference call. | *Device* that initiates, establishes *and* enables a conference call. |

The specification supports NICE's construction as it describes a "conference controller" as a component that is capable of performing several functions, including initiating, enabling, and/or establishing a conference call.  (col. 5:6-col. 6:32.)  Witness's construction seeks to impose a requirement that the conference controller has all three of

these functions, while the specification only provides exemplary situations in which the

conference controller has "initiated," "enabled" or "established" a conference call. (*Id.*)

Witness also seeks to impose a limitation that a conference controller is a "device."

However, nothing in the specification requires the "conference controller" to be limited

to a "device" or hardware and to exclude software. Because a conference controller need

not perform all of these functions and need not be a device, NICE's proposed

construction should be adopted.

**"through a conference controller" (claim 1)**

| NICE's Construction | Witness's Construction |
|---|---|
| By use of a conference controller. | The data packet transmissions of the IP data session *pass through the conference controller*. |

Claim 1 recites "implementing the data session as a conference call *through a*

*conference controller*."

Witness proposes that the word "through" literally means that data packets

physically flow into, through, and out of the conference controller. Witness's proposed

construction makes no sense based on how one skilled in the art would read and

understand the specification. Rather, "through a conference controller" means that the

conference controller is used to implement the conference call.[3]

The conference controller is a component that is used to enter the recording

device to the conference call ("Conference controller 30 enables recording device 24 to

participate in the conference call, as well as preferably enabling the conference call

---

[3]     As defined by Webster's, "through" is "used as a function word to indicate
       means, agency, or intermediacy: as a : by means of : by the agency of."
       WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1230 (1984).

itself." (col. 6: 21-23.)) For example, the conference controller may receive a request to

enter a recording device as a participant to the call. (*See, e.g.*, col. 5:46-48.) The

transmissions between the communications devices cannot and do not flow "through" the

conference controller. Accordingly, NICE's construction should be adopted.

**"recording device" (claim 1)**

| NICE's Construction | Witness's Construction |
|---|---|
| A device which records IP audio and/or video data. | Participant to a session that receives data for recording and monitoring ***and does not require an additional connection or port in the network***. |

A "recording device" has a plain meaning in the context of the '109 patent; it is a

device that records IP data, whether it is in audio or video form. In accordance with the

method of claim 1, the recording device is added as an additional participant to a

conference call. (*See* col.4:44-52.) Witness improperly seeks to impose a negative

requirement on the claim term that has no support in the specification: that the recording

device "does not require an additional connection or port in the network." This language

is ambiguous and is not used anywhere in the specification. There is simply no basis for

Witness's construction. Accordingly, NICE's construction should be adopted.

**"entering the recording device to said conference call as an additional participant"
(claim 1)**

| NICE's Construction | Witness's Construction |
|---|---|
| NICE has provided constructions for "recording device," "conference call," and the parties have agreed to a construction for "participant." The remaining words have a plain meaning that is clear and do not require further construction. | Joining the recording device to the conference call as an additional participant ***after the conference call has been established between the first and second participants***. |

Witness seeks to impose a timing or sequence limitation into the claim so that it

only covers a conference call in which the recording device is entered after the

13

conference between the first and second communication devices has commenced. This construction is not supported by the specification. Rather, according to the plain language, this claim term simply means adding the recording device to the conference call as a participant.

Accordingly, the plain meaning should be adopted and Witness's construction should be rejected.

**"the portion of the IP data session" (claim 1)**

| NICE's Construction | Witness's Construction |
|---|---|
| At least a part of one or more of a plurality of IP data sessions. | *All the data packets transmitted* between the first and second participants during the part of the IP data session being recorded. |

The antecedent basis for the term "the portion of the IP data session" is found in the preamble of the claim, which recites "[a] method for recording at least a portion of one or more of a plurality of IP data sessions." Under NICE's proposed construction, this term refers to the "at least a part of the plurality of IP data sessions" that is to be recorded as per the body of the claim.

Witness seeks to read into the claim non-existent limitations in its construction, "[a]ll the data packets transmitted between the first and second participants during the part of the IP data session being recorded." As explained above, one or more of the communication devices are preferably *not* IP telephones and therefore do not transmit or receive IP data. Also, there is no requirement that "all" IP data be recorded. Again, Witness seeks to read a limitation into the claim that is not present in the claim and has no basis in the specification. Accordingly, NICE's construction should be adopted.

14

C.    **The `079 Patent**

1.    **Technical Background**

The `079 patent is generally related to a telephone call monitoring system that has

the ability to monitor telephone calls and record those calls which meet a predetermined

criteria.

2.    **The Parties' Proposed Constructions**

**"event manager" (claim 1)**

| NICE's Proposed Construction | Witness's Proposed Construction |
| --- | --- |
| A component, which as a result of receiving input, controls the recording of audio and/or screen data or the playback of audio and/or screen data. | Device that controls *the voice logger and screen logger to begin* recording audio and video screen data of the telephone call. |

NICE construes the term "event manager" to mean "a component, which as a

result of receiving input, controls the recording of audio and/or screen data or the

playback of audio and/or screen data" while Witness construes it to mean a "device that

controls the voice logger and screen logger to begin recording audio and video screen

data of the telephone call." The `079 specification describes the term "event manager" as

having two primary functions:  (1) controlling the recording of "audio and/or screen data"

and (2) playing back such data. (*See* col. 3:22-42.)  There is no requirement that the

event manager directly control the voice logger and screen logger to perform its function.

Witness's construction requires the event manager to directly control a voice

logger and screen logger in order to perform its functions.  Witness relies on a description

of the preferred embodiment that states "Event manager 32 *may* then control voice logger

28 and screen logger 30 to begin recording audio and screen data of a telephone call for

which an event notification has been received."  (col. 3:29-33) (emphasis added).

Witness's construction impermissibly limits the implementation of the functionality of

the event manager to the method of the preferred embodiment.  *See Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1357-58 (Fed. Cir. 2006) (A court "cannot draw limitations into the claim from a preferred embodiment").

Witness further attempts to limit "event manager" to a single device as opposed to multiple devices or software.  There is no support in the claims, specification or prosecution history for a requirement that the "event manager" be limited to a device.

Accordingly, the Court should adopt NICE's proposed construction.

**"predefined monitoring condition" (claim 1)**

| NICE's Proposed Construction | Witness's Proposed Construction |
| --- | --- |
| A condition set prior to the telephone call which is used to determine whether to record audio and/or screen data related to the telephone call. | A monitoring condition established prior to the call, where a predefined monitoring condition *does not include: (1) schedules of agents, including the 'log-on' of an agent or the beginning of shift or other automated action initiated before an agent receives a call, and (2) a number of calls to be recorded in a predefined period of time*. |

The parties agree that the term "predefined monitoring condition" is a condition set prior to a telephone call.  The specification teaches that predefined monitoring conditions are used to determine whether audio and/or screen data is recorded.  (*See e.g.*, col. 4:49- col. 6:62.)  Witness seeks to narrow the meaning of the term "predefined monitoring condition" so as to exclude "(1) schedules of agents, including the 'log-on' of an agent or the beginning of shift or other automated action initiated before an agent receives a call, and (2) a number of calls to be recorded in a predefined period of time."  The disputed claim term "predefined monitoring condition" is not so limited and can include conditions such as the schedules of agents or automated actions.

Accordingly, the Court should adopt NICE's proposed construction.

16

### D.    The `372 Patent

#### 1.    Technical Background

The `372 patent generally is directed to a multi-stage data logging system. The logging system generally includes three stages: first, a telecommunication stage that receives input from several input channels. Second, a recorder stage for storing data associated with the information received by the telecommunication stage. Third, a distribution stage for providing access to the stored information. The logging system is designed so that at least two of the stages are physically separable and can be located wide distances apart.

#### 2.    The Parties' Proposed Constructions

**"telecommunications ("telecom") stage" (claim 1)**

| NICE's Construction | Witness's Construction |
|---|---|
| The stage that serves to capture and pre-process signals from two or more communication channels and interfaces with the recorder stage. | A *device* that receives input from communication channels *passively, and is not part of the communications system*. |

NICE's construction is based on the description of the telecom stage in the patent specification. Under the heading "The Telecom Stage," the patent states:

> In accordance with the present invention telecom stage 102 generally functions to capture and pre-process signals from a plurality of communication lines into a format that is recognized by the recorder stage. (col. 7:51-54.)

The patent specification also states that the telecom stage interfaces with the recorder stage (recorder stage has . . . "an interface 120 receiving input from the telecom stage" (col. 9:67-col:10:1.)) The specification, therefore, demonstrates that the telecom stage "serves to capture and pre-process signals" from a "plurality," or two or more, communications channels and that the telecom stage interfaces with the recorder stage.

17

Witness's construction is wrong because it limits the telecom stage to a "device." The patent specification does not require the telecom stage to be a single "device," but rather a "stage" that may be one or more components, either software and/or hardware. Witness's construction also inappropriately adds the limitation "passively." Since the specification makes clear that the telecom stage "captures" signals from the communications lines, it is inappropriate to limit the claim so that the telecom stage only receives signals "passively." Finally, Witness seeks to add the limitation that the telecom stage is not part of the communication system. This aspect of the telecom stage is clear from the claim language that the telecom stage receives input from the communication channels so there is no need to add another limitation.

Accordingly, the Court should adopt NICE's proposed construction.

**"distribution stage" (claim 1)**

| NICE's Construction | Witness's Construction |
|---|---|
| The stage that serves for retrieval of recorded information and providing it in a humanly recognizable form and/or for archiving the recorded information to removable storage. | Plain meaning. |

NICE's construction is based on the description of the distribution stage in the patent specification. Under the heading "The Distribution Stage and Switch Fabrics," the patent states:

> In accordance with the present invention a very flexible approach is taken to the design of the distribution stage of the logger. Generally the ***distribution stage serves for retrieval of recorded information and providing it in a humanly recognizable form***, i.e. as an image, a printout, a sound clip or others. In a preferred embodiment, the distribution stage also ***serves for archiving the recorded information to a removable storage***, such as magnetic tape, optical storage device, DVD, or others. (col. 11:40-48.)

18

Thus, the specification plainly states that the distribution stage serves "for retrieval of recorded information and providing it in a humanly recognizable form" and "for archiving the recorded information to a removable storage." NICE's construction will better help the jury to understand this technical claim term. Accordingly, the Court should adopt NICE's proposed construction.

**"wherein at least two stages of the system are physically separable and in operation can be located wide distances apart" (claim 1)**

| NICE's Construction | Witness's Construction |
|---|---|
| At least two of the stages are physically separable and are capable of functioning if physically separated by substantial distance. | wherein *the telecom stage and recorder stage are physically separable* and can be located wide distances apart, and wherein the distribution stage can be physically separable and located wide distances from the telecom and/or recorder stage. |

NICE's construction is demonstrated by the plain meaning of the term and the patent specification. NICE's construction tracks the language of the claim and explains the "in operation" claim language as "capable of functioning." This means that the stages of the claimed multi-stage logger operate together, or can be functional, even though separated by wide distances. The patent specification makes this aspect of the invention clear:

> In accordance with the present invention, separation of the logger into several functional stages provides the flexibility to perform different functions at spatially different locations, i.e., in different parts of the same building, city, or the world. (col. 3:8-11.)

Witness's proposed construction is wrong because it seeks to add a limitation not required by the claim language or the specification. Witness's proposed construction requires the telecom and recorder stage to be physically separable whereas the claim and the specification require that any two of the three stages be physically separable. In other

19

words, the claims and specifications do not require the telecom and recorder stages to be physically separable from each other as long as the combined telecom and recorder stages are physically separable from the distribution stage. Witness's proposed construction eliminates this possibility. Accordingly, the Court should adopt NICE's proposed construction.

**"Web server" (claim 33)**

| NICE's Construction | Witness's Construction |
| --- | --- |
| A component that provides access to information accessible from a computer connected to the Internet or an intranet. | A computer that receives a request for stored data, *retrieves the stored data, and transfers the data over the World Wide Web.* |

NICE's construction is based on the plain meaning of the term and the specification. The specification makes clear that the Web server provides computer access to information stored by the logging system via the internet, including or as part of a corporate intranet. The specification states that:

> [T]he Web server 280 acts as an intermediary between one or more recorders 252 in the recorder stage of the logger, and the users accessing the stored information via, for example, the Internet. (col. 12:18-21.)

and that:

> It will be appreciated that a similar distribution scheme can be provided as part of a corporate intranet. (col. 12:44-46.)

Witness's construction seeks to limit the Web server to a particular use of the Web server, that is, a computer that transfers and retrieves data over the World Wide Web. The claim and the specification are not so limited. Accordingly, the Court should adopt NICE's proposed construction.

### E.    The `920 Patent

#### 1.    Technical Background

The `920 patent generally is directed to a method for accessing information stored by at least one digital logger.  (The `920 patent is a divisional of and shares the same specification as the application which led to the `372 patent discussed above.)  The method generally relates to the use of a computer network server, for example, a Web server, to respond to a request for retrieval of stored information from a computer.

#### 2.    The Parties' Proposed Constructions

**"Web server" (claims 1, 6, 16, 21)**

| NICE's Construction | Witness's Construction |
|---|---|
| A component that provides access to information accessible from a computer connected to the Internet or an intranet. | A computer that receives a request for stored data, *retrieves the stored data, and transfers the data over the World Wide Web*. |

The discussion above for the construction of Web server in the claims of the `372 patent provides the support for NICE's construction of the term Web server as used in the `920 patent (that has the same specification as the `372 patent.)

**"digital logger" (claims 1, 6, 16, 18, 21)**

| NICE's Construction | Witness's Construction |
|---|---|
| A device, system or software for recording, in digital form, audio data representing multiple concurrent telephone calls. | A device system or software for recording audio in digital form. |

The difference between NICE's and Witness's construction of "digital logger" boils down to whether the logger is required to record from "multiple" input sources, or telephone calls (NICE's proposed construction).  The meaning of the term "logger," to include the recording from "multiple" input sources, or telephone calls, comes from the language of the claims themselves.  The claims expressly recite that the method includes "at least one digital logger storing data associated with input from a plurality of input

channels." This means that the claims themselves expressly require that the logger stores

data associated with a "plurality" of input channels, not a single channel. Accordingly,

the Court should adopt NICE's proposed construction.

**"receiving a request for retrieval of stored data" (claims 1, 16)**

| NICE's Construction | Witness's Construction |
|---|---|
| This phrase has a plain meaning that is clear and does not require construction. | The Web server receives a request for retrieval of *data stored in the digital logger*. |

The words "receiving a request for retrieval of stored data" are plain and ordinary

words that are clear enough for the jury to understand, so the phrase does not require

additional construction. Witness's construction is wrong because it attempts to add the

limitation that the data is "stored in the digital logger." The claims themselves show that

Witness's construction is wrong. Claims 6 and 21 each recite:

> wherein the step of retrieving stored data comprises
> accessing archived data at the Web server corresponding to
> a record of [a]...channel made by said at least one digital
> logger.

In other words, claims 6 and 21 expressly cover the situation where the retrieval

of stored data is accomplished by accessing data archived, or stored, at the Web server.

Therefore, under the principles of claim differentiation, claims 1 and 16 must be broader

to cover, at least, data stored at the logger or data stored at the Web server. *Acumed LLC*

*v. Stryker Corp.*, 2007 U.S. App. LEXIS 8375, at *12 (Fed. Cir. Apr. 12, 2007) ("[t]he

presence of a dependent claim that adds a particular limitation raises a presumption that

the limitation in question is not found in the independent claim") (internal citations

omitted). Witness's proposed construction should be rejected, as it violates the doctrine

of claim differentiation by requiring that the data be stored "in the logger."

Accordingly, the Court should adopt NICE's proposed construction.

**"retrieving stored data" (claims 1, 3, 6, 16, 18, 21)**

| NICE's Construction | Witness's Construction |
|---|---|
| This phrase has a plain meaning that is clear and does not require construction. | *The Web server* retrieves data stored *in the digital logger*. |

The words "retrieving stored data" are plain and ordinary words that are clear enough for the jury to understand, so the phrase does not require additional construction.

Witness improperly seeks to restrict the retrieval of "stored data" as the function of only the Web server. The claims flatly contradict the contrived limitation. For example, the method of claim 1 consists of three steps -- only one of which is required to be performed "at a Web server." As set forth above, the step of "receiving a request for retrieval of stored data" occurs "at a Web server." The remaining steps of "retrieving stored data" and "transferring the retrieved data" are not required to be performed by or at a Web server.

Witness further attempts to require that "data" must be stored at the "digital logger." The claim contains no such limitation. Witness's construction is wrong because it attempts to add the limitation that the data is "stored in the digital logger." As discussed above, the claims expressly cover the situation where the retrieval of stored data is accomplished by accessing data archived, or stored, at the Web server. This is a direct contradiction of Witness's proposed requirement that retrieval of data is of data stored "in the logger."

Accordingly, the Court should adopt NICE's proposed construction.

**"transferring the retrieved data" (claims 1, 16)**

| NICE's Construction | Witness's Construction |
|---|---|
| This phrase has a plain meaning that is clear and does not require construction. | *The Web server* sends the data *from the digital logger*. |

The words "transferring the retrieved data" are plain and ordinary words that are clear enough for the jury to understand, so the phrase does not require additional construction.

Witness's construction is wrong because it attempts to add the limitations that (a) the Web server transfers retrieved data and (b) the data is sent "from the digital logger." As discussed above, the claims themselves show that Witness's construction is wrong. The claims expressly cover the situation where the retrieval of stored data is accomplished by accessing data archived, or stored from any device, not just a Web server.

Accordingly, the Court should adopt NICE's proposed construction.

**"record of an input channel" (claims 3, 6)**

| NICE's Construction | Witness's Construction |
|---|---|
| Stored voice and/or call information received from an input channel. | A record *identified by* the input channel. |

NICE's construction is based on the plain meaning of the words in the claim and the patent specification. The plain meaning of a "record" in the context of the claim is stored information. The patent specification echoes this plain meaning and states:

> In a particular embodiment directed to storing voice records, the function of recorder stage 104 can be described broadly as creating voice files and providing an associated database with stored call information. (col. 10:30-34.)

In other words, the records contain "stor[ed] voice" information and associated call information. (The call information includes, for example, "information about the caller ID, the date and time of the communication, [and] its duration.") (col. 11:20-23.)

Witness's construction is wrong because it attempts to add the limitation that the record is "identified by the input channel." The claims and the specification do not

24

support such a limitation.  Accordingly, the Court should adopt NICE's proposed

construction.

**"record of a communication channel" (claims 18, 21)**

| NICE's Construction | Witness's Construction |
|---|---|
| Stored voice and/or call information received from a communication channel. | A record *identified by* a communication channel. |

NICE's construction is based on the plain meaning of the words in the claim and

the patent specification.  For the same reasoning as above with respect to the term "record

of an input channel," a record of a communication channel is stored voice and/or call

information received from a communication channel (as opposed to an input channel as

above).  Witness's construction is wrong because it attempts to add the limitation that the

record is "identified by a communication channel."  The claims and the specification do

not support such a limitation.  Accordingly, the Court should adopt NICE's proposed

construction.

### F.    The `570 and `345 Patents

#### 1.    Technical Background

The `570 and `345 patents are generally related to computer-aided data

monitoring and recording of telephone calls.  The patents are specifically related to a

method for collecting and storing data related to a telephone call from multiple sources so

as to facilitate monitoring, recording and playing back of complete telephone calls.  The

`345 patent is a continuation of the `570 patent and shares the same specification.

2.    **The Parties' Proposed Constructions**

**"telephone call" (`570 patent: claims 6, 7; `345 patent: claims 14, 40)**

| NICE's Construction | Witness's Construction |
|---|---|
| "Telephone calls" has a plain meaning that is clear and does not require further construction. | Entire conversation with an entity from a caller's perspective, including transfers and conferences. |

The term "telephone call" has a plain and ordinary meaning and requires no construction by the Court. Consistent with its plain meaning, the specification states that "the term [telephone call] covers any electronic communication." (*See* col. 5:5-8.)

Witness construes the term "telephone call" in a way that is not supported by the claims, specification or prosecution history, and creates confusion. It further creates unnecessary ambiguity as to the meaning of "telephone call." Witness relies on an excerpt from the description of the preferred embodiment that states

> In other words, ***within the system of the preferred embodiment,*** recording is managed in a call-centric (rather than event-centric) fashion. This corresponds with the typical caller's point of view, in which a call is the entire conversation with a business entity, even if the conversation involves transfers to other agents or conferencing of multiple parties.

(col. 8:5-11) (emphasis added). It is well established that the scope of a claim should not be construed so as to be limited to the preferred embodiment.[4] Witness's attempts to do so should be rejected by the Court.

Accordingly, the claim phrase "telephone call" does not require construction.

---

[4]    A court "cannot draw limitations into the claim from a preferred embodiment." *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1357-58 (Fed. Cir. 2006) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (explaining "we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment")).

**"telephony events" (`570 patent: claims 6, 7; `345 patent: claims 14, 40)**

| NICE's Construction | Witness's Construction |
|---|---|
| Actions or occurrences detected by a computer program and that are related to what happens to a phone call (such as the initiation of the call, the addition or removal of callers, the transfer of the phone call, or the termination of the call).[5] | Actions or occurrences detected by a computer program and that are related to what happens to a phone call (such as the initiation of the call, the addition or removal of callers, the transfer of the phone call, or the termination of the call)*, and are not identifying numbers. Agent-entered information is not data regarding telephone events*. |

The `570 specification defines an "event" as "simply an action or occurrence detected by a computer program." (col. 7:11-13.) In light of this definition, the parties essentially agree that a "telephony event" is an "event" related to a telephone call.

Witness's construction is identical to NICE's construction except for the last part which states "*and are not identifying numbers. Agent-entered information is not data regarding telephone events*." The additional language proposed by Witness is not supported by the intrinsic evidence and will not aid a jury in understanding the meaning of the term "telephony event." Moreover, it unnecessarily complicates the construction of the claim term, making it difficult to understand.

Witness also improperly seeks to construe the claim phrase "data regarding telephony events," which is not a term identified as in need of construction by the parties. The intrinsic evidence does not limit the claim phrase to exclude any data related to a telephony event. Witness, however, construes "data regarding telephony events" to

---

[5]     NICE's construction of the term "telephony events" is different in the parties' Joint Claim Construction Chart. NICE proposes this particular construction as a compromise in order to narrow the issues before the Court.

exclude agent-entered information which may be related to a telephony event without any support.

Accordingly, the Court should adopt NICE's proposed construction.

**"telephone call segments" (`570 patent: claims 6, 7; `345 patent: claims 14, 40)**

| NICE's Construction | Witness's Construction |
|---|---|
| Pieces or portions of a telephone call that are each bounded by telephony events.[6] | Portion of a phone call that is bounded by telephony events. |

The parties are in basic agreement that telephone call segments are "pieces or portions of an entire telephone call." The "Summary of the Invention" teaches that a telephone call is comprised of telephone call segments. (*See* `570 patent, col. 3:14-23; `345 patent, col. 3:16-26.) The specification further defines a segment as a "piece" of a "complete call." (`570 patent, col. 30:52-55; col. 55:54-57; `345 patent, col.30:45-48; col.58:61-64.) NICE construction incorporates the plural nature of the claim term, uses the definition of segment set forth in the specification and makes clear that each of the "telephone call segments" are bounded by telephony events.

Accordingly, the Court should adopt NICE's proposed construction.

---

[6]    NICE's construction of the term "telephone call segments" is different in the parties' Joint Claim Construction Chart. NICE proposes this particular construction as a compromise in order to narrow the issues before the Court.

**"data representation of a lifetime of the telephone call" (`570 patent: claims 6, 7)**

| NICE's Construction | Witness's Construction |
| --- | --- |
| Data (e.g., voice information and/or metadata) representing an entire telephone call. | *Call-centric data* record of the telephone call that includes a *detailed* cumulative start-to-finish history of a telephone call, including *all* telephony events and participants. *The data representation represents only the telephone call, is not event-centric, and is not constructed on a 1-to-1 basis for the events during the total lifetime of a call.* |

NICE construes the phrase "data representation of a lifetime of the telephone call" to mean "data (e.g., voice information and/or metadata) representing an entire telephone call." The claims require that "a data representation of a lifetime of the telephone call" be constructed "using data regarding telephony events associated with the telephone call segments of the telephone call." Thus, a data representation of a lifetime of the telephone call, as conveyed by NICE's construction, is a compilation of data representing a telephone call.[7] Witness's overly complex and ambiguous construction, on the other hand, impermissibly seeks to import the preferred embodiment's management of recording in a "call-centric (rather than event-centric) fashion" into the claims. (*See* col. 8:5-11; 30:16-23; *see also* discussion above for claim term "telephone call.")

The plural form of "data representation of a lifetime of the telephone call" used in the text of claims 14 and 40 of the `345 patent is also in dispute. For the same reasons

---

[7]    NICE construes the term "data representation" to mean "digital representation of data" while Witness construes it to mean a "data structure that represents an object as a single identifiable entity." As shown above, the "data representation" is a representation of various pieces of data digitally stored in a computer system which could be, for example, graphically displayed. Thus, to the extent this term requires construction by the Court, it should be construed to mean "digital representation of data."

discussed above, NICE construes the claim phrase "data representation**s** of lifetime**s** of telephone call**s**" in a manner consistent with its singular form, to mean "for each telephone call, data (e.g., voice information and/or metadata) representing an entire telephone call."

Accordingly, the Court should adopt NICE's proposed constructions of both "data representation of a lifetime of the telephone call" and "data representations of lifetimes of telephone calls."

**"constructing a data representation of a lifetime of the telephone call using data regarding telephony events associated with the telephone call segments of the telephone call" (`570 patent: claims 6, 7)**

| NICE's Construction | Witness's Construction |
|---|---|
| NICE has provided constructions for "data representation of a lifetime of the telephone call," "telephony events," "telephone call segments" and "telephone call." The remaining words have a plain meaning that is clear and do not require further construction. | Using data regarding telephony events to associate telephone call segments of a telephone call to form a data representation of the lifetime of the telephone call, *and not using an identifier or key to form the data representation*. |

The claim phrase "constructing a data representation of a lifetime of the telephone call using data regarding telephony events associated with the telephone call segments of the telephone call" does not require construction. Once the Court construes the claim terms "data representation of a lifetime of the telephone call," "telephony events" and "telephone call segments," the remaining words have a plain meaning that is clear and do not require further construction.

An examination of Witness's proposed construction supports NICE's position. Witness has simply rearranged words used in the claim phrase and improperly inserted a limitation to preclude the use of "an identifier or key" to form a data representation of a lifetime of a telephone call. As shown above during the discussion of the claim term

"telephony event," the claims, specification and prosecution history do not support a construction for "data regarding a telephony event" which excludes "an identifier or key."

Accordingly, the claim phrase "constructing a data representation of a lifetime of the telephone call using data regarding telephony events associated with the telephone call segments of the telephone call" does not require construction.

**"real-time link" (`570 patent: claim 7)**

| NICE's Construction | Witness's Construction |
|---|---|
| A data link providing data regarding telephony events during the call at the occurrence of each telephony event.[8] | Data link that provides data *defining* events during the call and *with* occurrence of the events. |

NICE construes the term "real-time link" to mean "a data link providing data regarding telephony events during the call at the occurrence of each telephony event," while Witness construes it to mean a "data link that provides data defining events during the call and with occurrence of the event." The "data regarding telephony events" is computer telephony integration ("CTI") data. (col. 1:34-54.) The "Background of the Invention" discloses a "real-time CTI link" as a source of information related to telephone calls. (*See* col. 2:66-col. 3:3.) It further teaches that the "CTI data link" "supplies . . . information about telephone calls . . . such as: telephone number of the parties involved in the call, Caller ID (CLID) or Automatic Number Identification (ANI); Dialed Number Identification Service (DNIS); or the Agent ID Number of the Customer Service Representative." (col. 1:34-54.) Moreover, the specification is replete with

---

[8]     NICE's construction of the term "real-time link" is different in the parties' Joint Claim Construction Chart. NICE proposes this particular construction as a compromise in order to narrow the issues before the Court.

statements that information sent over the "real-time link" is CTI data. (*See e.g.*, col. 5:58-59; col. 6:51-52; col. 8:52-53, 59; col. 11:15-20; col. 20:17; col. 22:16; col. 24:45-col. 25:28.)  Thus, there is no support in the claim or specification to limit the data sent over the real-time link to "data defining events."

The specification is also clear that the real time-link provides CTI data during the call at the occurrence of a telephony event.  For example, when explaining how to selectively record participants in a telephone call, the specification teaches that "[i]f the telephone switch environment reports events in real-time, recording of media can be prevented by turning the recording input channel off during the selective record participants' time of involvement." (col. 50:37-40.)  In order to prevent the recording of a particular telephone call segment, the "real-time link" must provide information that a participant entered the telephone call at the occurrence of the telephony event in order to ensure the call is not recorded.

Accordingly, the Court should adopt NICE's proposed construction.

**"wherein said data representations are constructed using data regarding telephony events associated with telephone call segments"[9]** (`345 patent: claim 14)

| NICE's Construction | Witness's Construction |
|---|---|
| NICE has provided constructions for "data representation," "telephony events," and "telephone call segments." The remaining words have a plain meaning that is clear and do not require further construction. | Using data regarding telephony events to associate two or more segments of a telephone call to form a data representation of the lifetime of the telephone call, *and not using identifiers or keys to form the data representations*. |

---

[9]     The phrase "wherein each data representation of a telephone call is constructed using data regarding telephony events associated with telephone call segments of the telephone call" in claim 40 of the `345 patent is also in dispute.  For the reasons set forth in this section, the court should not construe this claim phrase.

32

The `345 patent's claim phrase "wherein said data representations are constructed using data regarding telephony events associated with telephone call segments" does not require construction. Once the Court construes the claim terms "data representation of a lifetime of the telephone call," "telephony events" and "telephone call segments," the remaining words have a plain meaning that is clear and do not require further construction.

For the same reasons set forth on p. 30-31, Witness's construction of the claim phrase "wherein said data representations are constructed using data regarding telephony events associated with telephone call segments" suffers from the same defects as its construction of the claim phrase "constructing a data representation of a lifetime of the telephone call using data regarding telephony events associated with the telephone call segments of the telephone call." (*See supra* at p. 30-31). Additionally, the claim phrase at issue includes the language "said data representations" which refers to "data representation_s_ of lifetime_s_ of telephone call_s_." Witness's construction ignores the plural nature of the claim phrase as its construction relates to a single telephone call as opposed to more than one telephone call -- a requirement of claims 14 and 40 of the `345 patent.

Accordingly, the Court should reject Witness's construction and find that the claim phrase "wherein said data representations are constructed using data regarding telephony events associated with telephone call segments" does not require construction.

## G.    The `370 Patent

### 1.    Technical Background

Like the `570 and `345 patents, the `370 patent is generally related to computer-aided data monitoring and recording of telephone calls and particularly to a method for collecting and storing data related to a telephone call from multiple sources so as to

33

facilitate monitoring, recording and playing back of complete telephone calls. The data related to a specific telephone call is associated with a "master call record" that allows a call to be replayed in its proper sequence regardless of how the data is actually stored.

### 2.   The Parties' Proposed Constructions

**"call record" (claims 1, 27)**

| NICE's Construction | Witness's Construction |
|---|---|
| Data regarding telephony events for one or more segments of a telephone call. | *Call-centric data* record of a telephone call that includes a *detailed* cumulative history of a telephone call, including *all* telephony events and participants. *Each call record represents only a single call, is not event-centric, and is not constructed on a 1-to-1 basis for the events during the total lifetime of a call.* |

NICE construes the term "call record" to mean "data regarding telephony events for one or more segments of a telephone call" while Witness construes it to have the same meaning as its construction of the term "data representation of the lifetime of a call." The claims define a "call record" as being "updated . . . based on the received telephony event data." (*See* claim 1, step (d).) The specification further teaches that a call record is data regarding telephony events which occur in one or more segments of a telephone call. (*See* col. 7:9-25.)

The requirement imposed by Witness's construction that a "call record" contain all telephony events is flatly contradicted by both the claims and the specification. The claims teach that a call record is constructed and then updated after the occurrence of a related telephony event. Likewise, the specification teaches that a call record may be "updated after every event during the call." (*See* col. 7:21-24.) Therefore, a call record

34

may not, at all times, include *all* data regarding telephony events related to a particular call, as required by Witness's construction.

Just as with the claim term "telephone call" and claim phrase "data representation of a lifetime of the telephone call," Witness impermissibly seeks to import the preferred embodiment's management of recording in a "call-centric (rather than event-centric) fashion" into the claims. (*See* col. 8:14-19; col. 32:51:57.)

Accordingly, the Court should adopt NICE's proposed construction.

**"master call record" (claims 1, 27)**

| NICE's Construction | Witness's Construction |
| --- | --- |
| A record containing information about the location of all telephone call segments of an entire telephone call. | *Call-centric data record* of a telephone call that includes (a) data matching the call with the segments that make up the call; (b) data indicating the location of a recording for each segment; and (c) a *detailed* cumulative start-to-finish history of the telephone call, including all telephony events and participants. *Each master call record represents only a single call, in non event-centric, and is not constructed on a 1-to-1 bases for the events during the total lifetime of a call.* |

The parties are in agreement that a master call record is at least a record containing data or information about the location of all telephone call segments of an entire telephone call. Consistent with the parties' understanding, the claims require that the master call record contain "data indicating the location of recorded audio data for the segment of the call." The issue before the Court is whether the master call record must be a "call-centric data record." The claims, specification and prosecution history of the `370 patent do not require a master call record be "call-centric." The preferred embodiment, rather, is a call-centric system. (*See* col. 8:14-19; col. 32:51:57.) The Court

should reject Witness's improper attempt to import the limitations of the preferred embodiment into the claim term "master call record."

Accordingly, the Court should adopt NICE's proposed construction.

**"segment" (claims 1, 27)**

| NICE's Construction | Witness's Construction |
|---|---|
| The claim term "segment" is used in the claims and specification in the phrase "segment of the call." This claim term has a plain meaning that is clear and does not require further construction. | The term "segment" is indefinite; it can either be a telephone call segment or an audio data segment.<br><br>In the alternative, a segment is a portion of a phone call that is bounded by telephony events. |

Claim 1 of the '370 patent is "a method for constructing and maintaining data representations of lifetimes of telephone calls comprising one or segments." It is clear that the term "segment" as used in the preamble of claims 1 and 27 refers to a segment of a telephone call. The term "segment" is not indefinite as Witness argues.

The term "segment" also does not need to be construed by the Court. The specification defines it in a manner consistent with its plain meaning. Specifically, it defines "segment" to mean a "piece." (*See* col. 33:20-23.) Accordingly, the term "segment" does not require construction.

Witness alternatively construes the term "segment" to mean "a portion of a phone call that is bounded by telephony events," which is the same construction it proposes for the claim term "telephone call segments." *See* p. 28. To the extent the Court construes "segment" to be a "telephony call segment", the Court should adopt the singular form of NICE's construction of the term "telephone call segments" for the reasons set forth at p. 28.

**"matching a received telephony event with a constructed call record" (claim 1)**

| NICE's Construction | Witness's Construction |
|---|---|
| NICE has provided constructions for "telephony event" and "call record." The remaining words have a plain meaning that is clear and do not require further construction. | Performing a calculation to resolve an ambiguity between the received telephony event and the constructed call record. |

The claim phrase "matching a received telephony event with a constructed call record" does not require construction. Once the Court construes the claim terms "telephony event" and "call record," the remaining words have a plain meaning that is clear and do not require further construction.

Witness's construction of the claim phrase "matching a received telephony event with a constructed call record" is an attempt to have the Court restrict claim 1 of the `370 patent to one method of matching a telephony event to a call record set forth in the specification in connection with one embodiment of the invention. As a matter of law, Witness's construction should be rejected as it improperly limits the claimed method to the implementation of an embodiment. *See Conoco, Inc. v. Energy & Envtl. Int'l, L.C.,* 460 F.3d 1349, 1357-58 (Fed. Cir. 2006) (A court "cannot draw limitations into the claim from a preferred embodiment").

Accordingly, the claim phrase "matching a received telephony event with a constructed call record" does not require construction.

**"matching said one or more received telephony events with said call record" (claim 27)**

| NICE's Construction | Witness's Construction |
|---|---|
| NICE has provided constructions for "telephony event" and "call record." The remaining words have a plain meaning that is clear and do not require further construction. | Performing a calculation to resolve an ambiguity between the received telephony event and the constructed call record. |

Witness's construction of the claim phrase "matching said one or more received telephony events with said call record" in claim 27 of the `370 patent is the same as its proposed construction of the claim phrase "matching a received telephony event with a constructed call record" in claim 1 of the `370 patent. For the same reasons expressed above on p. 37, the Court should also reject Witness's construction of the claim phrase "matching said one or more received telephony events with said call record."

Accordingly, the claim phrase "matching said one or more received telephony events with said call record" does not require construction.

**"combining the updated call record with data indicating the location of recorded audio data for the segment of the call" (claim 1)**

| NICE's Construction | Witness's Construction |
|---|---|
| NICE has provided constructions for "segment" and "call record." The remaining words have a plain meaning that is clear and do not require further construction. | *Storing data* indicating the location of recorded audio data for the segment of the call in the updated call record, where the updated call record does not have data indicating the location of the recorded audio data for the segment of the call. |

The claim phrase "combining the updated call record with data indicating the location of recorded audio data for the segment of the call" does not require construction. Once the Court construes the claim terms "segment" and "call record," the remaining words have a plain meaning that is clear and do not require further construction.

38

Witness's construction is nonsensical, as it first requires the storage of "data indicating the location of recorded audio data for the segment of the call in the updated call record," and then disclaims this very requirement by stating "where the updated call record does not have data indicting the location of the recorded audio data for the segment of the call."

Focusing on the requirement of Witness's construction that the data containing the location of audio data is stored in an updated "call record," it becomes apparent that Witness's construction should be rejected. Claim 1 of the `370 patent does not require that a call record store the location of audio data. Instead, it merely states that an updated call record is combined with an indication of the location of recorded audio. The claims and specification are clear that only data regarding telephony events are stored in a call record. (*See* claim 1; col. 7:21-24.)

Accordingly, the claim phrase "combining the updated call record with data indicating the location of recorded audio data for the segment of the call" does not require construction.

**"combining said updated call record with data indicating one or more locations of recorded audio data for two or more segments of the call" (claim 27)**

| NICE's Construction | Witness's Construction |
|---|---|
| NICE has provided constructions for "segment" and "call record." The remaining words have a plain meaning that is clear and do not require further construction. | ***Storing data*** indicating one or more locations of recorded audio data for two or more segments of the call in an updated call record, where the updated call record does not have data indicating one or more locations of the recorded audio data for two or more segments of the call. |

Witness's construction of the claim phrase "combining said updated call record with data indicating one or more locations of recorded audio data for two or more segments of the call" in claim 27 of the `370 patent is substantially the same as its

39

proposed construction of the claim phrase "combining the updated call record with data

indicating the location of recorded audio data for the segment of the call" in claim 1 of

the '370 patent. For the same reasons expressed above on p. 38-39, the Court should also

reject Witness's construction of the claim phrase "combining said updated call record

with data indicating one or more locations of recorded audio data for two or more

segments of the call."

Accordingly, the claim phrase "combining said updated call record with data

indicating one or more locations of recorded audio data for two or more segments of the

call" does not require construction.

**"telephone call" (claims 1, 27)**

| NICE's Construction | Witness's Construction |
|---|---|
| "Telephone calls" has a plain meaning that is clear and does not require further construction. | Entire conversation with an entity from a caller's perspective, including transfers and conferences. |

For the same reasons set forth in section F, the Court should adopt NICE's

proposed construction. (*See supra* p. 26).

**"telephony events" (claims 1, 27)**

| NICE's Construction | Witness's Construction |
|---|---|
| Actions or occurrences detected by a computer program and that are related to what happens to a phone call (such as the initiation of the call, the addition or removal of callers, the transfer of the phone call, or the termination of the call). | Actions or occurrences detected by a computer program and that are related to what happens to a phone call (such as the initiation of the call, the addition or removal of callers, the transfer of the phone call, or the termination of the call)*, and are not identifying numbers. Agent-entered information is not data regarding telephone events.* |

For the same reasons set forth in section F, the Court should adopt NICE's

proposed construction. (*See supra* p. 27-28).

065251.1001

### H.    The `738 Patent

#### 1.    Technical Background

The `738 patent generally is directed to a modular digital voice processing system where voice processing functions are performed by processors running software.  The voice processing system generally includes a host computer that communicates with a voice processing card.  The voice processing card includes two processors: a digital signal processor and an application processor.  The voice processing card communicates with at least one audio card.  The audio card includes an audio processor and communicates with communication lines, such as a telephone.

#### 2.    The Parties' Proposed Constructions

**"digital signal processor" (claim 1)**

| NICE's Construction | Witness's Construction |
|---|---|
| A specialized processor that processes digital data. | A special purpose processor that performs *low-level functions on voice signals*. |

NICE's construction is supported by the plain meaning of the claim term "digital signal processor," which is a processor that processes digital signals or data.  This plain meaning is underscored by the patent specification, which states:

> ***Data is then received by a signal processor 36 [the digital signal processor] where processing*** such as speech compression and expansion, call programming, automatic gain control, dual tone multi-frequency extraction, and voice activated operations ***takes place***.  (col. 4:24-28) (emphasis added).

In other words, "data" is "received by a signal processor where" "processing takes place."  The data referred to is digital data.

Witness's construction is wrong for two reasons.  First, it improperly attempts to read into the claim a limitation that the type of processes performed by the processor are

41

"low-level functions" (an ambiguous technical term not used in the specification).

Second, it improperly limits the type of data processed by the processor to "voice

signals" rather than digital signals.  Limiting the data to "voice signals" is directly

contradicted by the specification.  The specification states that the processor performs

"dual tone multi-frequency extraction" ("DTMF") (col. 4:24-28.)  DTMF are the signals

generated by pressing the buttons on a telephone (e.g., Touchtone).  Importantly, DTMF

signals are not voice signals.  Accordingly, the Court should adopt NICE's proposed

construction.

**"application processor" (claim 1)**

| NICE's Construction | Witness's Construction |
|---|---|
| A processor that processes applications.[10] | A processor that *implements high level* applications of the system. |

NICE's construction is supported by the plain meaning of the term and the patent

specification.  The "application processor" by its own terms is a processor.  The claims

and specification show that the application processor performs application processing on

information from the digital signal processor:

- The voice processing circuit board performs . . . . application processing. (col. 1:52-55.)

- The application processors 38a, 38b run the application processing and database management.  Each application processor 38a, 38b is in communication with and controls a pair of signal processors [the digital signal processors] . . . .  (col. 2:51-55.)

- The application processor 38 performs high level application such as dictation, transcription, voice mail,

---

[10]  NICE's construction of the term "application processor" is different in the parties' Joint Claim Construction Chart.  NICE proposes this particular construction as a compromise in order to narrow the issues before the Court.

DB02:5971725.1                                                                065251.1001

> voice response, medical records, and the like.  (col. 4:28-30.)
>
> • application processing means . . . for performing application processing on the processed digital voice data.  (claim 8(g).)

The above-quoted language shows that the "application processor" performs application processing.

Witness's construction is wrong for two reasons.  First, Witness inappropriately interjects the term "implements" into its construction.  By its plain language and the above-quoted specification language, an application processor processes, performs, or runs, application processing: interjection of "implements" is unsupported.

Second, Witness inappropriately adds the limitation "high level" before "application".  The above-quoted specification language from the patent shows several instances where the  application processor runs or performs application processing, yet in only one instance does the patent refer to "high level" application.  That single use of "high level" does not justify adding the limitation "high level."  Accordingly, the Court should adopt NICE's proposed construction.

**"audio processor" (claim 1)**

| NICE's Construction | Witness's Construction |
|---|---|
| A processor that processes audio signals. | A device that receives from the interface a digitized, impedance balanced, optimized signal. |

NICE's construction is supported by the plain meaning of "audio processor," which is a processor that processes audio signals or data.  This  plain meaning is underscored by the patent specification, which states: "A digital signal will be sent to the audio processor 48 which is a fast acting signal processing chip."  (col. 4:6-8.)  The "digital signal" referred to is a digitized version of an analog telephone signal.  (*See, e.g.*,

43

col. 4:3-6.) In other words, the audio processor is a processing chip, or processor, that processes audio signals. Witness's construction is wrong because it inappropriately limits the signals received by the processor to "a digitized, impedance balanced, optimized signal." Accordingly, the Court should adopt NICE's proposed construction.

## I.    The `005 Patent

### 1.    Technical Background

The `005 patent generally is directed to a modular digital logger that records audio from multiple audio sources, for example, from multiple telephones. As summarized in the patent, "[t]he digital logger of this invention has a basic unit that comprises four primary components, an audio card that monitors audio sources (such as telephones), a main card that processes audio, a host computer that controls the overall operation and memory." (col. 1:33-38.) The logger includes an electrical circuit that converts the analog voice signals received from the telephone to a digital signal. The logger also has an electrical circuit that compresses the digital signal; for example, the signal can be compressed from 64,000 bits per second down to 13,000 bits per second. (col. 3:25-28.) The logger stores the compressed data on a digital audio tape, or DAT.

### 2.    The Parties' Proposed Constructions

**"circuit modules . . . for converting" (claims 1, 11)**

| NICE's Construction | Witness's Construction |
|---|---|
| A packaged assembly of electronic components that converts analog voice signals to digital voice signals. | A ***means for*** converting analog voice signals to digital voice signals. |

NICE's and Witness's dispute with respect to the "circuit modules" claim element boils down to whether the element is a means-plus-function limitation. The element is a structural element and is not a means-plus-function element. First, the claim does not

44

recite the word "means," and the absence of the word "means" ***creates a "strong"***

***presumption*** that 35 U.S.C. 112, paragraph 6 does not apply. *Lighting World, Inc. v.*

*Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) ("Our cases make clear,

however, that the presumption flowing from the absence of the term 'means' is a ***strong***

***one*** that is not readily overcome") (emphasis added).

Second, the claim recites structure for converting analog voice signals to digital

voice signals. The claim uses the word "circuit" which communicates structure to a

person skilled in the art, that is, an assembly of electronic components. *See, e.g.,*

*Harmonic Design Inc. v. Hunter Douglas, Inc.*, 88 F. Supp. 2d 1102, 1105 (C.D. Cal.

2000) ("[I]t appears that the ordinary meaning of the word 'circuit' connotes sufficiently

definite structure to avoid application of [35 U.S.C.] § 112,¶ 6"); *Nilssen v. Magnetek,*

*Inc.,* 1999 U.S. Dist. LEXIS 16718, at *26 (N.D. Ill. Oct. 22, 1999) (Exhibit B) ("[T]he

fact that the claim specifies the precise location of the circuit, in addition to the fact that

the term 'circuit' has a commonly known meaning in the art, are enough to show that the

claim is not in means-plus-function format"); *Cellnet Data Sys., Inc. v. Itron, Inc.*, 17 F.

Supp. 2d 1100, 1107 (N.D. Cal. 1998) ("[T]he Court finds that those skilled in the art

would understand the term 'circuit means' as a structural rather than a means-plus-

function element"); *Database Excelleration Sys., Inc. v. Imperial Tech., Inc.*, 48 U.S.P.Q.

2d (BNA) 1533, 1537 (N.D. Cal. 1998)("The term 'circuit' alone indicates sufficient

structure to avoid application of section 112, paragraph 6").

The claim also recites other structural aspects of the circuit for converting analog

voice signal: the claim states that the circuit includes "at least two terminals," is "in [a]

housing" and is connected to a "bus" to communicate with a compression circuit. (Claim

45

1 recites: "a first bus in said housing for providing communication between said circuit module and said compressing circuit").

In view of the absence of the word "means" and the recitation of structure in the claim, the "circuit modules . . . for converting" analog voice signals to digital voice signals is not a means-plus-function element. Accordingly, the Court should adopt NICE's proposed construction.

**"analog voice signals" (claims 1, 11)**

| NICE's Construction | Witness's Construction |
|---|---|
| An electrical wave used to convey voice information. | Plain meaning. |

NICE's construction is based on the plain technical meaning of the term "analog voice signal." The patent specification explains that "[t]he system 10 can monitor a number of different types of audio devices, including a private branch exchange (PBX) 38 to which a plurality of telephones 40a and 40b are connected. Other audio sources include radio, central office lines, microphones, speakers and the like." (col. 2:48-54.) The audio sources generate the analog voice signals in the form of electrical waves. The electrical waves convey the voice information. NICE's construction provides an understandable explanation of the technical term "analog voice signals" for the jury. On the other hand, Witness's "plain meaning" does not. Accordingly, the Court should adopt NICE's proposed construction.

**"a circuit . . . for compressing" (claim 1)**

| NICE's Construction | Witness's Construction |
|---|---|
| An assembly of electronic components that compresses digital voice signals. | A *means for* compressing that is separate from the *means for* converting analog voice signals to digital voice signals and contained within the same housing. |

46

NICE's and Witness's dispute with respect to "a circuit . . . for compressing" the digital voice signals claim element boils down to whether the element is a means-plus-function limitation. The element is a structural element and is not a means-plus-function element. First, the claim does not recite the word "means" and is thereby strongly presumed not to be a means-plus-function element. *Lighting World, Inc.*, 382 F.3d at 1358 ("Our cases make clear, however, that the presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome").

Second, the claim recites structure for compressing the digital voice signals. As discussed above, the claim uses the word "circuit" which communicates structure to a person skilled in the art, that is, an assembly of electronic components. *See, e.g., Harmonic Design Inc.*, 88 F. Supp. 2d at 1105; *Nilssen*, 1999 U.S. Dist. LEXIS 16718 at *26; *Cellnet Data Sys., Inc.*, 17 F. Supp. 2d at 1107; *Database Excelleration Sys., Inc.*, 48 U.S.P.Q. 2d (BNA) at 1537.

The claim also recites other structural aspects of the circuit: the circuit is "in [a] housing" and is connected to a multiplexer circuit ("a multiplexer circuit in said housing for providing communication between said compressing circuit and said first bus").

In view of the absence of the word "means" and the recitation of structure in the claim, the "a circuit . . . for compressing" element is not a means-plus-function element. Accordingly, the Court should adopt NICE's proposed construction.

47

**"digital audio tape (DAT)" (claims 1, 11)**

| NICE's Construction | Witness's Construction |
|---|---|
| A tape used to store digital data. | A *magnetic* tape *designed* for storage of audio in digital form. |

NICE's construction is based on the plain meaning of the term "digital audio tape (DAT)" and is the same construction of digital audio tape as that which NICE proposed for the same term in the `371 patent at p. 5-6. Witness's construction is wrong because Witness seeks to read in limitations that are not supported by the claim language or the specification. There is no support in the specification specifying that the tape must be "magnetic" or "designed" to store audio. Accordingly, the Court should adopt NICE's proposed construction.

**"a circuit . . . for converting" analog voice signals to and from digital voice signals" (claims 1, 11)**

| NICE's Construction | Witness's Construction |
|---|---|
| An assembly of electronic components that converts (i) analog voice signals to digital voice signals and (ii) digital voice signals to analog voice signals. | A *means for* converting analog voice signals to digital voice signals and contained within the same housing. |

NICE's and Witness's dispute with respect to the claim 11 element "a circuit . . . for converting" analog voice signals to and from digital voice signals boils down to whether the element is a means-plus-function limitation. The element is a structural element and is not a means-plus-function element. The claim does not recite the word "means," creating a strong presumption that it is not a means-plus-function element. *Lighting World, Inc.*, 382 F.3d at 1358 ("Our cases make clear, however, that the presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome"). As discussed above, the claim uses the word "circuit" which communicates structure to a person skilled in the art, that is, an assembly of electronic components. *See, e.g., Harmonic Design Inc.*, 88 F. Supp. 2d at 1105; *Nilssen*, 1999 U.S.

48

Dist. LEXIS 16718 at *26; *Cellnet Data Sys., Inc.*, 17 F. Supp. 2d at 1107; *Database Excelleration Sys., Inc..*, 48 U.S.P.Q. 2d (BNA) at 1537. The claim also recites other structural aspects of the circuit: the circuit is "in [a] housing" and includes "two terminals" for receiving analog voice signals.

In view of the absence of the word "means" and the recitation of structure in the claim, the "a circuit . . . for compressing" element is not a means-plus-function element. Accordingly, the Court should adopt NICE's proposed construction.

49

## CONCLUSION

For the foregoing reasons, NICE's claim construction positions should be adopted in all respects.

Dated: May 11, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Melanie K. Sharp (No. 2501)
Karen E. Keller (No. 4489)
Mary F. Dugan (No. 4704)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

P.O. Box 391
Wilmington, DE 19899
(302)571-6681
msharp@ycst.com

KAYE SCHOLER LLP
Scott G. Lindvall
Joseph M. Drayton
425 Park Avenue
New York, NY 10022
(212)836-8000

*Attorneys for Plaintiffs Nice Systems, Inc. and Nice Systems, Ltd.*

50

## CERTIFICATE OF SERVICE

I, Mary F. Dugan, Esquire, hereby certify that on May 11, 2007, I caused to be electronically filed a true and correct copy of the foregoing document PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

>        William J. Marsden, Jr., Esquire
>        Kyle Wagner Compton, Esquire
>        Fish & Richardson, P.C.
>        919 North Market Street, Suite 1100
>        P.O. Box 1114
>        Wilmington, DE  19899-1114

I further certify that on May 11, 2007, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

>        **BY E-MAIL**
>        Noah C. Graubart (graubart@fr.com)
>        Nagendra Setty (setty@fr.com)
>        Daniel A. Kent (kent@fr.com)
>        Christopher O. Green (green@fr.com)
>        Fish & Richardson, P.C.
>        1180 Peachtree Street, NE
>        21st Floor
>        Atlanta, GA  30309

>        Mary F. Dugan (No. 4704)
>        YOUNG CONAWAY STARGATT & TAYLOR, LLP
>        The Brandywine Building, 17th Floor
>        1000 West Street
>        Wilmington, DE  19801
>
>        P.O. Box 391
>        Wilmington, Delaware  19899-0391
>        (302) 571-5028
>        mdugan@ycst.com

# EXHIBIT A

LEXSEE 2007 U.S. APP. LEXIS 8375

**ACUMED LLC, Plaintiff-Appellee, v. STRYKER CORPORATION, STRYKER SALES CORPORATION, STRYKER ORTHOPAEDICS, and HOWMEDICA OS-TEONICS CORPORATION, Defendants-Appellants.**

**2006-1260, 2006-1437**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**2007 U.S. App. LEXIS 8375**

**April 12, 2007, Decided**

**PRIOR HISTORY:** [*1] Appealed from: United States District Court for the District of Oregon. Judge Anna J. Brown. Acumed LLC v. Stryker Corp., 2006 U.S. Dist. LEXIS 88070 (D. Or., Sept. 12, 2006).

**DISPOSITION:** AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED.

**COUNSEL:** Frederick C. Laney, Niro, Scavone, Haller & Niro, of Chicago, Illinois, argued for plaintiff-appellee. With him on the brief were Paul K. Vickrey, Robert A. Vitale, and Richard B. Megley, Jr.

Gregory J. Vogler, McAndrews, Held & Malloy, Ltd., of Chicago, Illinois, argued for defendants-appellants. With him on the brief was Sharon A. Hwang.

**JUDGES:** Before GAJARSA, LINN, and MOORE, Circuit Judges. Opinion for the court filed by Circuit Judge GAJARSA. Dissenting opinion filed by Circuit Judge MOORE.

**OPINION BY:** GAJARSA

**OPINION:** GAJARSA, Circuit Judge.

This patent infringement case deals with orthopedic devices for the treatment of fractures to the upper arm. Defendants Stryker Corp., Stryker Sales Corp., Stryker Orthopaedics, and Howmedica Osteonics Corp. (collectively, "Stryker") appeal from the final judgment of the United States District Court for the District of Oregon, following a jury trial, finding Stryker liable to plaintiff Acumed LLC ("Acumed") for willful infringement of U.S. Patent No. 5,472,444 ("the '444 patent"). We affirm the [*2] district court's findings of infringement and willfulness, but vacate the permanent injunction issued against Stryker and remand for reconsideration in light of

the Supreme Court's decision in eBay Inc. v. MercExchange, LLC, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006).

**I. BACKGROUND**

A. The Technology and Patent

Acumed is the assignee of the '444 patent, which is directed to an orthopedic nail for the treatment of fractures in the humerus (the upper arm bone which ends in the shoulder ball at top and the elbow joint at the bottom). In the most common form of fracture to this bone, the patient falls on top of his or her arm, breaking the shoulder ball (the "humeral cortex") off from the longer part of the bone (the "humeral shaft"). Sometimes the humeral cortex itself breaks into two or three pieces as well. See '444 patent col.1 ll.17-27. Orthopedic surgeons use nails like the one disclosed in the patent to treat this type of fracture by excavating a hole through the humeral cortex and down the humeral shaft, inserting the nail into the hole, then fixing it in place using bone screws that pass through holes in the nail. This procedure secures [*3] the bone pieces of the cortex to each other and to the shaft.

Claim 1 of the '444 patent contains every limitation disputed on appeal by the parties. It reads:

> An elongated tapered nail for securing fractures of the proximal humerus comprising:
>
> an elongated body having a curved shank configured to occupy an upper portion of the proximal humeral shaft, and a contiguous butt portion extending proximally from the shank and configured to occupy the humeral cortex;

the butt portion being shorter than the shank and defining a plurality of at least three transverse holes, each defining a hole axis, with the three hole axes angularly offset from each other, such that the holes may receive fasteners attached to fragments of the humeral cortex.

'444 patent col.5 ll.44-50 (disputed terms emphasized).

B. Stryker's Dealings with Opinion Counsel

On August 28, 2002, Stryker's German patent attorney, Edo Graalfs, wrote a letter to his American counterpart, Raymond W. Augustin, regarding the humeral nail Stryker was in the process of developing. Graalfs expressed concern that the Stryker nail might infringe the '444 patent:

> [T]he independent [*4] claim 1 of this US patent has a relatively brought [sic, "broad"] scope of protection . . . . I advised that the nail must not be provided with a curvature as this is a feature of independent claim 1. Now it turned out that for business reasons it would be a requirement to also use a curved shank. I expressed my doubts . . . that it could be possible to find a structure not covered by the mentioned US patent.

Augustin then placed a memorandum to file dated December 13, 2002, in which he echoed Graalfs' concerns:

> [T]he Stryker Trauma humeral nail would have each and every element of claim 1 . . . of the '444 patent. . . . [I]t is our opinion that there is no strong invalidity argument which could be used against all the '444 issued claims based on the prior art known at this time. . . . In conclusion, it is our opinion that a curved version of the Stryker Trauma humeral nail . . . should not be marketed in the United States.

Testimony at trial indicated that the Stryker nail eventually sold in the United States did not differ in any relevant respect from the design specifications reviewed by Graalfs and Augustin in writing these letters.

After his [*5] initial memorandum to file, Augustin drafted a formal opinion of counsel letter and transmitted it to Stryker on November 19, 2003. This opinion letter was longer and more detailed than the earlier memo to file. In it, Augustin concluded -- using claim construction arguments basically identical to those made by Stryker during this litigation -- that the Stryker nail would not infringe any claim of the '444 patent either literally or by equivalents. He also expressed a belief that Claim 1 of the '444 patent was invalid due to anticipation by an earlier Stryker product. n1

> n1 Stryker does not pursue any invalidity arguments in this appeal.

At trial, Acumed presented evidence tending to show that Stryker did not seriously rely upon the later opinion letter from Augustin. For instance, Stryker filed with the FDA its application for the accused device on August 14, 2003, some months before Augustin transmitted the favorable opinion letter. Gregory Plakson, Stryker's Director of Intellectual Property, testified at his deposition that he did not understand portions of the opinion letter and did not ask Augustin anything about the opinion. Acumed also presented evidence [*6] tending to show copying by Stryker, including that a Stryker consultant "confiscated" from an operating room a how-to chart detailing the assembly and insertion of Acumed's product.

C. Litigation background

Stryker began to sell its accused humeral nail in the United States in early 2004. In April 2004, Acumed filed suit against Stryker in the District of Oregon, alleging infringement of Claims 1, 3-5, 10, 11, and 14-17 of the '444 patent. Following a Markman hearing, the district court construed the disputed terms. It defined "curved shank" as "a shank that has a bend or deviation from a straight line without sharp corners or sharp angles" and "transverse holes" as "holes across the butt portion of the nail." It also found that

> the term "angularly offset from each other" means the axes of the three holes are spaced apart from each other, an angle is formed by the axes of any two such holes when viewed in two dimensions from the butt end or from the side, and the axes are not aligned in a parallel orientation.

Acumed LLC v. Stryker Corp, No. 04-CV-513-BR (D. Or. Oct. 14, 2004) ("Order on Claim Construction"). The case proceeded to jury trial [*7] on infringement, willfulness, and invalidity. The jury found that the asserted claims were valid, that Stryker's product literally infringed those claims, and that Stryker's infringement was willful. The district court denied Stryker's motion for judgment notwithstanding the verdict and awarded Acumed enhanced damages for willful infringement, increasing the damages found by the jury by fifty percent. It permanently enjoined Stryker from selling the accused device in the United States.

Stryker appeals the jury verdict of infringement and willfulness and the district court's grant of injunctive relief. This court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## II. DISCUSSION

### A. Standard of review

A finding of patent infringement requires a two-step process: first, the court determines the meaning of the disputed claim terms, then the accused device is compared to the claims as construed to determine infringement. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd, 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996). We review the construction step de novo. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed. Cir. 1998) [*8] (en banc). When reviewing a district court's denial of a motion for judgment as a matter of law, we review the jury's factfinding on the infringement step for support by substantial evidence. Id. at 1454. Whether infringement is willful is a factual question that must be proven by clear and convincing evidence. Comark Communs. v. Harris Corp., 156 F.3d 1182, 1190 (Fed. Cir. 1998). To reverse a willfulness verdict, an infringer must show that there is not "substantial evidence to support the jury's finding of willfulness by clear and convincing evidence." Id.

### B. Claim Construction and Infringement

#### 1. "Curved shank"

The main dispute between the parties on construction relates to the claim requirement of a "curved shank," construed by the district court to mean a shank that "has a bend or deviation from a straight line without sharp corners or sharp angles." Stryker challenges that interpretation, arguing that the better reading of the term is "a nonangular continuous bend."

When construing claims, a court must begin by "look[ing] to the words of the claims themselves . . . to define the scope of the patented invention." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) [*9]

(en banc) (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The task of comprehending those words is not always a difficult one. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Id. "[C]urved," as it is used in the '444 patent, is not a "term[] that ha[s] a particular meaning in a field of art." Id. Its ordinary meaning encompasses "curvature" made up of small discontinuities. Consider, for instance, an archway made from rectangular bricks. The bricks are at angles with respect to each other, but the overall effect is to describe an arc. It would be unreasonable to say that such an archway is not "curved." If the word "curved" is given its ordinary, lay meaning, the district court's construction is correct.

Stryker argues that "curved" is implicitly assigned a different, narrower meaning by virtue of the context in which it appears. See [*10] id. at 1316 ("[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs."). That argument is based on a particular manner of implanting the nail disclosed and touted by the written description. The '444 patent's Summary of the Invention section states that "[t]he curved tapered shape of the present invention permits it to be inserted into a cavity formed by a broach tool having the same shape as the nail." '444 patent col.1 ll.49-51. A broach tool is "essentially a rasp having the same profile as the hole it is intended to form." Id. col.3 ll.27-28. The patent teaches that broaching is advantageous, since, inter alia, it "generally causes less tissue damage than a rotating drill bit or reamer." Id. col.3 ll.32-33. However, "[b]roaching is only suitable for certain shapes of holes and objects" -- in particular, it is useful only for an object that "largely pass[es] through its own envelope." Id. col.3 ll.37-40. "Objects with angled bends or small radius curves (relative to the object length) do not pass through their own envelope [*11] on insertion, and are not well suited to insertion into a broached hole." Id. col.3 ll.45-48.

Stryker's argument is essentially an assertion that since the patent says broaching is desirable, the term "curved" must be construed to cover only embodiments whose curvature allows them to be inserted into a broached hole, excluding "angled bends or small radius curves." That assertion is flawed: it is an attempt to import a feature from a preferred embodiment into the claims. See Phillips, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against con-

fining the claims to those embodiments."). Neither use with a broaching tool nor suitability for such use is claimed. Indeed, the application which led to the '444 patent originally included claims to the method of implanting the nail with a broaching tool, but the patentee elected to withdraw those claims from the application after the Examiner noted they were directed to a separate, distinct invention.

The fact that usability with a broaching tool is merely a feature of a preferred embodiment provides sufficient grounds for refusing [*12] to read "curved" narrowly. We also note, though, that the patent's Claim 13 (not asserted by Acumed in this case) covers "[t]he nail of claim 1 having a profile that substantially passes within its own envelope." '444 patent col.6 ll.26-27. "[T]he presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim." Liebel-Flarsheim Co v. Medrad, Inc., 358 F.3d 898, 910 (Fed. Cir. 2004); see also Wenger Mfg., Inc. v. Coating Mach. Sys., Inc., 239 F.3d 1225, 1234 (Fed. Cir. 2001); Comark, 156 F.3d at 1187; Tandon Corp. v. U.S. Int'l Trade Comm'n, 831 F.2d 1017, 1023 (Fed. Cir. 1987). "That presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." Sunrace Roots Enter. Co. v. SRAM Corp., 336 F.3d 1298, 1303 (Fed. Cir. 2003); see also Ecolab Inc. v. Paraclipse, Inc., 285 F.3d 1362, 1375-76 (Fed. Cir. 2002); [*13] Wenger Mfg., 239 F.3d at 1233 ("Claim differentiation . . . is clearly applicable when there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, and that limitation is the only meaningful difference between the two claims."). If we were to give "curved" in Claim 1 the meaning which Stryker advances, Claim 1 would cover only nails that "substantially pass[] within [their] own envelope[s]." Such a restrictive reading would render Claims 1 and 13 identical in scope. Since independent claims are presumed to have broader scope than their dependents, the presumption is that Claim 1 should not be limited in the manner Stryker urges. For the reasons discussed above, that presumption has not been rebutted.

Stryker also argues that the district court's exclusion of "sharp corners or sharp angles" renders the construction insufficiently definite, since the court did not specify precisely how "sharp" is too sharp. However, a sound claim construction need not always purge every shred of ambiguity. The resolution of some line-drawing problems -- especially easy ones like this one -- is properly left to the trier of fact. [*14] See PPG Indus. v. Guardian Indus. Corp., 156 F.3d 1351, 1355 (Fed. Cir. 1998)

("[A]fter the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact."); Modine Mfg. Co. v. U.S. Int'l Trade Comm'n, 75 F.3d 1545, 1554 (Fed. Cir. 1996) (whether claim limitation requiring diameter of "about 0.040 inch" embodied held a matter of "technologic fact"); see also Abbott Labs. v. Baxter Pharm. Prods., Inc., 471 F.3d 1363, 1368 (Fed. Cir. 2006) (where result is the same under any reasonable construction, "we need not construe [the disputed] phrase with numerical exactitude."). Here, the accused product has a rounded-off six-degree angle in its shaft. A reasonable jury could have found that in the context of this sort of nail, a rounded bend of six degrees was not a "sharp angle." The jury's conclusion is bolstered by the testimony of Stryker's own technical expert, who noted in reference to the Stryker nail that "there's no sharp [*15] angle there." There may be some area of imprecision within the district court's "without sharp angles" construction, but this accused product is in no danger of falling within that area. The construction is correct, and the jury's finding that the Stryker nail possesses a "curved shank" is supported by substantial evidence.

2. "Transverse holes"

The district court defined "transverse holes" as "holes across the butt portion of the nail." Stryker argues that this claim term should be limited to holes that are perpendicular to the nail shaft, excluding from the claim scope holes that are tilted so that one end of the hole is vertically offset from the other end. Again, this argument is an improper attempt to read a feature of the preferred embodiment into the claims as a limitation.

Stryker's argument for a narrow reading of "transverse" stems from the fact that "[e]very description of the transverse holes in the '444 patent contemplates a perpendicular hole." This is a correct characterization of the patent: every figure which illustrates the holes shows them going perpendicularly through the shaft, and the written description characterizes the holes in Figure 2 as "perpendicular [*16] to the portion of the nail axis at the butt portion 14 of the nail." '444 patent col.2 ll.58-59. However, Figure 2 and the text characterizing it simply discloses a single, preferred embodiment of the invention. "[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." Phillips, 415 F.3d at 1323; see also Comark, 156 F.3d at 1186-87.

The plain meaning of Claim 1 covers more than the particular embodiment shown in the figures. While the

disclosed embodiment possesses "perpendicular" holes, the claim language covers all "transverse" holes -- a word that does not necessarily imply right angles. Moreover, the patentees' description of their preferred embodiment itself implies a difference between the words "perpendicular" and "transverse." The written description states that Figure 2 "illustrates a plurality of transverse holes, each of which is . . . perpendicular to the portion of the nail axis at the butt portion 14 of the nail." '444 patent col.2 ll.56-59. This implies that a "transverse" hole need not be "perpendicular" -- if it were, the [*17] patentee would not have needed to clarify that these holes, in addition to being transverse, were perpendicular to the nail axis. Just as in Phillips, where the asserted claim mentioned "steel baffles" and hence "strongly implie[d] that the term 'baffles' does not inherently mean objects made of steel," 415 F.3d at 1314, this usage of language is strong evidence that the patentee considered "transverse" and "perpendicular" to have distinctly different meanings.

The intrinsic evidence of the specification therefore suggests that the patentees knew how to restrict their claim coverage to holes passing through at right angles. They could have used the word "perpendicular," as they did in discussing their preferred embodiment. Instead, they chose a different term that implies a broader scope. The intrinsic evidence does not indicate that one of skill in the art would believe the patentees meant "perpendicular" when they said "transverse." There is very little indication that the patentees considered perpendicularlity important to their invention. The patentees tout the virtue of their preferred hole orientation only once, noting that "[t]he predictability of fracture [*18] modes makes the orientation of holes in the illustrated embodiment suitable in most cases." '444 patent col.4 ll.65-67 (emphasis added). Far from demonstrating that "the patentee[s] . . . intend[ed] for the claims and the embodiments in the specification to be strictly coextensive" with respect to this limitation, Phillips, 415 F.3d at 1323, this statement admits that the disclosed perpendicular hole orientation may not always be ideal. See '444 patent col.5 ll.2-4 (suggesting that, if holes are not "ideally situated, the surgeon may slightly rotate the nail to achieve a more favorable alignment"). Nowhere in the specification or the prosecution history do the patentees criticize or distinguish tilted, non-perpendicular holes.

The dissent states that the specification language which discloses only perpendicular holes should be determinative of the claim scope. In particular, it points to three instances in the written description where "transverse holes" are described as "perpendicular." Dissent at 3-4 (citing '444 patent col. 2 ll.57-59; col3 ll.1-3; col3 ll.9-11). All three of these instances appear in a textual description of the patent's Figure 2, [*19] indicating that the holes depicted in that figure are perpendicular to the nail axis. Thus, while the dissent emphasizes the fact that there are three references to "perpendicular" holes in the specification, its argument is ultimately premised on characteristics which the patentee has attributed to a single preferred embodiment. In the context of this patent, such an argument must be contradicted by "our repeated statements that limitations from the specification are not to be read into the claims." Comark, 156 F.3d at 1186; see also id. at 1187 ("[T]he language that [the defendant] argues should limit claim 1 is clearly found in the . . . patent's description of the preferred embodiment. It is precisely against this type of claim construction that our prior case law counsels.").

By highlighting the specification phrase "each of which is defined" and by describing that phrase as "important[]," Dissent at 5, the dissent appears to suggest that the patentee has in some sense imposed a limiting definition upon the word "transverse." But the use of the word "defined" here does not imply a lexicographic definition, especially not a definition [*20] of "transverse" to mean "perpendicular." Instead, the statement that the holes of the cited embodiment are "defined on . . . an axis" merely introduces the useful abstract concept of a "hole axis," later employed in the claims to describe the orientation of the holes with respect to each other. See '444 patent, Claim 1, col.5 ll.53-54 ("the three hole axes [are] angularly offset from each other . . ."). The claims repeatedly echo this form of usage of the word "define." See, e.g., '444 patent Claim 1, col.5 ll.51-53 ("the butt portion . . . defining a plurality of at least three transverse holes, each defining a hole axis" (emphasis added)); Claim 2, col.5 ll.57-58 ("the curved shank includes a curved portion defining a curved central axis"); Claim 3, col.5 ll.60-61 ("the butt portion defines a central axis"). If the word "define" were always to be an important signifier of limitation, this claim language would indicate that the butt portion has been defined to be transverse holes, that those holes in turn have been defined as hole axes, and that the curved portion and butt portion -- physical parts of the nail -- have each been dubbed identical to an [*21] imaginary central axis. These interpretations are incorrect, but they are the natural consequence of finding a restrictive definition of a term anywhere the word "define" might appear in this patent, regardless of context. The specification does not define "transverse" and "perpendicular" to be coequal in meaning.

The fact that the term "transverse" has a broader scope than "perpendicular" also distinguishes this case from Nystrom v. Trex Co., 424 F.3d 1136 (Fed. Cir. 2005), relied upon by the dissent. See Dissent at 5-6. In Nystrom, "both parties acknowledge[d] the ordinary meaning of 'board' as 'a piece of sawed lumber,'" but the patentee sought to have that claim term "broaden[ed] . . .

to encompass relatively obscure definitions that are not supported by the written description or prosecution history." Id. at 1145. We refused to impose a construction broader than the term's ordinary meaning. Id. at 1145-46. Here, on the contrary, we decline to impose a construction narrower than the term's ordinary meaning.

The dissent cites to other patents whose usage of "transverse" arguably supports its conclusion. Dissent [*22] at 8-9. One of them, U.S. Patent No. 5,697,934, is purely extrinsic evidence and therefore merits little consideration. See Phillips, 415 F.3d at 1317. The other, U.S. Patent No. 4,475,545, is cited by the '444 patent and is part of the intrinsic record. However, it was not "created by the patentee in attempting to explain and obtain the patent." Id. Its usage is not that of this patentee, and so it also merits less weight than the evidence of the patentee's own words. While these patents merit some consideration, the specification and claims of the '444 patent itself should be given significantly greater weight. Id. (noting that prosecution evidence "is less useful for claim construction purposes").

A proper reading of the intrinsic evidence indicates that where the patentees discussed the perpendicular holes of their preferred embodiment, they were not narrowly defining the term "transverse" or otherwise limiting the claims, but merely discharging their statutory duties "to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so." Phillips, 415 F.3d at 1323. That preferred embodiment [*23] cannot be the only product covered by the claims; if it were, the claims themselves would be unnecessary. The district court's construction of "transverse holes" is correct. n2

> n2 Observing that the district court defined "holes" as "openings through the butt portion of the nail" and "transverse" as "being across or set crosswise," the dissent argues that these two definitions imply that "transverse holes" has been construed to mean "openings through across the butt portion of the nail." Dissent at 7. If the district court's definitions of those two words are so concatenated, that is indeed the result. We of course do not propound such a construction. Neither did the district court: after defining "transverse" and "holes," it defined the phrase "transverse holes" as "holes across the butt portion of the nail." Order on Claim Construction at 1. The construction of the disputed phrase as a whole is correct, and that construction is what we affirm today. Our de novo review means that we need not decide whether the logic or subsidiary definitions used by the district court to reach the correct construction were sound. Likewise, de novo review makes the atmospherics of the Markman hearing, see Dissent at 1-3, legally irrelevant here. We review only the district court's finished product, not its process. Furthermore, the dissent's criticism of that process contends that Phillips prohibited the district court from beginning its interpretive inquiry by consulting a dictionary. Dissent at 3 ("In accordance with Phillips, the interpretative inquiry should begin not with a dictionary definition . . . ."). Although in Phillips we rejected an approach in which a broad dictionary definition is adopted and then whittled down only if contradicted by the specification, 415 F.3d at 1321, we did not prohibit the use of dictionaries in claim construction, nor did we define at what point in the claim construction analysis they may be consulted.

[*24]

3. "Angularly offset"

As noted above, the district court interpreted the claim requirement that the hole axes be "angularly offset" to mean that "the axes of the three holes are spaced apart from each other, an angle is formed by the axes of any two such holes when viewed in two dimensions from the butt end or from the side, and the axes are not aligned in a parallel orientation." Neither party challenges this definition on appeal, but Stryker argues that its accused product does not fall within the definition.

Stryker's argument is geometrical in nature. A "hole axis" under the district court's definition is the imaginary line that passes through the center of one of the transverse holes. Stryker correctly points out that the axes thus defined by the accused product form "skew lines" which are neither parallel nor intersecting in three-dimensional space. Since those lines neither form angles nor run parallel with each other, Stryker suggests that its product falls outside the district court's definition. However, this argument ignores an essential part of that definition, which states that "an angle is formed . . . when [the hole axes are] viewed in two dimensions." The [*25] district court's meaning here is clear: the hole axes need not actually intersect. It suffices that the axes appear to intersect in two dimensions. As an example, if the hole axes are sketched on a piece of paper (a two-dimensional view of the nail) and the lines of that drawing intersect, the product drawn meets the district court's definition of "angularly offset." It is totally clear that the hole axes of Stryker's product intersect when drawn on paper, a point well illustrated by Stryker's own diagram in support of its argument on this point:

[SEE DIAGRAM IN ORIGINAL]

This diagram, which represents the accused product, shows intersecting hole axes when viewed in two dimensions. The jury's finding that Stryker's product embodies the "angularly offset" claim limitation is therefore supported by substantial evidence.

### 4. Conclusion

Since the district court's claim construction is correct and there is substantial evidence to support the jury's finding that Stryker's product embodies each claim limitation at issue, the judgment of infringement is affirmed.

### C. Willful Infringement

The jury found Stryker's infringement to be willful, despite the fact that Stryker [*26] admitted into evidence the November 19, 2003 opinion letter from Augustin which concluded that Stryker's product would not infringe. Favorable opinions of counsel normally present a well-grounded defense to willfulness, but the protection they afford is not absolute. "Those cases where willful infringement is found despite the presence of an opinion of counsel generally involve situations where opinion of counsel was either ignored or found to be incompetent." Read Corp. v. Portec, Inc., 970 F.2d 816, 828-29 (Fed. Cir. 1992).

Willfulness is "not an all-or-nothing trait, but one of degree." Comark, 156 F.3d at 1182 (quoting Rite-Hite Corp. v. Kelley Co., 819 F.2d 1120, 1125-26 (Fed. Cir. 1987)). Whether an infringer ignored the opinion of its counsel is, as part of the willfulness inquiry, also a question of degree. Evidence of the extent of that ignorance should be weighed by the factfinder together with the totality of the other circumstances surrounding the infringer's culpability. See Comark, 156 F.3d at 1191 (evaluating opinion of counsel within a totality of the circumstances).

Here, substantial evidence supports [*27] a finding that Stryker ignored the November 2003 opinion letter to an extent sufficient to permit willfulness to be found in these circumstances. Most notable is the fact that two patent attorneys, Graalfs and Augustin, had at first strongly discouraged Stryker from marketing the infringing nail in the United States. Despite that advice, Stryker continued to push towards a United States market entry, filing its FDA application months before it received Augustin's revised legal advice. Additionally, Acumed presented evidence that Stryker copied its product, including that Stryker arranged to "confiscate" a hospital room chart instructing doctors in the use of the Acumed nail.

There is evidence in the record tending against willfulness, such as the Augustin opinion letter itself and the testimony of Stryker's Director of Intellectual Property that he ordered no sales be made in the United States

until after the favorable opinion letter. However, it is for the jury, not this court, to determine the weight and credibility to be given to the evidence. See Comark, 156 F.3d at 1192 (court determining whether to overturn a jury verdict is "not required to assume that the [*28] jury believed all or indeed any . . . exculpatory evidence"). The jury here was free to disbelieve or weigh lightly evidence tending to show Stryker's reliance on the opinion letter and to place that evidence within the overall factual context of the case.

Substantial evidence supports the jury's finding that Stryker's infringement was willful. The judgment of willfulness is therefore affirmed.

### D. Permanent Injunction

In ruling on the plaintiffs' motion for a permanent injunction, the district court applied "the general rule [in patent cases] that an injunction will issue, once infringement and validity have been adjudged . . . unless there are some exceptional circumstances that justify denying injunctive relief." Transcript of Record at 53, Acumed, LLC v. Stryker Corp., No. CV-04-513 (D. Oregon Feb. 22, 2006). The Supreme Court has since struck down that general rule in eBay v. MercExchange, making clear that the traditional four-factor test for injunctions applies to patent cases. 126 S. Ct. at 1840.

Acumed argues that the facts found by the district court can serve as independent support for the injunction, even without application of the [*29] old general rule. This court cannot express a position on that argument. If we were to weigh the evidence ourselves to reach a conclusion on injunctive relief, we would effectively be exercising our own discretion as if we were the first-line court of equity. That role belongs exclusively to the district court. Our task is solely to review the district court's decisions for an abuse of discretion. See eBay, 126 S. Ct. at 1839 ("The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion."). Accordingly, the permanent injunction is vacated. On remand, the district court should reconsider the four-factor test as propounded by the Supreme Court's decision in eBay as to whether or not an injunction should issue.

### III. CONCLUSION

The district court's claim construction and its findings of infringement and willfulness are affirmed. The permanent injunction is vacated and remanded.

AFFIRMED -IN-PART, VACATED-IN-PART, AND REMANDED

No costs.

**DISSENT BY:** Moore

**DISSENT:** MOORE, Circuit Judge, dissenting.

I agree with the majority's holding in all respects save [*30] one. I write separately to voice my disagreement with the majority's holding that the district court properly construed "transverse holes" in claim 1 of the '444 patent to mean "holes across the butt portion of the nail." Because the majority concludes that the district court's claim construction was proper, it affirms the court's finding of literal infringement. From that decision, I respectfully dissent.

At the outset, I note that I am troubled by the district court's clear reliance on a common English language dictionary, which was published ten years after the '444 patent issued to construe the term "transverse holes." During the claim construction hearing, the court explained that the dictionary would be "an aid to our work." The court not only used the dictionary as an "aid," but actually utilized the dictionary definitions as the starting point when defining each of the disputed claim terms. n1 Moreover, the court seemed to disregard the briefs in favor of off-the-cuff attorney argument during claim construction. In fact, when Stryker argued that Acumed's attorneys were changing their claim construction during the course of the hearing, the district court responded: "Let's [*31] not worry about changing. I'm going to keep you all focused right on the task at hand. I don't care what happened before today. I care what's going on here." After hearing arguments from the parties regarding the disputed claim terms and on the appropriateness of the dictionary definitions, the district court resolved each issue orally during the hearing. One week later, the court issued a one-page formal Order on Claim Construction that simply reiterated the court's oral rulings. Acumed LLC v. Stryker Corp., No. 04-cv-513-br (D. Or. Oct. 14, 2004).

> n1 It should be noted that the claim construction hearing in this case occurred before this court's en banc decision in Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005). Thus, the district court may have been following the methodology described in Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193, 1201-02 (Fed. Cir. 2002), which relied heavily on the use of dictionaries to ascertain the plain meaning of a claim term. After our Phillips decision, which clarified that the Texas Digital approach was not appropriate, the plaintiff asked the district court here to reconsider her claim construction, but that request was denied.

[*32]

While I acknowledge that there are not formal requirements for a district court's methodologies when conducting claim construction hearings and issuing related orders, I raise this concern because I believe the district court's methodology led it astray from determining the "meaning that the term ["transverse holes"] would have to a person of ordinary skill in the art . . . in the context of the entire patent, including the specification." Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). When one properly begins this claim construction inquiry with the intrinsic evidence, rather than dictionary definitions, it is evident that the district court's construction of "transverse holes" is in error.

With respect to the claim term "transverse holes," the district court utilized the dictionary to first determine that a "hole" is "an opening through something." The district court then referred to the dictionary and found two definitions for the term "transverse": "(1) acting, lying, or being across: set crosswise; (2) made at right angles to the anterior-posterior axis of the body." The district court concluded that we should construe the claim [*33] term in accordance with the broader of the two dictionary definitions n2 because there is no express disavowal of claim scope in the specification. This approach was specifically rejected by this court sitting en banc in Phillips, 415 F.3d at 1320, and we have continued to reject this approach to claim construction. See On Demand Mach. Corp. v. Ingram Indus., Inc., 442 F.3d 1331, 1340 (Fed. Cir. 2006).

> n2 The court emphasized that the broader definition appeared as the "number one" definition in Webster's dictionary. It should be noted, however, that this order is not indicative of importance or primacy, but merely reflects historical usage. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003) 19a ("Order of Senses").

In accordance with Phillips, the interpretive inquiry should begin not with a dictionary definition, but with the patent itself, to ascertain what an ordinarily skilled artisan reading the patent would understand the claim term to mean. Phillips, 415 F.3d at 1321. The intrinsic evidence provides no support for the broader of the two dictionary definitions set forth above (i.e., that "transverse" [*34] means "acting, lying, or being across; set crosswise"), but fully supports the narrower definition (i.e., that "transverse" means "made at right angles to the anterior-posterior axis of the body"). Each of the eight transverse holes described in the specification are specifically described as being perpendicular. Id. at col.2 ll.57-59 (describing "a plurality of transverse holes, each

of which is defined on a respective axis intersecting the nail axis 22, and perpendicular to the portion of the nail axis at the butt portion 14 of the nail"); col.3 ll.1-3 ("transverse hole 44a is oriented . . . perpendicular to the nail axis 22"); col.3 ll.9-11 ("the distal holes are . . . perpendicular to the butt end portion of the nail axis") (emphases added). The majority suggests that the use of both words "implies a difference between the words 'perpendicular' and 'transverse.'" Maj. Op. at 11. The majority contends that if transverse was meant to be construed as perpendicular, "the patentee would not have needed to clarify that these holes, in addition to being transverse, were perpendicular to the nail axis." Id. I disagree. First, the patentee used the two words to clearly [*35] specify which of the definitions of transverse applied to his invention; the purpose of using the word "perpendicular" was to further describe what the inventor meant by the term "transverse," not to distinguish it as the majority suggests. Second, to say that something is perpendicular also requires mention of a reference plane or line to which the object is located at a right angle. Here, the patent specification limits the discussion of "transverse holes" to holes having an axis perpendicular with respect to the nail axis at the butt portion. '444 patent, col.2 ll.56-59. That was the point of using the word perpendicular in the specification. Thus, by utilizing the word "transverse," the patentee did not need to repeat in the claim that each hole was perpendicular to the nail axis at the butt portion.

The specification describes "three sets of transverse holes." Id. at col.2 l.62. With reference to Figures 1 and 2 of the patent, reproduced below, the first set includes four proximal transverse holes (44a-44d), the second set is one intermediate transverse hole (46), and the third set includes three distal transverse holes (48a-48c). Each of these eight holes is then described [*36] and shown in the accompanying figures as being perpendicular to the nail axis 22. Id. at col.2 l.56-col.3 l.11. Most importantly, the specification states that "a plurality of transverse holes each of which is defined on a respective axis intersecting the nail axis 22, and perpendicular to the portion of the nail axis at the butt portion 14 of the nail." Id. at col.2 ll.56-59 (emphases added). Thus, the specification limits each of the transverse holes by the common characteristic that each has an axis perpendicular to the nail axis at the butt portion.

GET DRAWING SHEET 1 OF 1.

There is not a single non-perpendicular, "transverse" hole shown or described in the patent. Construing "transverse" to include something other than perpendicular -- in spite of the repeated, narrow usage of that term in the specification -- would provide patent coverage that is broader than what the inventor actually invented and disclosed in his specification, which clearly should have

been the starting point for claim construction. Smith v. Snow, 294 U.S. 1, 14, 55 S. Ct. 279, 79 L. Ed. 721, 1935 Dec. Comm'r Pat. 757, (1935) (stating "if the claim were fairly susceptible of two constructions, [*37] that should be adopted which will secure to the patentee his actual invention"). Since Phillips, we have repeatedly rejected the concept of construing claim terms to have meanings broader than the meaning derived from the intrinsic evidence. For example, in Nystrom v. Trex, Co. this court stated:

> [i]n the absence of something in the written description and/or prosecution history to provide explicit or implicit notice to the public -- i.e., those of ordinary skill in the art -- that the inventor intended a disputed term to cover more than the ordinary and customary meaning revealed by the context of the intrinsic record, it is improper to read the term to encompass a broader definition simply because it may be found in a dictionary, treatise, or other extrinsic source.

424 F.3d 1136, 1145 (Fed. Cir. 2005); see also Primos, Inc. v. Hunter's Specialties, Inc., 451 F.3d 841, 845, 847-48 (Fed. Cir. 2006) (affirming district court's claim construction after district court rejected dictionary definition that was broader and inconsistent with the use of the claim term at issue); Old Town Canoe Co. v. Confluence Holdings Corp., 448 F.3d 1309, 1318 (Fed. Cir. 2006) [*38] (patentee is "not entitled to a claim construction divorced from the context of the written description and prosecution history"); Atofina v. Great Lakes Chem. Corp., 441 F.3d 991, 996 (Fed. Cir. 2006) (quoting Free Motion Fitness, Inc. v. Cybex Int'l, Inc., 423 F.3d 1343, 1348-49 (Fed. Cir. 2005) for the proposition that "in those circumstances where reference to dictionaries is appropriate, the [court's] task is to scrutinize the intrinsic evidence in order to determine the most appropriate definition" (emphasis added)); In re Johnston, 435 F.3d 1381, 1384 (Fed. Cir. 2006) (citing Phillips, 415 F.3d at 1303 for the proposition that "[i]t is well established that dictionary definitions must give way to the meaning imparted by the specification"); Network Commerce, Inc. v. Microsoft Corp., 422 F.3d 1353, 1359-60 (Fed. Cir. 2005) (rejecting proposed construction of the term "download component" based on the combination of two dictionary definitions as untenable "in light of the specification").

Patent scope should be coextensive with what the inventor invented as evidenced by what is disclosed [*39] in the patent specification. Netword, LLC v. Cen-

traal Corp., 242 F.3d 1347, 1352 (Fed. Cir. 2001) (stating that the claims should not "enlarge what is patented beyond what the inventor has described as the invention"); Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998) ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."). Thus, where, as here, the intrinsic evidence clearly provides one meaning for the term "transverse," it is inappropriate to give that term a broader interpretation, particularly where the only support for the broader interpretation is extrinsic evidence -- in this case, a dictionary (which supports the narrower construction as well).

Moreover, the district court's interpretation of "hole," which neither party is challenging, makes the majority's interpretation of "transverse" redundant and nonsensical. The court found that the word "'holes' in the phrase 'defining a plurality of at least three transverse holes,' means openings through the butt portion of the nail." [*40] Claim Construction Order, at 1. This makes sense in the context of orthopedic implants, because a hole is necessarily through the part, which in the case of an intramedullary nail is to accept a screw. Here, the majority's definition of "transverse" as "being across" is redundant when read together with the definition of holes. It makes the phrase "transverse holes" mean "openings through across the butt portion of the nail." The majority's claim construction thus impermissibly renders the claim term "transverse" meaningless, a methodology that this court has repeatedly denounced. Merck & Co. v. Teva Pharms. USA, Inc., 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); see also Bicon, Inc. v. Straumann Co., 441 F.3d 945, 950 (Fed. Cir. 2006); Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1307 (Fed. Cir. 2005). Only if "transverse" requires perpendicularity does each claim term have a distinct meaning. n3

> n3 Claim 22, which indirectly depends from independent claim 19, further illustrates this point. Claim 22 recites "a plurality of second securement holes" in the butt portion of the claimed nail. These holes, like the transverse holes in claim 1, are required to go through the butt portion of the nail. But unlike the transverse holes, the securement holes need not be defined by an axis perpendicularly situated with respected to the nail axis at the butt portion.

[*41]

That "transverse" means perpendicular in direction is further supported by other intrinsic evidence, namely, other patent references cited during prosecution of the '444 patent. For example, U.S. Patent No. 4,475,545, entitled "Bone Nail," discloses a pair of holes "passing through the nail in transverse relation to its longitudinal direction and both axes of the said both pairs of holes being located in different planes extending in transverse direction relative to the longitudinal direction of the nail." '545 patent, Abstract. The first hole is defined by the nail entrance 8' and exit 8". The second distal hole is defined by the nail entrance 9' and exit 9". As shown in Figures 4 and 5, both of these holes are perpendicular to the longitudinal axis of the nail at the distal portion. The hole axes are similarly described as being located in a plane "normally extending relative to the longitudinal axis of the nail." '545 patent, col.3. ll.45-46. Thus, the usage of "transverse" in the '545 patent is consistent with the definition requiring perpendicularity.

The narrower definition of transverse is also more consistent with extrinsic evidence that demonstrates how those skilled in [*42] the art would understand the term. First, in another patent application filed within a year of the issue date of the '444 patent, the '444 patent's inventor, Randall Huebner, uses the word "transverse" in a way that clearly denotes perpendicularity in direction. There, as here, Mr. Huebner describes a "transverse hole" extending through a shaft, stating "the head [of the shaft] includes a hole extending therethrough in a direction generally transverse to the axis of the shaft." U.S. Patent No. 5,697,934, col.2 ll.45-46 (filed Dec. 2, 1996); see also id. at col.3 l.66-col.4 l.1 (describing another hole as "formed through head 50 with a central axis 54 generally transverse to elongate axis 38 of shaft 32"). Mr. Huebner's use of transverse in that application clearly shows a directional requirement implicit in the term "transverse" that is not encompassed in the broader definition accepted by the majority. Next, although the district court chose to rely exclusively on a general dictionary that was not contemporaneous with the patent, technical dictionaries, including one highly relevant to the field of orthopedic implants at the time the patent issued, define "transverse" as referring [*43] to a perpendicular direction. Dorland's Medical Dictionary defines transverse as "placed crosswise; situated at right angles to the long axis of a part." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1735 (28th ed. 1994).

Thus, the intrinsic and extrinsic evidence establish that the '444 patent's use of "transverse" is only consistent with the narrower definition rejected by the district court and the majority opinion. The only passage of the specification which the majority relies upon to support its broader interpretation of "transverse holes" is the language "[t]he predictability of fracture modes makes the

orientation of holes in the illustrated embodiment suitable in most cases." The majority suggests that this language "admits that the disclosed perpendicular hole orientation may not always be ideal." Maj. Op. at 12. I respectfully submit that the majority has taken the language out of context and imparted a meaning to it that is not correct. The entire paragraph wherein this sentence is found is discussing Figure 4 and the orientation of the holes relative to each other around the circumference of the nail, not relative to the nail axis at the butt portion 22. That paragraph [*44] focuses on the need to orient the screws "to prevent rotation or axial movement of the nail" and discusses that the screws should be located on "opposite sides of the nail." '444 patent, col.4 ll.61-65. Hence, when the very next sentence of the specification refers to the "orientation of the holes," '444 patent, col.4 ll.65-67, it is doing so in the context of their placement around the nail.

Tellingly, the majority opinion offers no other support -- intrinsic or extrinsic -- for its construction, and in fact, offers no explanation at all for its conclusion that "the claim language covers all 'transverse' holes -- a word that does not necessarily imply right angles." n4 Maj. Op. at 11. What, if not the specification, is the majority using to determine the plain meaning of this term? The district court based its conclusion regarding the plain meaning of transverse on Webster's Dictionary, which it acknowledged supported both the definition across and perpendicular. In the present case, as in Nystrom, I see no reason why we should adopt one, broader, plain meaning of the term "transverse" when there is another plain meaning that is completely consistent with the intrinsic evidence. [*45] When one begins with the patent specification, in my opinion, there is no doubt which of the two meanings of "transverse" is correct.

n4    The majority's observation that "[n]owhere in the specification or the prosecution history do the patentees criticize or distinguish tilted, non-perpendicular holes," Maj. Op. at 12, only underscores the absence of a written description broad enough to support the meaning that they attribute to the claim term "transverse."

The majority attempts to distinguish the Nystrom case as a case in which the patentee "sought to have [the] claim [at issue] 'broaden[ed] . . . to encompass relatively obscure definitions that are not supported by the written description or prosecution history.'" Maj. Op. at 14 (quoting Nystrom, 424 F.3d at 1145). The majority suggests that in Nystrom "[w]e refused to impose a construction broader than the term's ordinary meaning." Maj. Op. at 14. In this case, the Webster's Dictionary which provided the basis for the district court's determination of

the term's ordinary meaning included two definitions for the term transverse (across and perpendicular). Even the [*46] district court acknowledged both definitions. In this case, we must choose between two plain meanings of the word "transverse." As in Nystrom, we should interpret the claim term by reference to the specification and refuse to read the term "transverse" as encompassing meanings unsupported by even a modicum of intrinsic evidence; otherwise we give the patentee more than what was invented and disclosed to the public.

Even if I did not read the intrinsic record to clearly support the narrower of the two plain and ordinary meanings of the term "transverse," I would still be compelled by our precedent to conclude that the narrower meaning applies to this limitation. In Athletic Alternatives, Inc. v. Prince Manufacturing, Inc., this court was presented with a case in which there were two plain and ordinary meanings of a term. 73 F.3d 1573, 1579 (Fed. Cir. 1996). The court was at an impasse after concluding that the specification, the prosecution history and the doctrine of claim differentiation did not provide guidance on what the plain meaning of the claim term at issue was. Id. at 1579-81 (concluding that "the specification is completely silent with [*47] regard to the meaning" of the claim term; that there were "[t]wo strong and contradictory interpretative strands run[ning] through the patent's prosecution history . . . [that] together . . . are irreconcilable;" and that after analyzing claim differentiation "we [were] left with two equally plausible meanings of Claim 1"). Faced with such a conundrum, we resorted to the statutory basis for the claims themselves, 35 U.S.C. § 112, P 2, and concluded that

[w]ere we to allow [the patentee] successfully to assert the broader of the two senses of [the claim term] against Prince, we would undermine the fair notice function of the requirement that the patentee distinctly claim the subject matter disclosed in the patent from which he can exclude others temporarily. Where there is an equal choice between a broader and a narrower meaning of a claim, and there is an enabling disclosure that indicates that the applicant is at least entitled to a claim having the narrower meaning, we consider the notice function of the claim to be best served by the narrower meaning.

Id. at 1581.

Even if the specification was completely silent [*48] on whether the transverse holes had to be perpendicular to the nail axis at the butt portion of the nail -- which, as discussed above, I do not believe it is -- we must, according to our precedent, adopt the narrower of the two plain and ordinary meanings of the word "transverse." Accord Athletic Alternatives, 73 F.3d at 1581. The majority's rejection of Stryker's claim construction position as "an improper attempt to read a feature of the preferred embodiment into the claims as a limitation," fails to identify any language in the specification that demonstrates that the patentee contemplated anything more than transverse holes that are perpendicular to the nail axis at the butt portion. Thus, even adopting the majority's view of the intrinsic record, I cannot agree with their conclusion.

Based on the foregoing, I conclude that the district court's construction of the term "transverse holes" was improper and should be reversed. The term "transverse holes" in claim 1 of the '444 patent should be interpreted as "openings through the butt portion of the nail oriented perpendicularly with respect to the longitudinal axis of the butt portion." Because the uncontested [*49] evidence shows that the alleged infringing products do not literally infringe claim 1 of the '444 patent as properly construed, a remand on that issue would not be necessary. Acumed could, however, argue that Stryker's T2 PHN products infringe claim 1 of the '444 patent under the doctrine of equivalents. n5 Accordingly, I would reverse the judgment of literal infringement and remand for proceedings with respect to infringement under the doctrine of equivalents.

n5 Although Stryker argues that Acumed waived the doctrine of equivalents with respect to this claim element because it did not assert that theory at trial under the court's claim construction, that statement is incorrect. See Exxon Chem. Patents, Inc. v. The Lubrizol Corp., 137 F.3d 1475, 1479 (Fed. Cir. 1998) (determining that plaintiff did not waive equivalents arguments where the court's claim construction made a doctrine of equivalents argument under any other claim construction "moot").

# EXHIBIT B

LEXSEE 1999 U.S. DIST. LEXIS 16718

**OLE K. NILSSEN, Plaintiff and Counterdefendant, vs. MAGNETEK, INC., Defendant and Counterplaintiff.**

**Case No. 98 C 2229**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**1999 U.S. Dist. LEXIS 16718**

**October 22, 1999, Decided**
**October 26, 1999, Docketed**

**DISPOSITION:** [*1] Disputed claim terms construed.

**COUNSEL:** For OLE K NILSSEN, plaintiff: George S. Bosy, Harry J. Roper, John E. Titus, Roper & Quigg, Chicago, IL.

For MAGNETEK, INC., defendant: Brian Douglas Sieve, Robert J. Kopecky, Michael Anthony Parks, Michael John Newman, Kirkland & Ellis, Chicago, IL.

For MAGNETEK, INC., counter-claimant: Brian Douglas Sieve, Robert J. Kopecky, Michael Anthony Parks, Michael John Newman, Kirkland & Ellis, Chicago, IL.

For OLE K NILSSEN, counter-defendant: George S. Bosy, Harry J. Roper, John E. Titus, Roper & Quigg, Chicago, IL.

**JUDGES:** MATTHEW F. KENNELLY, United States District Judge.

**OPINION BY:** MATTHEW F. KENNELLY

**OPINION:**

### MEMORANDUM OPINION AND ORDER

This is a patent infringement case involving seven patents held by plaintiff Ole K. Nilssen: United States Patent Nos. 5,432,409; B1 4,677,345; 4,954,754; 5,039,919; 5,047,690; 5,374,874; and 4,963,795. All of the patents involve technology for electronic ballasts, which are devices used to power fluorescent lamps. Nilssen claims that defendant MagneTek Inc., which manufactures electronic ballasts, has infringed each of the seven patents. MagneTek has counterclaimed for a declaration of non-infringement. [*2]

The case is before the Court for construction of the disputed terms in the claims of certain of Nilssen's patents. The parties have submitted extensive briefs in support of their respective positions. On September 29, 1999, the Court held a claim construction hearing at which both parties made arguments in support of their proposed interpretations of the disputed claim terms. The purpose of this Memorandum Opinion and Order is to set forth the Court's construction of these disputed terms.

### INTRODUCTION

The parties agree what an electronic ballast does and, in general, how one is configured. A ballast converts electrical current into energy that a fluorescent lamp can use to create light. Because a fluorescent lamp requires greater voltage to start than it needs for continued operation, a ballast must provide a high voltage initially to ignite the lamp and then must reduce and maintain the voltage after ignition.

The patents in this case involve electronic ballasts (as contrasted with magnetic ballasts, which use an older technology that is less energy-efficient than that of electronic ballasts). An electronic ballast is powered by a conventional source for alternating current [*3] (AC) and has three basic parts: a rectifier, an inverter, and an output stage. The rectifier converts standard AC voltage, the frequency of which is 60 hertz (Hz) to direct current. The inverter converts the DC voltage to high frequency (30,000 Hz) AC voltage. The output stage takes the high frequency AC voltage and raises it to the level necessary to ignite the lamps.

The claim terms in issue here all concern the inverter and output sections of the ballast. There are several different types of inverters, including three which are pertinent here. A "full bridge" inverter includes four transistors connected together in two parallel circuits,

1999 U.S. Dist. LEXIS 16718, *

each of the parallel circuits including two transistors connected in series. A "half bridge" inverter includes two transistors connected in series. A "push-pull" inverter includes two transistors in parallel circuits. There is much more to an inverter than just the transistors, but these are the significant distinctions that account for the differences in terminology.

The disputed claim terms are the following:

| Patent No. | Claim No. | Disputed claim term |
|---|---|---|
| '874 patent | claim 16 | "inverter means" |
| '919 patent | claim 39 | "inverter means" |
| '409 patent | claim 3 | "inverter-type ballasting circuit" |
| | claim 35 | "inverter circuit" |
| | claim 36 | "inverter circuit" |
| | | "inductor means" |
| | | "output means" |
| '754 patent | claim 8 | "inverter means" |
| | | "circuit means" |
| '690 patent | claim 17 | "circuit means" |

[*4]

In the Discussion section of this opinion, we will set forth the text of the claims containing the disputed terms.

The construction of the claims of a patent is a question of law to be determined by the court. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996). In determining the meaning of the terms of the claims, the court considers "intrinsic" evidence, which consists of the language of the claims, the specification of the patent, and the prosecution history. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc); *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996). If the meaning of the claim terms is not ambiguous and can be determined from the intrinsic evidence, the court may not rely on extrinsic evidence in rendering its claim construction. *Vitronics,* 90 F.3d at 1583.

In this case, the only evidence other than the claims and specifications and the prosecution history that the parties have presented consists of definitions taken from technical dictionaries. The Federal Circuit's cases are not entirely clear [*5] on whether dictionary definitions constitute extrinsic evidence. *Karlin Technology, Inc. v. Surgical Dynamics, Inc.,* 177 F.3d 968, 971 (Fed. Cir. 1999), appears to treat dictionary definitions as intrinsic evidence. n1 On the other hand, *Markman* and several later decisions say unequivocally that such definitions are extrinsic evidence. *E.g., Markman,* 52 F.3d at 980; *Vitronics,* 90 F.3d at 1584; *Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1478 (Fed. Cir. 1998). The distinction may be one without a practical difference. *Vitronics* teaches that dictionary definitions, though extrinsic, "are worthy of special note. Judges are free to

consult such resources at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Vitronics,* 90 F.3d at 1584. This is the sense in which we have used dictionary definitions in this case.

n1 *Antonious v. Spalding & Evenflo Companies, Inc.,* 1999 U.S. App. LEXIS 22984, No. 98-1478, 1999 WL 777450 (Fed. Cir. Aug. 31, 1999), an unpublished decision, cites *Karlin* for the proposition that "dictionary definitions are considered to be intrinsic evidence." *Id.* at *3.

[*6]

## DISCUSSION

### A. '874 Patent, Claim 16 - "inverter means"

Claim 16 of the '874 patent reads as follows:

An arrangement comprising:

rectifier means connected with the AC voltage of an ordinary electric utility power line and operative to provide a unidirectional current to a pair of DC terminals; there existing a DC voltage across the DC terminals; the instantaneous absolute magnitude of the DC voltage being substantially equal to the larger of: (i) the instantaneous absolute magnitude of the

AC voltage, and (ii) a substantially constant absolute magnitude that is lower than the peak absolute magnitude of the AC voltage; the rectifier means including at least two energy-storing capacitors; the two energy-storing capacitors being: (i) during a part of each half-cycle of the AC voltage, charged in series by current supplied from the DC terminals; and (ii) during another part of each half-cycle of the AC voltage, discharged in parallel by supplying current to the DC terminals;

**inverter means** connected with the DC terminals and operative to provide a high-frequency voltage at an inverter output; the high-frequency voltage being of frequency substantially higher [*7] than that of the AC voltage and having a first amplitude-modulation; the first amplitude-modulation being characterized by having a first crest-factor; and

lamp means having lamp terminals.

U.S. Patent No. 5,373,874, Claim 16 (emphasis added). This claim does not describe any particular type of inverter. However, the specification of the '874 patent describes in detail the preferred embodiment of the patent, which includes a half-bridge inverter. MagneTek argues that claim 16 should be construed as limited to such an inverter.

The resolution of this issue turns mainly on whether the term "inverter means" as used in claim 16 is stated in means-plus-function form. This terminology comes from 35 U.S.C. § 112, P6, which reads:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

Under § 112, P6, were we to conclude that the claim language were indeed in means-plus-function [*8] form, then we would have to construe the term "inverter means" as covering only the particular type of inverter set forth in the specification, as well as any equivalent

thereof. *See, e.g., Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1536 (Fed. Cir. 1991).

"The word 'means' is 'part of the classic template for functional claim elements.'" *Rodime PLC v. Seagate Technology, Inc.,* 174 F.3d 1294, 1302 (Fed. Cir. 1999) (quoting *Sage Products, Inc. v. Devon Industries, Inc.,* 126 F.3d 1420, 1427 (Fed. Cir. 1997)). If the applicant uses the word "means" in his claim, then it is presumed that he intended to invoke § 112, P6. *Id.* There are at least two ways in which this presumption can be rebutted. First, if a claim element uses the word "means" but does not recite a corresponding function, § 112, P6 is not invoked. *Id.* Second, if the element recites "sufficient structure or material for performing that function," § 112, P6 does not apply. *Id.; see also, e.g., Personalized Media Communications, LLC v. International Trade Commission,* 161 F.3d 696, 704 (Fed. Cir. 1998) ("In deciding whether the presumption has [*9] been rebutted, the focus remains on whether the claim as properly construed recites sufficiently definite structure to avoid the ambit of § 112, P6"); *Sage Products,* 126 F.3d at 1427-28 ("Where a claim recites a function, but then goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function, the claim is not in means-plus-function format.").

There is no question that "inverter" is a term that describes a type of structure. The parties essentially agree what an inverter is, generically speaking: it is an electrical device that converts DC voltage to AC voltage. *See* D. Fink & H. Beaty, *Standard Handbook for Electrical Engineers* at 22-105 (13th ed. 1993); *Academic Press Dictionary of Science and Technology* at 1138 (definition of "static inverter"). The issue is whether this is enough to remove the claim language from the scope of § 112, P6.

When the purportedly "structural" language really just describes what the device does -- that is, when it "merely serves to further specify the function of the means" -- § 112, P6 may still apply. *See, e.g., Personalized Media,* 161 F.3d at 704; [*10] *Unidynamics Corp. v. Automatic Products International, Ltd.,* 157 F.3d 1311, 1319 (Fed. Cir. 1998); *Laitram,* 939 F.2d at 1536. Illustrative is *Signtech USA, Ltd. v. Vutek, Inc.,* 174 F.3d 1352 (Fed. Cir. 1999), in which the court held that the phrase "ink delivery means" did not recite sufficient structure to prevent application of P6, "because 'ink delivery' is purely functional language." *Id.* at 1356. MagneTek does not argue, and we do not believe, that "inverter" is "functional language" in this sense -- even though the function of an inverter is to "invert" electrical current. Rather, the term is well known in the art to be descriptive of a type of electrical device. As the Federal Circuit stated in holding that the term "detent mechanism" was not merely functional, "many devices take

their names from the functions they perform. The examples are innumerable, such as 'filter,' 'brake,' 'clamp,' 'screwdriver,' or 'lock.' ... What is important is not simply that a 'detent' or 'detent mechanism' is defined in terms of what it does, but that the term, as the name for structure, has a reasonably well understood meaning [*11] in the art." *Greenberg v. Ethicon Endo-Surgery, Inc.,* 91 F.3d 1580, 1583 (Fed. Cir. 1996). The same is true of the term "inverter" as used here.

It is true, as MagneTek argues, that there is more than one type of inverter, and that the claim here does not say anything about what particular form the inverter is to take. MagneTek contends that the claim thus does not recite "sufficient structure to perform entirely the recited function" and that the use of the term "inverter" alone is not enough to avoid the application of § 112, P6. *See Sage Products,* 126 F.3d at 1427-28 ("Where a claim recites a function, but then goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function, the claim is not in means-plus-function format."). However, the fact that the term "inverter" does not connote a *precise* physical structure in the minds of those skilled in the art does not mean that insufficient structure has been stated. *Personalized Media,* 161 F.3d at 705. As was the case in *Personalized Media,* which concerned the use of the term "detector," even though the term "inverter" [*12] may not specifically evoke a particular structure, it does convey to one who is knowledgeable in the art a variety of structures that are known as "inverters." That being the case, the term "inverter" is a sufficiently definite structural term to preclude the application of § 112, P6; the fact that it may not evoke a *particular* structure is of no moment. *See Personalized Media,* 161 F.3d at 705. We conclude for these reasons that the claim element is not stated in means-plus-function format.

MagneTek argues that even if the Court declines to read "inverter means" as a means-plus-function element, we should nonetheless construe the claim as limited to a half-bridge inverter, because that is the type of inverter described in the specification. It relies on, among other decisions, *Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1478 (Fed. Cir. 1998), in which the court stated that where the specification defines a term, there is no need to search for a further meaning. In this case, however, the specification does not contain a definition - - it does not define the term "inverter" in any way other than its ordinary meaning. Rather, it [*13] describes a specific type of inverter as part of the preferred embodiment of the patent. The law is clear that limitations found in the specifications are not to be imported into the claims, *Rodime,* 174 F.3d at 1303; *Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1186 (Fed. Cir. 1998), yet that is precisely what MagneTek is asking

us to do. As in *Comark,* rather than looking at the specification to ascertain the claims' meaning, MagneTek is asking us to look at the specification to limit the claim to the particular structure disclosed in the preferred embodiment. While the line between these two concepts may be a fine one, *see Comark,* 156 F.3d at 1186, it is one that we will not traverse in this case.

In sum, we conclude that as used in claim 16 of the '874 patent, the term "inverter means" has its commonly understood meaning, that is, an electrical device that converts DC voltage to AC voltage. We recognize that this is a broad reading of the claim, one that may perhaps be too broad to be upheld against a claim of invalidity as this case progresses. MagneTek has not, however, argued that the possibility of invalidity [*14] should lead us to construe the claim language narrowly, and we do not intend to address arguments the parties have not made. n2 The only issue along those lines raised by MagneTek is that this claim and others, if construed as Nilssen proposes, raise issues of "enablement" under 35 U.S.C. § 112, P1, which reads:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is more nearly connected, to make and use the same ...

In arguing that the claims (as construed by Nilssen) do not comport with the requirement of "enablement," MagneTek has misread § 112, P1: the statutory provision on its face applies only to the specification of the patent, not to the claims. In short, we reject MagneTek's "enablement" argument.

> n2 In addition, it is not clear where such an analysis would lead in this case. *See generally Rhine v. Casio, Inc.,* 183 F.3d 1342, 1345 (Fed. Cir. 1999) (claims are to be construed to sustain their validity; but a court cannot rewrite a claim to preserve its validity). Without argument by either party on the subject, we are not willing to travel down that road.

[*15]

## B. '919 Patent, Claim 39 - "inverter means"

Claim 39 of the '919 patent reads as follows:

An arrangement comprising:

a DC voltage provided at a set of DC terminals; and

**inverter means** connected with the DC terminals and being operative to provide an AC voltage at an AC output; the inverter means having a first transistor means and a second transistor means; the first transistor means being operative to switch periodically between a first ON-state and a first OFF-state; the second transistor means being operative to switch periodically between a second ON-state and a second OFF-state; the first ON-state occurring only at times when the second transistor means is in its OFF-state; and second ON-state occurring only at times when the first transistor means is in its OFF-state; the inverter means having control means operative to permit control of the duration of the first ON-state without significantly affecting the duration of the second ON-state.

U.S. Patent No. 5,039,919, Claim 39 (emphasis added).

MagneTek argues, again, that the term "inverter means" is in means-plus-function form, without describing any specific structure sufficient to perform [*16] the function in question, and that the claim must be limited to a half-bridge inverter, as that is the type described in the specification of the '919 patent. We reject these arguments for the same reasons discussed with regard to the '874 patent. Indeed, the claim at issue here includes even more recital of structure than did claim 16 of the '874 patent. For these reasons, the term "inverter means," as used in claim 39, has the meaning that is commonly understood in the art, that is, an electrical device that converts DC voltage to AC voltage.

**C. '409 Patent**

**1. Claim 3 - "inverter-type ballasting circuit"**

Claim 3 of the '409 patent describes:

An arrangement comprising:

an AC source functional to supply an AC power line voltage at a pair of AC power line terminals;

rectifying and filtering means connected with the AC power line terminals and functional to provide a DC supply voltage at a pair of DC supply terminals; a gas discharge lamp having lamp terminals; and

**an inverter-type ballasting circuit** having DC input terminals connected with the DC supply terminals and AC output terminals connected with the lamp terminals; **the inverter-type ballasting** [*17] **circuit** being functional to power the gas discharge lamp and being otherwise characterized by: (i) having a first transistor with a first transistor terminal connected with a second transistor terminal of a second transistor; and (ii) causing a substantially sinusoidal AC voltage to exist between the first transistor terminal and one of the DC input terminals; the frequency of the substantially sinusoidal AC voltage being several times higher than that of the AC power line voltage.

U.S. Patent No. 5,432,409, Claim 3 (emphasis added).

For the reasons discussed with regard to the '874 and '919 patents, we conclude that the term "inverter" as used in this claim has its ordinary meaning, that is, an electrical device that converts DC voltage to AC voltage. Claim 3 also includes other language describing the type of inverter that is contemplated, and these will serve to further define the scope of the claim, but there is no basis to read into the term "inverter" itself any limitations from the specification.

**2. Claims 35 & 36 - "inverter circuit"**

Claim 35 of the '409 patent describes:

An arrangement comprising:

a source operative to provide, between a first [*18] and a second DC terminal, a DC voltage of substantially constant magnitude;

**an inverter circuit** connected with the DC terminals and functional to provide an inverter AC voltage between a reference terminal and an inverter output terminal; the inverter AC voltage being of frequency several times higher than 60 Hz and otherwise characterized in having a

waveshape consisting of sinusoidally-shaped voltage pulses of alternating polarity; the inverter circuit including a tuned L-C circuit connected in circuit with the inverter output terminal and the reference terminal; the L-C circuit having a tank capacitor parallel-connected with a tank inductor and being resonant at or near the frequency of the inverter AC voltage; the inverter circuit being further characterized in that it includes two alternatingly conducting transistors series-connected between two auxiliary terminals between which exists a unidirectional voltage consisting of sinusoidally-shaped unidirectional voltage pulses, and having an average magnitude substantially equal to that of the DC voltage.

U.S. Patent No. 5,432,409, Claim 35 (emphasis added).

Claim 36 of the '409 patent describes:

An arrangement [*19] comprising:

a source providing, between a first and a second DC supply terminal, a constant-magnitude DC supply voltage;

**an inverter circuit** having a pair of AC output terminals as well as a first and a second DC input terminal;

**inductor means** having a first winding and a second winding; the first winding being connected between the first DC supply terminal and the first DC input terminal; the second winding being connected between the second DC supply terminal and the second DC input terminal; and

**output means** connected with the AC output terminals; the output means having lamp output terminals adapted to connect with a gas discharge lamp.

U.S. Patent No. 5,432,409, Claim 36 (emphasis added).

Claims 35 and 36 each use the phrase "inverter circuit." Making essentially the same arguments as they did concerning the patent claims discussed earlier, Nilssen argues that the term should be read in accordance with

the commonly understood definition of the term "inverter," while MagneTek argues that the term should be read as limited to full bridge inverters, the type of inverter described in the specification of the '409 patent.

MagneTek's primary [*20] argument is that the prosecution history of the '409 patent includes an admission by Nilssen that the patent language is in means plus function form. While Nilssen did make such a statement in prosecuting patent application number 06/787,692, that was not the application that led to the '409 patent. Nor was it a predecessor application of the one that led to the '409 patent. A chart introduced by Nilssen at the Markman hearing, the accuracy of which MagneTek has not contested, reveals that application number 06/787,692 may be best described as a cousin, once or twice removed, of the application that led to the '409 patent. We have attached the chart to this opinion as Appendix A for illustrative purposes. Our conclusion is that Nilssen's statement in prosecuting this separate patent application provides no support for MagneTek's position here.

We also conclude that claims 35 and 36 are not within the scope of § 112, P6. As was the case with the patents previously discussed, these claims recite structure sufficient to take them out of the means-plus-function arena. This is particularly true of claim 35, which describes a number of the specific components of the inverter.

MagneTek [*21] also argues, as it did with the '874 and '919 patents, that because the specification of the '409 patent describes a full bridge inverter, we should construe the claims as limited to that particular type. We reject this argument for the same reasons previously discussed.

In sum, as used in claims 35 and 36, the term inverter means an electrical device that converts DC voltage to AC voltage.

### 3. Claim 36 - "inductor means"

MagneTek does not contend that the term "inductor means" in claim 36 is in means-plus-function format but nonetheless argues that it must be construed as limited, as indicated in the specification of the '409 patent, to inductors that provide a total inductance large enough to keep the current flowing from the DC source into the inverter substantially constant. We reject this argument. As it did with regard to the term "inverter means," to accept MagneTek's argument would require us to ignore the Federal Circuit's "repeated statements that limitations from the specification are not to be read into the claims." *Comark,* 156 F.3d at 1186. We construe the term "inductor means" in claim 36 in accordance with its well known meaning to persons skilled [*22] in the art, that is, as

1999 U.S. Dist. LEXIS 16718, *

denoting a coil of wire wound on magnetic material. *See* D. Fink & H. Beaty, *Standard Handbook for Electrical Engineers* at 2-10 (13th ed. 1993).

#### 4. Claim 36 - "output means"

The term "output means" does not present any issue regarding the application of § 112, P6, for the claim element does not include any language describing the function of the output means. Absent such language, § 112, P6 does not apply. *See, e.g., Rodime,* 174 F.3d at 1302; *York Products, Inc. v. Central Tractor Farm & Family Center,* 99 F.3d 1568, 1574 (Fed. Cir. 1996) ("Without an identified function, the term 'means' in this claim cannot invoke 35 U.S.C. § 112, P6.")

MagneTek again asks the Court to import into the claim limitations that are found in the specification: it contends that "output means" should be construed as denoting an output circuit consisting of a capacitor connected between one AC input terminal of the inverter and the lamp. For the reasons we have previously discussed, we conclude that it is not proper to read this limitation into the claim. The term "output means" is sufficiently clear on its [*23] face and in the context of the claim. We construe it as defined in exactly the way it is described in the claim: as consisting of a means connected with the AC output terminals, having lamp output terminals adapted to connect with a gas discharge lamp.

#### D. '754 Patent, Claim 8

Claim 8 of the '754 patent describes:

An arrangement comprising:

**inverter means** connected with a source of DC voltage and operative to provide an inverter voltage at an inverter output; the inverter voltage having a frequency; **the inverter means** having a control input and being operative to control this frequency in response to a control signal received at the control output;

gas discharge lamp means having lamp terminals across which there exists a lamp voltage; the gas discharge lamp being characterized by requiring the lamp voltage to be of a relatively large magnitude for effective lamp ignition and to be of a relatively low magnitude for effecting proper lamp operation; a lamp current flowing through the gas discharge lamp means;

**circuit means** connected with the inverter output and operative to supply, from the inverter voltage, the lamp voltage and current [*24] to the lamp terminals; and

sensor means connected in circuit between the gas discharge lamp means and the control input; the sensor means being responsive only to the magnitude of the lamp current and operative to provide the control signal in response to this magnitude;

thereby to cause the frequency to change in response to a change in the magnitude of the lamp current.

U.S. Patent No. 4,954,754, Claim 8 (emphasis added).

#### 1. "Inverter means"

With regard to the term "inverter means," the parties have made the same arguments as those they made with regard to the use of this term in the '874 and '919 patents. We reject MagneTek's arguments for the reasons previously discussed and construe the term "inverter means" as denoting an electrical device that converts DC voltage to AC voltage.

#### 2. "Circuit means"

The "circuit means" element of the claim is stated in means-plus-function form; it uses the term "means" and describes the function that the means is to perform. MagneTek argues that this requires this claim element to be limited to the particular type of circuit described in the specification, namely a circuit with a tank capacitor and leakage reactance [*25] transformer, as well as the equivalents thereof. Nilssen argues that the term "circuit" by itself recites sufficient structure to avoid the application of § 112, P6. MagneTek essentially argues that the term is far too generic to remove the claim language from § 112, P6.

In *CellNet Data Systems, Inc. v. Itron, Inc.,* 17 F. Supp. 2d 1100 (N.D. Cal. 1998), the court was required to construe the term "circuit means" in the context of a patent for a utility meter of the type used by electric companies. Specifically, the parties disputed the meaning of a claim element described as a "circuit means for recording energy use." *Id.* at 1106. The court concluded that this could not be considered a "means plus function" element, because those skilled in the art would understand the term "circuit means" as a structural element denoting "the combination of a number of electrical devices and conductors that, when connected together to form a conducting path, fulfill a desired function ...." *Id.*

at 1107 (quoting *Penguin Dictionary of Electronics* (2d ed. 1988)).

The only significant difference between *CellNet* and this case is that there [*26] the specification did not describe any particular sort of circuitry, whereas here it does. *See id.* at 1107. The distinction is immaterial. In this case as in *CellNet*, the question is whether the claim recites sufficient structure to avoid the application of § 112, P6. And in this case as in *CellNet*, the fact that the claim specifies the precise location of the circuit, in addition to the fact that the term "circuit" has a commonly known meaning in the art, are enough to show that the claim is not in means-plus-function format. *Id.* We construe the term "circuit means" as denoting the combination of a number of electrical devices and conductors that, when connected together to form a conducting path, fulfill a desired function -- in this instance, the function of supplying lamp voltage and current from the inverter to the lamp terminals.

### E. '690 Patent, Claim 17 - "circuit means"

Claim 17 of the '690 patent reads as follows:

An arrangement comprising:

power input terminals across which is provided an ordinary AC power line voltage;

rectifier means connected with the power input terminals and operative to provide a DC voltage at [*27] a set of DC terminals;

gas discharge lamp having a pair of lamp terminals as well as a pair of thermionic cathodes; such lamp terminal being connected with one of the thermionic cathodes; each thermionic cathode having a pair of cathode terminals;

inverter means connected with the DC terminals and operative to provide an alternating inverter output voltage at a set of inverter output terminals; and

**circuit means** connected between the inverter output terminals and the lamp ter-

minals, thereby to provide lamp operating voltage to the lamp terminals; the circuit means having a pair of auxiliary output terminals at which is provided a cathode heating voltage; the pair of auxiliary output terminals being connected with one of the pairs of cathode terminals, thereby to provide a cathode heating voltage there across; the cathode heating voltage having a magnitude that is substantially higher before lamp ignition than it is after lamp ignition.

U.S. Patent No. 5,047,690, Claim 17 (emphasis added).

MagneTek argues that the "circuit means" part of the claim is stated in means-plus-function form, thus requiring the circuit means to be defined as limited to the particular [*28] type of circuit described in the specification. While it is true that the claim uses the term "means" and also describes a function for the circuit, we do not agree that § 112, P6 applies. The claim language clearly includes a particularized description of a specific structure, which is more than enough to remove this element from the scope of § 112, P6. We decline to read any limitations from the specifications into the claim language, for these reasons and those previously discussed. The particular language of the claim serves to describe the nature and specifics of the circuit means, but no other limitations are appropriate. We again construe the term "circuit means" as denoting the combination of a number of electrical devices and conductors that, when connected together to form a conducting path, fulfill a desired function -- in this instance, the function of supplying lamp voltage and current from the inverter to the lamp terminals -- with, of course, the other particulars spelled out in the claim element.

### CONCLUSION

The disputed claim terms are construed in accordance with the conclusions set forth in this Memorandum Opinion and Order. This case is set for a status [*29] hearing on November 8, 1999 at 9:30 a.m.

MATTHEW F. KENNELLY

United States District Judge

Dated: October 22, 1999