**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NICE SYSTEMS, INC. and NICE SYSTEMS LTD., | <u>**REDACTED**</u> |
| *Plaintiff*, | |
| v. | Civil Action No. 06-311-JJF |
| WITNESS SYSTEMS, INC., | **CONFIDENTIAL FILED UNDER SEAL** |
| *Defendant*. | |

**SECOND DECLARATION OF KYLE WAGNER COMPTON
IN SUPPORT OF WITNESS SYSTEMS, INC.'S MOTION TO COMPEL
NICE SYSTEMS, INC. AND NICE SYSTEMS LTD. TO PRODUCE
<u>DOCUMENTS AND RULE 30(b)(6) TESTIMONY</u>**

Dated:  July 6, 2007

FISH & RICHARDSON P.C.

William J. Marsden, Jr. (#2247)
marsden@fr.com
Kyle Wagner Compton (#4693)
kcompton@fr.com
919 N. Market Street, Suite 1100
P. O. Box 1114
Wilmington, Delaware  19899-1114
Telephone:  (302) 652-5070

Nagendra Setty (*pro hac vice*)
Daniel A. Kent (*pro hac vice*)
1180 Peachtree Street, NE, 21st Floor
Atlanta, GA 30309
Telephone:  (404) 892-5005

ATTORNEYS FOR DEFENDANT
WITNESS SYSTEMS, INC.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

NICE SYSTEMS, INC. and
NICE SYSTEMS LTD,

     *Plaintiffs*,

     v.

WITNESS SYSTEMS, INC.

     *Defendant*.

Civil Action No. 06-311-JJF

**CONFIDENTIAL**
**FILED UNDER SEAL**

**SECOND DECLARATION OF KYLE WAGNER COMPTON**
**IN SUPPORT OF WITNESS SYSTEMS, INC.'S MOTION TO COMPEL**
**NICE SYSTEMS, INC. AND NICE SYSTEMS LTD. TO PRODUCE**
**DOCUMENTS AND RULE 30(b)(6) TESTIMONY**

I, Kyle Wagner Compton, declare as follows:

     1.     I am an Associate with Fish & Richardson P.C., counsel for Defendant Witness

Systems, Inc.  I make the following statements based on personal knowledge, except where

noted.

     2.     Attached hereto as Exhibit 19 is a true and correct copy of additional excerpts of

the rough draft transcript of the Deposition of Mr. Eyal Rudnik taken June 13, 2007.

     3.     Attached hereto as Exhibit 20 is a true and correct copy of correspondence from

Mr. Joseph Drayton to Mr. John Hamann dated February 5, 2007.

     4.     Attached hereto as Exhibit 21 is a true and correct copy of correspondence from

Mr. John Hamann to Mr. Joseph Drayton dated February 2, 2007.

     5.     Attached hereto as Exhibit 22 is a true and correct copy of correspondence from

Mr. Jason Frank to Mr. Noah Graubart, dated March 7, 2007.

     6.     Attached hereto as Exhibit 23 is a true and correct copy of correspondence from

Mr. Joseph Drayton to Mr. Dan Kent dated July 2, 2007.

7.      Attached hereto as Exhibit 24 is a true and correct copy of an "Asset Purchase and Sale Agreement" between Dictaphone Corporation and NICE Systems Ltd. dated April 11, 2005 (NICE_DE_01135435-509).

8.      Attached hereto as Exhibit 25 is a true and correct copy of a presentation entitled "Dictaphone Communications Recording Systems Management Presentation" (NSDE006172).

9.      Attached hereto as Exhibit 26 is a Patent Assignment Agreement dated May 31, 2007.

10.      Attached hereto as Exhibit 27 is a true and correct copy of NICE Systems Ltd.'s Consolidated Financial Statements as of December 31, 2005.

11.      Attached hereto as Exhibit 28 is a true and correct copy of excerpts of NICE's Supplemental Objections and responses to Witness Systems' Third Set of Interrogatories dated April 6, 2007.

12.      Attached hereto as Exhibit 29 is a true and correct copy of correspondence from Mr. Daniel Kent to Mr. Joseph Drayton dated January 8, 2007.

I declare under penalty of perjury that the foregoing is true and correct, pursuant to 28 U.S.C. § 1746.

Executed on  July 6, 2007.

*/s/ Kyle Wagner Compton*
Kyle Wagner Compton (#4693)

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of July, 2007, I electronically filed with the Clerk of

Court the foregoing SECOND DECLARATION OF KYLE WAGNER COMPTON IN

SUPPORT OF WITNESS SYSTEMS, INC.'S MOTION TO COMPEL NICE SYSTEMS, INC.

AND NICE SYSTEMS, LTD. TO PRODUCE DOCUMENTS AND RULE 30(b)(6)

TESTIMONY using CM/ECF which will send electronic notification of such filing(s) to the

below-listed Delaware counsel.  In addition, the filing will also be sent via hand delivery.


Josy W. Ingersoll                                  *Attorneys for Plaintiffs*
Melanie K. Sharp                                   *Nice Systems Ltd. and Nice Systems, Inc.*
Karen E. Keller
Young, Conaway, Stargatt & Taylor, LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899


I also certify that on July 6, 2007, I have sent by electronic mail and U.S. First

Class Mail, the document(s) to the following non-registered participants:


Scott G. Lindvall                                  *Attorneys for Plaintiffs*
Daniel DiNapoli                                    *Nice Systems Ltd. and Nice Systems, Inc.*
Joseph M. Drayton
Robert R. Laurenzi
Jason Frank
Steven Chin
Kaye Scholer LLP
425 Park Avenue
New York, NY  10022


*/s/Kyle Wagner Compton*
Kyle Wagner Compton

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of July, 2007, I electronically filed with the Clerk of

Court the foregoing REDACTED SECOND DECLARATION OF KYLE WAGNER

COMPTON IN SUPPORT OF WITNESS SYSTEMS, INC.'S MOTION TO COMPEL NICE

SYSTEMS, INC. AND NICE SYSTEMS, LTD. TO PRODUCE DOCUMENTS AND RULE

30(b)(6) TESTIMONY using CM/ECF which will send electronic notification of such filing(s) to

the below-listed Delaware counsel:


Josy W. Ingersoll                              *Attorneys for Plaintiffs*
Melanie K. Sharp                               *Nice Systems Ltd. and Nice Systems, Inc.*
Karen E. Keller
Young, Conaway, Stargatt & Taylor, LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899


I also certify that on July 13, 2007, I have sent by electronic mail the document(s)

to the following non-registered participants:


Scott G. Lindvall                              *Attorneys for Plaintiffs*
Daniel DiNapoli                                *Nice Systems Ltd. and Nice Systems, Inc.*
Joseph M. Drayton
Robert R. Laurenzi
Jason Frank
Steven Chin
Kaye Scholer LLP
425 Park Avenue
New York, NY  10022


                                        */s/Kyle Wagner Compton*_____
                                        Kyle Wagner Compton

# EXHIBIT 19

**THIS DOCUMENT REDACTED
IN ITS ENTIRETY**

*Exhibit* 20

# Exhibit 20

**From:**   JDrayton@kayescholer.com
**Sent:**   Monday, February 05, 2007 10:49 AM
**To:**     John Hamann
**Cc:**     Daniel A. Kent; SLindvall@kayescholer.com
**Subject:** Re: NICE v. Witness Delaware - Kelley Drye & Warren subpoena

John,

As a courtesy and in order to prevent Court intervention, NICE is seeking an agreement with Witness does not object to NICE having an opportunity to review documents to protect against the disclosure of privileged or otherwise protectable information prior to disclosure to Witness.

We will produce the documents in a timely fashion depending on the quantity. I do not expect more than a three day delay from the date that Kelley Drye delivers the documents to NICE, but it depends on the quantity of Kelley Drye's production.

Kelley Drye will address any objections to the subpoena as well as the timing on the production of any documents responsive to Witness' subpoena. Also, the arrangement that I proposed was not an attempt to take any rights away from Witness.

With regard to a privilege log, I suggest that we follow the practice of the parties in past litigations at this time. We can always revisit it at a later date.

Please call if you have further questions. I would like to know your position today.

Thanks

Joseph M. Drayton
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022
(212) 836-7177
(212) 836-6576 (fax)

> "John Hamann" <Hamann@fr.com>

|                                       |                                                        |
| ------------------------------------- | ------------------------------------------------------ |
| **"John Hamann"** <Hamann@fr.com>     | To<JDrayton@kayescholer.com>                           |
|                                       | cc<SLindvall@kayescholer.com>; "Daniel A. Kent" <dak@fr.com> |
| 02/02/2007 03:22 PM                   | SubjectNICE v. Witness Delaware - Kelley Drye & Warren subpoena |

Dear Joe,

I write in response to your proposal you conveyed to Noah Graubart via telephone the other day regarding the Kelley Drye & Warren subpoena.
As I understand the proposal, Kelley Drye & Warren will soon forward any responsive documents in its possession, custody, or control to Kaye Scholer. At that point, Kaye Scholer will timely conduct a privilege review of those documents - in light of your representations that any documents runs to NICE as Dictaphone's corporate successor.

Witness Systems will not object to this procedure so long as: (1) this procedure does not delay the production of responsive non-privileged documents - we expect to receive the documents within the time period called for by the subpoena; (2) a privilege log in accordance with the FRCP is timely produced along with the responsive non-privileged documents listing all documents that Kaye Scholer have deemed to be privileged or otherwise which have been removed by Kaye Scholer; and (3) NICE agrees that Witness Systems has reserved all rights to pursue further relief against Kelley Drye & Warren to the extent its obligations under the subpoena are not satisfied.

Please contact me should you wish to discuss the matter further.

Thanks.

jdh

************************************************************************************************

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized use or disclosure is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

IRS CIRCULAR 230 DISCLOSURE: Any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

************************************************************************************************

                              *    *    *    *

IRS CIRCULAR 230 DISCLOSURE:  To ensure compliance with Treasury Department regulations, we inform

*Exhibit* 21

# Exhibit 21

**From:**    John Hamann
**Sent:**    Friday, February 02, 2007 3:22 PM
**To:**      'JDrayton@kayescholer.com'
**Cc:**      'SLindvall@kayescholer.com'; Daniel A. Kent
**Subject:**  NICE v. Witness Delaware - Kelley Drye & Warren subpoena

Dear Joe,

I write in response to your proposal you conveyed to Noah Graubart via telephone the other day regarding the Kelley Drye & Warren subpoena.
As I understand the proposal, Kelley Drye & Warren will soon forward any responsive documents in its possession, custody, or control to Kaye Scholer. At that point, Kaye Scholer will timely conduct a privilege review of those documents - in light of your representations that any privilege runs to NICE as Dictaphone's corporate successor.

Witness Systems will not object to this procedure so long as:  (1)  this procedure does not delay the production of responsive non-privileged documents - we expect to receive the documents within the time period called for by the subpoena; (2) a privilege log in accordance with the FRCP is timely produced along with the responsive non-privileged documents listing all documents that Kaye Scholer have deemed to be privileged or otherwise which have been removed by Kaye Scholer; and (3)  NICE agrees that Witness Systems has reserved all rights to pursue further relief against Kelley Drye & Warren to the extent its obligations under the subpoena are not satisfied.

Please contact me should you wish to discuss the matter further.

Thanks.

jdh

*Exhibit* 22

# Exhibit 22

**From:**    JFrank@kayescholer.com
**Sent:**    Wednesday, March 07, 2007 8:00 PM
**To:**    Noah Graubart; John Hamann
**Cc:**    SLindvall@kayescholer.com; JDrayton@kayescholer.com; GWang@kayescholer.com
**Subject:** NICE v. Witness, 1:2006cv00311-JFF (D. Del.)

Noah,

I have reviewed your letter to Joseph Drayton inquiring as to the status of various third party subpoenas. This afternoon we produced documents from John Henits, bearing bates labels HENITS 000001-000315 (see email from Joshua Arnold). With respect to the other inventors, Messrs. Morlando, Messologitis, Ni, Swick and Yosef have all confirmed that they do not possess any responsive documents.

NICE has received documents from Darby & Darby and Heshkovitz & Assoc., which we are in the process of preparing for production. We anticipate being able to produce these documents within the next week. With respect to Thelen Reid Brown Raysman & Steiner, we are currently working with them to collect documents responsive to your subpoena. We will produce them as soon as they are ready. Additionally, as to the Jones Day subpoena, NICE is prepared to work with Jones Day in a manner consistent with the way we worked with Kelley, Drye & Warren LLP. We are currently coordinating the receipt and review of documents responsive to the Jones Day subpoena. Once those documents have been reviewed, scanned and bates stamped we will produce them to Witness.

In your letter, you incorrectly state that Kaye Scholer would be responding to the subpoena served on Bulova. This is not the case. However, NICE has received five boxes of documents from Bulova responsive to the Bulova subpoena. Unless you inform me that you would like to review these documents, they will be sent out for copying with the boxes that NICE made available, and which Witness reviewed, on February 28. Allan Planchard has made arrangements with your NY vendor for these boxes to be picked up from our office on Friday March 9th and taken for processing.

If you have any further questions, please feel free to contact me.

Jason P. Frank, Esq.
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022
Phone: (212) 836-7337
Fax: (212) 836-6746
email: jfrank@kayescholer.com
-------------------------------------------------

*    *    *    *

IRS CIRCULAR 230 DISCLOSURE:   To ensure compliance with Treasury Department re

*Exhibit* 23

# Exhibit 23

# KAYE SCHOLER LLP

Joseph M. Drayton
212 836-7177
Fax 212 836-6576
jdrayton@kayescholer.com

425 Park Avenue
New York, New York 10022-3598
212 836-8000
Fax 212 836-8689
www.kayescholer.com

July 2, 2007

**VIA EMAIL**

Daniel A. Kent, Esq.
FISH & RICHARDSON, P.C.
1180 Peachtree Street, N.E.
19th Floor
Atlanta, Georgia 30309

> Re:   *NICE v. Witness,* Civil Action No. 06-311-JJF (D. Del.)

Dear Dan:

I write in response to your inquiry regarding whether NICE has any objections to the filing of the PowerPoint presentation used by Witness Systems at the June 26, 2007 Markman hearing in the above referenced matter.

NICE objects to the filing of presentation materials by Witness which incorrectly represent that NICE argued in the *Dictaphone v. NICE* litigation that claim 1 of the U.S. Patent 5,396,371 requires the simultaneous transfer data from a buffer to a random access memory or digital audio tape. NICE further objects to the filing of any presentation materials which were not presented to the Court during the oral argument as NICE had no opportunity to provide a rebuttal to materials which were not presented at oral argument.

NICE requests that your presentation be filed under seal since it contains highly confidential testimony of Messrs. David Glowny and John Henits, related to Dictaphone products.

Truly yours,

/s Joseph M. Drayton

Joseph M. Drayton

# EXHIBIT 24

**THIS DOCUMENT REDACTED
IN ITS ENTIRETY**

# EXHIBIT 25

**THIS DOCUMENT REDACTED
IN ITS ENTIRETY**

**EXHIBIT 26**

**THIS DOCUMENT REDACTED
IN ITS ENTIRETY**

# *Exhibit* 27

# Exhibit 27

# NICE®

NICE SYSTEMS LTD. AND SUBSIDIARIES

CONSOLIDATED FINANCIAL STATEMENTS

AS OF DECEMBER 31, 2005

IN U.S. DOLLARS

INDEX

|                                                        | Page          |
|--------------------------------------------------------|---------------|
| Report of Independent Registered Public Accounting Firm | F-2           |
| Consolidated Balance Sheets                            | F-3 - F-4     |
| Consolidated Statements of Income                      | F-5           |
| Statements of Changes in Shareholders' Equity          | F-6           |
| Consolidated Statements of Cash Flows                 | F-7 - F-9     |
| Notes to Consolidated Financial Statements            | F-10 - F-43   |

- - - - - - - - - -

 **ERNST & YOUNG**

■ Kost Forer Gabbay & Kasierer
  3 Aminadav St.
  Tel-Aviv 67067, Israel

■ Phone: 972-3-6232525
  Fax:   972-3-5622555

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

#### To the Shareholders of

#### NICE SYSTEMS LTD.

We have audited the accompanying consolidated balance sheets of NICE Systems Ltd. ("the Company") and subsidiaries as of December 31, 2004 and 2005, and the related consolidated statements of income, shareholders' equity and cash flows for each of the three years in the period ended December 31, 2005. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above, present fairly, in all material respects, the consolidated financial position of the Company and subsidiaries as of December 31, 2004 and 2005, and the consolidated results of their operations and cash flows for each of the three years in the period ended December 31, 2005, in conformity with accounting principles generally accepted in the United States.

Tel-Aviv, Israel
February 8, 2006

KOST FORER GABBAY & KASIERER
A Member of Ernst & Young Global

- F-2 -

NICE SYSTEMS LTD. AND SUBSIDIARIES

## CONSOLIDATED BALANCE SHEETS

U.S. dollars in thousands

| | December 31, | |
| --- | --- | --- |
| ASSETS: | 2004 | 2005 |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 26,579 | $ 254,956 |
| Short-term bank deposits | 175 | 102 |
| Marketable securities | 24,348 | 36,159 |
| Trade receivables (net of allowance for doubtful accounts of $ 2,661 and $ 2,214 at December 31, 2004 and 2005, respectively) | 46,407 | 66,153 |
| Other receivables and prepaid expenses | 8,581 | 9,544 |
| Inventories | 12,615 | 23,172 |
| Deferred tax assets | - | 3,360 |
| Total current assets | 118,705 | 393,446 |
| **LONG-TERM ASSETS:** | | |
| Marketable securities | 114,805 | 120,342 |
| Investment in affiliates | 1,200 | 1,200 |
| Severance pay fund | 7,356 | 7,907 |
| Other receivables and prepaid expenses | 854 | 648 |
| Deferred tax assets | - | 4,976 |
| Property and equipment, net | 16,981 | 14,888 |
| Other intangible assets, net | 12,665 | 23,990 |
| Goodwill | 25,745 | 49,853 |
| Total long-term assets | 179,606 | 223,804 |
| Total assets | $ 298,311 | $ 617,250 |

The accompanying notes are an integral part of the consolidated financial statements.

NICE SYSTEMS LTD. AND SUBSIDIARIES

## CONSOLIDATED BALANCE SHEETS

**U.S. dollars in thousands (except share data)**

|  | December 31, | |
| --- | --- | --- |
|  | **2004** | **2005** |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES:** | | |
| Trade payables | $    11,975 | $    18,194 |
| Accrued expenses and other liabilities | 55,302 | 100,544 |
| Total current liabilities | 67,277 | 118,738 |
| **LONG-TERM LIABILITIES:** | | |
| Accrued severance pay | 8,163 | 8,901 |
| Deferred tax liabilities | - | 2,493 |
| Other long-term liabilities | - | 77 |
| Total long-term liabilities | 8,163 | 11,471 |
| **COMMITMENTS AND CONTINGENT LIABILITIES** | | |
| **SHAREHOLDERS' EQUITY:** | | |
| Share capital- | | |
| Ordinary shares of NIS 1 par value: | | |
| Authorized: 50,000,000 and 75,000,000 shares at December 31, 2004 and 2005, respectively; Issued and outstanding: 18,180,260 and 24,137,643 shares at December 31, 2004 and 2005, respectively; | 5,464 | 6,772 |
| Additional paid-in capital | 244,400 | 473,203 |
| Accumulated other comprehensive income | 5,506 | 2,996 |
| Retained earnings (accumulated deficit) | (32,499) | 4,070 |
| Total shareholders' equity | 222,871 | 487,041 |
| Total liabilities and shareholders' equity | $    298,311 | $    617,250 |

The accompanying notes are an integral part of the consolidated financial statements.

**NICE SYSTEMS LTD. AND SUBSIDIARIES**

CONSOLIDATED STATEMENTS OF INCOME

U.S. dollars in thousands (except per share data)

| | Year ended December 31, | | |
|---|---|---|---|
| | **2003** | **2004** | **2005** |
| Revenues: | | | |
| Products | $  168,055 | $  182,616 | $  206,355 |
| Services | 56,203 | 70,027 | 104,755 |
| Total revenues | 224,258 | 252,643 | 311,110 |
| Cost of revenues: | | | |
| Products | 64,231 | 64,432 | 67,543 |
| Services | 42,084 | 49,876 | 68,683 |
| Total cost of revenues | 106,315 | 114,308 | 136,226 |
| Gross profit | 117,943 | 138,335 | 174,884 |
| Operating expenses: | | | |
| Research and development, net | 22,833 | 24,866 | 30,896 |
| Selling and marketing | 53,351 | 61,855 | 72,829 |
| General and administrative | 29,840 | 31,269 | 37,742 |
| Amortization of acquired intangibles | 350 | 317 | 1,331 |
| Restructuring expenses and settlement of litigation | 7,082 | - | - |
| Total operating expenses | 113,456 | 118,307 | 142,798 |
| Operating income | 4,487 | 20,028 | 32,086 |
| Financial income, net | 2,034 | 3,556 | 5,398 |
| Other income (expenses), net | 292 | 54 | (13) |
| Income before taxes on income | 6,813 | 23,638 | 37,471 |
| Taxes on income | 1,205 | 2,319 | 902 |
| Net income from continuing operations | 5,608 | 21,319 | 36,569 |
| Net income from discontinued operation | 1,483 | 3,236 | - |
| Net income | $  7,091 | $  24,555 | $  36,569 |
| Net earnings per share: | | | |
| Basic: | | | |
| Continuing operations | $  0.35 | $  1.22 | $  1.91 |
| Discontinued operation | 0.09 | 0.18 | - |
| Net earnings | $  0.44 | $  1.40 | $  1.91 |
| Diluted: | | | |
| Continuing operations | $  0.33 | $  1.14 | $  1.77 |
| Discontinued operation | 0.09 | 0.17 | - |
| Net earnings | $  0.42 | $  1.31 | $  1.77 |

The accompanying notes are an integral part of the consolidated financial statements.

NICE SYSTEMS LTD. AND SUBSIDIARIES

## STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY
U.S. dollars in thousands

| | Share capital | Additional paid-in capital | Deferred stock compensation | Accumulated other comprehensive income | Retained earnings (accumulated deficit) | Total comprehensive income | Total shareholders' equity |
|---|---|---|---|---|---|---|---|
| Balance as of January 1, 2003 | $ 4,908 | $ 213,003 | $ (12) | $ 782 | $ (64,145) | | $ 154,536 |
| Issuance of shares of ESPP | 49 | 1,470 | - | - | - | | 1,519 |
| Amortization of deferred stock compensation | - | - | 12 | - | - | | 12 |
| Exercise of share options | 185 | 10,382 | - | - | - | | 10,567 |
| Comprehensive income: | | | | | | | |
| Foreign currency translation adjustments | - | - | - | 3,031 | - | 3,031 | 3,031 |
| Unrealized gains on derivative instruments, net | - | - | - | 75 | - | 75 | 75 |
| Net income | - | - | - | - | 7,091 | 7,091 | 7,091 |
| Total comprehensive income | | | | | | $ 10,197 | |
| Balance as of December 31, 2003 | 5,142 | 224,855 | - | 3,888 | (57,054) | | 176,831 |
| Issuance of shares of ESPP | 31 | 2,234 | - | - | - | | 2,265 |
| Exercise of share options | 291 | 17,311 | - | - | - | | 17,602 |
| Comprehensive income: | | | | | | | |
| Foreign currency translation adjustments | - | - | - | 1,617 | - | $ 1,617 | 1,617 |
| Unrealized gains on derivative instruments, net | - | - | - | 1 | - | 1 | 1 |
| Net income | - | - | - | - | 24,555 | 24,555 | 24,555 |
| Total comprehensive income | | | | | | $ 26,173 | |
| Balance as of December 31, 2004 | 5,464 | 244,400 | - | 5,506 | (32,499) | | 222,871 |
| Issuance of shares upon public offering, net | 1,003 | 201,377 | - | - | - | | 202,380 |
| Issuance of shares of ESPP | 37 | 4,285 | - | - | - | | 4,322 |
| Exercise of share options | 268 | 21,640 | - | - | - | | 21,908 |
| Tax Benefit in respect of exercised options | | 1,501 | - | - | - | | 1,501 |
| Comprehensive income: | | | | | | | |
| Foreign currency translation adjustments | - | - | - | (2,493) | - | $ (2,493) | (2,493) |
| Unrealized losses on derivative instruments, net | - | - | - | (17) | - | (17) | (17) |
| Net income | - | - | - | - | 36,569 | 36,569 | 36,569 |
| Total comprehensive income | | | | | | $ 34,059 | |
| Balance as of December 31, 2005 | $ 6,772 | $ 473,203 | $ - | $ 2,996 | $ 4,070 | | $ 487,041 |

| | | |
|---|---|---|
| Accumulated unrealized gains on derivative instruments | $ 48 | |
| Accumulated foreign currency translation adjustments | 2,948 | |
| | $ 2,996 | |

Accumulated other comprehensive income as of December 31, 2005

The accompanying notes are an integral part of the consolidated financial statements.

NICE SYSTEMS LTD. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS

U.S. dollars in thousands

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | 2003 | 2004 | 2005 |
| Cash flows from operating activities: | | | |
| Net income | $ 7,091 | $ 24,555 | $ 36,569 |
| Less: net income from discontinued operation | (1,483) | (3,236) | - |
| Net income from continuing operations | 5,608 | 21,319 | 36,569 |
| Adjustments required to reconcile net income from continuing operations to net cash provided by operating activities from continuing operations: | | | |
| Depreciation and amortization | 17,617 | 13,793 | 13,152 |
| Amortization of deferred stock compensation | 12 | - | - |
| Accrued severance pay, net | 124 | 37 | 187 |
| Amortization of premium (accretion of discount) and accrued interest on held-to-maturity marketable securities | 1,459 | 1,205 | 812 |
| Tax benefit in respect of exercised options | - | - | 1,501 |
| Deferred taxes, net | - | - | (4,841) |
| Decrease (increase) in trade receivables | 3,901 | (585) | (11,488) |
| Decrease (increase) in other receivables and prepaid expenses | 1,247 | (654) | 566 |
| Decrease (increase) in inventories | 1,515 | (122) | (3,930) |
| Increase (decrease) in trade payables | (104) | (3,761) | 5,782 |
| Increase in accrued expenses and other liabilities | 4,819 | 13,043 | 27,339 |
| Increase in long-term liabilities related to legal settlement | 667 | - | - |
| Other | (5) | (7) | 54 |
| Net cash provided by operating activities from continuing operations | 36,860 | 44,268 | 65,703 |
| Net cash provided by operating activities from discontinued operation | 1,316 | 750 | - |
| Net cash provided by operating activities | 38,176 | 45,018 | 65,703 |

The accompanying notes are an integral part of the consolidated financial statements.

NICE SYSTEMS LTD. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS

U.S. dollars in thousands

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | 2003 | 2004 | 2005 |
| Cash flows from investing activities: | | | |
| Purchase of property and equipment | (5,492) | (6,701) | (6,128) |
| Proceeds from sale of property and equipment | 747 | 89 | 66 |
| Investment in marketable securities | (72,077) | (122,192) | (218,472) |
| Proceeds from maturity of marketable securities | 33,997 | 17,710 | 190,682 |
| Proceeds from sale and call of held-to-maturity marketable securities | 8,500 | 41,345 | 9,630 |
| Investment in short-term bank deposits | (132) | (129) | (39) |
| Proceeds from short-term bank deposits | 165 | 149 | 108 |
| Payment for the acquisition of certain assets and liabilities of Dictaphone CRS division (a) | - | - | (39,724) |
| Payment for the acquisition of certain assets and liabilities of Hannamax Hi-Tech Pty. Ltd. (b) | - | - | (1,889) |
| Decrease in accrued acquisition costs | (3,008) | (75) | - |
| Payments and proceeds in respect of TCS acquisition | (199) | (1,236) | 2,531 |
| Capitalization of software development costs | (2,291) | (1,305) | (806) |
| Deferred acquisition costs | - | - | (256) |
| Net cash used in investing activities from continuing operations | (39,790) | (72,345) | (64,297) |
| Net cash provided by (used in) investing activities from discontinued operation | (52) | 4,136 | - |
| Net cash used in investing activities | (39,842) | (68,209) | (64,297) |
| Cash flows from financing activities: | | | |
| Proceeds from issuance of shares upon public offering, net | - | - | 201,724 |
| Proceeds from issuance of shares upon exercise of options and ESPP, net | 12,086 | 19,867 | 25,259 |
| Short-term bank credit, net | (24) | - | - |
| Net cash provided by financing activities | 12,062 | 19,867 | 226,983 |
| Effect of exchange rate changes on cash | 182 | 44 | (12) |
| Increase (decrease) in cash and cash equivalents | 10,578 | (3,280) | 228,377 |
| Cash and cash equivalents at the beginning of the year | 19,281 | 29,859 | 26,579 |
| Cash and cash equivalents at the end of the year | $ 29,859 | $ 26,579 | $ 254,956 |
| Supplemental disclosure of cash flows activities: | | | |
| Cash paid during the year for: | | | |
| Income taxes | $ 564 | $ 598 | $ 389 |

The accompanying notes are an integral part of the consolidated financial statements.

NICE SYSTEMS LTD. AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF CASH FLOWS

**U.S. dollars in thousands**

| | | Year ended December 31, | |
|---|---|---|---|
| | 2003 | 2004 | 2005 |

**(a)** Payment for the acquisition of certain assets and liabilities of Dictaphone CRS Division
Estimated fair value of assets acquired and liabilities assumed at the acquisition date:

| | | | |
|---|---|---|---|
| Working capital deficit (excluding cash and cash equivalents) | | | $      (913) |
| Property and equipment | | | 202 |
| Other Intangible assets | | | 15,400 |
| Goodwill | | | 25,311 |
| Less - accrued acquisition costs | | | (276) |
| | | | $   39,724 |

**(b)** Payment for the acquisition of certain assets and liabilities of Hannamax Hi-Tech Pty. Ltd.
Estimated fair value of assets acquired and liabilities assumed at the acquisition date:

| | | | |
|---|---|---|---|
| Working capital deficit (excluding cash and cash equivalents) | | | $        (50) |
| Property and equipment | | | 10 |
| Other intangible assets | | | 930 |
| Goodwill | | | 1,159 |
| Other long-term liabilities | | | (38) |
| Less - accrued acquisition costs | | | (122) |
| | | | $     1,889 |

Non-cash activities:

**(i)** Adjustments of goodwill in respect of TCS acquisition:

| | | | |
|---|---|---|---|
| Related party receivables | $     2,156 | | |
| Accrued expenses and other liabilities | (319) | | |
| Other long-term liability | (5,162) | | |
| | $    (3,325) | | |

**(ii)** Adjustment of goodwill in respect of discontinued operation sale

| | | | |
|---|---|---|---|
| | | $      (250) | |

**(iii)** Deferred tax benefit on offering expenses

| | | | |
|---|---|---|---|
| | | | $     1,002 |

**(iv)** Accrued offering expenses

| | | | |
|---|---|---|---|
| | | | $       346 |

**(v)** Receivables on account of shares in respect of exercise of options

| | | | |
|---|---|---|---|
| | | | $       971 |

The accompanying notes are an integral part of the consolidated financial statements.

NICE SYSTEMS LTD. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands**

## NOTE 1:-  GENERAL

a.    General:

NICE Systems Ltd. ("NICE") and subsidiaries (collectively - "the Company") develop, market and support integrated, scalable multimedia digital recording platforms, enhanced software applications and related professional services. These solutions capture and analyze unstructured (non-transaction) data and convert it for business and security performance management applications. The Company's solutions capture multiple forms of interaction, including voice, fax, email, web chat, radio, and video transmissions over wire line, wireless, packet telephony, terrestrial trunk radio and data networks.

The Company's products are based on two types of recording platforms - audio and video. The Company's solutions are offered to various vertical markets in two major sectors: (1) the Enterprise Interaction Solutions Sector - contact centers and trading floors and (2) the Public Safety and Security Sector - safety organizations, transportation, corporate security, gaming and correctional facilities and government and intelligence agencies.

The Company's products are sold primarily through a global network of distributors, system integrators and strategic partners; a portion of product sales and most services are sold directly to end-users.

The Company's markets are located primarily in North America, EMEA and the Far East.

The Company depends on a limited number of contract manufacturers for producing its products. If any of these manufacturers become unable or unwilling to continue to manufacture or fail to meet the quality or delivery requirements needed to satisfy the Company's customers, it could result in the loss of sales, which could adversely affect the Company's results of operations and financial position.

The Company relies upon a number of independent distributors to market, sell and service its products in certain markets. If the Company is unable to effectively manage and maintain relationships with its distributors, or to enter into similar relationships with others, its ability to market and sell its products in these markets will be affected. In addition, a loss of a major distributor, or any event negatively affecting such distributors' financial condition, could cause a material adverse effect on the Company's results of operations and financial position.

As for major customer data, see Note 15c.

b.    Acquisitions:

1.    Acquisition of Dictaphone's Communications Recording Systems ("CRS"):

On June 1, 2005, the Company consummated an agreement to acquire the assets and assume certain liabilities of Dictaphone's Communications Recording Systems ("CRS") business for $ 40,000 (including acquisition costs). Dictaphone's CRS business is a leading provider of liability and quality management systems for first responders, critical facilities, contact centers and financial trading floors.

NICE SYSTEMS LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

NOTE 1:-   GENERAL (Cont.)

The acquisition was accounted for by the purchase method and accordingly, the purchase price has been allocated according to the estimated fair value of the assets acquired and liabilities assumed of CRS. The results of the CRS's operations have been included in the consolidated financial statements since June 1, 2005 ("the closing date").

With the acquisition of CRS, the Company expanded its customer base, presence in the U.S and Europe, and its network of distributors and partners. Additionally, the Company broadened its product offerings and global professional services team.

The following table summarizes the estimated fair values of the assets acquired and liabilities assumed:

| | |
|---|---:|
| Trade receivables | $    8,931 |
| Other receivables and prepaid expenses | 216 |
| Inventories | 7,730 |
| Property and equipment | 202 |
| Trademarks | 400 |
| Core technology | 4,900 |
| Distribution network | 10,100 |
| Goodwill | 25,311 |
| Total assets acquired | 57,790 |
| Trade payables | (571) |
| Accrued expenses and other liabilities | (17,219) |
| Total liabilities assumed | (17,790) |
| Net assets acquired | $    40,000 |

Trademarks, core technology and distribution network in the amount of $ 15,400 are amortized using the straight-line method at an annual weighted average rate of 19.5%.

2.    Acquisition of Hannamax Hi-Tech Pty. Ltd, ("Hannamax"):

On September 1, 2005, the Company consummated an agreement to acquire the assets and assume certain liabilities of Hannamax Hi-Tech Pty. Ltd, ("Hannamax") business for $ 2,011 (including acquisition costs). Hannamax is NICE's distributor in Australia and New Zealand.

The acquisition was accounted for by the purchase method and accordingly, the purchase price has been allocated according to the estimated fair value of the assets acquired and liabilities assumed of Hannamax. The results of the Hannamax's operations have been included in the consolidated financial statements since September 1, 2005 ("the closing date").

With the acquisition of Hannamax, the Company expects to expand its customer base and presence in Australia and New Zealand and to expand and strengthen the Company's support organization in the region.

- F-11 -

NICE SYSTEMS LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands, except share data

NOTE 1:- GENERAL (Cont.)

Under the terms of the acquisition agreement ("the agreement"), contingent cash payments of up to $ 500 in 2006 and $ 500 in 2007 would be due if certain financial performance criteria are met as part of a two-year earn-out provision covering 2005 through 2006. Should any contingent payment be made under the agreement in the future, the additional consideration, when determinable, will increase the purchase price and accordingly additional goodwill will be recorded. For subsequent event see Note 17.

The following table summarizes the estimated fair values of the assets acquired and liabilities assumed:

| | | |
|---|---|---:|
| Trade receivables | $ | 332 |
| Other receivables and prepaid expenses | | 16 |
| Inventories | | 318 |
| Property and equipment | | 10 |
| Distribution network | | 930 |
| Goodwill | | 1,159 |
| Total assets acquired | | 2,765 |
| Trade payables | | (91) |
| Accrued expenses and other liabilities | | (625) |
| Other long-term liability | | (38) |
| Total liabilities assumed | | (754) |
| Net assets acquired | $ | 2,011 |

Distribution network in the amount of $ 930 is amortized using the straight-line method at an annual rate of 10%.

3.  Acquisition of Thales Contact Solutions ("TCS"):

In November 2002, the Company consummated an agreement to acquire certain assets and liabilities of TCS, a developer of customer-facing technology for public safety, financial trading and customer contact centers, based in the United Kingdom. TCS was a unit of Thales Group, one of Europe's premier electronics companies. In connection with the acquisition, the Company paid an initial $ 29,900 in cash and issued 2,187,500 ordinary shares to Thales Group at a fair market value of $ 18,100 calculated at the date of closing.

In 2002, the Company recorded a current liability of $ 2,800 and a long-term liability of $ 13,500 reflecting obligations under a long-term contract the Company assumed in the TCS acquisition. In 2003, the Company completed negotiations to terminate this contract as of November 2004 and to amend the terms in the interim. Under the terms of the amended contract, the cost to the Company was approximately $ 5,200 less than the amount provided at the acquisition date and consequently, TCS acquisition goodwill was reduced by this amount.

NICE SYSTEMS LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**U.S. dollars in thousands**

NOTE 1:-   GENERAL (Cont.)

Under the terms of the agreement, the cash portion of the purchase price was subject to downward adjustment based on the value of net assets at closing and the full year 2002 sales of TCS. Based on our calculation of the actual value of net assets acquired and 2002 sales of TCS, the Company reduced the cash portion of the purchase price as of December 31, 2002 by $12,800. Of the $12,800 adjustment referred to above, Thales paid the Company approximately $ 6,600 in 2003.

Thales disputed the Company's calculation of the net asset value at closing and the matter was submitted in September 2003 to binding arbitration by an Independent Accountant, in accordance with the terms of the acquisition agreement. The Independent Accountant determined a higher net asset value at closing than our calculation of the actual value of net assets acquired in the amount of approximately $ 2,200. This additional amount was recorded as additional goodwill in 2003. The remaining related party receivable of approximately $ 4,000 was paid in 2004.

Under the terms of the agreement, the cash portion of the purchase price was subject to adjustment mechanisms and indemnities related to the assets sold to the Company. In September 2004, the Company notified Thales of claims in respect of such price adjustment mechanisms, mainly relating to uncollected receivables and inventory. NICE and Thales signed a settlement agreement in respect of such claims on February 24, 2005, according to which Thales paid the Company a total indemnity amount of approximately $ 2,600.

4.    Unaudited Pro-forma condensed results of operations:

The following represents the unaudited pro-forma condensed results of operations for the years ended December 31, 2004 and 2005, assuming that the acquisitions of CRS and Hannamax occurred on January 1, 2004 and 2005. The pro-forma information is not necessarily indicative of the results of operations, which actually would have occurred if the acquisition had been consummated on that dates, nor does it purport to represent the results of operations for future periods.

NICE SYSTEMS LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except per share data)

NOTE 1:-  GENERAL (Cont.)

|  | Year ended December 31, | |
|---|---|---|
|  | 2004 | 2005 |
|  | Unaudited | |
| Revenues | $  318,479 | $  336,145 |
| Net income (loss) from continuing operations | $  (1,701) | $  33,150 |
| Net income (loss) | $  (4,937) | $  33,150 |
| Basic net earnings (loss) per share from continuing operations | $  (0.28) | $  1.73 |
| Basic net earnings (loss) per share | $  (0.10) | $  1.73 |
| Diluted net earnings (loss) per share from continuing operations | $  (0.28) | $  1.61 |
| Diluted net earnings (loss) per share | $  (0.11) | $  1.61 |

c.    Disposal by sale of the COMINT/DF operation:

In the fourth quarter of 2003, the Company reached a definitive agreement to sell the assets and liabilities of its COMINT/DF military-related business to ELTA Systems Ltd. for $ 4,000 in cash. On March 31, 2004, the Company completed the sale of the COMINT/DF operation. The COMINT/DF business was treated as a discontinued operation in the financial statements.

The Company's balance sheets at December 31, 2004 and 2005 reflect the assets of the COMINT/DF operation, as assets of the discontinued operation within current assets. The balance of $ 644 and $ 646 at December 31, 2004 and 2005, respectively consist of trade receivables, net of a provision for warranty of $ 8 and $ 6, respectively.

Summarized selected financial information of the discontinued operation is as follows:

|  | Year ended December 31, | | |
|---|---|---|---|
|  | 2003 | 2004 | 2005 |
| Revenues | $  6,510 | $  816 | $  - |
| Net income | $  1,483 | $ *)  3,236 | $  - |

*)    Includes gain from the sale in the amount of $ 3,286.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**U.S. dollars in thousands**

## NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES

The consolidated financial statements were prepared in accordance with United States Generally Accepted Accounting Principles ("U.S. GAAP").

a.    Use of estimates:

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from those estimates.

b.    Financial statements in United States dollars:

The currency of the primary economic environment in which the operations of NICE and certain subsidiaries are conducted is the U.S. dollar ("dollar"); thus, the dollar is the functional currency of NICE and certain subsidiaries.

NICE and certain subsidiaries' transactions and balances denominated in dollars are presented at their original amounts. Non-dollar transactions and balances have been remeasured to dollars in accordance with Statement of Financial Accounting Standards ("SFAS") No. 52, "Foreign Currency Translation". All transaction gains and losses from remeasurement of monetary balance sheet items denominated in non-dollar currencies are reflected in the statements of operations as financial income or expenses, as appropriate.

For those subsidiaries whose functional currency has been determined to be their local currency, assets and liabilities are translated at year-end exchange rates and statement of operations items are translated at average exchange rates prevailing during the year. Such translation adjustments are recorded as a separate component of accumulated other comprehensive income in shareholders' equity.

c.    Principles of consolidation:

Intercompany transactions and balances have been eliminated upon consolidation.

d.    Cash equivalents:

The Company considers short-term unrestricted highly liquid investments that are readily convertible into cash, purchased with maturities of three months or less to be cash equivalents.

e.    Short-term bank deposits:

Bank deposits with maturities of more than three months but less than one year are included in short-term bank deposits. Such short-term bank deposits are stated at cost.

NICE SYSTEMS LTD. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands**

**NOTE 2:-    SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

f.    Marketable securities:

The Company accounts for investments in debt securities in accordance with SFAS No. 115, "Accounting for Certain Investments in Debt and Equity Securities". Management determines the appropriate classification of its investments in debt securities at the time of purchase and reevaluates such determinations at each balance sheet date.

Debt securities are classified as held-to-maturity when the Company has the positive intent and ability to hold the securities to maturity and are stated at amortized cost. The cost of held-to-maturity securities is adjusted for amortization of premiums and accretion of discounts to maturity. Such amortization, accretion, decline in value judged to be other than temporary, and interest are included in financial income or expenses, as appropriate.

Interest income resulting from investments in structured notes that are classified as held to maturity is accounted for under the provision of EITF No. 96-12, "Recognition of Interest Income and Balance Sheet Classification of Structured Notes". Under Emerging Issues Task Force ("EITF") No. 96-12, the retrospective interest method is used for recognizing interest income.

Auction rate securities are classified as available-for-sale and accordingly, these securities are stated at fair value. Realized gains and losses on sales of securities, as determined on a specific identification basis, are included in the consolidated statement of income.

g.    Inventories:

Inventories are stated at the lower of cost or market value. The cost of raw materials and work-in-progress is determined by the "average cost" method, and the cost of finished goods on the basis of costs charged by third party manufacturer.

Inventory provisions are provided to cover risks arising from slow-moving items, technological obsolescence, excess inventories, discontinued products and for market prices lower than cost. Inventory provisions for 2003, 2004 and 2005 were $ 2,368, $ 2,822 and $ 4,646, respectively, and have been included in cost of revenues.

h.    Investment in affiliates:

The investments in affiliated companies are stated at cost, since the Company does not have the ability to exercise significant influence over operating and financial policies of those investees.

The Company's investment in affiliates is reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of the investment may not be recoverable.

NICE SYSTEMS LTD. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands**

**NOTE 2:-    SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

i.     Property and equipment, net:

Property and equipment are stated at cost, net of accumulated depreciation.

Depreciation is calculated using the straight-line method over the estimated useful lives of the assets, at the following annual rates:

|                                      | %       |
|--------------------------------------|---------|
| Computers and peripheral equipment   | 33      |
| Office furniture and equipment       | 6 - 15  |
| Motor vehicles                       | 15      |

Leasehold improvements are amortized by the straight-line method over the term of the lease or the estimated useful life of the improvements, whichever is shorter.

j.     Other intangible assets, net:

Intangible assets are amortized over their useful lives using a method of amortization that reflects the pattern in which the economic benefits of the intangible assets are consumed or otherwise used, in accordance with SFAS No. 142, "Goodwill and Other Intangible Assets".

Amortization is calculated using the straight-line method over the estimated useful lives at the following annual rates:

|                                              | Weighted average % |
|----------------------------------------------|--------------------|
| Capitalized software development costs (see n)| 33                 |
| Core technology                              | 32                 |
| Trademarks                                   | 34                 |
| Distribution network                         | 11                 |
| Maintenance contracts                        | 33                 |

k.     Impairment of long-lived assets:

The Company's long-lived assets and certain identifiable intangibles are reviewed for impairment in accordance with SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of the assets to the future undiscounted cash flows expected to be generated by the assets. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. Assets to be disposed of are reported at the lower of the carrying amount or fair value less costs to sell. In 2005, no impairment indicators have been identified.

NICE SYSTEMS LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

NOTE 2:-    SIGNIFICANT ACCOUNTING POLICIES (Cont.)

l.    Goodwill:

Goodwill represents the excess of the cost over the fair value of the net assets of businesses acquired. Under SFAS No. 142, goodwill is not amortized.

SFAS No. 142 requires goodwill to be tested for impairment at least annually or between annual tests in certain circumstances, and written down when impaired, rather than amortized as previous accounting standards required. Goodwill is tested for impairment by comparing the fair value of the reporting unit with its carrying value. Fair value is determined using discounted cash flows and market capitalization. Significant estimates used in the fair value methodologies include estimates of future cash flows, future growth rates and the weighted average cost of capital of the reporting unit. The Company performed annual impairment tests during the fourth quarter of 2003, 2004 and 2005 and did not identify any impairment losses.

m.    Revenue recognition:

The Company generates revenues from sales of products, which include hardware and software, software licensing, professional services and maintenance. The Company sells its products indirectly through a global network of distributors, system integrators and strategic partners, all of whom are considered end-users, and through its direct sales force.

Revenues from sales of product and software license agreements are recognized when all criteria outlined in Statement Of Position ("SOP") 97-2, "Software Revenue Recognition" (as amended by SOP 98-9) are met. Revenue from products and license fees is recognized when persuasive evidence of an agreement exists, delivery of the product has occurred, the fee is fixed or determinable, no further obligations exist and collectibility is probable. Sales agreements with specific acceptance terms are not recognized until the customer has confirmed that the product or service has been accepted.

Where software license arrangements involve multiple elements, revenue is allocated to each element based on Vendor Specific Objective Evidence ("VSOE") of the relative fair values of each element in the arrangement, in accordance with the residual method. The Company's VSOE used to allocate the sales price to maintenance is based on the renewal percentage. Under the residual method, revenue is recognized for the delivered elements when (1) there is VSOE of the fair values of all the undelivered elements, and (2) all revenue recognition criteria of SOP 97-2, as amended, are satisfied. Under the residual method any discount in the arrangement is allocated to the delivered element.

The Company maintains a provision for product returns in accordance with SFAS No. 48, "Revenue Recognition When Right of Return Exists". The provision is estimated based on the Company's past experience and is deducted from revenues. Trade receivables as of December 31, 2004 and 2005, are presented net of provision for product returns in the amounts of $ 1,617 and $ 1,155 respectively.

Revenues from maintenance and professional services are recognized ratably over the contractual period or as services are performed.

NICE SYSTEMS LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**U.S. dollars in thousands**

**NOTE 2:-    SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

Deferred revenue includes advances and payments received from customers, for which revenue has not yet been recognized.

n.    Research and development costs:

Research and development costs (net of grants and participations) incurred in the process of software production before establishment of technological feasibility, are charged to expenses as incurred. Costs of the production of a product master incurred subsequent to the establishment of technological feasibility are capitalized according to the principles set forth in SFAS No. 86, "Accounting for the Costs of Computer Software to be Sold, Leased or Otherwise Marketed". Based on the Company's product development process, technological feasibility is established upon completion of a detailed program design.

Costs incurred by the Company between completion of the detailed program design or working model and the point at which the product is ready for general release have been capitalized.

Capitalized software development costs are amortized commencing with general product release by the straight-line method over the estimated useful life of the software product.

o.    Income taxes:

The Company accounts for income taxes in accordance with SFAS No. 109, "Accounting for Income Taxes". This statement prescribes the use of the liability method whereby deferred tax asset and liability account balances are determined based on differences between financial reporting and tax bases of assets and liabilities and are measured using the enacted tax rates and laws that will be in effect when the differences are expected to reverse. The Company provides a valuation allowance, if necessary, to reduce deferred tax assets to their estimated realizable value.

p.    Government grants:

Non-royalty bearing grants from the Government of Israel for funding research and development projects are recognized at the time the Company is entitled to such grants on the basis of the related costs incurred and recorded as a deduction from research and development costs.

q.    Concentrations of credit risk:

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of cash and cash equivalents, short-term bank deposits, trade receivables and marketable securities.

The Company's cash and cash equivalents and short-term bank deposits are invested in deposits mainly in dollars with major international banks. Such deposits in the United States may be in excess of insured limits and are not insured in other jurisdictions. Management believes that the financial institutions that hold the Company's investments are financially sound and, accordingly, low credit risk exists with respect to these investments.

NICE SYSTEMS LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share data)

NOTE 2:-   SIGNIFICANT ACCOUNTING POLICIES (Cont.)

The Company's trade receivables are derived from sales to customers located primarily in North America, EMEA and the Far East. The Company performs ongoing credit evaluations of its customers and obtains letter of credit and bank guarantees for certain receivables. Additionally, the Company insures certain of its receivables with a credit insurance company. An allowance for doubtful accounts is provided with respect to specific debts that the Company has determined to be doubtful of collection and a general provision on the remaining balance, based on the length of time the receivables are past due.

The Company's marketable securities include investment in U.S. corporate debentures, U.S government debentures and structured notes. Management believes that the portfolio is well diversified, and accordingly, minimal credit risk exists with respect to those marketable securities.

The Company entered into forward contracts and option strategies (together: "derivative instruments") intended to protect against the increase in value of forecasted non-dollar currency cash flows and the increase/decrease in fair value of non-dollar liabilities/assets. The derivative instruments effectively hedge the Company's non-dollar currency exposure (see Note 10).

r.     Severance pay:

The Company's liability for severance pay for its Israeli employees is calculated pursuant to Israeli severance pay law based on the most recent monthly salary of the employees multiplied by the number of years of employment as of the balance sheet date. Employees are entitled to one month's salary for each year of employment, or a portion thereof. The Company's liability is fully provided by monthly deposits with insurance policies and severance pay funds and by an accrual.

The deposited funds include profits accumulated up to the balance sheet date. The deposited funds may be withdrawn only upon the fulfillment of the obligation pursuant to Israeli severance pay law or labor agreements. The value of the deposited funds is based on the cash surrendered value of these policies and includes immaterial profits.

Severance pay expense for 2003, 2004 and 2005 was $ 2,745, $ 2,956 and $ 3,622 respectively.

s.     Basic and diluted net earnings per share:

Basic net earnings per share are computed based on the weighted average number of Ordinary shares outstanding during each year. Diluted net earnings per share are computed based on the weighted average number of Ordinary shares outstanding during each year plus dilutive potential equivalent Ordinary shares considered outstanding during the year, in accordance with SFAS No. 128, "Earnings Per Share".

The weighted average number of shares related to outstanding antidilutive options excluded from the calculations of diluted net earnings per share was 1,935,692, 1,094,775 and 968,611 for the years ended December 31, 2003, 2004 and 2005, respectively.

- F-20 -

NICE SYSTEMS LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands

NOTE 2:-   SIGNIFICANT ACCOUNTING POLICIES (Cont.)

    t.    Stock-based compensation:

The Company has elected to follow APB No. 25, "Accounting for Stock Issued to Employees" and FIN No. 44, "Accounting for Certain Transactions Involving Stock Compensation" in accounting for its employee stock option plan. Under APB No. 25, when the exercise price of the Company's options is less than the market value of the underlying shares on the date of grant, compensation expense is recognized and amortized ratably over the vesting period of the options.

The Company adopted the disclosure provisions of SFAS No. 148, "Accounting for Stock-Based Compensation - Transition and Disclosure", which amended certain provisions of SFAS No. 123. The Company continues to apply the provisions of APB No. 25, in accounting for stock-based compensation.

Pro forma information regarding net income (loss) and net earnings (loss) per share is required by SFAS No. 123, "Accounting for Stock-Based Compensation", and has been determined as if the Company had accounted for its employee options under the fair value method prescribed by that statement. The fair value for these options was estimated at the date of grant using the Black-Scholes option pricing model with the following assumptions:

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | 2003 | 2004 | 2005 |
| Risk free interest rate | 1.8% | 2.7% | 4.1% |
| Dividend yield | 0% | 0% | 0% |
| Volatility factor | 0.545 | 0.457 | 0.431 |
| Expected life of the options | 3 | 3 | 3.83 |

Black-Scholes pricing-model also was used to estimate the fair value of the ESPP compensation; assumptions are not provided due to the immateriality of the ESPP portion.

NICE SYSTEMS LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except per share data)

NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)

Pro forma information under SFAS No. 123:

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | 2003 | 2004 | 2005 |
| Net income as reported | $   7,091 | $  24,555 | $  36,569 |
| Add: Stock-based compensation expense included in the determination of net income as reported | 12 | - | - |
| Deduct: Stock-based compensation expense determined under fair value method for all awards | (10,350) | (7,182) | (9,382) |
| Pro forma net  income (loss) | $   (3,247) | $  17,373 | $  27,187 |
| Basic net earnings per share as reported | $     0.44 | $     1.40 | $     1.91 |
| Diluted net earnings per share as reported | $     0.42 | $     1.31 | $     1.77 |
| Pro forma basic net  earnings  (loss) per share | $    (0.20) | $     0.99 | $     1.42 |
| Pro forma diluted net earnings (loss) per share | $    (0.20) | $     0.93 | $     1.32 |

u.    Fair value of financial instruments:

The following methods and assumptions were used by the Company in estimating its fair value disclosures for financial instruments:

The carrying amount reported in the balance sheet for cash and cash equivalents, trade receivables and trade payables approximates their fair value due to the short-term maturities of such instruments.

The fair value for marketable securities is based on quoted market prices and does not differ significantly from the carrying amount (see Note 3).

v.    Advertising expenses:

Advertising expenses are charged to expense as incurred. Advertising expenses for the years 2003, 2004 and 2005 were $ 2,077, $ 2,621 and $ 3,222, respectively.

NICE SYSTEMS LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share data)

NOTE 2:-    SIGNIFICANT ACCOUNTING POLICIES (Cont.)

    w.    Derivatives and hedging activities:

SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" requires the Company to recognize all of its derivative instruments as either assets or liabilities on the balance sheet at fair value. The accounting for changes in the fair value (i.e., gains or losses) of a derivative instrument depends on whether it has been designated and qualifies as part of a hedging relationship and further, on the type of hedging relationship. For those derivative instruments that are designated and qualify as hedging instruments, a company must designate the hedging instrument, based upon the exposure being hedged, as a fair value hedge, cash flow hedge or a hedge of a net investment in a foreign operation.

For derivative instruments that are designated and qualify as a fair value hedge (i.e., hedging the exposure to changes in the fair value of an asset or a liability or an identified portion thereof that is attributable to a particular risk), the gain or loss on the derivative instrument as well as the offsetting loss or gain on the hedged item attributable to the hedged risk are recognized in the line item associated with the hedged item in earnings during the period of the change in fair values. For derivative instruments that are designated and qualify as a cash flow hedge (i.e., hedging the exposure to variability in expected future cash flows that is attributable to a particular risk), the effective portion of the gain or loss on the derivative instrument is reported as a component of accumulated other comprehensive income and reclassified into earnings in the line item associated with the hedged transaction in the period or periods during which the hedged transaction affects earnings. The remaining gain or loss on the derivative instrument in excess of the cumulative change in the present value of future cash flows of the hedged item, if any, is recognized in financial income/expense in the period of change.

    x.    Impact of recently issued accounting standards:

In December 2004, the Financial Accounting Standards Board ("FASB") issued SFAS No. 123 (revised 2004), "Share-Based Payment". SFAS No. 123(R) will provide investors and other users of financial statements with more complete and neutral financial information by requiring that the compensation cost relating to share-based payment transactions be recognized in financial statements. That cost will be measured based on the fair value of the equity or liability instruments issued. SFAS No. 123(R) covers a wide range of share-based compensation arrangements including share options, restricted share plans, performance-based awards, share appreciation rights and employee share purchase plans. SFAS No. 123(R) replaces SFAS No. 123, "Accounting for Stock-Based Compensation", and supersedes APB No. 25, "Accounting for Stock Issued to Employees". SFAS No. 123, as originally issued in 1995, established as preferable a fair-value-based method of accounting for share-based payment transactions with employees. However, that Statement permitted entities the option of continuing to apply the guidance in APB No. 25, as long as the footnotes to financial statements disclosed what net income would have been had the preferable fair-value-based method been used. The Company will be required to apply SFAS No. 123(R) as of the first annual reporting period that begins after June 15, 2005. As permitted by SFAS No. 123, the Company currently accounts for share-based payments to employees using APB No. 25's intrinsic value method.

NICE SYSTEMS LTD. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

U.S. dollars in thousands (except share data)

NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)

Accordingly, the adoption of SFAS No. 123(R)'s fair value method will have a significant impact on the Company's result of operations, although it will have no impact on its overall financial position. The Company plans to adopt SFAS No. 123(R) using the "modified prospective" method. The "modified prospective" method requires compensation cost to be recognized beginning with the effective date (a) based on the requirements of SFAS No. 123(R) for all share-based payments granted after the effective date and (b) based on the requirements of SFAS No. 123 for all awards granted to employees prior to the effective date of SFAS No. 123(R) that remain unvested on the effective date. The impact of adoption of Statement 123(R) on future periods cannot be predicted at this time because it will depend on levels of share-based payments granted in the future. However, had the Company adopted SFAS No. 123(R) in prior periods, the impact of that standard would have approximated the impact of SFAS No. 123 as described in the disclosure of pro forma net income and earnings per share in Note 2(t) to the financial statements.

In December 2004, the FASB issued SFAS No. 153, "Exchanges of Nonmonetary Assets, an amendment of APB Opinion No. 29". The guidance in APB Opinion No. 29, Accounting for Nonmonetary Transactions ("APB No. 29"), is based on the principle that exchanges of nonmonetary assets should be measured based on the fair value of the assets exchanged. APB No. 29 included certain exceptions to that principle. SFAS No. 153 amends APB No. 29 to eliminate the exception for nonmonetary exchanges of similar productive assets and replaces it with a general exception for exchanges of nonmonetary assets that do not have commercial substance. A nonmonetary exchange has commercial substance if the future cash flows of the entity are expected to change significantly as a result of the exchange. SFAS No. 153 is effective for nonmonetary assets exchanges occurring in fiscal periods beginning after June 15, 2005. The Company does not expect that the adoption of SFAS No. 153 will have any material effect on its financial position or results of operations.

In May 2005, the FASB issued SFAS No. 154, "Accounting Changes and Error Corrections", a replacement of APB No. 20, "Accounting Changes" and SFAS No. 3, "Reporting Accounting Changes in Interim Financial Statements". SFAS No. 154 provides guidance on the accounting for and reporting of accounting changes and error corrections. APB No. 20 previously required that most voluntary changes in accounting principles be recognized by including in net income for the period of the change, the cumulative effect of changing to the new accounting principle. SFAS No. 154 requires retroactive application to prior periods' financial statements of a voluntary change in accounting principles unless it is impracticable. SFAS 154 is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005. As of December 31, 2005, adoption of SFAS No. 154 will not have a material impact on the Company's financial position or results of operation.

NICE SYSTEMS LTD. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

U.S. dollars in thousands (except share data)

**NOTE 2:-   SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

In November 2005, the FASB issued FSP FAS 115-1. The FSP addresses the determination as to when an investment is considered impaired, whether that impairment is other than temporary, and the measurement of an impairment loss. The FSP also includes accounting considerations subsequent to the recognition of other than-temporary impairment and requires certain disclosures about unrealized losses that have not been recognized as other-than-temporary impairments. The guidance in this FSP amends SFAS No. 115, Accounting for Certain Investments in Debt and Equity. The FSP replaces the impairment evaluation guidance of EITF Issue No. 03-1, "The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments," with references to the existing other-than-temporary impairment guidance. The FSP clarifies that an investor should recognize an impairment loss no later than when the impairment is deemed other-than-temporary, even if a decision to sell an impaired security has not been made. The guidance in this FSP is to be applied to reporting periods beginning after December 15, 2005. As of December 31, 2005, adoption of FSP FAS 115-1 will not have a material impact on the Company's financial position or results of operations.

y.   Reclassification:

Certain amounts from prior years have been reclassified to conform to the current year's presentation. The reclassification had no effect on previously reported net income, shareholders' equity or cash flows.

**NOTE 3:-   MARKETABLE SECURITIES**

a.   The following table summarizes amortized costs, gross unrealized gains and losses and estimated fair values of held-to-maturity marketable securities as of December 31, 2004 and 2005:

| | Amortized cost December 31, | | Gross unrealized gains December 31, | | Gross unrealized losses December 31, | | Estimated fair value December 31, | |
|---|---|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2004 | 2005 | 2004 | 2005 | 2004 | 2005 |
| U.S. corporate debentures | $ 37,968 | $ 71,043 | $   1 | $   - | $ (368) | $ (1,172) | $ 37,601 | $ 69,871 |
| U.S government debentures | 74,805 | 73,278 | 11 | 4 | (560) | (1,424) | 74,256 | 71,858 |
| Structured notes | 12,680 | 12,180 | - | - | - | - | 12,680 | 12,180 |
| | $125,453 | $156,501 | $  12 | $  4 | $ (928) | $ (2,596) | $124,537 | $153,909 |

NICE SYSTEMS LTD. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

U.S. dollars in thousands (except share data)

**NOTE 3:-   MARKETABLE SECURITIES (Cont.)**

The following table shows the gross unrealized losses and fair value of Company's investments with unrealized losses that are not deemed to be other-than-temporarily impaired, aggregated by investment category and length of time that individual securities have been in a continuous unrealized loss position, at December 31, 2005:

| | December 31, 2005 | | | | | |
| | Less than 12 months | | 12 months or greater | | Total | |
| | Fair value | Unrealized losses | Fair value | Unrealized losses | Fair value | Unrealized losses |
|---|---|---|---|---|---|---|
| U.S. corporate debentures | $ 40,066 | $ (571) | $ 29,805 | $ (601) | $ 69,871 | $ (1,172) |
| U.S government debentures | 9,816 | (154) | 60,034 | (1,270) | 69,850 | (1,424) |
| | $ 49,882 | $ (725) | $ 89,839 | $ (1,871) | $ 139,721 | $ (2,596) |

The unrealized losses in the Company's investments in held-to-maturity marketable securities were caused by interest rate increases. The contractual cash flows of these investments are either guaranteed by the U.S. government or an agency of the U.S. government or were issued by highly rated corporations. Accordingly, it is expected that the securities would not be settled at a price less than the amortized cost of the Company's investment. Based on the immaterial severity of the impairments and the ability and intent of the Company to hold these investments to maturity, the bonds were not considered to be other than temporarily impaired at December 31, 2005.

As of December 31, 2004 and 2005, all the Company's U.S. corporate debentures, U.S. government debentures and structured notes were classified as held-to-maturity.

In 2004 the Company sold debt securities, which were classified as held-to-maturity, due to a rating decrease, in consideration of $ 911. As a result of the sale, the Company recorded a loss of $ 14. In 2005, the Company did not sell any securities prior to their maturity and accordingly, did not realize any gains or losses on held-to-maturity securities in that year.

During 2004 and 2005, held-to-maturity marketable securities in the amount of $ 40,434 and $ 9,630 respectively, were called by the issuers prior to maturity.

The scheduled maturities of held-to-maturity marketable securities at December 31, 2005 are as follows:

| | Amortized cost | Estimated fair value |
|---|---|---|
| Held-to-maturity: | | |
| Due within one year | 36,159 | 35,764 |
| Due after one year through five years | 112,842 | 110,645 |
| Due after five years through ten years | 7,500 | 7,500 |
| | 156,501 | 153,909 |

- F-26 -

NICE SYSTEMS LTD. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

U.S. dollars in thousands (except share data)

**NOTE 3:-  MARKETABLE SECURITIES (Cont.)**

     b.   Auction rate securities in the amount of $ 13,700 as of December 31, 2004, were classified as available-for-sale marketable securities and were presented as short-term marketable securities. As of December 31, 2005, no auction rate securities were held by the Company.

**NOTE 4:-  SHORT-TERM OTHER RECEIVABLES AND PREPAID EXPENSES**

|  | December 31, | |
|  | 2004 | 2005 |
|---|---|---|
| Government authorities | $ 1,848 | $ 1,959 |
| Interest receivable | 994 | 1,202 |
| Prepaid expenses | 4,250 | 4,062 |
| Assets of discontinued operation | 644 | 646 |
| Other | 845 | 1,675 |
|  | $ 8,581 | $ 9,544 |

**NOTE 5:-  INVENTORIES**

|  | December 31, | |
|  | 2004 | 2005 |
|---|---|---|
| Raw materials | $ 1,286 | $ 1,022 |
| Work-in-progress | 71 | 29 |
| Finished goods | 11,258 | 22,121 |
|  | $ 12,615 | $ 23,172 |

**NOTE 6:-  PROPERTY AND EQUIPMENT, NET**

|  | December 31, | |
|  | 2004 | 2005 |
|---|---|---|
| Cost: | | |
| Computers and peripheral equipment | $ 50,474 | $ 55,260 |
| Office furniture and equipment | 13,701 | 13,839 |
| Leasehold improvements | 3,823 | 3,986 |
| Motor Vehicles | - | 23 |
|  | $ 67,998 | $ 73,108 |
| Accumulated depreciation: | | |
| Computers and peripheral equipment | 42,454 | 47,439 |
| Office furniture and equipment | 6,501 | 8,038 |
| Leasehold improvements | 2,062 | 2,739 |
| Motor Vehicles | - | 4 |
|  | 51,017 | 58,220 |
| Depreciated cost | $ 16,981 | $ 14,888 |

Depreciation expense totaled $ 10,547, $ 8,603 and $ 7,941 for the years ended December 31, 2003, 2004 and 2005, respectively.

NICE SYSTEMS LTD. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share data)**

**NOTE 7:-  OTHER INTANGIBLE ASSETS, NET**

a.    Other intangible assets:

| | December 31, | |
|---|---|---|
| | **2004** | **2005** |
| Original amounts: | | |
| Capitalized software development costs | $    19,355 | $    20,161 |
| Core technology | 4,419 | 9,319 |
| Trademarks | 1,040 | 1,440 |
| Distribution Network | 7,092 | 17,517 |
| Maintenance contracts | 576 | 534 |
| | 32,482 | 48,971 |
| Accumulated amortization: | | |
| Capitalized software development costs | 14,980 | 17,364 |
| Core technology | 3,695 | 5,037 |
| Trademarks | 726 | 982 |
| Distribution Network | - | 1,064 |
| Maintenance contracts | 416 | 534 |
| | 19,817 | 24,981 |
| Other intangible assets, net | $    12,665 | $    23,990 |

b.    Amortization expense amounted to $ 7,070, $ 5,190 and $ 5,211 for the years ended December 31, 2003, 2004 and 2005, respectively.

c.    Estimated amortization expense for the years ended (excluding amortization of capitalized software development costs):

| | December 31, |
|---|---|
| 2006 | 3,951 |
| 2007 | 3,309 |
| 2008 | 2,819 |
| 2009 | 2,210 |
| 2010 | 1,887 |
| Thereafter | 7,017 |
| | $    21,193 |

NICE SYSTEMS LTD. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

U.S. dollars in thousands (except share data)

**NOTE 8:- GOODWILL**

The changes in the carrying amount of goodwill for the years ended December 31, 2004 and 2005 are as follows:

| | | |
|---|---|---:|
| Balance as of January 1, 2004 | $ | 25,311 |
| Applied against sale of discontinued operation | | (250) |
| Foreign currency translation adjustments | | 684 |
| | | |
| Balance as of December 31, 2004 | | 25,745 |
| Adjustment to goodwill in respect of settlement | | (1,191) |
| Additions in respect of the acquisitions of CRS and Hannamax | | 26,470 |
| Foreign currency translation adjustments | | (1,171) |
| | | |
| Balance as of December 31, 2005 | $ | 49,853 |

**NOTE 9:- ACCRUED EXPENSES AND OTHER LIABILITIES**

| | December 31, | |
|---|---|---|
| | **2004** | **2005** |
| Employees and payroll accruals | $ 13,228 | $ 20,692 |
| Accrued expenses | 19,949 | 26,868 |
| Restructuring accrual | 256 | 106 |
| Deferred revenues | 18,677 | 44,769 |
| Other | 3,192 | 8,109 |
| | $ 55,302 | $ 100,544 |

**NOTE 10:- DERIVATIVE INSTRUMENTS**

To protect against changes in the value of forecasted foreign currency transactions and balances, the Company has instituted a foreign-currency hedging program. The Company hedges portions of its forecasted cash flows and balances denominated in foreign currencies with forward contracts and option strategies (together: "derivative instruments").

The Company entered into derivative instrument arrangements to hedge a portion of anticipated New Israeli Shekel ("NIS") payroll payments. These derivative instruments are designated as cash flows hedges, as defined by SFAS No. 133, as amended, and are all highly effective as hedges of these expenses when the salary is recorded. The effective portion of the derivative instruments is included in payroll expenses in the statements of income.

In addition, the Company entered into derivative instruments to hedge certain trade receivables, trade payable payments, expected payments under fixed price contracts denominated in foreign currency, liabilities to employees and other long-term liability. The purpose of the Company's foreign currency hedging activities is to protect the Company from changes in the foreign currency exchange rate to the dollar.

At December 31, 2005, the Company expects to reclassify $ 48 of net gains on derivative instruments from accumulated other comprehensive income to earnings during the next twelve months.

NICE SYSTEMS LTD. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share data)**

**NOTE 11:- COMMITMENTS AND CONTINGENT LIABILITIES**

    a.    Lease commitments:

The Company leases office space, office equipment and various motor vehicles under operating leases.

        1.    The Company's office space and office equipment are rented under several operating leases.

Future minimum lease commitments under non-cancelable operating leases for the years ended December 31, are as follows:

| | |
|---|---:|
| 2006 | $ 5,475 |
| 2007 | 3,196 |
| 2008 | 1,524 |
| 2009 | 640 |
| | $ 10,835 |

Rent expenses for the years ended December 31, 2003, 2004 and 2005 were approximately $ 6,554, $ 6,107 and $ 6,317, respectively.

        2.    The Company leases its motor vehicles under cancelable operating lease agreements.

The minimum payment under these operating leases, upon cancellation of these lease agreements was $ 749 as of December 31, 2005.

Lease expenses of vehicles for the years ended December 31, 2003, 2004 and 2005 were $ 2,124, $ 2,396 and $ 2,552, respectively.

    b.    Other commitments:

The Company is obligated under certain agreements with its suppliers to purchase goods and under an agreement with its manufacturing subcontractor to purchase excess inventory. Non cancelable obligations as of December 31, 2005, were approximately as follows:

| | |
|---|---:|
| 2006 | $ 2,225 |
| 2007 | 572 |
| 2008 | 537 |
| 2009 | 537 |
| 2010 | 237 |
| | $ 4,108 |

NICE SYSTEMS LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share data)

NOTE 11:- COMMITMENTS AND CONTINGENT LIABILITIES (Cont.)

c.    Legal proceedings:

1.    On October 19, 2004, CipherActive filed an action against the Company in the District Court of Tel Aviv, State of Israel. In this lawsuit, CipherActive claimed that under a development agreement with the Company, it is entitled to receive license fees in respect of certain software that it allegedly developed for the Company and which has been embedded in one of the Company's products. CipherActive claims that it is entitled to license fees in the amount of $ 600,000 in addition to the amount of $ 100,000 already paid to CipherActive by the Company in respect of such license fees. In the Company's statement of defense it claims that the software developed by CipherActive under the agreement has not been successful in the market, is no longer embedded in the Company's product and, therefore, CipherActive is not entitled to any additional license fees. The lawsuit is in its initial stages.

2.    On July 20, 2004, STS Software System Ltd. ("STS"), a wholly owned subsidiary of the Company, brought a lawsuit against Witness Systems, Inc. asserting that Witness Systems is infringing three U.S. patents of STS relating to Voice over Internet Protocol ("VoIP"). STS claims that Witness Systems infringes the VoIP patents by marketing and selling products that incorporate methods of detecting, monitoring and recording information – all fully protected by the patents. STS is seeking an injunction to prevent Witness Systems from making, using, offering to sell or selling any product in the United States that infringes these patents. In response, Witness Systems is asserting that the patents are invalid and not infringed. The case, which is pending in the U.S. District Court for the Northern District of Georgia, is in discovery and claims construction stage and no trial date has been set.

On August 30, 2004, Witness Systems filed a lawsuit in the United States District Court for the Northern District of Georgia against Nice Systems Inc., a wholly owned subsidiary of the Company. Witness Systems is alleging infringement of two U.S. patents entitled "Method and Apparatus for Simultaneously Monitoring Computer User Screen and Telephone Activity from a Remote Location" and is seeking unspecified damages and injunctive relief. On February 24, 2005, Witness systems filed a similar action in the Northern District of Georgia against the Company alleging infringement of the same two patents. The two actions were consolidated in April 2005. The Company has denied infringing these patents and is vigorously defending against Witness's claims. The case is currently in discovery and no trial date has been set.

On January 19, 2006, Witness Systems filed a new patent infringement action in the United States District Court for the Northern District of Georgia against Nice-Systems Ltd. and Nice Systems Inc., alleging infringement of a U.S. patent relating to technology to extract particular information from recorded telephone conversations. This technology is used as an option with a NICE product called NicePerform. Witness Systems, Inc. is requesting unspecified damages and an injunction to prevent any sale of allegedly infringing products. The Company has denied all material allegations and is asserting a number of defenses. This lawsuit is in its early stages. The Company believes that the claims are without merit and intends to vigorously defend against them.

NICE SYSTEMS LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**U.S. dollars in thousands (except share data)**

NOTE 11:- COMMITMENTS AND CONTINGENT LIABILITIES (Cont.)

On May 10, 2006, NICE Systems, Ltd. and its wholly owned subsidiary, NICE Systems, Inc. filed a lawsuit against Witness Systems, Inc. in the United States District Court for District of Delaware claiming that Witness Systems is infringing ten U.S. patents.  These patents cover various aspects of recording customer interaction communications and traditional logging including event triggered call and screen recording, "cradle-to-grave" recording of customer calls, traditional TDM loggers, off-site storage of calls, and multi-stage telephone data logging.  In this lawsuit, the Company claims that Witness Systems infringes Company's patents by marketing and selling products that use methods, products and systems which the Company believes are protected by Company's patents.  The Company is seeking an injunction to prevent Witness Systems from making, using, or offering to sell or selling any product in the United States which infringes these patents.  In addition, the Company is seeking damages for Witness Systems' past willful infringement of these patents.

3.  The Company is currently in dispute with Origin Data Realisation Limited (Origin) relating to the terms of a license of software supplied by Origin and incorporated within the Company's Wordnet Series 3 voice recorder and certain other matters. Origin and the Company agreed to submit the disputes to mediation and, accordingly, attended a mediation session on July 25, 2005. The mediation did not result in a resolution of the disputes but the parties have continued to negotiate with the aim of reaching a settlement. To date, no formal legal proceedings have been instituted by either side.

4.  On July 28, 2004, Dictaphone Corp. filed an action against Mercom Systems, Inc. in the United States District Court for the Southern District of New York asserting that Mercom Systems is infringing two U.S. patents, which the Company subsequently acquired from Dictaphone. Pursuant to the terms of the Company's agreement with Dictaphone, the Company succeeded to the right to enforce these patents and to control this litigation. In response, Mercom Systems is asserting that the patents are invalid and not infringed, including alleging that the Company's previous defense of an action by Dictaphone against the Company in which the Company challenged the validity of one of the patents at issue in this action, estopped the Company from making the claim of infringement.  The Company and Mercom Systems have reached an agreement in principle to settle the action. It is expected that the documentation for this agreement will be shortly concluded.

5.  On July 27, 2004, Dictaphone Corp. filed an action against VoicePrint in the United States District Court for the Central District of California asserting the infringement by VoicePrint of the same patents as those asserted in the Mercom Systems lawsuit, which the Company subsequently acquired from Dictaphone. Similar to the Mercom Systems lawsuit, this lawsuit has also been settled in principle. The documentation for this settlement is expected to be completed and signed shortly.

NICE SYSTEMS LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share data)

NOTE 11:- COMMITMENTS AND CONTINGENT LIABILITIES (Cont.)

6.    In April 2006, the Company received a letter from Calyon Corporate and Investment Bank ("Calyon"), demanding that the Company pay an amount of $ 648 to Calyon. This amount was deducted by the Company in January 2004 from an amount transferred by Calyon to the Company's account at the instruction of Thales, in connection with the acquisition of Thales Contact Solutions ("TCS"). Calyon now claims it was not done rightfully. The Company notified TCS in 2004 that it had setoff such amount with respect to an overdue payment by TCS. The Company had previously notified Calyon that it had sent TCS a setoff notice to that effect, and therefore, believes that Calyon's claim is not justified.

NOTE 12:- CREDIT LINES

As of December 31, 2005, the Company had authorized credit lines from banks in the amount of approximately $ 353,000. When utilized, the credit lines will be denominated in dollars and will bear interest at the rate of up to LIBOR + 0.7 %. An amount of approximately $ 328,000 out of the total credit lines is secured by the Company's cash and cash equivalents and marketable securities. As of December 31, 2005, $ 6,296 of the $ 353,000 referred to above was used for bank guarantees.

One of the Company's credit lines contains a negative pledge covenant and one contains covenants requiring the Company to maintain a minimum amount of cash and shareholders' equity. As of December 31, 2005, the Company is in compliance with the covenants.

NOTE 13:- TAXES ON INCOME

a.    Measurement of taxable income:

Results for tax purposes are measured in real terms, in accordance with the changes in the Israeli Consumer Price Index ("CPI") or changes in the exchange rate of the NIS against the dollar for a "foreign investors" company. NICE has elected to measure its results for tax purposes on the basis of the changes in the exchange rate of NIS against the dollar.

b.    Tax benefits under the Israel Law for the Encouragement of Capital Investments, 1959 ("the Law"):

Certain production facilities of NICE have been granted the status of an "Approved Enterprise" under the Law, in four separate investment programs.

According to the provisions of the Law, NICE elected the "alternative benefits" and waived government grants in return for a tax exemption.

Income derived from the first and second program was tax-exempt for a period of four years, commencing 1999 and 1997, respectively, and is taxed at the reduced corporate tax rate of 10%-25% (based on the percentage of foreign ownership in each taxable year) for an additional period of six years.

NICE SYSTEMS LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share data)

NOTE 13:- TAXES ON INCOME (Cont.)

Income derived from the third and fourth programs are tax-exempt for a period of two years, commencing 2005, and will be taxed at the reduced corporate tax rate of 10%-25% (based on the percentage of foreign ownership in each taxable year) for an additional period of eight years.

The period of tax benefits detailed above is subject to a limit of the earlier of 12 years from the commencement of production or 14 years from receiving the approval.

The entitlement to the above benefits is conditional upon NICE fulfilling the conditions stipulated by the above Law, regulations published thereunder and the certificates of approval for the specific investments in an "Approved Enterprise". In the event of failure to comply with these conditions, the benefits may be canceled and NICE may be required to refund the amount of the benefits, in whole or in part, including interest. As of December 31, 2005, management believes that NICE is in compliance with all the conditions required by the Law.

The tax-exempt income attributable to an "Approved Enterprise" can be distributed to shareholders without subjecting NICE to taxes only upon the complete liquidation of NICE.

As of December 31, 2005, approximately $ 26,272 was derived from tax-exempt profits earned by NICE's "Approved Enterprises". NICE has decided not to declare dividends out of such tax-exempt income. Accordingly, no deferred tax liabilities have been provided on income attributable to NICE's "Approved Enterprises". If this net retained tax exempt income is distributed in a manner other than in the complete liquidation of NICE, it would be taxed at the corporate tax rate applicable to such profits as if NICE had not elected the alternative tax benefits (currently 20% of the gross dividend) and an income tax liability would be incurred of approximately $ 6,568 as of December 31, 2005.

Income of NICE from sources other than the "Approved Enterprise" during the period of benefits will be taxable at regular corporate tax rates.

A recent amendment to the Law, effective April 1, 2005 (the "Amendment") changed certain provisions of the Law. The Amendment allowed tax benefits to be awarded pursuant to the Law so that companies no longer require Investment Center pre-approval in order to qualify for tax benefits. The Company's existing Approved Enterprises will generally not be covered by the Amendment. As a result of the Amendment, where NICE benefits from tax-exempt income pursuant to the new regime, any such tax-exempt income generated will be subject to taxes on its distribution or upon liquidation of the Company.

c.    Tax benefits under the Israeli Law for the Encouragement of Industry (Taxation), 1969:

NICE is an "Industrial Company" as defined and, as such, is entitled to certain tax benefits including accelerated depreciation, deduction of public offering expenses in three equal annual installments and amortization of other intangible property rights for tax purposes.

NICE SYSTEMS LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share data)

NOTE 13:- TAXES ON INCOME (Cont.)

    d.    Corporate tax rates in Israel:

        Taxable income of Israeli companies is subject to tax at the rate of 34% in 2005, 31% in 2006, 29% in 2007, 27% in 2008, 26% in 2009 and 25% in 2010 and thereafter.

    e.    Net operating loss carryforward:

        As of December 31, 2005, the Company had carry forward tax losses totaling approximately $ 19,878, most of which can be carried forward and offset against taxable income with expiration dates from 2006 to 2025. Utilization of U.S. net operating losses may be subject to substantial annual limitation due to the "change in ownership" provisions of the Internal Revenue Code of 1986 and similar Sate provisions. The annual limitation may result in the expiration of net operating losses increasing taxes before utilization.

    f.    Deferred tax assets and liabilities:

        Deferred taxes reflect the net tax effect of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts recorded for tax purposes. Significant components of the Company's deferred tax assets and liabilities are as follows:

| | December 31, | |
| --- | --- | --- |
| | 2004 | 2005 |
| Deferred tax assets: | | |
| Net operating losses carry forward | $ 8,712 | $ 12,763 |
| Other | 3,658 | 5,833 |
| Deferred tax assets before valuation allowance | 12,370 | 18,596 |
| Valuation allowance | (10,286) | (10,260) |
| Deferred tax assets | 2,084 | 8,336 |
| Deferred tax liabilities | (2,084) | (2,493) |
| Deferred tax assets, net | $ - | $ 5,843 |

The Company has provided valuation allowances in respect of certain deferred tax assets resulting from tax loss carry forwards and other reserves and allowances due to uncertainty concerning realization of these deferred tax assets.

NICE SYSTEMS LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share data)

**NOTE 13:- TAXES ON INCOME (Cont.)**

g. A reconciliation of the Company's effective tax rate to the statutory tax rate in Israel is as follows:

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | 2003 | 2004 | 2005 |
| Income before taxes on income, as reported in the consolidated statements of income | $ 6,813 | $ 23,638 | $ 37,471 |
| Statutory tax rate in Israel | 36% | 35% | 34% |
| Approved enterprise benefits | - | - | (1.9%) |
| Changes in valuation allowance | (27.0%) | (27.2%) | (30.8%) |
| Other | 8.6% | 2.0% | 1.1% |
| Effective tax rate | 17.6% | 9.8% | 2.4% |
| Net earnings per ordinary share - amounts of the benefit resulting from the "Approved Enterprise" status | | | |
| Basic | $ - | $ - | $ 0.04 |
| Diluted | $ - | $ - | $ 0.03 |

h. Income before taxes on income is comprised as follows:

| | | | |
| --- | --- | --- | --- |
| Domestic | $ 4,345 | $ 15,367 | $ 30,681 |
| Foreign | 2,468 | 8,271 | 6,790 |
| | $ 6,813 | $ 23,638 | 37,471 |

i. Taxes on income are comprised as follows:

| | | | |
| --- | --- | --- | --- |
| Current | $ 1,205 | $ 2,319 | $ 5,743 |
| Deferred | - | - | (4,841) |
| | $ 1,205 | $ 2,319 | $ 902 |
| Domestic | $ 949 | $ 1,836 | $ 1,553 |
| Foreign | 256 | 483 | (651) |
| | $ 1,205 | $ 2,319 | $ 902 |

NICE SYSTEMS LTD. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**U.S. dollars in thousands (except share data)**

**NOTE 14:- SHAREHOLDERS' EQUITY**

a.  The Ordinary shares of the Company are traded on the Tel Aviv Stock Exchange and its ADS's are traded on NASDAQ.

In December 2005 the Company effected a secondary public offering of its ADS's on NASDAQ. The Company issued 4,600,000 shares at a price of $ 46.25 per share before underwriting and issuance expenses. Total net proceeds from the issuance amounted to approximately $ 201,724.

b.  Share option plans:

In 1995, the Company adopted an employee share option plan ("the 1995 Option Plan"). Under the 1995 option plan, employees and officers of the Company may be granted options to acquire Ordinary shares. The options to acquire Ordinary shares, which may only be determined by the Board of Directors of the Company, are granted at an exercise price, subject to certain exceptions, of not less than the fair market value of the Ordinary shares on the grant date. 8,345,566 options of the 1995 Option Plan were granted.

The options generally vest gradually over a four-year period from the date of grant. As of February 15, 2000, the Board of Directors of the Company adopted a resolution amending the exercise terms for any option granted subsequent to February 15, 2000 under the 1995 Option Plan whereby 25% of the stock options granted become exercisable on the first anniversary of the date of grant and 6.25% become exercisable once every quarter during the subsequent three years. The options expire no later than 6 years from the date of grant.

In 1996, the Company adopted the 1997 Executive Share Option Plan ("the 1997 Option Plan"). Under the terms of the 1997 Option Plan, stock options will be exercisable during a 60-day period ending four years after grant. The plan met the definition of Time Accelerated Restricted Stock Award Options Plan ("TARSAP"). The TARSAP includes an acceleration feature based on the following: if the year-end earnings per share of the Company shall reach certain defined targets, 40% of such stock options shall become exercisable; if earnings per share shall reach certain higher defined targets, an additional 30% of such stock options shall become exercisable; and if earnings per share shall reach certain higher defined targets, an additional 30% of such stock options shall become exercisable, provided that with respect to all of the above-referenced periods, the operating profit of the Company shall not be less than 10% of revenues and earnings per share shall exclude any non-recurring expenses related to mergers and acquisitions. Notwithstanding the foregoing, none of the stock options shall be exercisable before the expiration of two years from the date of issuance. 950,000 options of the 1997 Option Plan were granted. As of December 31, 2005, none of the targets specified under the TARSAP were met and accordingly there was no acceleration of options.

NICE SYSTEMS LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share data)

## NOTE 14:- SHAREHOLDERS' EQUITY (Cont.)

In 2001, the Company adopted the 2001 Stock Option Plan ("the 2001 Option Plan"). The options to acquire Ordinary shares, which may only be determined by the Board of Directors of the Company, are granted at an exercise price, of not less than the fair market value of the Ordinary shares on the grant date. 2,959,750 options of the 2001 Option Plan were granted. Under the terms of the 2001 Option Plan, a one third of the stock options granted became exercisable ten months after the grant date and the remaining two thirds will become exercisable on the first and second anniversaries of the first date of exercise so long as the grantee is, subject to certain exceptions, employed by the Company at the date stock option becomes exercisable. The third portion of the options may be exercised at the end of the second year following the first date of exercise, if the Company meets a pre-tax profit target of 20% of revenues. Unless otherwise determined by the Company's Board of Directors as of the date of grant, the stock options expire six years after the date of grant.

In 2003, the Company adopted the 2003 Stock Option Plan ("the 2003 Option Plan"). Under the 2003 option plan, employees and officers of the Company may be granted options to acquire Ordinary shares. The options to acquire Ordinary shares, which may only be determined by the Board of Directors of the Company, are granted at an exercise price, subject to certain exceptions, of not less than the fair market value of the Ordinary shares on the grant date. 2,707,000 options of the 2003 Option Plan were granted. Unless otherwise determined by the Company's Board of Directors as of the date of grant, the stock options expire six years after the date of grant.

A summary of the Company's stock options activity and related information for the years ended December 31, 2003, 2004 and 2005, is as follows:

| | 2003 | | 2004 | | 2005 | |
|---|---|---|---|---|---|---|
| | Number of options | Weighted average exercise price | Number of options | Weighted average exercise price | Number of options | Weighted average exercise price |
| Outstanding at the beginning of the year | 5,965,980 | $ 25.74 | 4,910,389 | $ 26.80 | 4,270,317 | $ 28.40 |
| Granted | 390,000 | $ 22.55 | 997,500 | $ 21.33 | 1,338,500 | $ 35.38 |
| Exercised | (823,363) | $ 12.83 | (1,291,394) | $ 13.63 | (1,190,338) | $ 18.42 |
| Forfeited | (622,228) | $ 32.52 | (346,178) | $ 40.46 | (350,102) | $ 51.80 |
| Outstanding at the end of the year | 4,910,389 | $ 26.80 | 4,270,317 | $ 28.40 | 4,068,377 | $ 31.60 |
| Exercisable at the end of the year | 2,790,417 | $ 33.55 | 2,556,779 | $ 34.59 | 1,782,431 | $ 34.96 |

NICE SYSTEMS LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share data)

NOTE 14:- SHAREHOLDERS' EQUITY (Cont.)

The options outstanding as of December 31, 2005, have been separated into exercise price categories as follows:

| Ranges of exercise price $ | Options outstanding as of December 31, 2005 | Weighted average remaining contractual life (Years) | Weighted average exercise price $ | Options exercisable as of December 31, 2005 | Weighted average exercise price of options exercisable $ |
|---|---|---|---|---|---|
| 7.83-11.14 | 181,925 | 2.77 | 9.98 | 89,205 | 10.19 |
| 12.00-16.81 | 657,225 | 1.78 | 13.01 | 595,754 | 13.02 |
| 19.33-28.07 | 1,219,277 | 4.47 | 21.87 | 412,172 | 22.02 |
| 30.33-45.5 | 1,324,650 | 5.55 | 35.43 | - | |
| 48.13-64.88 | 341,100 | 0.78 | 55.46 | 341,100 | 55.46 |
| 70.88-76.25 | 344,200 | 0.28 | 74.56 | 344,200 | 74.56 |
| | 4,068,377 | 3.65 | 31.60 | 1,782,431 | 34.96 |

Weighted average fair values and weighted average exercise prices of options whose exercise price is equal to the market price of the shares at date of grant are as follows:

| | Weighted average fair value of options granted at an exercise price | | | Weighted average exercise price of options granted at an exercise price | | |
|---|---|---|---|---|---|---|
| | Year ended December 31, | | | | | |
| | 2003 | 2004 | 2005 | 2003 | 2004 | 2005 |
| | $ 8.36 | $ 7.14 | $ 13.27 | $ 22.55 | $ 21.33 | $ 35.38 |

c.  Employee Stock Purchase Plan ("ESPP"):

In February 1999, the Company's Board of Directors adopted the Employee Stock Purchase Plan ("the Purchase Plan"). Eligible employees can have up to 10% of their earnings withheld, up to certain maximums, to be used to purchase Ordinary shares. The price of Ordinary shares purchased under the Purchase Plan will be equal to 85% of the lower of the fair market value of the Ordinary shares on the commencement date of each offering period or on the semi-annual purchase date.

During 2003, 2004 and 2005, employees purchased 221,184, 139,913 and 167,045 shares at average prices of $ 6.86, $ 16.20 and $ 25.87 per share, respectively.

d.  Dividends:

Dividends, if any, will be paid in NIS. Dividends paid to shareholders outside Israel may be converted to dollars on the basis of the exchange rate prevailing at the date of the conversion. The Company does not intend to pay cash dividends in the foreseeable future.

NICE SYSTEMS LTD. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

U.S. dollars in thousands (except share data)

**NOTE 14:- SHAREHOLDERS' EQUITY (Cont.)**

    e.    Increase in authorized share capital:

        On September 28, 2005 the shareholders of the Company approved an Amendment to the Company's Memorandum and Articles of Association in order to increase the authorized share capital from 50,000,000 to 75,000,000 Ordinary Shares.

**NOTE 15:- MAJOR CUSTOMER AND GEOGRAPHIC INFORMATION**

    a.    Summary information about geographic areas:

        The Company manages its business on a basis of one reportable segment. See Note 1a for a brief description of the Company's business. The following data is presented in accordance with SFAS No. 131, "Disclosure About Segments of an Enterprise and Related Information". Total revenues are attributed to geographic areas based on the location of end customers.

        The following table presents total revenues and long-lived assets for the years ended December 31, 2003, 2004 and 2005 and as of December 31, 2003, 2004 and 2005 respectively:

| | 2003 | | 2004 | | 2005 | |
|---|---|---|---|---|---|---|
| | Total revenues | Long-lived assets | Total revenues | Long-lived assets | Total revenues | Long-lived assets |
| Americas | $ 118,594 | $ 9,926 | $ 121,578 | $ 10,130 | $ 163,286 | $ 41,479 |
| EMEA *) | 70,926 | 19,586 | 89,768 | 19,372 | 95,888 | 23,107 |
| Far East | 31,832 | 72 | 37,779 | 140 | 48,476 | 2,261 |
| Israel | 2,906 | 30,547 | 3,518 | 25,749 | 3,460 | 21,884 |
| | $ 224,258 | $ 60,131 | $ 252,643 | $ 55,391 | $ 311,110 | $ 88,731 |

    *)    Includes Europe, the Middle East (excluding Israel) and Africa.

    b.    Market sectors:

        Total revenues from external customers divided on the basis of the Company's market sectors are as follows:

| | Year ended December 31, | | |
|---|---|---|---|
| | 2003 | 2004 | 2005 |
| Enterprise Interaction Solutions | $ 171,381 | $ 194,111 | $ 237,353 |
| Public Safety and Security sector | 52,877 | 58,532 | 73,757 |
| | $ 224,258 | $ 252,643 | $ 311,110 |

    c.    Major customers' data as a percentage of total revenues:

| | | | |
|---|---|---|---|
| Customer A | 20.0% | 18.8% | 21.2% |

NICE SYSTEMS LTD. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

U.S. dollars in thousands

**NOTE 16:- SELECTED STATEMENTS OF OPERATIONS DATA**

a.    Research and development, net:

|  | Year ended December 31, | | |
|---|---|---|---|
|  | 2003 | 2004 | 2005 |
| Total costs | $ 26,384 | $ 27,512 | $ 33,404 |
| Less - grants and participations | (1,260) | (1,341) | (1,702) |
| Less - capitalization of software development costs | (2,291) | (1,305) | (806) |
|  | $ 22,833 | $ 24,866 | $ 30,896 |

b.    Financial income, net:

|  | 2003 | 2004 | 2005 |
|---|---|---|---|
| Financial income: | | | |
| Interest and amortization/accretion of premium/discount of marketable securities | $ 1,821 | $ 2,349 | $ 4,073 |
| Interest | 422 | 1,427 | 1,979 |
| Foreign currency translation | 405 | 1,078 | 258 |
|  | 2,648 | 4,854 | 6,310 |
| Financial expenses: | | | |
| Interest | (79) | (2) | - |
| Foreign currency translation | (204) | (894) | (542) |
| Other | (331) | (402) | (370) |
|  | (614) | (1,298) | (912) |
|  | $ 2,034 | $ 3,556 | $ 5,398 |

c.    Restructuring expenses and settlement of litigation:

|  | 2003 | 2004 | 2005 |
|---|---|---|---|
| Restructuring expenses (income) | $ 1,888 | $ - | $ - |
| Settlement of litigation (*) | 5,194 | - | - |
|  | $ 7,082 | $ - | $ - |

(*)    In the fourth quarter of 2003, the Company reached a settlement agreement with one of its competitors to settle a patent infringement claim filed by the competitor in June 2000. Under the settlement agreement, the Company paid the competitor $ 10,000 (of which approximately $ 4,800 was covered by insurance).

**NICE SYSTEMS LTD. AND SUBSIDIARIES**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

**NOTE 16:- SELECTED STATEMENTS OF OPERATIONS DATA (Cont.)**

    d.    Net earnings per share:

        The following table sets forth the computation of basic and diluted net earnings per share:

        1.    Numerator:

| | Year ended December 31, | | |
|---|---|---|---|
| | 2003 | 2004 | 2005 |
| Numerator for basic and diluted net earnings per share - | | | |
| Net income from continuing operations | $ 5,608 | $ 21,319 | $ 36,569 |
| Net income from discontinued operation | 1,483 | 3,236 | - |
| Net income available to Ordinary shareholders | $ 7,091 | $ 24,555 | $ 36,569 |

        2.    Denominator (in thousands):

| | 2003 | 2004 | 2005 |
|---|---|---|---|
| Denominator for basic net earnings per share - | | | |
| Weighted average number of shares | 16,038 | 17,497 | 19,121 |
| Effect of dilutive securities: | | | |
| Add - Employee stock options | 731 | 1,198 | 1,521 |
| Add - ESPP | 12 | 8 | 4 |
| Denominator for diluted net earnings per share - adjusted weighted average shares | 16,781 | 18,703 | 20,646 |

**NOTE 17:- SUBSEQUENT EVENTS**

    a.    On November 17, 2005, the Company signed a definitive agreement to acquire all of the outstanding shares of FAST Video Security AG, a Switzerland-based developer of innovative video systems for security and surveillance purposes. Under the agreement, the Company acquired FASTVideo Security AG for $ 21,000 in cash, with potential earn out based on performance milestones amounting to a maximum of $ 12,000 payable over the next three years. The closing was on January 4, 2006.

    b.    In the second quarter of 2006, it became reasonably assured that the Company shall pay additional consideration in the amount of $ 500 in respect of Hannamax acquisition, due to meeting the performance criteria specified in the acquisition agreement relating to year 2005.

    c.    On March 27, 2006, the Company and Dictaphone have agreed to amend the CRS's purchase agreement, according to which, Dictaphone shall pay to the Company $ 2,000 as a final adjustment to the purchase price under the purchase agreement.

NICE SYSTEMS LTD. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

U.S. dollars in thousands (except share and per share data)

NOTE 17:- SUBSEQUENT EVENTS (Cont.)

    d.    In April 2006, the Company signed a definitive agreement to acquire IEX Corporation, a worldwide provider of contact center workforce management solutions. Under the terms of the definitive agreement, the Company will acquire the shares of IEX, a wholly owned subsidiary of Tekelec, for approximately $ 200,000 in cash. The transaction is subject to the satisfaction of customary closing conditions and is anticipated to close towards the end of the second or the beginning of the third quarter of 2006.

    e.    In April 2006, the Company signed a definitive agreement to acquire Performix Technologies Ltd., a pioneer of contact center performance management. Under the terms of the definitive agreement, the Company will acquire Performix for a total purchase price of $13,200 in cash. The purchase price may increase by up to an additional $ 6,150 (of which up to $ 3,000 may be payable at closing) based on certain performance criteria. The transaction is subject to the satisfaction of customary closing conditions and is anticipated to close towards the end of the second or the beginning of the third quarter of 2006.

- - - - - - - - - -

F:\W2000\w2000\2620\M\05\E$12.DOC

*Exhibit* 28

# Exhibit 28

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NICE SYSTEMS, INC., a Delaware Corporation, and )
NICE SYSTEMS, LTD., an Israeli Corporation, )
                                        )
                          Plaintiffs, )
                     v. )      Civil Action No. 06-311-JJF
                                          )
WITNESS SYSTEMS, INC, a Delaware Corporation, )
                                        )
                         Defendant. )

## PLAINTIFFS' SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANT WITNESS SYSTEMS, INC.'S THIRD SET OF INTERROGATORIES

         Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Local Rules of the District of Delaware Rule 26.1, Plaintiffs NICE Systems, Inc. and NICE Systems, Ltd. (collectively "NICE"), by their attorneys, hereby provide the following supplemental responses to Defendant Witness Systems, Inc.'s ("Witness") Third Set of Interrogatories (referred to hereafter individually as "Interrogatory" and collectively as "Interrogatories"). These supplemental responses supersede NICE's prior objections and responses to Witness's Third Set of Interrogatories.

## GENERAL OBJECTIONS

         1. NICE objects to each interrogatory to the extent that it seeks material not reasonably calculated to lead to the discovery of admissible evidence and/or material protected by the attorney-client privilege and/or material protected by the work-product doctrine and/or material which otherwise exceed the bounds of the Local Rules of the District of Delaware and/or the Federal Rules of Civil Procedure. The responses given herein by NICE to any of the Interrogatories shall not be deemed to waive any claim of privilege or immunity.

                                                           

discovery uncovers a basis to support such a claim and any analysis of price erosion is required or becomes necessary, such analysis will be the subject of expert testimony and as such NICE has no information to disclose at this time.

Subject to, and without waiving, the foregoing General and Specific Objections, in accordance with Rule 33(d) of the Fed. R. Civ. P., NICE responds that it has produced or will produce documents sufficient to explain why "it is entitled to lost profits, a reasonable royalty, a permanent injunction." NICE further responds that it is entitled to recover lost profits because: (1) there was and remains a demand for products using the methods or embodying the apparatus of the asserted claims in this litigation during the time of Witness's infringing sales; (2) NICE is not aware of any acceptable non-infringing substitutes; (3) NICE had and has the ability to meet the demand for products using the methods or embodying the apparatus of the asserted claims in this litigation; and (4) but for Witness's infringing sales, NICE would have made a profit equal to or greater than the profit normally associated with the sales of its products. Further, NICE's basis for seeking a reasonable royalty includes one or more of the following factors: (1) NICE and Witness are competitors in the call center market; (2) the profitability of the "Witness Products" stemming from their commercial success and/or profitability; (3) the advantages of the Witness Products over other competing methods or devices; (4) the relationship between Witness's profits and the patented aspects of the Accused Products; and, (5) the rate that NICE would have received from Witness if the parties had engaged in a prudent and reasonable attempt to negotiate a royalty rate. Additionally, injunctive relief is premised upon at least the successful litigation of this matter, the irreparable harm stemming from the clear threat to commercial value of NICE's products due to Witness's infringement and the balance of harm weighing in NICE's favor if an injunction were not awarded. If, upon completion of fact and expert discovery, NICE

065251.1001

obtains further information responsive to this interrogatory, it will supplement its response at that time.

**INTERROGATORY NO. 23:**

Identify all current or former NICE employees, consultants, or independent contractors who also were or are employees, consultants, or independent contractors of Dictaphone, including for each person identified, please provide their name, address, job titles held, responsibilities for each job held, their tenure, their current position, and which NICE and/or Dictaphone locations at which they work or worked.

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 23:**

NICE objects to Interrogatory No. 23 as overly broad, unduly burdensome and not likely to lead to the discovery of admissible evidence to the extent it seeks the identification of "all current or former NICE employees, consultants, or independent contractors who also were or are employees, consultants, or independent contractors of Dictaphone." NICE further objects to this interrogatory as overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent that, for each person it seeks identification of their "address, job titles held, responsibilities for each job held, their tenure, their current position, and which NICE and/or Dictaphone locations at which they work or worked."

Subject to, and without waiving, the foregoing General and Specific Objections, in accordance with Rule 33(d) of the Fed. R. Civ. P., NICE responds that it has produced or will produce documents sufficient to identify "all current or former NICE employees, consultants, or independent contractors who also were or are employees, consultants, or independent contractors of Dictaphone." NICE further responds as follows, upon information and belief, that the following "current or former NICE employees, consultants, or independent contractors who also were or are employees, consultants, or independent contractors of Dictaphone":

| | | | |
|---|---|---|---|
| Mark Bayless | David Glowny | Phil Min Ni | John Sands |
| Guy Belliveau | Floyd Griffin | Mark Myette | Rich Seinkowicz |
| Bob Butler | Jim Hammond | Robert Olley | Pat Shearman |
| Nick D'Agosto | John Henits | Bob Osborne | Phil Sidebottom |
| Deborah D'Orazio | Mark Henson | Ed Ostigny | Barbara Spain |
| Sandra Davias | Chuck Hudak | Jitendra Patel | Kathleen Steuber |
| David Diamond | Fred Jurs | Mark Petersen | Brian Stocklin |
| Joseph Ernst | John Kaiser | Rick Piper | Paul Strilka |
| Tim Feldman | Dave Langlands | Anita Rego | Larry Williston |
| Chris Gallahan | Thomas McKenna | John Richter | |
| Jim Gleason | Frank McQueeney | Vincent Rosso | |

NICE further responds that, upon information and belief, the information sought in this Interrogatory is contained in the document bates numbered NICE_DE_001136430-441.

**INTERROGATORY NO. 24:**

Identify all persons having knowledge concerning the Dictaphone products identified in response to Interrogatories Nos. 20 and/or 21, including for each person identified, their name, address, job titles held, responsibilities for each job held, their tenure, their current position, and each NICE and/or Dictaphone locations at which they work or worked.

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 24:**

NICE objects to Interrogatory No. 24 as overly broad, burdensome and not likely to lead to the discovery of admissible evidence to the extent it seeks the identification of "all persons having knowledge." NICE further objects to this interrogatory as overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent that, for each person it seeks identification of their "address, job titles held, responsibilities for each job held, their tenure, their current position, and each NICE and/or Dictaphone locations at which they work or worked." NICE further objects to this interrogatory to the extent that the information it seeks documents that have been, or will be, produced to Witness.

# *Exhibit* 29

# Exhibit 29

# FISH & RICHARDSON P.C.

1180 Peachtree Street
Atlanta, Georgia
30309

Telephone
404 892-5005

Facsimile
404 892-5002

Web Site
www.fr.com

Daniel A. Kent
(404) 724-2828

Email
kent@fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

**VIA EMAIL**

January 8, 2007

Joseph Drayton
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022-3598

**FR**

ATLANTA

AUSTIN

BOSTON

DALLAS

DELAWARE

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

Re:    *NICE Systems, Inc. & NICE Systems LTD. v. Witness Systems, Inc.*
       *USDC D. Del. Case No: 1:06-cv-00311*

Dear Joe:

This confirms our prior agreement and discussions (including in your December 20, 2006 e-mail to me) that the parties to this action have designated for production in this case all documents produced in the cases pending between or among them in the Northern District of Georgia. As a result, documents produced by any party to the following cases are deemed to be produced also in this action under the terms of the protective order submitted by the parties to the Court for approval on December 29, 2006:

   *STS Software Sys., Ltd. v. Witness Sys., Inc.*,
   Civil Action No. 1 :04-CV-02111-RWS (N.D. Ga.)

   *Witness Sys., Inc. v. NICE Sys., Inc. and NICE Sys., Ltd.*
   Civil Action No. 1 :04-CV-253 1-CAP (N.D. Ga.)

   *Witness Sys., Inc. v. NICE Sys., Inc. & NICE Sys., Ltd.*
   Civil Action No. 1 :06-CV-00126-TCB (N.D. Ga.)

We understand that this agreement will also extend to any documents produced in the newly filed declaratory judgment case, also now pending in the Northern District of Georgia. Please contact me immediately if you believe I have misstated anything concerning our agreement.

Sincerely,

Daniel A. Kent

12012013.doc